Michael R. Johnson, Esq. (A7070)
David H. Leigh (A9433)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, 14th Floor
Salt Lake City, Utah  84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: mjohnson@rqn.com
Email: dleigh@rqn.com

*Attorney for Keystone Private Income Fund*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| In re: | Bankruptcy No. 25-21038 |
|---|---|
| **HALL LABS, INC.,** | Chapter 11 |
| Debtor-in-Possession. | Honorable Joel T. Marker |

## REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR COMFORT ORDER THAT THE AUTOMATIC STAY DOES NOT APPLY TO VANDERHALL STOCK OWNED BY THE DAVID R. HALL TRUST AND PLEDGED AS COLLATERAL TO KEYSTONE

Keystone Private Income Fund ("**Keystone**"), through counsel, respectfully files this

Reply Memorandum in further support of its *Motion for Comfort Order that the Automatic Stay*

*does not Apply to Vanderhall Stock Owned by the David R. Hall Trust and Pledged as Collateral*

*to Keystone* (the "**Motion**"), filed on March 19, 2025 as Dkt. 17.

<u>**ARGUMENT**</u>

I.      **The Motion Should be Granted, and the Court Should Enter the Proposed Form of Order Attached as Exhibit "C" to the Motion.**

The Motion should be granted, any and all objections to the Motion should be overruled, and the Court should enter the proposed form of Order attached as Exhibit "C" to the Motion. Three parties filed responses to the Motion. The first response was filed by Ronald Grant Kennington ("**Mr. Kennington**"), who asked the Court to deny the Motion because, if the Motion is granted, that "would decrease the likelihood of note-holders like me being made whole." [Dkt. 33]

The second response was filed by the Debtor. In its response, the Debtor admits it "does not have any objection *per se* to the Court granting the Motion," but seeks inappropriate language in the Court's Order which would preclude Keystone from conducting an execution sale, and further demands that "Keystone be required to conduct a commercially reasonable sale of such stock" although the Debtor does not say what a "commercially reasonable sale of such stock" would look like. [Dkt. 36] Keystone also seeks language in the Court's Order granting the Motion stating that "granting of the Motion shall not affect the Debtor's right to object to Keystone's claims, including the amount that Keystone applies to its claim based upon the proceeds from a sale of the Vanderhall Stock owned by the David R. Hall Trust." [*Id.*]

The third, and frankly most interesting, response was filed Jamie D. Evans and Evans Development (the "**Evans Parties**"). In that response, the Evans Parties contend that the Debtor engaged in a Ponzi scheme by using new investor money to repay old investors, and they ask that the Court deny the Motion because in a Ponzi scheme all transfers are presumed to have been

made with actual intent to hinder, delay or defraud and, as a result, the pledge of the Hall Trust's

shares to Keystone can be avoided.  [Dkt. 37]  The Evans Parties also assert that because "there

is a prima facie case that the Vanderhall Stock pledge was part of a fraudulent transfer, the

automatic stay of 11 U.S.C. § 362(a) *does* apply to prevent Keystone from foreclosing on or

selling the Vanderhall Stock at this time."  [*Id.*]

      With respect to Mr. Kennington's response, granting the Motion will not "decrease the

likelihood of none-holders" being made whole because, as the Debtor admits in its response, the

Debtor does not own the Vanderhall Stock that is the subject of the Motion.  Rather, that stock is

owned by the Hall Trust. The Debtor's general creditors have no claim to the assets of non-

debtors like the Hall Trust, so Keystone's foreclosure on those shares will not harm the Debtor's

general creditors in any way.  Rather, it could help the Debtor's general creditors because any

value realized from the Hall Trust shares will reduce the amount of Keystone's claim against the

Debtor, thus making the claims of all other creditors more valuable.

      With respect to the Debtor's response, the Debtor's admission that the Vanderhall Stock

is owned by the Hall Trust and is not property of the bankruptcy estate should be the end of the

matter.  Because the Hall Trust's Vanderhall Stock is not property of the estate, the Court likely

lacks subject matter jurisdiction to make any substantive rulings regarding the stock, including

directing the processes and procedures that Keystone is required to follow in exercising its rights

and remedies concerning the stock.  *See, e.g., In re Wilkinson*, 2012 WL 112945, at \*5 (Bankr.

W.D. Tex. Jan. 12, 2012) ("[B]ecause the property at issue is not property of the bankruptcy

estate, this court lacks the subject matter jurisdiction to entertain the Wilkinsons' claims with

respect to this property.").  Further, there is no need to add any language to the Court's Order

granting the Motion beyond the language Keystone proposed in its proposed Order attached as

Exhibit "C" to the Motion.  Keystone has filed a proof of claim, and the Debtor retains all rights

it may have with respect to that claim, including by objecting to the claim if the Debtor believes

that is an appropriate action to take.

    With respect to Evans Parties' response, the Evans Parties do not even allege that the

Vanderhall Stock that the Hall Trust pledged to Keystone was originally owned by the Debtor.

If the stock was never owned by the Debtor then there would obviously be no fraudulent transfer

claim that could be asserted.  Moreover, *even if* the Vanderhall Stock was originally owned by

the Debtor, the stock would have first been transferred to the Hall Trust and then the Hall Trust

would have granted Keystone a lien on the stock.  Thus, the Hall Trust would have been the

initial transferee of the stock, and Keystone would have been a subsequent transferee.  Utah

Code Ann. § 25-6-202(1)(a) does allow a transfer or obligation to be avoided "if the debtor made

the transfer or incurred the obligation with actual intend to hinder, delay, or defraud any creditor

of the debtor."  Further, Keystone admits that, where a Ponzi scheme is actually proven (not just

alleged as exists here), then transfers made by the Ponzi scheme actor are presumptively made

with actual intent to hinder, delay or defraud.  However, Utah Code § 25-6-304(1) expressly

provides that "a transfer or obligation is not voidable under Subsection 25-6-202(1)(a) against a

person who took in good faith and for a reasonably equivalent value given the debtor ***or against***

***any subsequent transferee or obligee***." (Emphasis supplied).  Here, Keystone is a subsequent

transferee not an initial transferee.  Thus, there is no fraudulent transfer claim against Keystone

as a matter of law concerning the stock even if, as alleged, the Debtor was engaged in a Ponzi

scheme.  Moreover, there would be no Section 25-6-202(1)(a) claim against Keystone even if it

were an initial transferee of the stock because it clearly gave reasonably equivalent value in the

form of a multi-million loan, and there is no allegation that Keystone, having made its loan in

2021, had any knowledge of (let alone any involvement in) the 2015-2020 transactions referred

in paragraph 6(a)-(h) of the Evans Parties' response.

Furthermore, the Evans Parties' assertion in part 3 of their argument that "the automatic

stay of 11 U.S.C. § 362(a) *does* apply" here because "there is a prima facie case that the

Vanderhall Stock pledge was part of a fraudulent transfer" is simply an incorrect statement of the

law.  While there clearly is no colorable fraudulent transfer claim against Keystone related to the

stock pledged by the Hall Trust to secure in part Keystone's multi-million dollar loan to the

Debtor, as noted above, even if there were a colorable claim the law is crystal clear that property

that was transferred prior to a bankruptcy filing, whether as part of a fraudulent transfer or

otherwise, is not property of the bankruptcy estate.  Rather, it can only become property of the

state if there is a judgment entered by the court avoiding and recovering the transfer for the

benefit of the estate.  *See* 11 U.S.C. § 541(a)(3) (property of the estate includes "any interest in

property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this

title"); *see also  In re Saunders*, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989) ("[W]e find that

neither a fraudulent transfer action nor the property so transferred are property of the bankruptcy

estate until such property is recovered by a trustee pursuant to his avoiding powers."); *In re

Colonial Realty Co.* 980 F.2d 125, 131 (2nd Cir. 1992) ("'If property that has been fraudulently

transferred is included in the § 541(a)(1) definition of property of the estate, then § 541(a)(3) is

rendered meaningless with respect to property recovered pursuant to fraudulent transfer

actions'") (citing *Saunders*, 101 B.R. at 305); *In re Stillwater Asset Backed Offshore Fund Ltd.*,

559 B.R. 563, 605 (Bankr. S.D.N.Y. 2016) (fraudulently conveyed property only becomes

property of the estate if, after bankruptcy filing, the transfer is avoided and the property is

recovered using the avoidance powers).

> **II.      Keystone Shares the Evans Parties' Concerns About the Debtor, and Questions Whether the Case Should be Converted, or Alternatively Whether a Chapter 11 Trustee Should be Appointed Under Section 1104(a)(2).**

While the points raised by the Evans Parties should have no bearing on the Court's

resolution of Keystone's Motion, those points—both alone and in conjunction with other

evidence already in the Court's files—should raise questions in the Court's mind about whether a

Chapter 11 trustee should be appointed in this case, or alternatively whether this case should be

converted to Chapter 7.

At the 341 meeting, Matt Burne of the US Trustee's Office asked David Hall, the

Debtor's representative, whether anyone had made any allegations of fraudulent or unlawful

conduct against the Debtor, and Mr. Hall answered no.  But according to the response filed by

the Evans Parties, the Evans Parties filed a lawsuit against the Debtor and others in July of 2022

"alleging claims for, among other things, securities fraud and fraudulent transfer and also

directly alleging that Hall Labs had used Evens' and Evans Development (as assignee) funds to

pay off prior noteholders of Hall Labs."  [Dkt. 37, ¶11] Thus, it appears that Mr. Hall may have

been untruthful in answering the US Trustee's questions.

Furthermore, the Debtor's response to the Motion clearly admits that this will be a

liquidation case and not a reorganization case.  [*See* Dkt. 36 ("The Debtor is currently working

on a plan of reorganization that would essentially distribute the Vanderhall stock that it owns to

creditors on a prorate basis based upon the amount of their allowed claims against the estate")]

Further, Mr. Hall admitted at the 341 meeting that the Debtor is not conducting any business but, instead, merely holds assets that it intends to liquidate.  That reality is born out by the Statement of Financial Affairs which showed "gross revenue from business" in all of 2024 at $28,733.00, and only $27,919.00 from January 1, 2025 to the Petition Date.  [Dkt. 2, pg. 71]  As the Court is aware, cause to dismiss or convert a case exists where there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).  "'Rehabilitation' is a different and, unfortunately for Debtor, much more demanding standard than 'reorganization'" and "rehabilitation does not include liquidation."  *In re Brutsche*, 476 B.R. 298, 301-302 (Bankr. D.N.M. 2012).  If this case will be a liquidation case and the Debtor's only means of generating funds is through asset sales, that liquidation should likely occur under Chapter 7 under the supervision of a neutral estate fiduciary.

Finally, the Schedules and Statements filed in this case, and Mr. Hall's testimony at the 341 meeting, make clear that there have been numerous transactions with insiders and affiliates that will need to be examined in this case.  For example, Schedule A/B shows as estate assets "nonrecourse" promissory notes that allegedly have no value that are owed by David Hall's son and daughter, Michael Hall and Emily Brimhall, and by his long-time business partner Carl Belliston. [Dkt. 2, pgs. 11-12] Michael Hall and Carl Belliston are both executives of the Debtor. [*Id.*, pg. 86]  Furthermore, Schedule D shows that the Debtor apparently guaranteed substantial loans owed by its affiliates Hall Property Holdings, LLC and DRH Holdings, LLC to Central Bank.  [*Id.*, pgs. 25-26]   The Debtor also is apparently indebted to Hillcrest Bank on loans taken out by its affiliates SmarterHome, Inc. and DRH Holdings, LLC.  [*Id.*, pg. 26] Additionally,

7

although Mr. Hall testified at the 341 meeting that the Debtor is only a guarantor of the Central

Bank debt, the Debtor paid Central Bank $529,400.05 during the 90-day preference period in

"interest payment on secured debt." [*Id.,* pg. 72]  If the Debtor is only a guarantor of these loans,

then it has contribution and reimbursement claims against its affiliates, who are the primary

obligors on the loans, that need to be pursued.  *See, e.g., Goatcher v. United States*, 944 F.2d

747, 750 (10th Cir. 1991) (noting that a "guarantor can recover from the primary obligor any

amounts he has to pay a creditor").  As Mr. Hall controls both the Debtor and the affiliates,

however, that is unlikely.

And these are not the only concerning transactions revealed by the Schedules and

Statements.  On February 20, 2025, the Debtor apparently transferred "all of the capital stock of

Nernst Power Limited to Nernst Electric Inc." for no consideration.  [*Id.*, pg. 73] On March 7,

2023, the Debtor also apparently transferred shares of Vanderhall Motor Works having a value

of $1,700,000 to Mr. Hall's daughter Emily Brimhall.  [*Id.*, pg.76]  The Debtor also apparently

transferred Bacon Work, Inc. shares having a value of $2,500,000 to its affiliate Hall

Opportunity Fund 1A, LP.  [*Id.*, pg. 77]  The Debtor also apparently transferred certain assets to

Dyol Manufacturing Inc., a company controlled by Mark Hall, Mr. Hall's son.  [*Id.*]  The Debtor

also apparently repurchased stock in Sure-Fi, Inc., another entity controlled by Mark Hall, Mr.

Hall's son.  [*Id.*]  The Debtor also apparently repurchased stock in MicroClimate, Inc., an entity

controlled by Michael Hall, another son of Mr. Hall.  [*Id.*, pg. 78] The Debtor also apparently

transferred certain assets to Hall Logic, Inc., another entity controlled by Mr. Hall's son Michael

Hall.  [Id.]  The Debtor also apparently transferred 648,148 shares of Vanderhall Motor Works

having a value of $700,000 to its wholly-owned affiliate DRH Holdings, LLC.  [*Id.*]

Section 1104(a)(2) of the Bankruptcy Code provides that "[a]t any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of a trustee if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." Under Section 1104(a)(2), "the court may appoint a trustee even if no 'cause' exists." *In re Euro–Am. Lodging Corp.,* 365 B.R. 421, 428 (Bankr.S.D.N.Y.2007). Indeed, section 1104(a)(2) simply reflects the practical reality that a trustee is needed. *Id.; see also In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010) ("It is not necessary to find fault on the part of the debtor before appointing a chapter 11 trustee in 'the interests of creditors, any equity security holders, and other interests of the estate' pursuant to § 1104(a)(2)."). Factors that courts have used to determine whether a trustee should be appointed under this subsection include: (1) the trustworthiness of the debtor; (2) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (3) the confidence—or lack thereof—of the business community and of creditors in present management; and (4) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *See In re Euro–Am. Lodging Corp.,* 365 B.R. at 427 (quoting *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990)).

The Tenth Circuit BAP has affirmed the appointment of a Chapter 11 trustee under section 1104(a)(2) where it was in the best interests of creditors to do so. *See Sims v. Sims (In re Sims)*, 1997 Bankr. LEXIS 2112, at *13 (10th Cir. BAP 1997). Among the reasons the court found supporting the appointment, the court determined that there was a question as to whether

9

the debtor would pursue potentially avoidable transfers where the transfers were made to the

debtor's insider-family members. *See id.* at *11. These same concerns about management's

ability to fulfill their fiduciary duties to the estate and its creditors also have convinced courts in

other jurisdictions to appoint a trustee. *See, e.g., In re Ridgemour Meyer Props., LLC*, 413 B.R.

101, 113 (Bankr. S.D.N.Y. 2008) ("An independent trustee should be appointed under §

1104(a)(2) when [the Debtor's management] suffer from material conflicts of interest, and

cannot be counted on to conduct an independent investigation of questionable transactions in

which they were involved."); *In re Sharon Steel Corp.*, 86 B.R. 455, 465 (Bankr. W.D. Pa. 1988)

("The failure of Sharon management to pursue recovery of insider preferences and fraudulent

conveyances, and its apparent inability to do so because of conflicts of interest, is a violation of

its fiduciary duty, amounts to gross mismanagement and warrants the appointment of a trustee

under either § 1104(a)(1) or § 1104(a)(2)."); *In re Eurospark Indus.*, 424 B.R. at 629 (ordering

appointment of a trustee under Section 1104(a)(2); "As Mr. Speigel's statements confirm, his

interests materially conflict with the estate's interests"); *In re Bowman*, 181 B.R. 836, 845

(Bankr. D. Md. 1995) ("The presence of a conflict on the facts of this case compels the court to

remove a debtor-in-possession from administration of the case").

Finally, loss of confidence by the debtor's creditors, or extreme acrimony between the

debtor and its creditors, have each been held by courts to constitute elements relevant to the

decision of whether it is in the best interests of creditors and others under section 1104(a)(2) to

appoint a trustee. *See, e.g., In re Marvel Entm't Group,* 140 F.3d 463 (3d Cir. 1998); *In re G–I*

*Holdings, Inc.,* 385 F.3d at 316. As stated by one court, "acrimony between the creditors and the

debtor's management, standing alone, has been found to be a basis to appoint a chapter 11 trustee

under § 1104(a)(2)." *In re Eurospark Indus., Inc.*, 424 B.R. 621 (Bankr. E.D. Md. 2010).

Moreover, in certain extreme cases, the presence of rancor and acrimony has been found to be

significant enough to actually constitute cause to appoint a trustee under section 1104(a)(1). *Id.*

The Utah Department of Commerce website shows that, on April 20, 2023, an entity

named Vanderhall North America, LLC was registered with a principal office address located at

3500 Mountain Vista Parkway, Provo, Utah 84606 and that James Thayer is its Registered

Agent. [*See* Exhibit "A" attached hereto]  Mr. Thayer is also a secretary and registered principal

of Vanderhall Motor Works, Inc., which also has a principal office address located at 3500

Mountain Vista Parkway, Provo, Utah 84606.  [*See* Exhibit "B" attached hereto]  Further, on

January 1, 2025 (just a few months prior to the Debtor's bankruptcy filing), an entity named

Vanderhall, Inc. was formed in the State of Delaware.  [*See* Exhibit "C" attached hereto]

Although the Debtor claims to own 51% of Vanderhall Motor Works, Inc., *see* Dkt. 2, pg.

7, Mr. Hall had no information to provide creditors at the 341 meeting when he was questioned

about Vanderhall North America, Inc. and Vanderhall, Inc.  Specifically, he was asked to "tell

me what your understanding is of Vanderhall North America." [*See* 341 Transcript, pg. 92 (cited

portions of the transcript are attached hereto as Exhibit "D"]  He answered that "I'm not aware of

those details." [*Id.*]  He was then asked if he had "an understanding of Vanderhall, Inc.," and

Mr. Hall answered that "I'm not aware of their current—their current organization structure."

[*Id.*]  He was then asked "does the debtor have any ownership interest?  Either Vanderhall, Inc.,

Vanderhall North America?" Mr. Hall answered "I don't know.  I know they have been

reorganizing."  [*Id.*]  He also was asked if he knew whether "assets were transferred out of

Vanderhall Motor Works to one or both of those entities, including the gas line business," and he

answered "I'm not aware." [*Id.*, pg. 93] He was then asked "does debtor have any—as the 51

percent common ownership—stock ownership holder, does the debtor have any information or

records regarding what either Vanderhall North America or Vanderhall, Inc. is and what they

may own?" Mr. Hall answered "I don't have any of that." [*Id.*, pgs. 93-94] This testimony was

troubling given that (a) Mr. Hall is the Debtor's Chairman and CEO [id., pg. 8], (b) the Debtor's

most valuable asset by far is apparently its stock ownership of Vanderhall Motor Works, Inc.,

and (c) Mr. Hall's son Steven is "the founder of that company" and is its CEO. [*Id.*, pgs. 52-53]

Mr. Burne of the US Trustee's Office also asked Mr. Hall about the $299,000 in accounts

receivable listed on Schedule A/B, including "how you arrived at the value of this," and "who

owes that money? Is it just one party, or is it multiple people that owe the debtor $299,000?"

[*Id.*, pg. 59] Mr. Hall had no answer to those questions, stating "I will have to get back to you on

the details of that." [*Id.*] Mr. Burne also asked Mr. Hall about the "two hand-held laser welders

valued at $17,000." Mr. Hall first responded that "since the time of this filing, they might have

been sold" and then, when asked who they were sold to, stated "I'm not familiar.  So I'll have to

get back to you on that." [*Id.*] During questioning, the Debtor's attorney Andy Diaz also

disclosed that two of the three accounts listed as Debtor accounts on Schedule A/B were in fact

accounts belonging to affiliates DRH Holdings and Hall Properties Holdings.  [*Id.*, pgs. 55-56]

How are creditors of the Debtor supposed to have faith and confidence in the Debtor

when its Chairman and CEO cannot answer even the most basic questions about the Debtor's

assets, including whether the value of its most valuable asset—its ownership interest in

Vanderhall Motor Works, Inc--has been eliminated by a "restructuring" overseen by the Debtor's

son Steven to place Vanderhall Motor Works, Inc. assets into other Vanderhall companies?

In short, it appears to Keystone that the foregoing facts and case law may well support the appointment of a trustee in this case under section 1104(a)(2) of the Bankruptcy Code.  The Debtor is liquidating not reorganizing. The Evans Parties have filed suit against the Debtor alleging that the Debtor engaged in securities fraud and were running a Ponzi scheme. Keystone does not trust that Mr. Hall will faithfully perform his obligations as the Debtor's representative and it appears that other creditors may feel the same way.  Further, the Schedules and Statements reveal numerous questionable transactions with insiders and affiliates of the Debtor, all of which should be investigated, and Mr. Hall is not only conflicted but he cannot even answer basic questions regarding the Debtor's assets and liabilities.

## CONCLUSION

Keystone's Motion should be granted, and the Court should issue a comfort order regarding the Vanderhall Stock pledged by the Hall Trust that is substantially in the form attached as Exhibit C to the Motion.  Further, and while not relevant to the Motion, the response to the Motion filed by the Evans Parties along with other evidence in the Court's file raises questions in Keystone's mind about whether a Chapter 11 trustee should be appointed in this case, or alternatively if the case should be converted to Chapter 7.

DATED this 15th day of April, 2025.

RAY QUINNEY & NEBEKER P.C.


*/s/ Michael R. Johnson*
Michael R. Johnson
*Attorney for Keystone Private Income Fund*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 15, 2025, the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which sent notice of electronic filing to all electronic filing users in this case.

<em>/s/ Annette Sanchez</em>

1705473

# EXHIBIT A

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

VANDERHALL NORTH AMERICA, LLC

**Entity Number:**

13370576-0160

**Entity Type:**

Domestic Limited Liability Company

**Entity Subtype:**

Limited Liability Company

**Formation Date:**

04/20/2023

**Profession:**

N/A

**Formation Effective Date:**

04/20/2023

**Entity Status:**

Active

**Renew By Date:**

04/30/2026

**Entity Status Details:**

Current

Give Feedback

**Last Renewed Date:**

04/02/2025

**Status Updated On:**

04/02/2025

## REGISTERED AGENT INFORMATION

**Name:**

JAMES THAYER

**Registered Agent Type:**

Individual

**Street Address:**

3500 MTN VISTA PKWY, Provo, UT, 84606, USA

**Last Updated:**

9/13/2024 9:22:44 PM

## PRINCIPAL INFORMATION

| Title | Name | Address | Last Updated |
|-------|------|---------|--------------|
| Member | VANDERHALL MOTOR WORKS, INC. | 3500 S MOUNTAIN VISTA PKWY, PROVO, UT, 84606, USA | 09/13/2024 |

**Page 1 of 1, records 1 to 1 of 1**

## ADDRESS INFORMATION

**Physical Address:**

3500 MOUNTAIN VISTA PKWY, Provo, UT, 84606, USA

**Updated Date:**

9/13/2024 8:42:59 PM

**Mailing Address:**

**Updated Date:**

## SERVICE OF PROCESS INFORMATION

**Service of Process Name:**

VANDERHALL NORTH AMERICA, LLC

**Last Updated:**

9/13/2024 8:42:59 PM:

**Service of Process Address:**

3500 MOUNTAIN VISTA PKWY, Provo, UT, 84606, USA

Filing History        Name History        Mergers/Conversions

Give Feedback

Return to Search        Return to Results

# EXHIBIT B

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

VANDERHALL MOTOR WORKS, INC.

**Entity Number:**

12454275-0143

**Domicile Name:**

N/A

**Entity Type:**

Foreign Business Corporation

**Jurisdiction:**

DE

**Entity Subtype:**

Foreign Corporation

**Formation Date:**

08/26/2021

**Profession:**

N/A

**Formation Effective Date:**

08/26/2021

**Entity Status:**

Active

**Renew By Date:**

08/31/2025

**Entity Status Details:**

Current

**Last Renewed Date:**

07/31/2024

**Status Updated On:**

09/26/2024

## REGISTERED AGENT INFORMATION

**Name:**

JAMES THAYER

**Registered Agent Type:**

Individual

**Street Address:**

3500 MOUNTAIN VISTA PARKWAY, PROVO, UT, 84606, USA

**Last Updated:**

9/13/2024 9:22:44 PM

## PRINCIPAL INFORMATION

| Title | Name | Address | Last Updated |
|-------|------|---------|--------------|
| Director | THOMAS GEBHARDT | 3500 MOUNTAIN VISTA PARKWAY, Provo, UT, 84606, USA | 09/19/2024 |
| Director | STEPHEN HALL | 3500 MOUNTAIN VISTA PARKWAY, Provo, UT, 84606, USA | 09/13/2024 |
| President | STEPHEN HALL | 3500 MOUNTAIN VISTA PARKWAY, Provo, UT, 84606, USA | 09/13/2024 |
| Director | MARY PETROVICH | 3500 MOUNTAIN VISTA PARKWAY, Provo, UT, 84606, USA | 09/19/2024 |
| Secretary | JAMES THAYER | 3500 MOUNTAIN VISTA PARKWAY, PROVO, UT, 84606, USA | 09/13/2024 |

< Previous    ...    1    2    ...    Next >    Page 1 of 2, records 1 to 5 of 6    [          ]    Go to Page

## ADDRESS INFORMATION

**Physical Address:**

3500 MOUNTAIN- VISTA PARKWAY, Provo, UT, 84606, USA

**Updated Date:**

9/13/2024 8:42:59 PM

**Mailing Address:**

**Updated Date:**

## SERVICE OF PROCESS INFORMATION

**Service of Process Name:**

VANDERHALL MOTOR WORKS, INC.

**Last Updated:**

9/13/2024 8:42:59 PM:

**Service of Process Address:**

3500 MOUNTAIN- VISTA PARKWAY, Provo, UT, 84606, USA

Filing History        Name History        Mergers/Conversions

Return to Search        Return to Results

Give Feedback

# **EXHIBIT C**

4/14/25, 5:10 PM                                                          Division of Corporations - Filing

Delaware.gov                                                    Governor | General Assembly | Courts | Elected Officials | State Agencies

---

**Department of State: Division of Corporations**

Allowable Characters

**HOME**

Entity Details

THIS IS NOT A STATEMENT OF GOOD STANDING

| File Number: | **10055499** | Incorporation Date / | **1/1/2025** |
|---|---|---|---|
| | | Formation Date: | (mm/dd/yyyy) |

| Entity Name: | **VANDERHALL, INC.** | | |
|---|---|---|---|
| Entity Kind: | **Corporation** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| Name: | **HARVARD BUSINESS SERVICES, INC.** | | |
|---|---|---|---|
| Address: | **16192 COASTAL HWY** | | |
| City: | **LEWES** | County: | **Sussex** |
| State: | **DE** | Postal Code: | **19958** |
| Phone: | **302-645-7400** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or
more detailed information including current franchise tax assessment, current filing history
and more for a fee of $20.00.
Would you like ○ Status ○ Status,Tax & History Information

Submit

New Entity Search

---

For help on a particular field click on the Field Tag to take you to the help area.

site map   |   privacy   |   about this site   |   contact us   |   translate   |   delaware.gov

# EXHIBIT D

4.9.25 Hearing

```
 1              UNITED STATES BANKRUPTCY COURT
 2                    DISTRICT OF UTAH
 3                        * * *
 4    In re:                    ) Bankruptcy Case No.
                                ) 25-21038
 5    HALL LABS, LLC,           )
                                ) Chapter 11
 6              Debtor.         )
                                )
 7                              ) Meeting of Creditors
 8                        * * *
 9
10
                     **OFFICIAL TRANSCRIPTION**
11          OF THE MEETING OF CREDITORS IN
             THE MATTER OF HALL LABS, LLC
12
                     DATE OF MEETING:
13                   April 9th, 2025
                       11:00 a.m.
14
15
                          At:
16
          Office of the United States Trustee
17         Washington Federal Bank Building
           405 South Main Street, Suite 300
18          Salt Lake, City Utah 84111
19
20                      * * *
21                Amber R. Fraass
           - Registered Professional Reporter -
22
23
24
25
                                          Page 1
```

4.9.25 Hearing

```
 1              A P P E A R A N C E S
 2   For the Debtor:          Andres Diaz
                              DIAZ & LARSEN
 3                            757 East South Temple
                              Suite 201
 4                            Salt Lake City, Utah 84102
 5   For the Keystone Private Michael Johnson
     Income Fund:             RAY QUINNEY & NEBEKER
 6                            36 South State Street
                              Salt Lake City, Utah 84111
 7
 8   For Evans Development,   Richard Willie
     LLC:                     WW PARTNERS
 9                            8941 South 700 East
                              Suite 202
10                            Sandy, Utah 84070
11   For Central Bank:        Cohne Kinghorn, P.C.
                              111 E. Broadway
12                            11th Floor
                              Salt Lake City, Utah 84111
13
     For Various Tort Claims: Steve Baron
14
15   For Doug Eilertson:      Kenyon D. Dove
                              Smith Knowles, PLLC
16                            2225 Washington Blvd.
                              Ste 200
17                            Ogden, Utah 84401
18   For Sierra Partners,     Jeffrey L. Trousdale
     LLC:                     Cohne Kinghorn, P.C.
19                            111 E. Broadway
                              11th Floor
20                            Salt Lake City, Utah 84111
21   For Petersen Advantage,  Cragun Berube
     LLC, et al:              1920 W. 250 N.
22                            Suite 1
                              Ogden, Utah 84404
23
     For JB&B Capital, LLC    Cole Wheeler
24
25
                        *  *  *

                                            Page 2
```

4.9.25 Hearing

```
 1                    I N D E X
 2    EXAMINATION                              PAGE
 3    BY MR. JOHNSON                             83
      BY MR. WILLIE                             104
 4    BY MR. TROUSDALE                          112
      BY MR. BARON                              115
 5
 6
 7    EXHIBITS
 8             No Exhibits Marked.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                            Page 3
```

4.9.25 Hearing

```
 1              P R O C E E D I N G S
 2                     -o0o-
 3
 4         T.A. MATTHEW BURNE:  Okay.  Okay.  Once
 5    again, this is Matthew Burne.  I'm a trial attorney
 6    with the office of the United States Trustee in the
 7    Salt Lake City office.  I'm calling to order the
 8    meeting of creditors in the case of Hall Labs, LLC.
 9    Case No. 25-21038.  Today is April 9th, 2025, and
10    it is now 11:02 a.m.
11         Just by way of introductions, the office
12    of the United States Trustee supervises the
13    administration of bankruptcy cases, and my office
14    here in Salt Lake City for the cases filed in the
15    district of Utah.
16         Pursuant to Section 341 of the bankruptcy
17    code, a designated representative of the debtor is
18    required to appear and be examined under oath
19    regarding the bankruptcy case and the debtor's
20    operations.
21         This examination is being recorded.
22    We'll place the debtor's representative under oath,
23    and all testimony -- all testimony will be given
24    subject to penalty of perjury.
25         The general sequence is that I'll begin
```

Page 4

4.9.25 Hearing

1    by asking questions of the debtor's representatives
2    regarding the case, the reason for the bankruptcy
3    filing, the debtor's debts, liabilities and assets,
4    as well as the plan going forward in the Chapter 11
5    case.
6             After I finish my questions, I'll -- I'll
7    give the bankruptcy auditor from my office,
8    Reinhart Peshell, the opportunity to ask any
9    questions he may have.  And once he does, or if he
10   has no questions, I'll open up the floor to
11   creditors to ask questions.
12            We're going to go one party at a time
13   when we're asking questions.  And before you start
14   asking questions, just, if you could give me your
15   name and the party that you represent so we can
16   include that in the minutes for the -- for the
17   meeting of creditors that gets filed with the
18   court.
19            Again, as I said before, since we're
20   on -- doing a telephone -- and recording it, if
21   we're not speaking, just keep your phone on mute.
22   And try and be in a place where there's minimal
23   background noise so that the recording doesn't pick
24   all that up.
25            Under Section 342 of the bankruptcy code

Page 5

4.9.25 Hearing

1     in bankruptcy Rule 2004 B, there's a limited scope

2     of questions for this meeting of creditors.  It has

3     to relate to acts, conduct or property of the

4     debtor's estate, the debtor's liabilities or assets

5     or the plan going forward in this case.

6              In other words, this isn't to take the

7     place of a -- a formal Rule 2004 examination, or

8     deposition or any other discovery in an adversarial

9     proceeding or other related litigation.

10             If creditors' questions exceeds this

11    scope, I'll ask you to -- to stop that line of

12    questioning.  And if the creditor fails to do so,

13    they may waive or forfeit their right to continue

14    asking questions of the debtors.

15             Okay.  With that I'm going to take --

16    take the appearances of debtors's counsel and the

17    debtors's representative, and then I'll place those

18    parties under oath that are going to be giving

19    testimony here today.

20             MR. DIAZ:  This is Andy Diaz, the

21    attorney for Hall Labs.  I also have present with

22    me, Mr. Hall.

23             THE COURT:  Okay.  And that's David Hall?

24             MR. DIAZ:  Yes.

25             THE COURT:  Okay.  And Andy, I know at

Page 6

4.9.25 Hearing

1    the initial debtor interview Carl had appeared.   Is

2    he there today?   Is he going to be giving

3    testimony?

4            MR. DIAZ:   He will not be.   He's not

5    here.   I think he might be online, but he won't be

6    giving any testimony.

7            THE COURT:   Okay.

8            MR. DIAZ:   Only Mr. Hall will.

9            THE COURT:   Okay.   All right.   Sounds

10   good.

11           And Andy, if you could, I don't know if

12   you're able to, but if you could turn your phone up

13   a little bit.   I've got my volume maxed, but you're

14   just coming over a little low.

15           MR. DIAZ:   Is that a little bit better?

16           THE COURT:   Yeah.   Sounds a little

17   better.   Okay.   Thanks.

18           All right.   Mr. Hall, could you raise

19   your right hand so I can administer the oath?

20

21               DAVID HALL

22         was sworn and testified as follows:

23

24           THE COURT:   Okay.   Please state your name

25   for the record.

                                            Page 7

4.9.25 Hearing

1          MR. DAVID HALL:  David R. Hall.

2          T.A. MATTHEW BURNE:  Okay.  And what is

3     your capacity or position with the debtor?

4          MR. DAVID HALL:  I'm the chairman and

5     CEO.

6          T.A. MATTHEW BURNE:  Okay.  And in this

7     capacity, are you authorized to testify on the

8     debtor's behalf?

9          MR. DAVID HALL:  Yes.

10         T.A. MATTHEW BURNE:  Okay.  Are you

11    suffering from any illnesses, or have you taken any

12    medication that would prevent you from testifying

13    truthfully and accurately here today?

14         MR. DAVID HALL:  No.

15         T.A. MATTHEW BURNE:  Okay.  Do you

16    understand that you're testifying under oath, and

17    that your failure to testify truthfully, accurately

18    and completely may expose you to consequences,

19    including criminal consequences?

20         MR. DAVID HALL:  Yes.  I understand.

21         T.A. MATTHEW BURNE:  Okay.  And are you

22    familiar with the petition -- the bankruptcy

23    petition, the bankruptcy schedules, the statement

24    of financial affairs, the debtor's operations

25    generally, and all the other documents you provided

Page 8

4.9.25 Hearing

1          T.A. MATTHEW BURNE:  Okay.  How about any
2    of your family members?
3          MR. DAVID HALL:  I have a son, Steven,
4    who's the founder of that company, who is this CEO.
5          T.A. MATTHEW BURNE:  Okay.  So he's C --
6    so he's an officer, but he's not on the board?
7          MR. DAVID HALL:  Oh, he's probably on the
8    board, too.
9          T.A. MATTHEW BURNE:  Okay.  All right.
10         So, Andy, I'm going to put that on the
11   list.  We'll need to know who the board of
12   directors are of Vanderhall Motors.
13         And then there's another -- another
14   entity Vanderhall North America.  Do you know
15   anything about that company?
16         MR. DAVID HALL:  No.
17         T.A. MATTHEW BURNE:  Okay.  Do you know
18   if Vanderhall Incorporated or Vanderhall North
19   America, if they're, like, the parent company for
20   Vanderhall Motor Works?  Or if they're subsidiaries
21   to Vanderhall Motor Works?
22         MR. DAVID HALL:  I'm sorry.  I don't know
23   those details.
24         T.A. MATTHEW BURNE:  Okay.  All right.
25   I'm going to go to the schedules now.  And

Page 53

4.9.25 Hearing

1   that's -- was filed in the case at Docket No. 2.

2   So let me know when you have those.  And I'm going

3   to go right to Schedule AB, which is on Page 6.

4             MR. DIAZ:  Got it.

5             THE COURT:  Oh, actually, you know what?

6   I'm sorry.  I'm going to -- I want to go back to

7   Page 2 of that document.  And I'm referring to the

8   page numbers at the top of the page under the time

9   stamp, okay?  Sorry about that.  So go to Page 2,

10  if you could.

11            MR. DAVID HALL:  Okay.

12            T.A. MATTHEW BURNE:  So this is the list

13  of the 20 largest creditors on the case --

14  unsecured creditors on the case.  Do you remember

15  reviewing this document, or did you review this

16  document before it was filed?

17            MR. DAVID HALL:  Yes.

18            T.A. MATTHEW BURNE:  Okay.

19            UNIDENTIFIED MALE:  I have an investment

20  with one of the companies who went bankrupt, so.

21            T.A. MATTHEW BURNE:  Hello?  I'm hearing

22  someone else speak.  This is Matt Burne.  If you

23  just called in, please put your phone on mute,

24  unless you're going to be asking questions later

25  on, okay?  Thank you.

                                        Page 54

4.9.25 Hearing

1    T.A. MATTHEW BURNE:  Okay.  So looking on

2 Page No. 2, there's a -- the second one down,

3 Sierra Partners, LLC, and it says guarantee of --

4 of real estate lease at 300 -- or 3000 Sierra Vista

5 Way.  What was that property, and why would the

6 debtor guarantee a lease for that property?

7    MR. DAVID HALL:  So that was originally

8 our Hall Labs headquarters.  And we stopped paying

9 on the lease, and then were evicted from the

10 facility.

11    But it's a facility that we've

12 guaranteed.  The building's now been sold.

13    T.A. MATTHEW BURNE:  Okay.  Okay.  And

14 then I'm going to go down two more spots to the

15 Allen and Jean Hall foundation.  Can you tell me

16 what's the -- what's your relationship with Allen

17 and Jean Hall, or this foundation?

18    MR. DAVID HALL:  Allen is a cousin, and

19 he has a foundation that made an investment in the

20 (inaudible).

21    T.A. MATTHEW BURNE:  Okay.  All right.

22 And do you have any beneficial interest in this

23 Allen -- in this foundation?  You personally?

24    MR. DAVID HALL:  No.

25    T.A. MATTHEW BURNE:  Okay.  Okay.  I'm

                 Page 55

4.9.25 Hearing

1  going to go over to the next page, Page No. 3.

2  Down at the bottom you have Michael Hall listed.

3  Can you -- what's your relationship with Michael

4  Hall?

5          MR. DAVID HALL:  He's a son.

6          T.A. MATTHEW BURNE:  Okay.  And he worked

7  for Hall Labs?

8          MR. DAVID HALL:  Yes.

9          T.A. MATTHEW BURNE:  Okay.  All right.

10  Now I'm going to go over to Page No. 6.  Sorry

11  about that to back -- make you backtrack.  So let

12  me know when you're on Page 6.

13          MR. DAVID HALL:  Okay.  I'm here.

14          T.A. MATTHEW BURNE:  All right.  Looking

15  at Item No. 3 under part one there, can you tell me

16  those three Chase accounts, are they currently

17  open, or have they been closed?

18          MR. DAVID HALL:  I can't answer directly.

19  I'm not sure whether they're open or closed.  I

20  would -- I don't know.  Sorry.

21          T.A. MATTHEW BURNE:  Okay.

22          MR. DIAZ:  Let me just -- let me clarify.

23  The -- the first one, 3.1 was a Hall Labs account.

24  The 3.2 was a -- a DRH Holdings account.  And 3.3

25  was the DR -- or Hall Properties holdings account.

Page 56

4.9.25 Hearing

1   One of the amendments we're going to make is -- so

2   to clarify that so that there's no confusion there.

3           T.A. MATTHEW BURNE:  Okay.

4           MR. DIAZ:  And I believe that they were

5   instructed, I don't know if it's taken place yet,

6   but the first one that was the Hall Labs account

7   should have been closed.  And I believe it was

8   closed based on information that I heard -- saw

9   from Chase Bank.

10          T.A. MATTHEW BURNE:  Okay.  And was

11  the -- if that one was closed, would -- were --

12  what was done with the $86,000 balance?

13          MR. DIAZ:  It was put into the -- the --

14  the DIP account, and/or the cash collateral

15  account.

16          T.A. MATTHEW BURNE:  Okay.  And then

17  going down to the DRH account, I guess if that's

18  not held in the debtor's name, why is it listed?

19  What's the debtor's interest in that account?

20          MR. DIAZ:  Yeah.  Let me -- and that was

21  a -- an attorney decision for disclosure purposes.

22  We just wanted to make sure because we were going

23  to be able to access those funds, that we listed

24  them so people would know that we had access to

25  those funds.

Page 57

4.9.25 Hearing

1          T.A. MATTHEW BURNE:  Okay.

2          MR. DIAZ:  But with the clarifying notes

3   as to who owns the accounts, that would be even

4   better as far as transparency.

5          T.A. MATTHEW BURNE:  All right.  So do

6   you intend to amend that to include that note,

7   Andy?

8          MR. DIAZ:  Yes.

9          T.A. MATTHEW BURNE:  Okay.

10          MR. DIAZ:  That's -- that's one of our

11   amendments, yes.

12          T.A. MATTHEW BURNE:  And that's the one

13   you're talking about the 6590, ending in 6590?

14          MR. DIAZ:  I think that's the -- I think

15   that's the DRH Holdings account, yes.

16          T.A. MATTHEW BURNE:  Okay.

17          MR. DIAZ:  And the last one, the 5112

18   account is the Hall Property Holdings account.

19          T.A. MATTHEW BURNE:  All right.  So I'm

20   going to ask for account statements from those two

21   accounts, okay?

22          And who -- who was signatory authority of

23   those two accounts, Mr. Hall?  Now we're talking

24   about number 3.2 and 3.3 there.

25          MR. DAVID HALL:  That would likely be

Page 58

4.9.25 Hearing

1   myself and Wendy.

2          T.A. MATTHEW BURNE:  Okay.  Okay.  Going

3   over to the next page, Page No. 7, and at part 3,

4   No. -- Item No. 10 there, the accounts receivables,

5   you have listed $299,000.  Can you tell me how you

6   arrived at the value of this?  And who owns that

7   money?  Is it just one party, or is it multiple

8   people that owe the debtor $299,000?

9          MR. DAVID HALL:  I will have to get back

10  to you on the details of that.

11         T.A. MATTHEW BURNE:  Okay.  All right.

12  I'm going to go to Page No. 9.  And Item No. 49 --

13  or Item No. 50, sorry.  You have two hand-held

14  laser welders valued at $17,000.  First of all,

15  where are these located?  Are they in use, and are

16  they insured?

17         MR. DAVID HALL:  Since the time of this

18  filing, they might have been sold.  They're not

19  used by us.  I -- and I'm not sure exactly where

20  they're at.  I can get that information to you.

21         T.A. MATTHEW BURNE:  Okay.  And you said

22  they were sold.  Who would they have been sold to?

23         MR. DAVID HALL:  I'm not familiar.  So

24  I'll have to get back to you on that.

25         T.A. MATTHEW BURNE:  All right.  And you

                                        Page 59

4.9.25 Hearing

1   America.  Do you recall that?

2           MR. DAVID HALL:  Yes.

3           MR. JOHNSON:  And tell me what your

4   understanding is of Vanderhall North America.

5           MR. DAVID HALL:  I'm not aware of those

6   details.

7           MR. JOHNSON:  And do you have an

8   understanding of Vanderhall, Inc.?

9           MR. DAVID HALL:  I'm not aware of their

10  current -- their current organization structure.

11          MR. JOHNSON:  I don't see any indication

12  on the schedule statements that the debtor has any

13  interest in either Vanderhall North America or

14  Vanderhall, Inc.  Is that accurate?

15          MR. DIAZ:  Are you asking -- are you

16  asking is it accurate that we haven't listed any,

17  or are you asking if they have some that we didn't

18  list?

19          MR. JOHNSON:  Well, my question is is

20  does the debtor have any ownership interest?

21  Either Vanderhall, Inc., Vanderhall North America?

22          MR. DAVID HALL:  I don't know.  I know

23  they've been reorganizing.

24          MR. JOHNSON:  And -- and don't you also

25  know that assets were transferred out of Vanderhall

Page 92

4.9.25 Hearing

1    Motor Works to one or both of those entities,
2    including the gas line business?
3              MR. DAVID HALL:  I'm not aware.
4              T.A. MATTHEW BURNE:  Hi, Mike --
5              MR. JOHNSON:  If that happened --
6              T.A. MATTHEW BURNE:  Mike, I'm sorry to
7    interrupt.
8              MR. JOHNSON:  Yeah.
9              THE COURT:  There's someone on the line
10   that doesn't have their phone muted and is not
11   asking questions.  Please mute your line because
12   we're picking up a lot of background noise, and
13   it's affecting the recording, and we can't
14   understand the questions or the answers.
15             So please mute your lines if you're not
16   communicating.  Thank you.
17             Sorry, Mike.
18             MR. JOHNSON:  No problem.
19             So do you have any -- does debtor have
20   any -- as the 51 percent common ownership -- stock
21   ownership holder, does the debtor have any
22   information or records regarding what either
23   Vanderhall North America or Vanderhall, Inc. is and
24   what they may own?  Or do you not have any of that?
25             MR. DAVID HALL:  I don't have any of

Page 93

4.9.25 Hearing

1    that.

2              MR. JOHNSON:  Why not?

3              MR. DIAZ:  Counsel, that's really a

4    speculative question.  If he doesn't have any, he

5    doesn't have it.

6              MR. JOHNSON:  Well, is it your belief

7    that as the owner of the majority of the common

8    shares, you're entitled to information on a

9    restructuring at the Vanderhall Motor Works level?

10             MR. DAVID HALL:  No.

11             MR. JOHNSON:  You said your son is the

12   CEO of Vanderhall Motor Works and is also on the

13   board.  More than likely on the board; correct?

14             MR. DAVID HALL:  That's what I

15   understand.

16             MR. JOHNSON:  To your knowledge does your

17   son have any ownership or management authority for

18   either Vanderhall North America or Vanderhall,

19   Inc.?

20             MR. DAVID HALL:  I'm not aware of what he

21   exactly is over.

22             MR. JOHNSON:  Has there been any effort

23   to market Hall -- to market the debtor's stock

24   ownership in Vanderhall Motor Works or any of these

25   other entities?

Page 94

4.9.25 Hearing

```
 1                    TRANSCRIBER'S CERTIFICATE
 2
      STATE OF UTAH           )
 3                            ) ss
      COUNTY OF SALT LAKE     )
 4
 5
            I, Amber R. Fraass, a Utah Certified Court
 6    Reporter and Registered Professional Reporter, do hereby
      certify:
 7
 8          That I listened to the recorded MEETING OF
      CREDITORS and took down in shorthand the foregoing on
 9    April 13th, 2025.
10
            That I thereafter transcribed my said shorthand
11    notes into typewriting and that the typewritten
      transcript of said conversation is a complete, true and
12    accurate transcription of my said shorthand notes taken
      down at said time, to the best of my ability to hear and
13    understand the audio file.
14
            I further certify that I am not a relative or
15    employee of an attorney or counsel involved in said
      action, nor a person financially interested in said
16    action.
17
18          IN WITNESS WHEREOF, I hereby certify this
19    transcript in the County of Utah, State of Utah, this
20    14th day of April, 2025.
21
22
23
24              Amber R. Fraass
                Amber R. Fraass, RPR, CSR
25
```

                                             Page 122