Andres Diaz (A4309)
Timothy J. Larsen (A10263)
**DIAZ & LARSEN**
757 E. South Temple, Suite 201
Salt Lake City, UT 84102
Telephone: (801) 596-1661
Fax: (801) 359-6803
Email: courtmail@adexpresslaw.com
*Attorneys for the Debtor in Possession*

---

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>HALL LABS, LLC<br><br>Debtor. | **MOTION TO APPROVE SETTLEMENT BETWEEN DEBTOR AND SPHL PROPERTIES, LLC UNDER BANKRUPTCY RULE 9019**<br><br>Case No. 25-21038<br><br>Chapter 11<br><br>Judge Joel T. Marker |

Debtor Hall Labs, LLC, the above-captioned debtor and debtor in possession (the "**Debtor**"), by and through counsel, hereby moves the Court for entry of an order under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and section 105(a) of Title 11 of the United States Code (the "**Bankruptcy Code**"), substantially in the form attached as <u>Exhibit A</u> hereto (the "**Proposed Order**"), approving a settlement of certain claims held SPHL Properties, LLC ("**SPHL**") against the Debtor's estate on the terms set forth in the Mutual Termination of Land Lease Transaction and Settlement Agreement attached as <u>Exhibit 1</u> hereto (the "**Agreement**").

### <u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.      Venue is property in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The Debtor seeks approval of the Agreement pursuant to Bankruptcy Rule 9019.

## FACTUAL BASIS FOR MOTION

5.      On March 5, 2025, (the "**Petition Date**"), the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the District of Utah (the "**Bankruptcy Court**").

6.      The Debtor continues to operate and control the Debtor's affairs as a debtor in possession pursuant to 11 U.S.C. § 1108.

7.      SPHL, as Landlord, and Hall Property Holdings, LLC ("**Tenant**"), as Tenant, entered into that certain Net Land Lease dated January 22, 2020, as amended by that certain First Amendment to Net Land Lease dated September 30, 2022 (collectively, the "**Land Lease**"). A copy of the Land Lease is attached as <u>Exhibit 2</u> hereto.

8.      The Tenant's obligations arising under the Land Lease are guaranteed by the Debtor, DRH Holdings, LLC, and David R. Hall (collectively, the "**Guarantors**") pursuant to the terms of that certain Guaranty of Net Land Lease dated January 22, 2020, executed by the Guarantors in favor of Landlord (the "**Guaranty of Land Lease**"). A copy of the Guaranty of Land Lease is attached as <u>Exhibit 3</u> hereto.

9.      SPHL and Tenant are also parties to that certain Development Agreement dated January 22, 2020, as amended by that certain First Amendment to Development Agreement dated September 30, 2022 (collectively, the "**Development Agreement**"). A copy of the Development Agreement is attached as <u>Exhibit 4</u> hereto.

2

10.    The Tenant's obligations arising under the Development Agreement are guaranteed by the Guarantors, including the Debtor, pursuant to the terms of that certain Guaranty of Development Agreement dated January 22, 2020, executed by the Guarantors in favor of Landlord (the **"Guaranty of Development Agreement"**). A copy of the Guaranty of Development Agreement is attached as <u>Exhibit 5</u> hereto.

11.    The Land Lease is memorialized by that certain Memorandum of Land Lease dated January 23, 2020 and recorded on February 4, 2020 in the office of the Recorder for Utah County, Utah as ENT: 14671: 2020 (the "**Memorandum of Lease**"), and that certain First Amendment to Memorandum of Land Lease dated September 30, 2022 and recorded on October 6, 2022 in the office of the Recorder for Utah County, Utah as ENT: 107530: 2022 (the "**First Amendment to Memorandum of Lease**"). Copies of the Memorandum of Lease and Amendment to Memorandum of Lease is attached as <u>Exhibit 6</u> hereto.

12.    SPHL, Tenant, and the Guarantors are involved in litigation regarding the Land Lease and Guaranty of Land Lease pending in the Third Judicial District Court for Salt Lake County, Utah, under Civil No. 240404432 captioned as follows:  SPHL PROPERTIES, LLC, an Indiana limited liability company vs. HALL PROPERTY HOLDINGS, LLC, a Utah limited liability company; HALL LABS, LLC, a Utah limited liability company; DRH HOLDINGS, LLC, a Utah limited liability company; and DAVID R. HALL, an individual (the "**Pending Litigation**").

13.    The Debtor's Statement of Financial Affairs identify the Pending Litigation, and its Schedule E/F lists a corresponding disputed and contingent claim in favor of SPHL in the amount of $608,551 associated with the Guaranty of Land Lease. (ECF 2).

14.     All parties to the Pending Litigation have executed the Agreement, which is intended to settle and resolve all disputes between or among the parties related to the Pending Litigation, Land Lease, Guaranty of Land Lease, Development Agreement,

15.     The releases contemplated by the Agreement are subject to the following material conditions precedent:[1]

      a.     The Tenant's execution and recording of the Release of Memorandum of Lease in the form reflected in Exhibit A to the Agreement;

      b.     Approval of the Agreement by this Court under Bankruptcy Rule 9019; and

      c.     SPHL's closing on the sale of the leased property to a third-party buyer.

## LEGAL BASIS FOR MOTION

Bankruptcy Rule 9019 provides that, after notice and a hearing, a court may approve a proposed compromise or settlement. Fed. R. Bankr. P. 9019(a). Section 105(a) of the Bankruptcy Code allows a court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

"Compromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citation omitted). In the Tenth Circuit, courts consider the *Kopexa* factors as a useful guide for determining whether to approve a settlement under Bankruptcy Rule 9019:

(1) the probable success of the underlying litigation on the merits,

(2) the possible difficulty in collection of a judgment,

(3) the complexity and expense of the litigation, and

(4) the interests of creditors in deference to their reasonable views.

---

[1] In the event of any conflict between the description of the terms of the Agreement in the Motion and the Agreement itself, the Agreement shall control.

*Kopp v. All Am. Life Ins. Co. (In re Kopexa Realty Venture Co.)*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997).

## ANALYSIS

The *Kopexa* factors weigh in favor of approving the Agreement and settlement of the Pending Litigation is in the best interests of the Debtor and the estate. Absent approval, the Debtor would be forced to invest significant time and money into the Pending Litigation, even if it proceeds against the non-Debtor parties alone. Additionally, there is a possibility that the Pending Litigation could give rise to a claim to a judgment for which the Debtor would be liable in light of the Guaranty of Land Lease and Guaranty of Development Agreement. Such a judgment would likely dilute any payment available to other unsecured creditors of the debtor's estate.

Approval of the Agreement, on the other hand, presents an opportunity for all parties to settle the Pending Litigation in a manner that does not give rise to a claim or force the debtor to incur any out-of-pocket expense. Accordingly, the Court should approve the Agreement under Bankruptcy Rule 9019.

## NOTICE

The Debtor has served or will serve this Motion on (a) the Office of the United States Trustee for the District of Utah; (b) all parties to the Pending Litigation, through counsel; (c) all ECF notice parties; (d) all parties who have appeared in this case and requested notice; and (e) all parties on the Debtor's Master Service List, attached to the certificate of service filed with the notice of hearing on this Motion. Bankruptcy Rule 2002(a). The Debtor submits that no further notice is necessary considering the nature of the relief requested in this Motion.

No prior application for the relief sought in the Motion has been made to this Court or any other court in connection with this proceeding.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtor moves for entry of the Proposed

Order, substantially in the form attached as <u>Exhibit A</u> hereto, approving the Agreement under

Bankruptcy Rule 9019.

DATED this 18th day of April 2025.

DIAZ & LARSEN

By: /s/ Andres Diaz
    Attorneys for the Debtor in Possession

# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>HALL LABS, LLC<br><br>    Debtor. | **ORDER GRANTING MOTION TO APPROVE SETTLEMENT BETWEEN DEBTOR AND SPHL PROPERTIES, LLC UNDER BANKRUPTCY RULE 9019**<br><br>Case No. 25-21038<br><br>Chapter 11<br><br>Judge Joel T. Marker |

Upon the motion (the "**Motion**")[2] filed by Debtor Hall Labs, LLC (the "**Debtor**") under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") for entry of an order approving the settlement agreement attached as <u>Exhibit 1</u> hereto (the "**Settlement Agreement**"), which provides for the settlement of disputes between the Debtor, SPHL and the non-Debtor defendants in the Pending Litigation; and finding that the Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, that this is a core matter under 28 U.S.C. § 157(b)(2), that notice of the Motion and all other notices were sufficient under the circumstances and that no further notice need be given; and the legal and factual bases set forth in the Motion establish just cause

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed them in the Motion.

for the relief granted herein and it appearing that granting the relief requested in the Motion, and the entry of this Order are necessary and in the best interests of the Debtor, its estate, creditors, and other parties in interest; and the Court having found and determined that the relief sought in the Motion is an appropriate exercise of the Debtor's business judgment; and sufficient cause appearing therefor,

**THEREFORE, THE COURT FINDS AS FOLLOWS:**

1.    The Motion is granted as set forth herein.

2.    The Settlement Agreement, attached as <u>Exhibit 1</u> hereto, is approved, and incorporated herein by reference, and shall be binding on the parties thereto, all parties in interest in this case, and any subsequently appointed trustee.  In the event of any inconsistency between this Order, the Motion, and the Settlement Agreement, the Settlement Agreement will control.

3.    The Debtor and Claimants are authorized and directed to act in accordance with the Settlement Agreement and perform their respective duties thereunder.

4.    This Order is immediately effective and enforceable upon its entry.

5.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

###

## EXHIBIT 1

## MUTUAL TERMINATION OF LAND LEASE TRANSACTION
## AND SETTLEMENT AGREEMENT

This Mutual Termination of Land Lease Transaction and Settlement Agreement (the "Agreement"), dated as of _April 18_, 2025 (the "Effective Date"), is entered into by and among SPHL Properties, LLC, an Indiana limited liability company ("Landlord"), and Hall Property Holdings, LLC, a Utah limited liability company ("Tenant"), Hall Labs, LLC, a Utah limited liability company ("Hall Labs"), DRH Holdings, LLC, a Utah limited liability company ("DRH Holdings"), and David R. Hall ("DRH", and together with Hall Labs and DRH Holdings, collectively, and jointly and severally, the "Guarantors"). The Landlord, Tenant, and Guarantors are collectively referred to hereinafter as the "Parties" or individually as a "Party".

RECITALS:

WHEREAS, Landlord and Tenant entered into that certain Net Land Lease dated January 22, 2020, as amended by that certain First Amendment to Net Land Lease dated September 30, 2022 (collectively, the "Land Lease");

WHEREAS, the Tenant's obligations arising under the Land Lease are guaranteed by the Guarantors pursuant to the terms of that certain Guaranty of Net Land Lease dated January 22, 2020 executed by the Guarantors in favor of Landlord (the "Guaranty of Land Lease");

WHEREAS, Landlord and Tenant entered into that certain Development Agreement dated January 22, 2020, as amended by that certain First Amendment to Development Agreement dated September 30, 2022 (collectively, the "Development Agreement");

WHEREAS, the Tenant's obligations arising under the Development Agreement are guaranteed by the Guarantors pursuant to the terms of that certain Guaranty of Development Agreement dated January 22, 2020 executed by the Guarantors in favor of Landlord (the "Guaranty of Development Agreement");

WHEREAS, the Land Lease is memorialized by that certain Memorandum of Land Lease dated January 23, 2020 and recorded on February 4, 2020 in the office of the Recorder for Utah County, Utah as ENT: 14671: 2020 (the "Memorandum of Lease"), and that certain First Amendment to Memorandum of Land Lease dated September 30, 2022 and recorded on October 6, 2022 in the office of the Recorder for Utah County, Utah as ENT: 107530: 2022 (the "First Amendment to Memorandum of Lease");

WHEREAS, the Parties are involved in litigation regarding the Land Lease and Guaranty of Land Lease pending in the Third Judicial District Court for Salt Lake County, Utah, under Civil No. 240404432 captioned as follows: SPHL PROPERTIES, LLC, an Indiana limited liability company vs. HALL PROPERTY HOLDINGS, LLC, a Utah limited liability company; HALL LABS, LLC, a Utah limited liability company; DRH HOLDINGS, LLC, a Utah limited liability company; and DAVID R. HALL, an individual (the "Pending Litigation");

WHEREAS, on March 5, 2025 (the "Petition Date"), Hall Labs filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Utah, styled *In re: Hall Labs, LLC*, Case No. 25-21038-JTM (the "Hall Labs Bankruptcy Case").

WHEREAS, the Parties now wish to amicably settle and resolve all disputes and controversies between and among them, including but not limited to terminating the Land Lease, Guaranty of Land Lease, Development Agreement, Guaranty of Development Agreement, Memorandum of Lease, and First Amendment to Memorandum of Lease (collectively, the "Lease Transaction Documents"), terminating and releasing the Memorandum of Lease and First Amendment to Memorandum of Lease, and settling the Pending Litigation; and

WHEREAS, the Parties have consulted with their respective attorneys prior to executing this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Agreement, intending to be legally bound hereby, the undersigned Parties do hereby agree as follows:

1. **Recitals; Defined Terms**. The foregoing Recitals are hereby incorporated as if fully stated herein. Capitalized terms used, but not defined, in this Agreement shall have the same meaning ascribed to such terms in the Land Lease.

2. **Release of Memorandum of Lease**. Tenant shall cause a written termination of the Memorandum of Lease and First Amendment to Memorandum of Lease sufficient to release and terminate the Memorandum of Lease and First Amendment to Memorandum of Lease of record, in form attached hereto and incorporated herein as **Exhibit A** (the "Release of Memorandum of Lease"), to be executed and recorded in the office of the Recorder for Utah County, Utah. Tenant shall pay the filing fee and cause the Release of Memorandum of Lease to be recorded.

3. **Termination of the Lease Transaction Documents**. Subject to Section 7 below, as of the Effective Date, the Parties hereby agree that the Lease Transaction Documents are terminated, null and void, and of no further force and effect.

4. **Landlord's Release**. For good and valuable consideration, the sufficiency of which is hereby expressly acknowledged, and conditioned solely on the satisfaction of the conditions precedent set forth in Section 7 below, Landlord, on behalf of itself and the other Landlord Releasees (as defined below), **DOES FULLY AND FOREVER RELEASE AND DISCHARGE** Tenant, Guarantors, and each of their respective successors, predecessors, assigns, subsidiaries, parents, and affiliates, and each of their respective agents, employees, partners, members, managers, representatives, attorneys, insurers, and family members, collectively and individually, in their individual and representative capacities, past and present (all referred to as the "Tenant Releasees"), from any and all claims, demands, liabilities, obligations, damages, causes of action, or suits, whether known or unknown, that Landlord may have had, may have now, or hereinafter may acquire against the Tenant Releasees, based on acts or events from the beginning of time to the Effective Date. Without limiting the generality of the foregoing, this

-2-

release includes all matters, claims, demands, liabilities, obligations, damages, causes of action, or suits, between Landlord and the Tenant Releasees, or any of them, whether known or unknown or whether based in contract or in tort, including without limitation those arising out of or in any way related to the Lease Transaction Documents or those that were or could have been asserted in the Pending Litigation.

     **5.**    <u>**Tenant's Release.**</u> For good and valuable consideration, the sufficiency of which is hereby expressly acknowledged, and conditioned solely on the satisfaction of the conditions precedent set forth in <u>Section 7</u> below, Tenant, on behalf of itself and the other Tenant Releasees, **DOES FULLY AND FOREVER RELEASE AND DISCHARGE** Landlord, its successors, predecessors, assigns, subsidiaries, parents and affiliates, and each of their respective agents, employees, partners, members, managers, representatives, attorneys, insurers, and family members, collectively and individually, in their individual and representative capacities, past and present (all referred to as the "<u>Landlord Releasees</u>"), from any and all claims, demands, liabilities, obligations, damages, causes of action, or suits, whether known or unknown, that Tenant may have had, may have now, or hereinafter may acquire against the Landlord Releasees, based on acts or events from the beginning of time to the Effective Date. Without limiting the generality of the foregoing, this release includes all matters, claims, demands, liabilities, obligations, damages, causes of action, or suits, between Tenant and the Landlord Releasees, or any of them, whether known or unknown or whether based in contract or in tort, including without limitation those arising out of or in any way related to the Lease Transaction Documents or those that were or could have been asserted in the Pending Litigation.

     **6.**    <u>**Guarantors' Release.**</u> For good and valuable consideration, the sufficiency of which is hereby expressly acknowledged, and conditioned solely on the satisfaction of the conditions precedent set forth in <u>Section 7</u> below, each Guarantor, on behalf of itself and the other Tenant Releasees, **DOES FULLY AND FOREVER RELEASE AND DISCHARGE** Landlord Releasees from any and all claims, demands, liabilities, obligations, damages, causes of action, or suits, whether known or unknown, that Guarantors may have had, may have now, or hereinafter may acquire against the Landlord Releasees, based on acts or events from the beginning of time to the Effective Date. Without limiting the generality of the foregoing, this release includes all matters, claims, demands, liabilities, obligations, damages, causes of action, or suits, between Guarantors and the Landlord Releasees, or any of them, whether known or unknown or whether based in contract or in tort, including without limitation those arising out of or in any way related to the Lease Transaction Documents or those that were or could have been asserted in the Pending Litigation.

     **7.**    <u>**Conditions Precedent**</u>. The effectiveness of <u>Sections 4, 5, and 6</u> of this Agreement are conditioned upon (i) the Release of Memorandum of Lease being unconditionally terminated and released as an encumbrance against Landlord, the Real Estate, or the Premises; (ii) the approval by the Court in the Hall Labs Bankruptcy Case of this Agreement, pursuant to a motion under Rule 9019 of the Federal Rules of Bankruptcy Procedure ("<u>Motion</u>"), which Motion the Tenant and Guarantors hereby agree not to oppose and provide reasonable efforts to support on request; and (iii) Landlord's closing on the sale of the Premises to a third party.

8. **Bankruptcy Court Approval**. The effectiveness and validity of this Agreement is made expressly contingent upon Court approval of the Motion. If the Court does not approve the Motion, the Parties will be returned to their previous positions *ex ante* this Agreement without any prejudice to their pre-Agreement rights

9. **The Parties' Obligations**. The Parties shall bear their own costs and shall pay their own attorneys' fees. By signing this Agreement, Landlord, on behalf of itself and its attorneys, forever waives any claims for attorneys' fees it and/or its law firm may have against Tenant or the Guarantors pursuant to the Lease Transaction Documents. By signing this Agreement, Tenant, on behalf of itself and its attorneys, forever waives any claims for attorneys' fees it and/or its law firm may have against Landlord pursuant to the Lease Transaction Documents. By signing this Agreement, each Guarantor, on behalf of itself and its attorneys, forever waives any claims for attorneys' fees it and/or its law firm may have against Landlord pursuant to the Lease Transaction Documents.

10. **Legal Action**. The Parties agree that, other than the Pending Litigation, neither has filed a legal action on the basis of the Lease Transaction Documents and they shall refrain from doing so in the future.

11. **No Admission of Liability**. This Agreement is executed pursuant to a compromise and settlement, without any admission of liability by the Parties, but solely for the purpose of avoiding costly litigation on disputed claims and avoiding uncertainty, controversy and legal expense.

12. **Amendment**. This Agreement shall be binding upon the Parties and may not be amended, supplemented, changed, or modified in any manner, orally or otherwise, except by an instrument in writing of concurrent or subsequent date signed by all of the Parties.

13. **Entire Agreement**. This Agreement contains and constitutes the entire understanding and agreement between the Parties and cancels all prior or contemporaneous oral or written understandings, negotiations, agreements, commitments, warranties, representations, and promises in connection herewith.

14. **Severability**. If any provision in this Agreement is declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected, and the illegal or invalid part, term, or provision shall be deemed not to be a part of this Agreement.

15. **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, and the counterparts shall together constitute one and the same agreement, notwithstanding that all Parties are not a signatory to the original or the same counterpart. Furthermore, the Parties mutually agree that this Agreement may be executed by a faxed signature or digital copy in counterparts which taken together should be considered an original.

**16.** **Construction**. The headings of the sections contained herein are for convenience only and are not to be used to define, limit or construe their contents. Whenever the context requires, the gender of any word used in this Agreement includes the masculine, feminine or neuter, and the number of any word includes the singular or plural.

**17.** **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Utah. The proper venue for any action brought to construe or enforce this Agreement shall be Utah County, Provo and/or the U.S. District Court for the State of Utah.

**18.** **Successors and Assignment**. All of the rights and obligations of the Parties under this Agreement shall bind and inure to the benefit of the respective successors of the Parties. This Agreement may not be assigned by any Party, in whole or in part, without prior written consent of the other Party.

**19.** **Authority**. The Parties represent and warrant that: (i) the individuals who execute this Agreement are duly authorized to execute this Agreement on behalf of the respective entities they purport to represent, respectively; (ii) no other signature, act or authorization is necessary to make this Agreement binding on the respective parties; (iii) to the best of their knowledge, the Parties named are all the necessary and proper parties; and (iv) they have not assigned, sold, or transferred any claims otherwise released herein.

**20.** **Representation by Counsel**. The Parties hereby acknowledge that each has been represented by legal counsel of its own choice throughout all of the negotiations which preceded the execution of this Agreement and that each of them has executed this Agreement with the consent and on the advice of such legal counsel. The Parties further acknowledge that each of them and their counsel have had an adequate opportunity to make whatever investigations or inquiry that they may deem necessary or desirable in connection with the subject matter of this Agreement prior to the execution hereof and the delivery and acceptance of the consideration specified herein. Each Party has reviewed and revised, or had the opportunity to revise this Agreement, and accordingly the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**21.** **Waiver**. No failure by either Party, at any time, to require the performance by the other of any term of this Agreement, shall in any way affect the right of either Party to enforce such terms, nor shall any waiver by either Party of any term hereof be taken or held to be a waiver of any other provision of this Agreement. No waiver of any term or provision of this Agreement shall be effective unless the same is in writing and signed by the Party granting such waiver.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

By signing below, the Parties acknowledge that they have consulted with legal counsel regarding this Agreement and have carefully read and fully understand all of the provisions of this Agreement and that they are voluntarily entering into this Agreement, intending to be legally bound hereby, to be effective as of the Effective Date.

"Landlord"                               "Tenant"

SPHL PROPERTIES, LLC,              HALL PROPERTY HOLDINGS, LLC,
an Indiana limited liability company    a Utah limited liability company

By: _____              By: Hall Labs, LLC, Member
Name: Marc D. Pfleging
Title:  Manager                           By: _____
                                              David R. Hall, Manager

                                         "Hall Labs"

                                         Hall Labs, LLC,
                                         a Utah limited liability company

                                         By: _____
                                              David R. Hall, Manager

                                         "DRH Holdings"

                                         DRH Holdings, LLC,
                                         a Utah limited liability company

                                         By: _____
                                         Name: DAVID R. HALL
                                         Its:  MANAGER

                                         "DRH"

                                         _____
                                         David R. Hall, Individually

**PREPARED BY
AND RETURN TO:**

David J. Duncan, Esquire
Scannell Properties
8801 River Crossing Blvd
Suite 300
Indianapolis, IN  46240
(317) 843-5959

_____

(ABOVE SPACE FOR RECORDER'S USE ONLY)

**Cross Reference:  Ent: 14671: 2020 and Ent: 107530: 2022**

### RELEASE OF MEMORANDUM OF LAND LEASE AND
### FIRST AMENDMENT TO MEMORANDUM OF LAND LEASE

THIS **RELEASE OF MEMORANDUM OF LAND LEASE AND FIRST AMENDMENT TO MEMORANDUM OF LAND LEASE,** is made as of the _18th_ day of _April_, 2025, by and between **SPHL PROPERTIES, LLC,** an Indiana limited liability company (the "Landlord"), whose address is 8801 River Crossing Blvd., Suite 300, Indianapolis, IN 46240, and **HALL PROPERTY HOLDINGS, LLC,** a Utah limited liability company (the "Tenant"), whose address is 3000 Sierra Vista Way, Provo, UT  84606.

Landlord and Tenant entered into that certain Net Land Lease dated January 22, 2020, as amended by that certain First Amendment Net Land Lease dated September 30, 2022 (collectively, the "Land Lease") with respect to certain real estate located at Ironton Business Park, Provo, Utah County, Utah, as described in Exhibit A, attached hereto (the "Property").

In connection with the Land Lease, Landlord and Tenant executed that certain Memorandum of Land Lease dated January 23, 2020 and recorded February 4, 2020, with the Recorder of Utah County, Utah as Ent: 14671: 2020; as amended by that certain First Amendment to Memorandum of Land Lease dated September 30, 2022 and recorded October 6, 2022, with the

Recorder of Utah County, Utah as Ent: 107530: 2022 (as amended, the "Memorandum of Lease").

Landlord and Tenant have terminated the Land Lease and desire to release the Memorandum of Land Lease.

**NOW, THEREFORE,** for and in consideration of the sum of One Dollar ($1.00) and other valuable consideration received, the parties agree that the Memorandum of Land Lease dated January 23, 2020 and recorded February 4, 2020, with the Recorder of Utah County, Utah as Ent: 14671: 2020 and the First Amendment to Memorandum of Land Lease dated September 30, 2022 and recorded October 6, 2022, with the Recorder of Utah County, Utah as Ent: 107530: 2022 are hereby RELEASED IN FULL.

(Execution on following page.)

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Release of Memorandum of Land Lease and First Amendment to Memorandum of Land Lease through their respective authorized officers, effective as of the date written above.

**LANDLORD:**                              **TENANT:**

**SPHL PROPERTIES, LLC,**              **HALL PROPERTY HOLDINGS, LLC,**
an Indiana limited liability company    a Utah limited liability company

                                         By:  Hall Labs, LLC, Member

By: _____          By: _____
      Marc D. Pfleging, Manager              David R. Hall, Manager


Date: _____April 16____, 2025          Date: ___4/19/25___, 2025

- 3 -

## ACKNOWLEDGMENT – LANDLORD

STATE OF INDIANA     )
                      ) SS:
COUNTY OF MARION     )

Before me, _Joy R Jackson_, a Notary Public in and for the above State and County, on this _16th_ day of _April_, 2025, personally appeared Marc D. Pfleging, Manager of **SPHL PROPERTIES, LLC**, an Indiana limited liability company, known to me to be the same person who signed and acknowledged that he signed the foregoing instrument as such Manager of said limited liability company for and on behalf of the limited liability company, and that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of the limited liability company, for the uses and purposes set forth in the instrument.

**IN TESTIMONY WHEREOF**, I have subscribed my signature and affixed my official seal on the day and year set forth above.

_Joy R Jackson_
Notary Public

My commission expires: _11/23/32_

County of residence: _Hamilton_

JOY R. JACKSON
Commission Number: 691848
My Commission Expires
11/23/2032

## ACKNOWLEDGMENT – TENANT

STATE OF UTAH              )
                          ) SS:
COUNTY OF _Utah_ )

      Before me, _Madalyn Fenn_ , a Notary Public in and for the above State and County, on this 15th day of _April_ , 2025, personally appeared David R. Hall, Manager of Hall Labs, LLC, the Member of **HALL PROPERTY HOLDINGS, LLC**, a Utah limited liability company, known to me to be the same person who signed and acknowledged that he signed the foregoing instrument as such Manager for and on behalf of the limited liability companies, and that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of the limited liability companies, for the uses and purposes set forth in the instrument.

      **IN TESTIMONY WHEREOF**, I have subscribed my signature and affixed my official seal on the day and year set forth above.

MADALYN FENN
Notary Public - State of Utah
Comm. No. 725262
My Commission Expires on
Jun 15, 2026

_____
Notary Public

My commission expires: _June 15, 2026_

County of residence: _Utah_

## EXHIBIT A

### Legal Description of the Property

Parcels 1, 2 and 3 of New Vista South Subdivision recorded November 7, 2019, with the Recorder of Utah County, Utah in Plat Book 47, Page 358.

# EXHIBIT 2

## NET LAND LEASE

THIS NET LAND LEASE (this "**Lease**") is made and entered into as of the 22ᴺᵒᵗ day of _____January_____, 2020, by and between SPHL PROPERTIES, LLC, an Indiana limited liability company ("**Landlord**"), and HALL PROPERTY HOLDINGS LLC, a Utah limited liability company ("**Tenant**"). Simultaneously with the execution of this Agreement, the parties are entering into a Development Agreement pertaining to the same Premises covered by this Lease (the "**Development Agreement**"). For and in consideration of the mutual covenants and conditions set forth herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

ARTICLE 1.

## LEASE OF THE PREMISES

Section 1.1.    THE DEMISE. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, upon and subject to the terms and provisions of this Lease, approximately 48.084 acres of unimproved land located in Ironton Business Park, in the City of Provo, in Utah County, Utah, being more particularly described in Exhibit A, which is attached hereto and hereby made a part hereof ("**Real Estate**"), and together with all easements and appurtenances thereunto belonging (collectively, the "**Premises**").

Section 1.2.    PERMITTED USE. Tenant shall have the right to access, use and enjoy the Premises in its undeveloped, unimproved condition only for temporary storage of vehicles, equipment, and other personal property and for any other lawful purpose which Landlord may approve in writing in its sole discretion, it being the intent of Landlord and Tenant that each and every proposed use of the Premises pursuant to this Lease other than temporary storage shall require Landlord's specific prior written approval. In no event shall the Premises nor any part thereof ever be used for any noxious or hazardous business or any unlawful purpose during the Term or used for any purpose which could invalidate the insurance herein required, or result in the Premises becoming unsuitable for development by Landlord.

Section 1.3.    CONDITION OF PREMISES. Tenant acknowledges the Premises are leased "AS-IS", "WHERE-IS", "WITH ALL FAULTS", with Tenant accepting any and all defects, if any; and Landlord makes no warranty of any kind, express or implied, with respect to the Premises (without limitation, Landlord makes no warranty as to the habitability, fitness or suitability of the Premises for a particular purpose, nor as to compliance with any laws, rules or regulations, nor as to the absence of any toxic or otherwise hazardous substances). Tenant agrees that no promise to modify, develop, landscape, alter, repair or improve the Premises either before or after the execution hereof has been made by Landlord to Tenant.

ARTICLE 2.

## TERM AND TERMINATION

Section 2.1.    TERM. The term of this Lease is for a period of fifteen (15) years which, subject to earlier termination as provided in this Lease, may be referred to hereinafter as the

"**Term**", commencing on January 23, 2020 (the "**Commencement Date**") and expiring on January 22, 2035 _____, (the "**Expiration Date**").

Section 2.2.   TERMINATION OF DEVELOPMENT AGREEMENT. Notwithstanding any other provision of this Lease, in the event the Development Agreement expires or terminates for any reason, either party may, by written notice to the other party, terminate this Lease effective on the date set forth in the notice, which termination date may be any date on or after the date of the notice.

ARTICLE 3.

RENT

Section 3.1.   BASIC RENT. Tenant agrees to pay Landlord without demand, deduction or offset, and without relief from valuation or appraisement laws, a basic annual rent for the Premises of during the Term of $20,000 per Net Acre of land encompassed in the Premises as indicated in Exhibit B, which is attached hereto and hereby made a part hereof. For the avoidance of doubt, the Parties hereby agree that there are 46.024 Net Acres of land encompassed in the Premises as of the Commencement Date.

Such rental may be referred to hereinafter as the "**Basic Rent**". The annual Basic Rent shall be payable in twelve (12) equal installments (prorated for a partial month, if applicable), in advance on the 1st business day of each calendar month during the Term. All rental shall be paid to Landlord by ACH or Wire Transfer pursuant to the following instructions (or such alternative instructions as Landlord may designate in writing):

Wire Instructions for Scannell Properties

| | |
|---|---|
| Bank: | Regions Bank |
| | 1900 5th Ave N |
| | Birmingham, Alabama 35203 |
| Routing: | 062005690 |
| Account: | 8270104030 |

Account Name: Scannell Development

The first lease year shall also include the partial month, if any in which the Commencement Date occurs.

Section 3.2.   IMPOSITIONS. Tenant covenants and agrees to pay before delinquent, as additional rent, any and all real estate taxes, assessments, and other governmental charges, general and special, including assessments for public improvements or benefits, which may be laid, levied, assessed or imposed upon, and become due and payable as a lien upon the Premises or any part thereof during the Term (all of which taxes, assessments and other governmental charges, including, without limitation, penalties, interest and lien costs, are hereinafter referred to as

- 2 -

"**Impositions**") and to furnish a copy of the paid receipt therefor to Landlord not later than ten (10) business days prior to the due date of any such Imposition.

Section 3.3.   PRORATION OF IMPOSITIONS.   Any Imposition relating to a fiscal period of the taxing authority, a part of which is included in a period of time subsequent to the termination of the Term, shall be adjusted as between Landlord and Tenant so that Tenant shall pay that proportion of the Imposition which relates to that proportion of the applicable fiscal period that falls within the Term and that Landlord shall pay the remainder thereof.

Section 3.4.   CONTEST OF IMPOSITIONS.   Tenant shall have the right to contest the amount or validity of any Imposition by appropriate legal proceedings, but this shall not be deemed or construed in any way as relieving Tenant of its covenant to pay any such Imposition pending the outcome of the dispute.  Landlord shall join in any such proceeding to the extent necessary to permit Tenant to properly prosecute the same; provided, however, that Landlord shall not be subjected to any liability for the payment of any costs or expenses in connection with any such proceeding brought by Tenant, and Tenant hereby covenants to indemnify and hold Landlord harmless from any such costs or expenses. No protest, contest, or other action, however, shall be maintained by Tenant after the time limit for the payment of the tax or assessment without penalty or interest unless Tenant shall first pay the amount of such tax or assessment under protest or shall have procured a stay of proceedings to enforce the collection thereof, and shall have also provided for the payment thereof together with all penalties, interest, costs and expenses by the deposit of a bond in form approved by Landlord if required by law to accomplish such stay.

Section 3.5.   LIMITATION.   Nothing contained in this Lease shall require Tenant to pay any franchise, estate, inheritance, succession, capital levy or transfer tax of Landlord, or any income, excess profits or revenue tax or any other tax, assessment, charge or levy upon the rent payable by Tenant under this Lease

Section 3.6.   OPERATING EXPENSES.   Tenant shall be solely responsible for any and all common expenses, maintenance and repair costs, dues, fees and assessments (general or special) incurred under any covenants, easement or other encumbrance or charged by any owners association.

ARTICLE 4.

IMPROVEMENTS AND MAINTENANCE

Section 4.1.   ALTERATIONS.   Tenant shall have no right to change, alter, develop, construct, or install any improvements on, over, in, under, or across the Premises or any part thereof without the Landlord's prior written consent.

Section 4.2.   REPAIR AND MAINTENANCE.   Tenant shall, at its expense, keep the Premises in good condition and repair, secured, safe and in a clean and sightly condition, reasonable use and wear excepted, and shall not cause or permit any nuisance or waste, nor allow any trash to accumulate on the Premises. Tenant shall comply with all laws, statutes, ordinances and regulations (collectively, "**Laws**") of all governmental authorities having jurisdiction over the Premises and with respect to Tenant's use and occupancy thereof, and shall, at its sole cost and

expense, take any and all actions which may be necessary to comply with any and all such Laws. Risk of loss to the Premises during the Term shall be borne by Tenant. During the Term, Landlord shall not be responsible for any maintenance, security, repair, or defect, either latent or patent, in the Premises or by reason of any change of condition of the Premises, nor shall Landlord be liable to anyone for damages by reason of the condition or management of the Premises, nor be liable for the conditions of any street, alley, sidewalk or area adjacent to the Premises.

Section 4.3.   NO LIENS. Tenant will not permit any mechanic's or materialman's lien or liens, or any lien or liens of any type whatsoever to be filed or maintained against the Premises during the Term of this Lease for any work done for, or materials furnished to, Tenant or securing any liability or obligation of Tenant; unless such lien or liens are being contested in good faith. In the event any mechanic's lien or other lien or encumbrance is filed against the Premises or any part thereof for work claimed to have been done for, or material claimed to have been furnished to, the Tenant, Tenant shall deposit with Landlord, pending the outcome of any lien dispute, one of the following (to be determined by Landlord): (a) an amount equal to one hundred fifty percent (150%) of the claimed lien; (b) a surety bond written by sureties approved by Landlord and in an amount sufficient to indemnify Landlord from any loss, expense or damages (including court costs and reasonable attorney's fees) which Landlord may sustain in the event that Tenant is unsuccessful in contesting such lien or liens; or (c) such other security as may be satisfactory to Landlord.

ARTICLE 5.

INDEMNITY AND INSURANCE

Section 5.1.   GENERAL INDEMNITY.  Tenant hereby agrees to indemnify, defend (with counsel acceptable to Landlord) and hold Landlord harmless from any third party claim (and any loss, cost, expense, liability or damage related thereto) arising out of, or connected with Tenant's use and occupancy of the Premises or arising out of any breach or default of Tenant in performance of its obligations under this Lease.  In case any action or proceeding be brought or threatened against Landlord by reason of any such claim, Tenant agrees to resist or defend such action or proceeding by reliable legal counsel acceptable to Landlord and to promptly pay and discharge any final judgment rendered against Landlord therein, reserving the right to appeal such judgment prior to payment thereof.

Section 5.2.   LIABILITY INSURANCE. Tenant shall procure and maintain in full force and effect, beginning on the Effective Date and continuing throughout the Term, commercial general liability insurance against claims for personal injury, death or property damage (including product liability) occurring upon, in or about the Premises and in or about the adjoining streets and sidewalks, with single limit protection to both Landlord and Tenant of not less than One Million Dollars ($1,000,000.00) per occurrence, Two Million Dollars ($2,000,000.00) in the aggregate, and Five Million Dollars ($5,000,000.00) of umbrella liability coverage. Such insurance shall be primary and non-contributory and shall provide coverage on an occurrence basis. Tenant shall name Landlord and Landlord's mortgagee as an additional insured on any policy of liability insurance carried by Tenant which may cover the Premises.  Tenant shall provide Landlord with an ACORD 25 form or, upon Landlord's request, copies of the insurance policies at issue to evidence that such insurance is in force and reflecting that Landlord is an additional insured on such policy. All such insurance shall provide that the same may not be canceled without thirty (30)

days' prior written notice to Landlord. The company or companies issuing such policy or policies shall be licensed to do business in Utah and shall be in such form and cover such risks as may be reasonably acceptable to Landlord and any mortgagee of Landlord. The commercial general liability insurance limits required of Tenant under this Lease may be satisfied by any combination of primary and excess or umbrella per occurrence policies. All insurance required to be carried by Tenant hereunder shall (i) be issued by one or more insurance companies reasonably acceptable to Landlord, licensed to do business in the State in which the Leased Premises is located and having an AM Best's rating of A IX or better, and (ii) provide that said insurance shall not be materially changed, canceled or permitted to lapse on less than thirty (30) days' prior written notice to Landlord. In addition, Tenant shall name Landlord, Landlord's managing agent, and any mortgagee requested by Landlord, as additional insureds under its commercial general liability, excess and umbrella policies (but only to the extent of the limits required hereunder). The commercial general liability policy shall include contractual liability which includes the provisions of Sections 5.1 and 16.2 of this Lease. Tenant agrees that Landlord or Landlord's mortgagee may require such increases in limits and additional coverages as Landlord or Landlord's mortgagee may from time to time require consistent with insurance requirements of prudent landlords in similar projects in the area.

Section 5.3.     LANDLORD'S RIGHTS.   If Tenant shall refuse or fail to procure, pay for or keep in force the policies of insurance above set forth in Section 5.2 of this Lease, or to deliver said policies or certificates showing the existence of any such insurance, Landlord may, at its election, procure, pay for, keep in force and/or from time to time renew such insurance, and the amounts expended therefor shall be due from Tenant within ten (10) days of Landlord's delivery of an invoice for such amounts expended.

Section 5.4.     WAIVER OF SUBROGATION.   Landlord and Tenant each hereby waive all rights of recovery against the other and against the officers, employees, agents and representatives of the other, on account of loss by or damage to the waiving party of its property or the property of others under its control, to the extent that such loss or damage is insured against under any fire and extended coverage insurance policy which either may have in force at the time of the loss or damage. Tenant shall, upon obtaining the policies of insurance required under this Lease, give notice to its insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Lease.

ARTICLE 6.

DAMAGE BY CASUALTY

Section 6.1.     REPAIR OR RESTORATION.   In the event of material damage to or destruction of the Premises by fire or other casualty, Tenant at its sole expense, shall promptly restore the Premises as nearly as possible to its condition prior to such damage or destruction (including, without limitation, the restoration of vegetation and plant life as may be necessary to keep and maintain the Premises in a safe, secure, prudent, and sightly condition). There shall be no abatement of Basic Rent because of damage or destruction resulting from a fire or other casualty.

ARTICLE 7.

EMINENT DOMAIN

Section 7.1.    TOTAL TAKING.  If during the Term the entire Premises shall be taken by an exercise of the power of eminent domain (hereinafter referred to as a **"Proceeding"**), this Lease shall terminate as of the date of the vesting of title in the taking authority pursuant to such Proceeding.

Section 7.2.    PARTIAL TAKING.  If during the Term less than the entire Premises shall be taken in any Proceeding, this Lease shall terminate as to the portion of the Premises so taken upon the vesting of title in the Proceeding.  Tenant shall be responsible for any necessary restoration of the improvements on the remainder of the Premises as required for Tenant's use thereof.

Section 7.3.    VESTING OF TITLE.  Wherever the term "vesting of title" or any similar phrase is used in this Article, a taking of possession by the condemning party shall be deemed a vesting of title.

Section 7.4.    DAMAGES.  All compensation awarded for such taking shall belong to and be the property of Landlord.  Tenant shall be entitled to claim, prove and receive any award as may be allowed to tenants under applicable Laws, but only if such award is in addition to the award to Landlord for the Premises, and then only to the extent such award to Tenant does not diminish or lessen any award that would otherwise be payable to Landlord.

Section 7.5.    RIGHTS ON TERMINATION.  Upon any termination of this Lease as a result of an exercise of the right of eminent domain, all Basic Rent, Impositions and additional rent and charges of all types shall be adjusted and prorated to the date of such termination and all other rights and obligations of the parties hereunder shall be terminated as of said date except for the distribution of any award or compensation for such taking.

ARTICLE 8.

ASSIGNMENT AND SUBLETTING

Section 8.1.    RIGHT TO ASSIGN OR SUBLET.  If Tenant shall desire to assign its rights in this Lease or sublet the Premises, Tenant shall so notify Landlord in writing, which notice shall contain the identification of the proposed assignee or sub-tenant and the terms of such assignment or sublease.  Tenant shall not assign this Lease or sublet the Premises to any person or entity without Landlord's prior written consent.  Tenant shall not encumber this Lease Tenant's interest herein, or Tenant's interest in the Premises pursuant hereto, in each case without Landlord's prior written consent.

- 6 -

ARTICLE 9.

## DEFAULTS AND REMEDIES

Section 9.1.    DEFAULTS BY TENANT.  Landlord may terminate this Lease or Tenant's right to possession under this Lease upon the happening of any one or more of the following events of default: (a) the making by Tenant of an assignment for the benefit of its creditors; (b) the levying of a writ of execution or attachment on or against the Premises as the property of Tenant and the same not released or discharged within sixty (60) days thereafter; (c) (subject to the provisions of the federal bankruptcy law) upon the institution of proceedings in a court of competent jurisdiction for the reorganization, liquidation or involuntary dissolution of Tenant, or for its adjudication as a bankrupt or insolvent, or for the appointment of a receiver of the property of Tenant, and said proceedings are not dismissed, and any receiver, trustee or liquidator appointed therein discharged, within sixty (60) days after the institution of said proceedings; (d) Tenant's failure to pay an installment of rent five (5) days after the same is due (except that the five (5) day grace period shall not be applicable if Tenant fails to pay installments rent as herein provided when due on three (3) or more occasions during the Term); (e) Tenant's failure to perform any other of its covenants under this Lease within thirty (30) days after written notice; (f) a default by Tenant under the Development Agreement subject to any applicable grace or cure periods; or (g) a default by any guarantor that is an affiliate of Tenant and/or Hall under a BTS Lease, subject to any applicable grace or cure periods.  In the event that any such default (other than payment of rent) cannot be cured within thirty (30) days, Landlord shall not have a right to terminate this Lease so long as Tenant is diligently pursuing appropriate action to cure the default if such action was commenced within thirty (30) days after the giving of notice of the default and is cured no later than ninety (90) days after said notice.

Section 9.2.    RE-ENTRY.  Upon termination of this Lease, or the termination of Tenant's right to possession, as aforesaid, Landlord may re-enter the Premises, with or without process of law, using such force as may be necessary, and remove all persons and property therefrom, and Landlord shall not be liable for damages or otherwise by reason of such re-entry or termination of this Lease.  In addition to all other obligations of Tenant, Tenant shall be liable for the cost of seizure and repossession of the Premises and reasonable attorneys' fees incurred as a result of the seizure and repossession of the Premises.  Landlord may but shall not be obligated to relet the Premises at such rental and upon such terms as may be reasonably obtained under the circumstances.  Landlord is authorized to make all necessary repairs and alterations in or to the Premises for the new lessee and to charge the cost thereof to Tenant.  The net amount of rental received by Landlord from such reletting, after deduction of any and all costs and expenses incurred in connection with such repossession and reletting, shall be credited upon Tenant's obligation to Landlord.

Section 9.3.    ADVANCES.  In the event of any default of this Lease (as defined in Section 9.1) by Tenant, Landlord may, after thirty (30) days' written notice to Tenant, enter the Premises without terminating this Lease or Tenant's possession of the Premises and take such action as Landlord determines is necessary in order to cure such breach or default for the account and at the expense of Tenant, and Tenant will promptly take all steps reasonably necessary to permit Landlord to exercise the rights granted herein.  Any money spent or cost or expense incurred by Landlord in curing such a breach or default for the account of Tenant shall be deemed additional

rental due from Tenant to Landlord on the first day of the month following the payment of such money or incurrence of such costs or expenses and the certification of the amount thereof to Tenant by Landlord, plus an administrative charge of ten percent (10%) of such amount.

Section 9.4.   DAMAGES. Landlord shall have the right at any time to file suit to recover any sums which have fallen due under this Lease from time to time on one or more occasions without being obligated to wait until the expiration of the term of this Lease, including, but not limited to, past-due rent, additional rent, interest, late payment charges, advances and attorneys' fees.  Landlord shall also be entitled to recover immediately as damages from Tenant a sum of money equal to the total of the cost of recovering possession of the Premises, the unpaid rent and other sums owed at the time of such termination or repossession, the balance of the rent and other charges reasonably estimated to be due for the remainder of the Term, less the fair market value rental of the Premises for such period, and any sum of money or damages owed by Tenant to Landlord.  The failure or delay of Landlord to take possession of the Premises or to pursue any remedy granted by the terms of this Lease or to exercise any such right hereunder at the time of any default shall not operate as a waiver of any of the rights of Landlord herein granted and shall not extend any additional rights to Tenant, but the Landlord does expressly reserve the right to take any such action for the same or any subsequent default at any time thereafter.

Section 9.5.   GUARANTOR. Simultaneously with the execution of this Lease, Tenant shall cause Hall Labs, LLC, a Utah limited liability company, DRH Holdings, LLC, a Utah limited liability company, and David R. Hall (collectively, the "Guarantor"), to execute and deliver to and for the benefit of Landlord a Guaranty of Tenant's obligations under and with respect to this Lease in a form acceptable to SP (the "Guaranty").  Tenant acknowledges and agrees that Landlord's willingness to enter into this Lease with Tenant is expressly contingent upon the execution and delivery by Guarantor of the Guaranty to and for the benefit of Landlord.

ARTICLE 10.

ACCESS TO PREMISES

Section 10.1.   INSPECTION. Landlord shall have the right to enter upon the Premises during all regular business hours for the purpose of inspecting the same to determine that Tenant is fully performing all of its obligations under this Lease.

Section 10.2.   EXHIBITION OF PREMISES. At any time during regular business hours during the Term, Landlord or any of its mortgagees, may enter upon the Premises for the purpose of exhibiting the same to prospective tenants, investors or mortgagees.

Section 10.3.   EXERCISE OF RIGHTS. The exercise of the rights of the Landlord as in this Article contained shall not be an eviction of Tenant therefrom.

ARTICLE 11.

NOTICES

Section 11.1.   MANNER OF GIVING NOTICE. Whenever under this Lease a provision is made for notice of any kind, such notice shall be in writing, and it shall be deemed sufficient

- 8 -

notice and service thereof if such notice is to Tenant and either personally delivered to Tenant or sent by registered or certified mail, postage prepaid, to Tenant at **Hall Property Holdings, LLC, 3000 Sierra Vista Way, Provo, UT 84606, Attention: David R. Hall**, or to such other post office address as Tenant may furnish to Landlord for such purpose; and if to Landlord, either personally delivered or sent by registered or certified mail, postage prepaid, to Landlord at **SPHL Properties, LLC, c/o Scannell Development Company, 8801 River Crossing Blvd., Suite 300, Indianapolis, IN 46240, Attention: General Counsel**, or to such other post office address as Landlord may furnish to Tenant for such purpose, or to the place then fixed for the payment of rent.

Section 11.2.   NOTICES TO MORTGAGEE.  If Tenant is provided the name and address for notices of any bona fide first mortgagee of the Premises, Tenant shall send to such first mortgagee a copy of any notice of default or demand for performance served upon Landlord and shall permit such first mortgagee to cure any such default or otherwise perform Landlord's obligations.

## ARTICLE 12.

## SUBORDINATION, AND REPRESENTATIONS

Section 12.1.   SUBORDINATION OF LEASE.  This Lease is subject and subordinate to the lien of any mortgage which may now or hereafter encumber the Premises.  If required by Landlord's mortgagee, Tenant shall, at Landlord's request from time to time, promptly execute any agreement requested by the holder of the mortgage to evidence such subordination, provided, that, said subordination agreement provides that so long as Tenant shall not be in default under the terms and conditions of this Lease, its occupancy of the Premises shall not be disturbed.  In the event of foreclosure of such mortgage or conveyance in lieu of foreclosure, Tenant agrees to attorn to the mortgagee or to the purchaser at foreclosure or other sale and to recognize same as the new landlord under this Lease.  If the Premises or any part thereof or premises of which the Premises are a part are at any time subject to a first mortgage or a first deed of trust and this Lease or the rentals are assigned to such mortgagee, trustee or beneficiary and the Tenant is given written notice thereof, including the post office address of such assignee, then the Tenant shall not terminate this Lease for any default on the part of the Landlord without first giving written notice to such assignee, specifying the default in reasonable detail, and affording such assignee a reasonable opportunity to make performance for and on behalf of the Landlord.

Section 12.2.   REPRESENTATIONS AND WARRANTIES.

(A)     Tenant hereby represents and warrants that (i) Tenant is duly organized, validly existing and in good standing (if applicable) in accordance with the laws of the State under which it was organized; (ii) Tenant is authorized to do business in the State where the Premises are located; and (iii) the individual(s) executing and delivering this Lease on behalf of Tenant has been properly authorized to do so, and such execution and delivery shall bind Tenant to its terms.

(B)     Landlord hereby represents and warrants that (i) Landlord is duly organized, validly existing and in good standing (if applicable) in accordance with the laws of the State under which it was organized; (ii) Landlord is authorized to do business in the State where the Premises are

located; and (iii) the individual(s) executing and delivering this Lease on behalf of Landlord has been properly authorized to do so, and such execution and delivery shall bind Landlord to its terms.

## ARTICLE 13.

### RIGHTS ON TERMINATION

Section 13.1.  <u>SURRENDER OF PREMISES</u>.  At the expiration of the tenancy created hereunder, whether by lapse of time or otherwise, Tenant shall surrender the Premises to Landlord, including the surrender to Landlord of improvements then located upon the Premises.

Section 13.2.  <u>HOLDING OVER</u>.  In the event Tenant remains in possession of the Premises with the consent of Landlord after the expiration of the tenancy created hereunder, and without the execution of a new lease or any further extension of this Lease, it shall be deemed to be occupying the Premises as a Tenant at sufferance at a rental equal to 200% of the then current rental, and subject to all the other conditions, provisions and obligations of this Lease.

## ARTICLE 14.

### BROKERAGE COMMISSIONS

Section 14.1.  <u>MUTUAL INDEMNITY</u>.  Whereas the execution of this Lease by Tenant, and the rental which Tenant has agreed to pay, are based upon no broker's commission or finder's fee being paid by Tenant or Landlord, it is hereby agreed that Landlord or Tenant shall pay any and all brokers' commissions or finder's fees that may be payable because of their respective actions, and Landlord and Tenant further agree to indemnify and hold the other harmless from any liability arising from their respective actions resulting in any claim for any such broker's commission or finder's fee in connection with this transaction (including, without limitation, the cost of counsel's fee in connection with defending from any such claim).

## ARTICLE 15.

### GENERAL PROVISIONS

Section 15.1.  <u>REMEDIES CUMULATIVE - NON-WAIVER</u>.  The various rights and remedies herein contained and reserved to each of the parties shall not be considered as exclusive of any other right or remedy of such party, but shall be construed as cumulative and shall be in addition to every other remedy now or hereafter existing at law, in equity, or by statute, and said rights and remedies may be exercised and enforced concurrently and whenever and as often as occasion therefor arises.  No delay or omission to exercise any right or power by either party shall impair any such right or power, or be construed as a waiver of any default or as acquiescence therein.  One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed by the other party as a waiver of a subsequent or continuing breach of the same covenant, term or condition.  The consent or approval by either party to or of any act by the other party of a nature requiring consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

- 10 -

Section 15.2.  MEMORANDUM OF LEASE.  The parties hereto shall not record this Lease, but each party shall execute upon request of the other a "memorandum of lease" suitable for recording.  All costs and expenses associated with preparing, executing, and recording a "memorandum of lease" shall be borne by the party requesting execution of such document, and such party shall pay any documentary transfer tax or other special tax or assessment associated with, or triggered by, such recording. In the event a "short form" memorandum of this Lease is recorded, Tenant shall, upon the request of Landlord, execute and acknowledge an amendment thereto in order to reflect any releases of portions of the Premises pursuant to the Development Agreement.

Section 15.3.  COMPLETE AGREEMENT.  The headings of the several Articles and Sections contained herein are for convenience only and do not define, limit or construe the contents of such Articles and Sections. All negotiations, considerations, representations and understandings between the parties are incorporated herein, and may be modified or altered only by agreement in writing signed by the party to be bound.

Section 15.4.  CONSENTS AND APPROVALS.  Whenever provision is made in this Lease for Tenant to secure the consent or approval of Landlord, or whenever Landlord's consent, approval or cooperation shall be requested by Tenant, such consent, approval or cooperation shall not be unreasonably withheld, delayed or conditioned.

Section 15.5.  CONSTRUCTION OF TERMS.  Whenever the singular or plural number, or masculine, feminine or neuter gender, is used herein, it shall equally include the other, and the terms and provisions of this instrument shall be construed accordingly.

Section 15.6.  AGREEMENT BINDING UPON SUCCESSORS; ASSIGNMENT.  The covenants, agreements and obligations herein contained shall extend to, bind and inure to the benefit not only of the parties hereto, but their respective personal representatives, heirs, successors and assigns. Notwithstanding the foregoing, in no event shall Landlord or Tenant assign this Lease, or assign their respective interests in and to the Premises (or any portion thereof) without the prior written consent of the other, except (a) in accordance with any assignment, transfer or other conveyance necessary to effectuate the releases contemplated in the Development Agreement, and (b) any mortgage, deed of trust, assignment or other such conveyance or transfer by Landlord in connection with any financing secured in whole or in part by the Premises.

Section 15.7.  NET LEASE.  The Landlord and Tenant acknowledge that this Lease is intended to be an absolutely **"Net Lease"**, which means that the Tenant pays as additional rent, without defense, offset, or deduction, all expenses of every nature and type connected with the Premises.

Section 15.8.  LAW.  The law of the State of Utah shall govern the construction, performance and enforcement of this Lease.

Section 15.9.  TIME OF ESSENCE.  Time shall be of the essence in the performance of every term, covenant and condition of this Lease.

Section 15.10.  EXCULPATION.  If there is a default or breach of this Lease by Landlord, then Tenant shall look solely to the rents, issues, profits, and other income actually received on

account of Landlord's right title and interest to the Property, and no other real, personal or mixed property of Landlord (or of any of partners or members of Landlord) to satisfy any damages incurred.

Section 15.11. SURVIVAL OF OBLIGATIONS. The obligations of Tenant incurred but unpaid during the Term of this Lease shall survive the expiration or earlier termination of this Lease.

Section 15.12. COUNTERPARTS. This Lease may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one in the same instrument, and that facsimile counterparts of the signatures of the undersigned of this Lease shall be effective for all purposes as original signed counterparts.

Section 15.13. ESTOPPEL CERTIFICATES. Tenant shall, at any time, and within ten (10) days of the written request of Landlord, execute, acknowledge, and deliver to Landlord or the mortgagee a written statement certifying that this Lease continues unmodified and in full force and effect (or if there have been modifications, that this Lease continues in full force and effect as modified and stating the modifications), confirming the then-current description of the Premises, stating the dates to which the rent has been paid, and stating whether Landlord is in default in performing any covenants to this Lease, and, should Landlord be in default, specifying each and every such default, and stating such other matter as Landlord or Landlord's mortgagee reasonably requests; it being intended that any such statement delivered pursuant to this paragraph may be relied on by Landlord, its designee or mortgagee or any assignee of any such mortgagee.

Section 15.14. RELATIONSHIP OF PARTIES. Nothing in this Lease shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of landlord and tenant.

Section 15.15. NO OFFSET; INDEPENDENT COVENANTS. Tenant shall not for any reason withhold or reduce Tenant's required payments of Rent and other charges provided in this Lease, it being agreed (i) that the obligations of Landlord under this Lease are independent of Tenant's obligations except as may be otherwise expressly provided in this Lease and (ii) that to the maximum extent permitted under applicable law, Tenant hereby waives all rights which it might otherwise have to withhold rent or any other payment due and/or payable by Tenant hereunder.

Section 15.16. SEVERABILITY, COMPLETE AGREEMENT. If any provision of this Lease shall be held to be invalid, void or unenforceable, the remaining provisions shall remain in full force and effect to the maximum degree possible under applicable Laws. This Lease represents the entire agreement between Landlord and Tenant covering everything agreed upon or understood in this transaction pertaining to the lease of the Premises; provided, however, that the parties acknowledge and agree that they are entering into the Development Agreement simultaneously with this Lease and that the Development Agreement sets out rights and obligations of the parties pertaining to the development of the Premises. There are no oral promises, conditions,

- 12 -

representations, understandings, interpretations or terms of any kind as conditions or inducements to the execution hereof or in effect between the parties. No change or addition shall be made to this Lease except by a written agreement executed by Landlord and Tenant.

## ARTICLE 16.

## BUILD TO SUIT PROJECTS

Section 16.1.   DEFINITIONS.  As used in this Lease, the following terms shall have the following definitions, and capitalized terms not otherwise defined shall have the meanings given them in the Development Agreement:

"**BTS Landlord**" means an affiliate of Landlord or SPHL Properties, LLC that executes a BTS Lease, as landlord, with respect to a BTS Project as contemplated by the Development Agreement.

"**BTS Lease**" means a lease entered into by and between a BTS Landlord and a BTS Tenant with respect to a BTS Project.

"**BTS Tenant**" means an affiliate of Tenant that executes a BTS Lease, as tenant, with respect to a BTS Project as contemplated by the Development Agreement.

"**Hall**" means Hall Labs, LLC, a Utah limited liability company.

## ARTICLE 17.

## ENVIRONMENTAL MATTERS

Section 17.1.    HAZARDOUS MATERIALS.  For purposes of this Lease, hazardous materials ("**Hazardous Materials**") shall include, but shall not be limited to, any substances, materials or wastes that are regulated by any local governmental authority, the State of Utah, or the United States of America because of toxic, flammable, explosive, corrosive, reactive, radioactive, or other properties that may be hazardous to human health or the environment. Hazardous Materials also include, without limitation, any materials or substances that are listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) as amended from time to time. Tenant agrees that it will not use, handle, generate, treat, store or dispose of, or permit the use, handling, generation, treatment, storage or disposal of any Hazardous Materials in, on, under, around or above the Premises now or at any future time.

Section 17.2.    INDEMNITY. Tenant shall indemnify, defend (by counsel acceptable to Landlord) and save Landlord harmless from any and all actions, proceedings, costs, expenses, fines, fees, penalties, claims, liabilities and losses of any kind, including but not limited to those arising from injury to any person, including death, damage to or loss of use or value of real or personal property, and costs of investigation and clean up or other environmental remedial work, which may arise in connection with Hazardous Materials introduced to the Premises by Tenant or any of its affiliates, agents, contractors or employees. The foregoing indemnity shall apply without respect to whether the matter indemnified for arose or accrued or is otherwise attributable to a time prior to the date of this Lease. Neither the written consent of Landlord to the presence, use or

storage of Hazardous Materials in, on, under or about any portion of the Premises nor the strict compliance by Tenant with all environmental Laws shall excuse Tenant from its obligations of indemnification pursuant hereto. Tenant shall not be relieved of its indemnification obligations under the provisions of this Section 16.2 due to Landlord's status as either an "owner" or "operator" under any environmental Laws.

Section 17.3.  ENVIRONMENTAL REQUIREMENTS. If at any time during the term of this Lease it is determined that there are any Hazardous Materials located in, on, under, around or above the Premises which were introduced to the Premises by Tenant or any of its affiliates, agents, contractors, or employees, and which are subject to any federal, state or local environmental law, statute, ordinance or regulation, court or administrative order or decree, or private agreement ("**Environmental Requirements**"), including Environmental Requirements requiring special handling of Hazardous Materials and their use, handling, collection, storage, treatment or disposal, then Tenant shall commence with diligence within thirty (30) days after receipt of notice of the presence of the Hazardous Materials and shall continue to diligently take all appropriate action, at Tenant's sole expense to comply with all such Environmental Requirements. Failure of Tenant to comply with all Environmental Requirements shall constitute a default under this Lease.

ARTICLE 18.

NON-RECOURSE TO FIRST AMERICAN EXCHANGE

Section 18.1.  Non-Recourse to First American Exchange.  As of the date of this Agreement, First American Exchange Company, LLC ("**FAEC**") is the sole member of Landlord. The parties agree that FAEC shall not have any personal liability for the obligations of Landlord hereunder. Notwithstanding anything to the contrary in this Lease, Tenant hereby waives any right to obtain money judgment or equitable relief against First American Exchange Company, LLC and any and all members, shareholders, partners and employees of FAEC, whether by an action brought upon this Lease or any document executed in connection with this Lease, or an action brought for a deficiency judgment against FAEC and/or the members, shareholders, partners and employees of FAEC, and agrees that the extent of liability on the part of such parties with respect to this Lease (or any document executed in connection with this Lease) is and shall for all purposes be limited to the assets of Landlord and Landlord's interest in the Property, including policies of hazard insurance on the Property and any proceeds thereof and any award of damages on account of condemnation for public use of the Property, Tenant agreeing to look solely to Landlord, Landlord's interest in the Property, and such insurance policies and condemnation awards in satisfaction of all obligations. The terms of this paragraph shall supersede any and all other terms and conditions herein.

[Signature page follows.]

- 14 -

IN WITNESS WHEREOF, the parties have executed this Lease in multiple counterparts, each of which shall be deemed an original instrument, as of the day and year first above written.

LANDLORD:

SPHL PROPERTIES, LLC,
an Indiana limited liability company

By: _____
    Mark A. Bullock, Manager

TENANT:

HALL PROPERTY HOLDINGS, LLC,
a Utah limited liability company

By:  Hall Labs, LLC, Member

    By:_____
        David R. Hall, Manager

- 15 -

IN WITNESS WHEREOF, the parties have executed this Lease in multiple counterparts, each of which shall be deemed an original instrument, as of the day and year first above written.

LANDLORD:

SPHJ PROPERTIES, LLC,
an Indiana limited liability company

By: _____

        Mark A. Bullock, Manager

TENANT:

HALL PROPERTY HOLDINGS, LLC,
a Utah limited liability company

By:  Hall Labs, LLC, Member

By: _____

        David R. Hall, Manager

- 15 -

## **EXHIBIT A**

Legal Description

Parcels 1, 2 and 3 of New Vista South Subdivision recorded November 7, 2019, with the Recorder of Utah County, Utah in Plat Book 47, Page 358.

## EXHIBIT B

### Net Acreage Determination

Parcel 1 (26.534 acres) plus Parcel 2 (16.101 acres) plus Parcel 3 (1.517) plus Tracy Hall
Parkway (3.932 acres) minus Wetlands (2.06 acres) = 46.024 Net Acres



B-1

DocuSign Envelope ID: 22036577-2E6A-416B-9906-94C422724F34

## FIRST AMENDMENT TO NET LAND LEASE

**THIS FIRST AMENDMENT TO NET LAND LEASE** (this "**Amendment**") is made and entered into effective as of _September 30_ 2022 (the "**Effective Date**"), by and between SPHL Properties, LLC, an Indiana limited liability company ("**Landlord**"), and Hall Property Holdings, LLC, a Utah limited liability company ("**Tenant**" together with SP, collectively referred to herein as the "**Parties**").

### WITNESSETH:

WHEREAS, Landlord and Tenant entered into a Net Land Lease dated as of January 22, 2020 (the "**Lease**");

WHEREAS, Landlord and Tenant entered into a Development Agreement dated as of January 22, 2020 as amended but a First Amendment to Development Agreement dated of even date herewith (collectively, the "**Agreement**");

WHEREAS, Pursuant to Section 7(c) of the Agreement, SP and Hall have agreed to enter into this Amendment to exclude the Lot 3 SP Takedown Parcel (as defined in the Agreement) from the definition of the Premises under the Lease; and

WHEREAS, Landlord and Tenant now desire to amend the Lease in order to reflect a revision to the legal description of the Real Estate excluding the Lot 3 SP Takedown Parcel.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein, Landlord and Tenant hereby agree to the following amendments to the Agreement and the Lease:

1.    _Defined Terms_. Terms used, but not defined in this Amendment, shall have the same meaning ascribed to such terms in the Lease.

2.    _Legal Description of Real Estate_. Exhibit A to the Lease is hereby replaced and superseded in its entirety with First Amendment Exhibit A, attached hereto and incorporated herein.

3.    _Net Acreage Determination_. Exhibit B to the Lease is hereby replaced and superseded in its entirety with First Amendment Exhibit B, attached hereto and incorporated herein.

4.    _Basic Rent_. The reference to "46.024 Net Acres" identified in Section 3.1 of the Lease is hereby amended and restated to read "36.054 Net Acres" resulting in Basic Rent due under the Lease being reduced accordingly.

5.    _Subdivision Plat_. Landlord shall prepare and record a subdivision plat of the Premises (the "**Subdivision Plat**") consistent with the revised legal description of the Real Estate set forth in First Amendment Exhibit A and the revised net acreage determination set forth in First Amendment Exhibit B. Tenant shall cooperate with Landlord's efforts to prepared and recording the Subdivision Plat.

6.    _Amendment to Memorandum of Lease_. Pursuant to Section 15.2 of the Lease, promptly following the Subdivision Plat being recorded, the Parties shall execute and acknowledge an amendment to that certain Memorandum of Land Lease dated January 23, 2020 between the Parties in order to reflect a release of Lot 3 SP Takedown Parcel from the Lease and the Memorandum of Lease. The agreed upon form of such amendment is attached hereto and incorporated herein as First Amendment Exhibit C. The parties agree that the form of Landlord shall thereafter record such amendment.

DocuSign Envelope ID: 22036577-2E6A-416B-9906-94C422724F34

7.    <u>Miscellaneous</u>. Except as expressly modified or amended by this Amendment, all terms, conditions, and provisions of the Agreement and the Lease, are hereby ratified and confirmed and shall remain in full force and effect; provided, however, that any other provision of the Lease shall be deemed modified as necessary to give practical effect to the provisions of this Amendment. To the extent that the terms and provisions of this Amendment conflict with the Lease, the terms and provisions of this Amendment shall control.

8.    <u>Counterparts</u>.    This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. The Parties agree that signatures transmitted by electronic scan and email (including by way of DocuSign or other similar electronic signature exchange software or service) shall have the legal effect of original signatures. At the request of either Party, the Parties shall promptly exchange executed original counterparts of this Agreement or any amendment hereto.

SIGNATURE PAGE TO FOLLOW

DocuSign Envelope ID: 22036577-2E6A-416B-9906-94C422724F34

### SIGNATURE PAGE TO FIRST AMENDMENT TO NET LAND LEASE

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Net Land Lease to be effective as of the Effective Date.

**LANDLORD:**

SPHL Properties, LLC,

By:_____
Marc D. Pfleging, Manager

**TENANT:**

HALL PROPERTY HOLDINGS, LLC,
a Utah limited liability company

By: Hall Labs, LLC, Member

By:_____
David R. Hall, Manager

## FIRST AMENDMENT EXHIBIT A

### Legal Description

Parcels 1 and 3 of New Vista South Subdivision recorded November 7, 2019, with the recorder of Utah County, Utah in Plat Book 47, Page 358

Together with:

Lot 2 of New Vista South Subdivision – Plat "B" Vacating Parcel 2 of New Vista South Subdivision Located in the Southeast Quarter of Section 20, The Southwest Quarter of Section 21, the Northeast Quarter of Section 29 and the Northwest Quarter of Section 28, Township 7 South, Range 3 East, Salt Lake Base and Meridian, Provo City, Utah County, Utah.

DocuSign Envelope ID: 22036577-2E6A-416B-9906-94C422724F34

## FIRST AMENDMENT EXHIBIT B

Net Acreage Determination

Parcel 1 (26.412 acres) plus Tracy Hall Parkway Dedication - Parcel 1 (1.167 acres) plus Parcel 3 (1.517) plus Tracy Hall Parkway Dedication – Lot 1 (1.596 acres) plus Lot 2 (6.903) plus Tracy Hall Parkway Dedication – Lot 2 (0.519 acres) minus Wetlands (2.06 acres) = 36.054 Net Acres



DocuSign Envelope ID: 22036577-2E6A-416B-9906-94C422724F34

## **FIRST AMENDMENT EXHIBIT C**

Form of First Amendment to Memorandum of Land Lease

[SEE ATTACHED]

**PREPARED BY
AND RETURN TO:**

David J. Duncan, Esquire
Scannell Properties
8801 River Crossing Blvd
Suite 300
Indianapolis, IN  46240
(317) 843-5959

---

(ABOVE SPACE FOR RECORDER'S USE ONLY)

**FIRST AMENDMENT TO MEMORANDUM OF LAND LEASE**

      **THIS FIRST AMENDMENT TO MEMORANDUM OF LEASE**, is made as of the _____ day of _____, 2022,  by and between **SPHL PROPERTIES, LLC,** an Indiana limited liability company (the "Landlord"), whose address is 8801 River Crossing Blvd., Suite 300, Indianapolis, IN 46240, and **HALL PROPERTY HOLDINGS, LLC,** a Utah limited liability company  (the "Tenant"), whose address is 3000 Sierra Vista Way, Provo, UT  84606.

      Landlord and Tenant entered into that certain Net Land Lease dated January 22, 2020, as amended by that certain First Amendment Net Land Lease dated _____, 2022 (as amended, the "Lease").

      Landlord and Tenant executed that certain Memorandum of Land Lease dated January 23, 2020 and recorded February 4, 2020, with the Recorder of Utah County, Utah as Ent: 14671: 2020 (the "Memorandum of Lease").

      **NOW, THEREFORE,** for and in consideration of the sum of One Dollar ($1.00) and other valuable consideration, the parties agree as follows:

      1.     The real estate described in Exhibit A, attached hereto and incorporated herein by reference, is hereby released from the Lease and the Memorandum of Lease.

2.      The Lease and the Memorandum of Lease shall remain in full force and effect with respect to the remainder of the Property subject to the Lease and the Memorandum of Lease.

(End of text.  Execution on following page.)

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this First Amendment Memorandum of Lease through their respective authorized officers.

**LANDLORD:**                          **TENANT:**

**SPHL PROPERTIES, LLC,**              **HALL PROPERTY HOLDINGS, LLC,**
an Indiana limited liability company   a Utah limited liability company

                                       By:  Hall Labs, LLC, Member

By: _____
    Marc D. Pfleging, Manager          By: _____
                                               David R. Hall, Manager



Date: _____, 2022             Date: _____, 2022

## ACKNOWLEDGMENT – LANDLORD

STATE OF UTAH       )

                       ) SS:

COUNTY OF SALT LAKE )

        Before me, _____, a Notary Public in and for the above State and County, on this _____ day of _____, 2022, personally appeared Marc D. Pfleging, Manager of **SPHL PROPERTIES, LLC**, an Indiana limited liability company, known to me to be the same person who signed and acknowledged that he signed the foregoing instrument as such Manager of said limited liability company for and on behalf of the limited liability company, and that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of the limited liability company, for the uses and purposes set forth in the instrument.

        **IN TESTIMONY WHEREOF,** I have subscribed my signature and affixed my official seal on the day and year set forth above.

_____

                Notary Public

**My commission expires:**

**County of residence:**

## ACKNOWLEDGMENT – TENANT

STATE OF INDIANA      )
                                  ) SS:
COUNTY OF MARION     )

        Before me, _____, a Notary Public in and for the above State and County, on this _____ day of _____, 2022, personally appeared David R. Hall, Manager of Hall Labs, LLC, the Member of **HALL PROPERTY HOLDINGS, LLC**, a Utah limited liability company, known to me to be the same person who signed and acknowledged that he signed the foregoing instrument as such Manager for and on behalf of the limited liability companies, and that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of the limited liability companies, for the uses and purposes set forth in the instrument.

        **IN TESTIMONY WHEREOF,** I have subscribed my signature and affixed my official seal on the day and year set forth above.


_____
                       Notary Public

**My commission expires:**

**County of residence:**

# EXHIBIT A

## Legal Description of the Released Property

# EXHIBIT 3

## GUARANTY

THIS GUARANTY (this "**Guaranty**"), executed as of the 22nd day of _January_, 2020 by Hall Labs, LLC, a Utah limited liability company, DRH Holdings, LLC, a Utah limited liability company, and David R. Hall (collectively, and jointly and severally, the "**Guarantor**"), in favor of SPHL Properties, LLC, an Indiana limited liability company (the "**Landlord**").

### RECITALS

WHEREAS, Landlord has leased to Hall Property Holdings, LLC, a Utah limited liability company (the "**Tenant**"), and Tenant has leased from Landlord, certain land located on Tracy Hall Parkway in Provo, Utah (the "**Leased Premises**"), which Leased Premises are more particularly described in that certain Net Land Lease entered into by and between Landlord and Tenant of even date herewith (the "**Lease**");

WHEREAS, "**Obligations**" as used in this Guaranty shall mean (a) all obligations, liabilities, and indebtedness of Tenant to Landlord, now or hereafter existing under the Lease or with respect to the Leased Premises (including, without limitation all Basic Rent, additional rent, and any other sums payable by Tenant to Landlord), together with all costs and expenses (including, without limitation, prevailing party's reasonable attorneys' fees) incurred by Landlord in the enforcement or collection thereof whether such obligations, liabilities, and indebtedness are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several; and (b) all costs and expenses (including without limitation, reasonable attorneys' fees) incurred by Landlord in the enforcement or collection of this Guaranty; and

WHEREAS, Landlord, as a condition to entering into the Lease, has required that Guarantor enter into this Guaranty.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged hereby, Guarantor covenants and agrees as follows:

**1.     Incorporation of Recitals; Capitalized Terms.** The recitals are incorporated herein by reference. Capitalized terms not defined herein shall have the meaning ascribed to them in the Lease.

**2.     Guarantee.** Guarantor absolutely and unconditionally guarantees the full and prompt payment and performance when due of the Obligations. This Guaranty shall continue, in full force and effect throughout the entire term, including any extension or renewal terms, of the Lease, until all of the Obligations are paid and performed in full.

**3.     Joint and Several Liability.** The obligations and liabilities of each Guarantor under this Guaranty shall be joint and several.

**4.     Waivers.** Guarantor expressly waives (a) presentment for payment, demand, notice of demand and dishonor, protest, and notice of protest and nonpayment or nonperformance of the

Obligations; and (b) diligence in (i) enforcing payment or performance of, or collecting, the Obligations; (ii) exercising its rights or remedies under the Lease; or (iii) bringing suit against Tenant or any other party. Landlord shall be under no obligation (a) to notify Guarantor of (i) its acceptance of this Guaranty or (ii) the failure of Tenant to timely pay or perform any of the Obligations, except as provided in the Lease, or (b) to use diligence in (i) preserving the liability of Tenant or any other party or (ii) bringing suit to enforce payment or performance of, or to collect, the Obligations. To the full extent allowed by applicable law, Guarantor waives all defenses (a) given to sureties or guarantors at law or in equity, other than the actual payment and performance of the Obligations, and (b) based upon questions as to the validity, legality, or enforceability of the Obligations. The payment by Guarantor of any amount pursuant to this Guaranty shall not in any way entitle Guarantor to any right, title, or interest (whether by way of subrogation or otherwise) in and to (a) any of the Obligations; (b) any proceeds thereof; or (c) any security therefor. Guarantor unconditionally waives (a) any claim or other right now existing or hereafter arising against Tenant or any other party that arises from, or by virtue of, the existence or performance of this Guaranty (including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, or to payment); and (b) any right to participate or share in any right, remedy, or claim of Landlord.

5.    **Rights.**    Landlord, without (a) authorization from, or notice to, Guarantor, and/or (b) impairing or affecting the liability of Guarantor hereunder; from time to time except as provided in the Lease, at its discretion and with or without consideration, may (a) alter, compromise, accelerate, or extend the time or manner for the payment or performance of any or all of the Obligations as provided in the Lease; (b) release, discharge, or increase the obligations of Tenant; (c) add, release, discharge, or increase the obligations of any other endorsers, sureties, guarantors, or other obligors; (d) make changes of any sort whatever in the terms or conditions of (i) payment or performance of the Obligations; or (ii) doing business with Tenant or any other party; (e) settle or compromise with Tenant or any other party on such terms and conditions as Landlord may determine to be in its best interests; and (f) apply all moneys received from Tenant or any other party against the payment of the Obligations (regardless of whether then due) as Landlord may determine to be in its best interests, without in any way being required to (i) marshal securities or assets; or (ii) apply all or any part of such moneys against any particular part of the Obligations. Landlord is not required to retain, protect, exercise due care with respect to, perfect security interests in, or otherwise assure or safeguard any collateral or security for the Obligations. No exercise, or failure to exercise, by Landlord of any right or remedy in any way shall (a) affect (i) any of the obligations of Guarantor hereunder or (ii) any collateral or security furnished by Guarantor, or (b) give Guarantor any recourse against Landlord.

6.    **Continuing Liability.**   Notwithstanding the incapacity, death, disability, dissolution, or termination of Tenant or any other party, the liability of Guarantor hereunder shall continue. The failure by Landlord to file or enforce a claim against the estate (either in administration, bankruptcy, or other proceeding) of Tenant or any other party shall not affect the liability of Guarantor hereunder. Guarantor shall not be released from liability hereunder if recovery from Tenant or any other party (a) becomes barred by any statute of limitations or (b) otherwise is restricted, prevented or unavailable.

7.    **Action by Landlord.**   Landlord shall not be required to pursue any other rights or remedies before invoking the benefits of this Guaranty. Specifically, Landlord shall not be required to

2

exhaust its rights and remedies against Tenant or any other endorser, surety, guarantor, or other obligor. Landlord may maintain an action on this Guaranty, regardless of whether (a) Tenant is joined in such action or (b) a separate action is brought against Tenant.

**8.    Default.** Guarantor absolutely and unconditionally covenants and agrees that, if (a) Tenant defaults for any reason in the payment or performance of all or any part of the Obligations and (b) Landlord exercises any of its rights or remedies under the Lease, then Guarantor shall pay, upon demand, such amounts as may be due to Landlord as a result of the default by Tenant and the exercise by Landlord of its rights or remedies, without (a) further notice of default or dishonor; and (b) any notice with respect to any matter or occurrence having been given to Guarantor previous to such demand.

**9.    Preference.** If (a) any payment by Tenant to Landlord is held to constitute a preference under any bankruptcy law, or (b) Landlord is required for any reason to refund any such payment, or pay the amount thereof to any party, then (a) such payment by Tenant to Landlord shall not constitute a release of Guarantor from any liability under this Guaranty, (b) Guarantor shall pay the amount thereof to Landlord upon demand, and (c) this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment.

**10.    Subordinated Debt.** Guarantor expressly agrees that (a) all Subordinated Debt (as defined below) shall be subordinated to the Obligations; (b) it shall not receive or accept any payment from Tenant with respect to the Subordinated Debt at any time from and after a default by Tenant of its obligations under the Lease; and (c) if it receives or accepts any payment from Tenant on the Subordinated Debt in violation of this Section, then Guarantor shall (i) hold such payment in trust for Landlord; and (ii) immediately turn such payment over to Landlord, in the form received, to be applied to the Obligations. For purposes of this Guaranty, "**Subordinated Debt**" shall mean all obligations, liabilities, and indebtedness of Tenant to Guarantor, together with all interest accruing thereon, whether such obligations, liabilities, and indebtedness are (a) direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, joint and several, or evidenced by a written instrument; or (b) now due or hereafter to be due, now existing or hereafter owed, or now held or hereafter to be held by Guarantor.

**11.    Representations.** Guarantor hereby represents and warrants to Landlord that (a) this Guaranty is the legal, valid, and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms and conditions; (b) there is no action or proceeding at law or in equity, or by or before any court or governmental instrumentality or agency, now pending against or, to the knowledge of Guarantor, threatened against, Guarantor that may materially and adversely affect the financial condition of Guarantor; (c) any schedule of consolidated stockholder's equity that has been or hereafter may be furnished to Landlord in connection with this Guaranty does and shall represent fairly the financial condition of Guarantor for the period for which such schedule of consolidated stockholder's equity is furnished; (d) all other information, reports, and other papers and data furnished to Landlord shall be (i) accurate and correct in all respects at the time given; and (ii) complete, such that Landlord is given a true and accurate reporting of the subject matter; and (e) Guarantor is solvent.

**12.    Financial Statements.** So long as they are not publicly available on sec.gov or similar resource during the term of this Agreement, Guarantor shall provide to Landlord on an annual

3

basis within ten (10) days following the end of Guarantor's fiscal year copies of Guarantor's current financial statement prepared in accordance with generally accepted accounting principles. In addition, upon request by Landlord in connection with any refinancing, sale, or other recapitalization event related to the Leased Premises, Guarantor shall provide to Landlord, within five (5) days of Landlord's request, a copy of Guarantor's most recent financial statements prepared as of the end of Guarantor's fiscal year. All such financial statements shall be signed by Guarantor or an officer of Guarantor, if applicable, who shall attest to the truth and accuracy of the information set forth in such statements.

**13.   Notice.**   All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Guaranty shall be in writing and shall be deemed to have been given and received for all purposes upon delivery, refusal to accept delivery or the inability to deliver on account of a change of address with respect to which no notice was given if delivered in person or by Federal Express or other reliable 24-hour delivery service or sent by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at the address set forth below or when delivery is refused, and such notices shall be addressed as follows:

> To Landlord:   c/o Scannell Development Company
> 8801 River Crossing Blvd., Suite 300
> Indianapolis, IN  46240
> Attention:  General Counsel

> To Guarantor:   Hall Labs, LLC
> 3000 Sierra Vista Way
> Provo, UT 84606
> Attention: David R. Hall

> DRH Holdings, LLC
> 3000 Sierra Vista Way
> Provo, UT 84606
> Attention: David R. Hall

For the purposes of this Section, any party may substitute another address stated above (or substituted by a previous notice) for its address by giving fifteen (15) days' notice of the new address to the other party, in the manner provided above.

**14.   Miscellaneous.**   The rights of Landlord are cumulative and shall not be exhausted by its exercise of any of its rights and remedies against Guarantor under this Guaranty or otherwise; or by any number of successive actions, until and unless each and all of the obligations of Guarantor under this Guaranty have been paid, performed, satisfied, and discharged in full. This Guaranty shall be deemed to have been made under, and shall be governed by, the laws of the state in which the Leased Premises is located in all respects, and shall not be modified or amended, except by a writing signed by Landlord and Guarantor. This Guaranty shall bind Guarantor and its successors, assigns, and legal representatives, and inure to the benefit of all transferees, credit participants,

4

endorsees, successors, and assigns of Landlord, provided non-permitted third-party transfer cannot increase Guarantor's liability hereunder. If the status of Tenant changes, then this Guaranty shall continue, and cover the Obligations of Tenant in its new status, according to the terms and conditions hereof. Landlord is relying, and is entitled to rely, upon each and every one of the terms and conditions of this Guaranty. Accordingly, if any term or condition of this Guaranty is held to be invalid or ineffective, then all other terms and conditions shall continue in full force and effect. Each of the parties signing below as Guarantor shall be jointly and severally liable for all obligations set forth herein and the release, in part or in whole, of one guarantor shall not affect the liability of the other.

[Signature page follows.]

IN WITNESS WHEREOF, Guarantor has hereto caused this Guaranty to be duly executed under seal as of the day and year first above written.

**GUARANTOR:**

Hall Labs, LLC,
a Utah limited liability company

By: _____
David R. Hall, Manager


DRH Holdings, LLC,
a Utah limited liability company

By: _____

Name: _____

Its: _____


_____
David R. Hall, Individually

6

# EXHIBIT 4

# DEVELOPMENT AGREEMENT

This DEVELOPMENT AGREEMENT (this "**Agreement**") is made as of the _22nd_ day of _January_, 2020 (the "**Effective Date**"), by and between SPHL PROPERTIES, LLC, an Indiana limited liability company ("**SP**"), and HALL PROPERTY HOLDINGS, LLC, a Utah limited liability company ("**Hall**"; together with SP, collectively referred to herein as the "**Parties**").

## RECITALS

A.    Contemporaneously herewith, SP acquired from Hall approximately 47.034 gross acres of land and related appurtenances, and all improvements, structures and/or fixtures located thereon, located in Ironton Business Park, in the City of Provo, in Utah County, Utah, and as more particularly described in the attached Exhibit A (the "**Land**," which Land and any improvements and/or fixtures thereon, now and in the future, and all appurtenances thereto are hereinafter collectively referred to in this Agreement as the "**Property**").

B.    Contemporaneously herewith, Orchard SP, LLC, a Florida limited liability company (an undivided 10% interest as a tenant in common), SPHL Properties #1A, LLC, an Indiana limited liability company (an undivided 32.4% interest as a tenant in common), and SPHL Properties #1B, LLC, an Indiana limited liability company (an undivided 57.6% interest as a tenant in common), as tenants in common (collectively, as tenants in common, hereinafter "**SP1**"), as landlord, and Hall or an Affiliate (as defined hereafter) of Hall (each a "**Hall Party**"), as tenant, will enter into a lease agreement ("**Building 1 Lease Agreement**") for approximately 9.834 acres of the Property more specifically described on Exhibit B ("**Building 1 Premises**"), which Building 1 Lease Agreement will be substantially in the form of the lease set out in the attached Exhibit C (the "**BTS Project Lease Form**").

C.    Contemporaneously herewith, SP, as landlord, and Hall, as tenant, entered into a net land lease for the remaining portions of the Property not subject to the Building 1 Lease Agreement ("**Land Lease Agreement**").

D.    The Parties desire to provide for the development and construction by SP, an Affiliate of SP (each an "**SP Party**"), or a joint venture entity owned by Hall and SP of approximately four (4) to seven (7) build-to-suit projects on the Property (each such project satisfying the terms of this Agreement, a "**BTS Project**").

E.    The Parties anticipate that each of the BTS Projects will be used for businesses related to Hall's venture capital start-up companies.

F.    SP and Hall each desire to enter into this Agreement to memorialize each party's expectations with respect to the development of the Property, the general terms on which each BTS Project will be completed, and certain rights and obligations of the Parties related thereto.

G.    Certain capitalized terms used in this Agreement are defined in Section 15.

## AGREEMENT

1

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, SP and Hall agree as follows:

1. <u>Recitals</u>. The above recitals are true and correct and are by this reference incorporated into and made a part hereof.

2. <u>BTS Projects</u>. While this Agreement is in effect, the parties shall cooperate to identify, plan, and construct BTS Projects on the Property for occupancy and use by Affiliates of Hall, as follows:

     a.    Hall will initiate each BTS Project by identifying a parcel of land within the Building 1 Premises or the remaining undeveloped Property, as applicable (the "**BTS Project Site**"), identifying a Hall Party who will be the tenant of the BTS Project (the "**BTS Tenant**"), and providing proposed specifications for a building to be constructed on the BTS Project Site. Identification of the BTS Project Site shall include the proposed location and orientation of the BTS Project, the site plan, and building square footage, and a timeframe for completion of construction.

     b.    SP will identify an SP Party, or the parties will create a joint venture entity as contemplated in <u>Section 13</u>, to develop and construct the BTS Project (the "**BTS Landlord**").

     c.    Each BTS Project will include acreage of at least 7-10 acres and gross building square footages of at least 150,000 square feet.

     d.    Prior to starting the BTS Project, the BTS Landlord and BTS Tenant will work together in good faith to define mutually acceptable plans and specifications, project budget and project schedule for the BTS Project (collectively, the "**BTS Project Specifications**").

     e.    The BTS Landlord will develop and construct the BTS Project under the terms of a lease substantially in the form of the BTS Project Lease Form. SP will be responsible to provide all equity and financing required to fund the cost of constructing the BTS Project, subject to any equity from the applicable Hall Parties with respect to any joint venture entity serving as the BTS Landlord. Hall will have no obligation to contribute any capital or be involved in securing funding, other than cooperating to provide necessary financial/company information. The only exception to providing capital will be for those items considered in SP's <u>reasonable</u> opinion to be specialized or extraordinary scope items. These specialized or extraordinary scope items may need to be funded by Hall and/or the applicable tenant under the BTS Project Lease. "Specialized or extraordinary scope items" shall mean those items that are not customarily funded by landlords for build-to-suit projects in the Pertinent Market and relate to the construction and installation of the applicable tenant's equipment and/or fixtures that are not customarily included in the construction of the building shell. Notwithstanding the foregoing, the Parties acknowledge

2

and agree that the items set forth on Exhibit F shall not constitute specialized or extraordinary scope items.

   f. SP, as developer and lessor, will be responsible for all project execution, project delivery under the agreed upon schedule, and standard industry warranty for major building components. The execution will involve, but not be limited to, project design, selection of outsourced A&E providers, selection and contracting with a general contractor, securing and guarantying the construction debt, management of the BTS Project construction, and securing permits and final certificate of occupancy from the City of Provo.

  3. Building Lease. In connection with each BTS Project, the Parties shall enter into a lease in the form of the BTS Project Lease Form, with such modifications as the Parties mutually agree upon (each a "**BTS Project Lease**"); provided, however, that each BTS Project Lease shall:

   a. be for a lease term of at least fifteen (15) years;

   b. be guaranteed by DRH Holdings, LLC, Hall Labs, LLC and David R. Hall (collectively, the "**Guarantors**"); and

   c. include base rent determined in accordance with the rent formula reflected in the BTS Project Lease Form in accordance with the requirements set out in Exhibit D.

  4. SP's Lease Conditions. Prior to commencing any BTS Project or entering into a BTS Project Lease, Hall shall deliver to SP the most recent audited financial information of the Guarantors, which information shall be reasonably acceptable to SP; provided, however, that if the audited financials for Guarantors show a total tangible net worth (as defined hereinafter) of Guarantors that is not less than the aggregate tangible net worth of Guarantors as of the Effective Date, then such financial information shall be deemed acceptable to SP. As used herein, "tangible net worth" shall mean the excess of the value of tangible assets (i.e. assets excluding those which are intangible such as goodwill, patents and trademarks) over liabilities. In the event such Guarantor financial information is not reasonably acceptable to SP, Hall agrees to provide additional collateral to secure the applicable tenant's obligations under the respective BTS Project Lease, with such additional collateral being subject to SP's reasonable approval.

  5. Amendment of Land Lease. Simultaneously with the execution of each BTS Project Lease, Hall and SP shall amend the Land Lease Agreement to exclude the BTS Project Site from the description of the premises and reduce the rent proportionally. Following the execution of such amendment, the Land Lease Agreement shall terminate as to the BTS Project Site (and the amendment shall provide for such termination), and Hall shall immediately surrender such BTS Project Site for conveyance to the BTS Landlord. In the event a "short form" memorandum of the Land Lease Agreement is recorded, Hall and SP shall execute and acknowledge a written amendment to the "short form" memorandum to reflect any release of a portion of the premises pursuant to this Section 5.

  6. BTS Project Timing.

a.    Contemporaneously herewith, SP1, as landlord, and Hall of an Affiliate shall enter into the Building 1 Lease Agreement.

b.    Following the commencement of construction of the BTS Project on the Building 1 Premises, Hall will initiate and approve a new BTS Project at a target rate of approximately every 18 months thereafter.

c.    Provided Hall meets the targets referenced in Section 6(b) and no default then exists under the Land Lease or this Agreement, or by any Hall Party Guarantor under a BTS Project Lease, subject to any applicable grace and cure periods, SP agrees to hold the Property for Hall's exclusive use subject to the terms and conditions of this Agreement.

d.    The Parties presently anticipate that the Property will be developed in accordance with the BTS Project Schedule and the Master Development Plan attached hereto as Exhibit E (the "**Master Development Plan**"), which identifies the approximate locations and layout of anticipated BTS Projects. The Parties may modify the Master Development Plan from time to time by mutual agreement, consistent with Hall's commitment as set out in Section 6(b), but the Parties agree to exercise commercially reasonable efforts to achieve full development of the Property within about seven (7) years from the Effective Date.

e.    Notwithstanding any other provision of this Agreement, the Parties acknowledge that BTS Projects are anticipated to be for the benefit and use of start-up enterprises whose growth trajectory is and will be unpredictable. Accordingly, adherence to a rigid development schedule will be impracticable, and the Parties will have to work together on timing, and Hall will not be deemed to be in breach of this Agreement if it is unable to initiate or authorize a new BTS Project on the anticipated timeline.

7. Failure to Adhere to Target BTS Project Timing. In the event Hall fails to initiate or approve a new BTS Project substantially as contemplated in Section 6(b) and the Master Development Plan, then one of the following shall occur:

a.    SP and Hall will negotiate in good faith to mutually agree on an amendment to the BTS Project Schedule.

b.    If SP and Hall are not able to reach an agreement regarding amendment of the BTS Project Schedule, notwithstanding their good faith and commercially reasonable efforts, within thirty (30) days after SP provides written notice to Hall that it considers Hall to be out of compliance with its obligations under Sections 6(b) and 6(d) (the "**Amendment Negotiation Period**"), Hall shall have the option to purchase the land contemplated for the next BTS Project on the Master Development Plan (a "**BTS Buyback Parcel**") for an amount equal to the greater of: (i) SP's Investment Basis (as defined below), or (ii) the then current Fair Market Value (as defined below) of the applicable BTS Project (the "**BTS Buyback Option**"). In order to exercise the BTS Buyback Option, Hall shall provide written notice of such election to SP within sixty (60) days after the expiration of the

4

Amendment Negotiation Period, and closing shall occur no later than sixty (60) days following Hall's BTS Buyback Option notice (subject to any extensions required to determine the Fair Market Value pursuant to this <u>Section 7(b)</u> or as required by any lender(s) under any SP Mortgage (as defined hereinafter) in order to release the BTS Buyback Parcel from the applicable SP Mortgage). The following provisions shall apply:

i.  In the event the BTS Buyback Option is exercised and the purchase of the BTS Buyback Parcel is consummated, (x) the Land Lease will be amended to remove and release the applicable BTS Project land from the Land Lease and reduce the rent under the Land Lease proportionately, effective as of the closing of the purchase of the BTS Buyback Parcel; (y) at the closing of the purchase of the BTS Buyback Parcel, SP shall deliver a limited warranty deed conveying the BTS Buyback Parcel to Hall (subject to any matters existing as of the Effective Date, any matters created by, caused by, consented to, or suffered by Hall or otherwise contemplated by this Agreement, the lien of nondelinquent real estate taxes and assessments, and all easements, restrictions, covenants, agreements and other matters of record); and (z) SP shall bear no costs or expenses in connection with the closing of the conveyance of the BTS Buyback Parcel to Hall, including, without limitation, any obligation with regard to any expenses associated with the BTS Buyback Parcel, title insurance, survey costs, closing costs, transfer or document stamp taxes, the payment of any real estate taxes or assessments, or the cost of amending the "short form" memorandum to reflect any release of the BTS Buyback Parcel.

ii.  Notwithstanding anything contained herein to the contrary, Hall shall only have the right to exercise the BTS Buyback Option two (2) times, and upon the second and final instance of Hall exercising a BTS Buyback Option, the BTS Buyback Option shall be void and of no further force or effect.

iii.  For the period commencing on the date Hall provides to SP written notice of its intent to exercise the BTS Buyback Option and continuing for a period of twenty (20) days (the "**Fair Market Value Negotiation Period**"), SP and Hall shall use good faith efforts to agree upon the Fair Market Value of the BTS Buyback Parcel. In the event that SP and Hall fail, after good faith efforts, to agree upon the Fair Market Value of the BTS Buyback Parcel within the Fair Market Value Negotiation Period, the Fair Market Value shall be determined by arbitration as hereinafter provided. If the Fair Market Value is to be determined by arbitration, then SP and Hall shall each (a) submit to one another their respective determination of the Fair Market Value (each a "**Proposed Fair Market Value**"), and (b) appoint within ten (10) days after the expiration of the Fair Market Value Negotiation Period a qualified and impartial appraiser (a qualified appraiser being one who has had at least ten (10) years' experience in the evaluation of industrial warehousing/manufacturing/office/distribution space in the Pertinent Market area and M.A.I. Designation) to act as arbitrator. The identity and

5

address of each such appraiser shall be designated in writing by each party to the other. In case either party fails to appoint an appraiser within the period set forth above, then the appraiser appointed by the party timely providing notice hereunder shall determine the Fair Market Value of the BTS Buyback Parcel. Upon each party appointing an appraiser, the two appraisers shall appoint a qualified and impartial appraiser who has had at least ten (10) years' experience in the evaluation of industrial warehousing/manufacturing/office/distribution space in the Pertinent Market as a third arbitrator and shall notify the other parties of the identity and address of such appointee. The arbitrators so appointed shall on or before the earlier of (a) thirty (30) days after appointment, or (b) forty-five (45) days after the expiration of the Fair Market Value Negotiation Period, determine the Fair Market Value. The determination of a majority of the arbitrators shall be binding on the parties. Upon determination of the Fair Market Value by the arbitrators, the Proposed Fair Market Value that is closest to the Fair Market Value determined by the arbitrators shall be deemed to be the Fair Market Value for the BTS Buyback Parcel. The fees of the arbitrators and the expenses incident to any proceedings shall be borne equally between SP and Hall.

c.    If SP and Hall are not able to reach an agreement regarding amendment of the BTS Project Schedule (which may also include an agreement to amend the term of the Land Lease to be consistent with the BTS Project Schedule), notwithstanding their good faith efforts, within thirty (30) days after SP provides written notice to Hall that it considers Hall to be out of compliance with its obligations under Sections 6(b) and 6(d) (the "**Amendment Negotiation Period**"), and Hall does not exercise its option to purchase the BTS Buyback Parcel as provided in Section 7(b) (or if SP and Hall are not able to reach an agreement regarding amendment of the BTS Project Schedule and Hall has already exercised both BTS Buyback Options), SP shall have the right to remove and release the land contemplated for the next BTS Project on the Master Development Plan (an "**SP Takedown Parcel**") from this Agreement, in which case the Land Lease will be amended to remove and release the SP Takedown Parcel land from the Land Lease and reduce the rent under the Land Lease proportionately, and SP shall thereafter have the right to develop, lease and/or sell the SP Takedown Parcel to a third party, including, without limitation, developing the SP Takedown Parcel as a speculative development. In order to exercise the option to remove and release the SP Takedown Parcel from this Agreement and the Land Lease, SP shall provide written notice of such election to Hall within ninety (90) days after the expiration of the Amendment Negotiation Period. In the event Hall fails to timely execute and deliver to SP any instrument, amendment, certificate or other document requested by Landlord in connection with the release of the SP Takedown Parcel contemplated in this Section 7, Hall hereby constitutes and appoints SP as its true and lawful attorney-in-fact and with full power of substitution in the premises to execute and deliver such instrument, amendment, certificate or other document in Hall's name and for and on behalf of SP. This power of attorney shall be deemed to be a power coupled with an interest and not subject to revocation.

6

8. <u>Assignment</u>. SP shall not have the right to assign this Agreement or any of its rights hereunder without the prior written consent of Hall, to be given in Hall's sole and absolute discretion; provided, however, that Hall's consent shall not be required for any assignment by SP of its rights hereunder to an Affiliate or subsidiary of SP so long as SP remains liable for the performance of all obligations undertaken by SP in this Agreement. Hall shall not have the right to assign this Agreement or any of its rights hereunder without the prior written consent of SP, to be given in SP's sole and absolute discretion; provided, however, that SP's consent shall not be required for any assignment by Hall of its rights hereunder to an Affiliate or subsidiary of Hall so long as Hall remains liable for the performance of all obligations undertaken by Hall in this Agreement. Any such assignment in the absence of such written consent (where required) shall for all purposes be deemed null and void. SP shall also have the right to collaterally assign its rights in this Agreement in favor of SP's lender in connection with obtaining financing for the acquisition of the Property and/or the construction of any BTS Projects (collectively, "**SP Mortgage**") without the consent of Hall; provided, that Hall shall execute an acknowledgement of consent of any such assignment on a form reasonably acceptable to such lender.

9. <u>Term</u>. The term of this Agreement shall commence on the Effective Date and shall continue until SP's final completion of all BTS Projects, unless this Agreement is earlier terminated pursuant to the provisions contained in this Agreement. The Parties will endeavor in good faith to achieve full development of all of the BTS Projects on the Property within seven (7) years of the Effective Date.

10. <u>Representations and Warranties</u>.

    a.    Hall hereby represents and warrants that (i) Hall is duly organized, validly existing and in good standing (if applicable) in accordance with the laws of the State under which it was organized; (ii) Hall is authorized to do business in the State where the Property is located; and (iii) the individual(s) executing and delivering this Agreement on behalf of Hall has been properly authorized to do so, and such execution and delivery shall bind Hall to its terms.

    b.    SP hereby represents and warrants that (i) SP is duly organized, validly existing and in good standing (if applicable) in accordance with the laws of the State under which it was organized; (ii) SP is authorized to do business in the State where the Property is located; and (iii) the individual(s) executing and delivering this Agreement on behalf of SP has been properly authorized to do so, and such execution and delivery shall bind SP to its terms.

11. <u>Defaults and Remedies</u>.

    a.    <u>Event of Default</u>. The occurrence of any of the following events shall be deemed a default under this Agreement (a "**Default**"):

    i.    Failure or refusal by either Party to observe and perform any covenant, condition, obligation or agreement hereunder, which failure or refusal shall continue for a period of thirty (30) days after written notice from the Party

7

not in default, or, in the case of a failure which reasonably requires more than thirty (30) days to cure, for such additional time (not to exceed a total of ninety (90) additional days) as may be reasonably necessary to cure such failure so long as the cure of such failure is being diligently prosecuted by the defaulting Party.

ii. A default by either Party under the Land Lease, which default shall continue after any applicable notice and cure period.

iii. A Party or any Guarantor becomes insolvent (for clarity, the insolvency of a Guarantor shall be deemed a default of Hall).

iv. The adjudication of a Party or any Guarantor as a bankrupt.

v. The making by a Party or any Guarantor of a general assignment for the benefit of creditors.

vi. The appointment of a receiver in equity for a Party's or any Guarantor's property if such appointment is not vacated or satisfied within sixty (60) days from the date of such appointment.

vii. The appointment of a trustee or receiver for a Party's or any Guarantor's property in a reorganization, arrangement or other bankruptcy proceeding if such appointment is not vacated or set aside within sixty (60) days from the date of such appointment.

viii. A Party's or any Guarantor's filing of a voluntary petition in bankruptcy or for reorganization or arrangement.

ix. A Party's or any Guarantor's filing of an answer admitting bankruptcy or agreeing to reorganization or arrangement.

For clarity, any of the above-identified events or actions pertaining to a Guarantor shall be deemed a default of Hall. Notwithstanding any other provision of this Agreement, Hall's failure to meet target BTS project timing or to enable adherence to the Master Development Plan shall not be deemed a Default, and SP's inability to construct a BTS Project within a timeframe requested by Hall at a price and on terms acceptable to Hall shall not be deemed a Default. Notwithstanding the foregoing, in the event that (a) SP defaults under a BTS Project Lease prior to the commencement date thereunder and such default is not cured within the applicable cure or grace period, or (b) Hall has identified a BTS Project and, prior to the execution of a BTS Project Lease with respect to the identified BTS Project, SP fails to timely respond and/or perform its obligations under this Agreement within thirty (30) days following SP's receipt of written notice from Hall specifically identifying such failure, then Hall shall have the right to remove and release the identified BTS Project land from the Land Lease and reduce the rent under the Land Lease proportionately (the "**Hall Removal Right**"); provided, however, that if such failure is of such a nature that it cannot

8

be cured or corrected within such thirty (30) day period, SP shall be entitled to such additional time as may be necessary to cure or correct such failure so long as SP promptly commences such cure or corrective action and diligently pursues such cure or corrective action to completion. In the event Hall exercises the Hall Removal Right and SP has not cured such failure within the applicable cure period set forth above, Hall shall execute and deliver to SP a written amendment to the Land Lease (and any short-form memorandum thereof, if applicable) removing and releasing the identified BTS Project land from the Land Lease, and SP shall thereafter have the right to develop, lease and/or sell the identified BTS Project to a third party, including, without limitation, developing the identified BTS Project as a speculative development.

   b.   Notice of Default. In the event a Party determines that it will be in default under this Agreement or upon the occurrence of a Default by a Party, the defaulting Party shall use its best efforts to give prompt notice to the other Party. Such notice shall detail the Default, the reasons for the Default, and the Party's proposal to cure the Default.

   c.   Remedies. In the event of a Default under this Agreement, the non-defaulting party may, at its option, take whatever action at law or in equity which the non-defaulting party deems necessary and desirable to enforce observance and performance of any covenant, condition, obligation or agreement of the defaulting party under this Agreement. No remedy or right of a Party shall be exclusive of, but shall be cumulative and in addition to, every other remedy or right now or hereafter existing at law or in equity or by statute or otherwise.

12. Indemnity and Limitation of Liability.

   a.   SP shall indemnify and hold harmless Hall from and against all claims, and all actual damages, losses and expenses, including attorneys' fees and costs incurred by Hall related thereto, arising out of or resulting from SP's breach or default under this Agreement; provided, however, that SP shall not be liable for any such claims arising out of or resulting from the gross negligence or willful misconduct by Hall or breach of this Agreement by Hall or any of the Guarantors.

   b.   Hall shall indemnify and hold harmless SP from and against all claims, and all actual damages, losses and expenses, including attorneys' fees and costs incurred by SP related thereto, arising out of or resulting from Hall's breach or default under this Agreement; provided, however, that Hall shall not be liable for any such claims arising out of or resulting from the gross negligence or willful misconduct by SP or breach of this Agreement by SP.

   c.   In no event shall any party be liable for any consequential, incidental, indirect, special, punitive or exemplary damages (including, without limitation, lost profits, business or goodwill) suffered or incurred by any other party or its Affiliates in connection with this Agreement. Notwithstanding the foregoing, in the event of a default by Hall under this Agreement or any Hall Party under the Land Lease results in a default by any

9

SP Party under any loan or other financing arrangement entered into by any SP Party in connection with the Land Lease or a BTS Project, Hall's indemnification obligation in Section 12(b) above shall apply.

d.      The terms and conditions of this Section 12 shall survive the expiration or earlier termination of this Agreement for a period of twelve (12) months.

13.   Opportunity Zone/JV.  The Property is located within an area designated as a Federal "opportunity zone".  As such, the financing of some or all BTS Projects may be structured in a way that could provide tax advantages to SP and/or Hall.  SP and Hall will review the details of each BTS Project, and the statutes, rules and regulations governing qualified opportunity zones, to determine whether the parties desire to own a BTS Project through a joint venture entity which qualifies as a qualified opportunity zone business as contemplated in 26 U.S.C § 1400Z-2.  SP and Hall agree to work cooperatively to determine the benefits that may be achievable under the opportunity zone rules and endeavor to structure transactions in a way allowing those benefits to be realized if so desired.  Without limiting the generality of the preceding sentence, the parties agree to consider structuring the construction, ownership, and operation of each BTS Project as a qualified opportunity zone business.  If a BTS Project is structured as a qualified opportunity zone business, whether or not one or both of the parties establishes an opportunity fund that holds an interest in the qualified opportunity zone business or otherwise realizes any benefits, SP will afford Hall and/or its Affiliates (including Hall Venture Partners and Hall Opportunity Fund 1) the opportunity to invest as limited partners in all BTS Projects up to a maximum 49% of the equity stack, on terms to be defined and agreed upon.  Notwithstanding the structure of any BTS Project, no party shall be guaranteed any tax advantages or other treatment under the opportunity zone rules and regulations, and no limitations shall be placed on the timing of the market or sale of a BTS Project.  Except as provided in this paragraph or as mutually agreed hereafter, it is not required that both SP and Hall receive opportunity zone benefits on any specific BTS Project.  SP, or a SP Party, will manage any joint venture created as provided in this Section 16, control day-to-day operations, and have full voting control on all matters, subject to limited approval rights for Hall (and any applicable Hall Party).

14.   Notices.  All notices and other communications which are required to be, or which may be given under this Agreement shall be in writing, and shall be delivered at the addresses set out below.  Notice may be given by personal delivery, recognized overnight courier, by United States mail or by email transmission in the manner set forth below.  Notice shall be deemed to have been duly given (a) if by personal delivery, on the first to occur of the date of actual receipt or refusal of delivery by any person at the intended address, (b) if by overnight courier, on the first (1st) Business Day after being delivered to a recognized overnight courier, (c) if by mail, on the second (2nd) Business Day after being deposited in the United States mail, certified or registered mail, return receipt requested, postage prepaid, or (d) by electronic mail transmission shall be deemed to have been given on the day and at the time transmitted, as evidenced by the confirmation slip generated by the sender's email records addressed as follows:

**Hall:**                          Hall Labs, LLC
                                   3000 Sierra Vista Way
                                   Provo, UT 84606

10

Attn: David R. Hall
E-Mail: dhall@halllabs.com

SP:                         Scannell Properties, LLC
                           8801 River Crossing Blvd., Suite 300
                           Indianapolis, IN 46240
                           Attn: David J. Duncan
                           E-mail:
                           davidd@scannellproperties.com

with a courtesy copy to:    Ice Miller LLP
                           One American Square, Suite 2900
                           Indianapolis, IN 46282
                           Attn: Blake J. Schulz
                           E-Mail: blake.schulz@icemiller.com

15. Certain Defined Terms.

a.    **"Affiliates"** shall mean as to a party hereunder, any entity which directly controls, is controlled by, or is under common control with such party, where "control" means ownership of fifty-one percent (51%) or greater of the equity of such party or the ability to direct the management of such party.

b.    **"Business Day"** shall mean any day other than Saturday, Sunday and any day which is a legal holiday in the State of Utah.

c.    **"Fair Market Value"** shall mean the value determined in accordance with Section 7(b)(iii). In connection with the determination of Fair Market Value, the Parties and any appraisers shall seek to establish a value that is equal to the purchase price that a willing purchaser would pay and a willing seller would accept in an arm's length, bona fide negotiation for sale of the applicable BTS Project to be executed at the time of determination, taking into consideration all relevant terms and conditions of any comparable sale transactions for real estate in the Pertinent Market and sales of any such comparable properties in the Pertinent Market which are comparable to the applicable BTS Project.

d.    **"Force Majeure Event"** shall mean a delay occasioned by a cause or causes beyond the control of the party whose performance is so delayed. Such causes shall include, without limitation: moratoria, adverse weather conditions, civil commotion, war like operations, sabotage, terrorism, governmental or judicial action/inaction, regulation, legislation or controls (including permitting or approval delays), material shortages, or acts of God. The Parties acknowledge and agree that either Party's incompetence or failure to deploy reasonable resources to meet its obligations hereunder shall not be deemed to constitute a Force Majeure Event.

11

    e.    **"Pertinent Market"** shall mean the Property, together with any other comparable real estate in Utah County, Utah, if any.

    f.    **"SP's Investment Basis"** shall mean all "hard" and "soft" costs and expenses incurred by SP and/or the applicable SP Party to acquire and develop the applicable BTS Project, including, without limitation, the costs of labor and materials, design, permitting and engineering fees, construction management or project management fees, development fees, administrative fees, acquisition costs for the applicable BTS Project, financing costs, interest and other reasonable carrying costs, reasonable legal fees, brokerage commissions, and sales or other excise taxes; provided, that such hard and soft costs incurred on items which benefit one or more BTS Projects, shall be equitably allocated among such benefitted BTS Projects on a proportionate share basis where a BTS Project's share of such costs and expenses shall be an amount determined by a factor the numerator of which is the gross acreage of the BTS Project and the denominator of which is the gross acreage of all BTS Projects benefited by such costs and expenses.

16.  <u>Guarantor</u>.  Simultaneously with the execution of this Agreement, Hall shall cause Hall Labs, LLC, a Utah limited liability company and David R. Hall (each a **"Guarantor"**), to execute and deliver to and for the benefit of SP a Guaranty of Hall's obligations under and with respect to this Agreement in a form acceptable to SP (the **"Guaranty"**).  Hall acknowledges and agrees that SP's willingness to enter into this Agreement with Hall is expressly contingent upon the execution and delivery by each Guarantor of the Guaranty to and for the benefit of SP.

17.  <u>Severability of Provisions</u>.  Each provision of this Agreement shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid.

18.  <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original copy and all of which together shall constitute one agreement binding on all Parties hereto, notwithstanding that all the Parties shall not have signed the same counterpart.

19.  <u>No Partnership; Competition</u>.  Hall shall not and does not by this Agreement in any way or for any purpose become a partner of SP in the conduct of its business, or otherwise, or a joint venturer of or a member of a joint enterprise with SP.  It is expressly understood and agreed by the Parties hereto that either Party may engage in any other business or investment, including the ownership of, or investment in, real estate and the development, operation, leasing and management of industrial, manufacturing and warehouse buildings and that the other Party hereto shall have no rights in and to any such business or investment or the income or profit derived therefrom.

20.  <u>Applicable Law</u>.  This Agreement shall be construed and enforced in accordance with the laws of the State of Utah.

21. Attorneys' Fees. In the event legal action is instituted by any party to enforce the terms of this Agreement, the prevailing party in such legal action will be entitled to receive from the other party the prevailing party's reasonable attorneys' fees and court costs, including the costs of appeal. The term "prevailing party" shall mean a party who brings an action against the other by reason of the other's breach or default and obtains substantially the relief sought whether by compromise, settlement or judgment.

22. No Waiver. No waiver by either party of any default of any other party or of any event, circumstance or condition permitting a party to terminate this Agreement shall constitute a waiver of any other default of the other party or of any other event, circumstance or condition, permitting such termination, whether of the same or of any other nature or type and whether preceding, concurrent or succeeding; and no failure on the part of either party to exercise any right it may have by the terms hereof or by law upon the default of the other party and no delay in the exercise of such right shall prevent the exercise thereof by the non-defaulting party at any time when the other party may continue to be so in default, and no such failure or delay and no waiver of default shall operate as a waiver of any other default, or as a modification in any respect of the provisions of this Agreement. The subsequent acceptance of any performance pursuant to this Agreement shall not constitute a waiver of any preceding default by a defaulting party or of any preceding event, circumstance or condition permitting termination hereunder, other than default in the payment of the particular performance of the particular matter so accepted, regardless of the non-defaulting party's knowledge of the preceding default or the preceding event, circumstance or condition, at the time of accepting such performance, nor shall the non-defaulting party's acceptance of such performance after termination constitute a reinstatement, extension or renewal of this Agreement or revocation of any notice or other act by the non-defaulting party.

23. Number and Gender. When necessary for proper construction hereof, the singular of any word used herein shall include the plural, the plural shall include the singular and the use of any gender shall be applicable to all genders.

24. Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

25. Entire Agreement. This Agreement is the entire agreement between the Parties hereto with respect to the subject matter hereof and supersedes all prior agreements between the Parties hereto with respect thereto; provided, however, that the Parties acknowledge and agree that they are entering into the Land Lease Agreement simultaneously with this Agreement and that they intend to enter into leases for BTS Projects that set out rights and obligations of the Parties pertaining to the Property. No claim of waiver, modification, consent or acquiescence with respect to any of the provisions of this Agreement shall be made against either party, except on the basis of a written instrument executed by or on behalf of such party.

26. Non-Recourse to First American Exchange. As of the date of this Agreement, First American Exchange Company, LLC ("FAEC") is the sole member of SP. The parties agree that FAEC shall not have any personal liability for the obligations of SP hereunder. Notwithstanding anything to the contrary in this Agreement, Hall hereby waives any right to obtain money judgment or equitable relief against FAEC and any and all members, shareholders, partners and employees

13

of FAEC, whether by an action brought upon this Agreement or any document executed in connection with this Agreement, or an action brought for a deficiency judgment against FAEC and/or the members, shareholders, partners and employees of FAEC, and agrees that the extent of liability on the part of such parties with respect to this Agreement (or any document executed in connection with this Agreement) is and shall for all purposes be limited to the assets of SP and its interest in the Property, including policies of hazard insurance on the Property and any proceeds thereof and any award of damages on account of condemnation for public use of the Property, Hall agreeing to look solely to SP, SP's interest in the Property, and such insurance policies and condemnation awards in satisfaction of all obligations. The terms of this paragraph shall supersede any and all other terms and conditions herein

[The signature page follows.]

14

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the Effective Date.

"SP"

**SPHL PROPERTIES, LLC,**
an Indiana limited liability company

By: _____
      Mark A. Bullock, Manager


"HALL"

**HALL PROPERTY HOLDINGS, LLC,**
a Utah limited liability company

By:  Hall Labs, LLC, Member

By: _____
      David R. Hall, Manager


[Signature Page to Development Agreement]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the Effective Date.

"SP"

**SPHL PROPERTIES, LLC,**
an Indiana limited liability company

By: _____
      Mark A. Bullock, Manager

"HALL"

**HALL PROPERTY HOLDINGS, LLC,**
a Utah limited liability company

By: _____
      Matt Van Dyke, Chief Financial Officer

[Signature Page to Development Agreement]

**EXHIBIT A**

**LEGAL DESCRIPTION OF PROPERTY**

Parcels 1, 2 and 3 of New Vista South Subdivision recorded November 7, 2019, with the Recorder of Utah County, Utah in Plat Book 47, Page 358.

## EXHIBIT B

### BUILDING 1 PREMISES

Lot 1 of New Vista South Subdivision recorded November 7, 2019, with the Recorder of Utah County, Utah in Plat Book 47, Page 358.

**EXHIBIT C**

**BTS PROJECT LEASE FORM**

[Form to be mutually agreed upon by the Parties prior to the Satisfaction Date as defined in the Real Estate Purchase Agreement between Scannell Properties, LLC, and Hall Property Holdings, LLC, dated June 25, 2019]

# EXHIBIT D

# RENT FORMULA

The actual Total Improvement Cost, as determined upon pursuant to each BTS Project Lease, will be utilized to establish the Base Rent for each BTS Project utilizing the formula set forth below. The Base Rent for the BTS Project to be set forth in the BTS Project Lease will be initially determined based upon the Total Improvement Cost multiplied by the Base Rental Rate Constant (as herein defined) for the initial lease year for the BTS Project. For all lease years following the initial lease year, the Base Rent for the BTS Project and the premises would thereafter be increased at the end of each lease year for the remainder of the lease term by multiplying the then-existing amount of Base Rent by 1.025.

As used herein, the **"Base Rental Rate Constant"** shall be the amount calculated by adding (i) the product of seventy percent (70%) and the debt constant based on a commercial loan SP is able to secure for the BTS Project based upon a seventy percent (70%) loan to value ratio and a twenty (20) year amortization period after exercising commercially reasonable efforts to obtain the most favorable interest rate it can for such BTS Project, to (ii) the product of thirty percent (30%) and the sum of seven and one-half percent (7.5%) and the Treasury Rate (as defined hereinafter). As used herein, the term **"Treasury Rate"** will mean and refer to the applicable ten (10) year Treasury Constant Maturities Rate published by the Federal Reserve Board based on the average yield of a range of Treasury securities, all adjusted to the equivalent of a 10-year maturity.

As an example, and solely for illustrative purposes, in today's debt environment and a current Treasury Rate of 2.50%, if the most favorable commercial loan rate SP can secure for the BTS Project is 7.86%, then the Base Rental Rate Constant would be:

$$(70\% \times 7.86\%) + (30\% \times (7.5\% + 2.5\%)) = 8.50\%$$

D-1

## EXHIBIT E

## MASTER DEVELOPMENT PLAN



E-1

**EXHIBIT F**

## EXCLUSIONS TO SPECIALIZED OR EXTRAORDINARY SCOPE ITEMS

The following items will constitute a "standard" finish for Hall related facilities.  The list is a guide to show quality level of agreed specifications, but is not a comprehensive list or binding if the Parties mutually agree to modify:

1. full heat pump heating & air conditioning throughout square feet; no swamp
2. Office areas will be ducted; and warehouse will be a dump system
3. zoned thermostat control
4. skylights or clear story wall windows
5. bright LED lighting
6. 6-7 inch non-reinforced concrete floor slab
7. diamond ground floors
8. high grade exterior (the Parties agree to work to find a suitable value engineered alternative to brick exterior)
9. high quality parking - with a ratio of approximately 1.5 spaces per 1,000 square feet of building area
10. high quality rock/plant landscaping around property perimeter with berms to hide parking
11. painted ceilings and walls in warehouse areas
12. approximately 20% of the overall square footage will be office
13. full height frame and drywall demising wall between office / warehouse areas
14. glass panel in at least one private office wall
15. granite bathrooms
16. wide hallways
17. magnet access Sure-Fi access control
18. 9-10 foot office ceilings
19. 30-32 foot clear warehouse / production area
20. Paved loading areas will provide full turning radius of 130 feet from building and have 60 foot concrete dolly pad in front of docks
21. dock and drive-in doors will be equipped with standard equipment
22. roofing will be TPO membrane system with rigid insulation on the deck, or its equivalent
23. buildings will be equipped with ESFR fire protection equipment

DocuSign Envelope ID: 22036577-2E6A-416B-9906-94C422724F34

## FIRST AMENDMENT TO DEVELOPMENT AGREEMENT

**THIS FIRST AMENDMENT TO DEVELOPMENT AGREEMENT** (this "**Amendment**") is made and entered into effective as of _September 30_, 2022 (the "**Effective Date**"), by and between SPHL Properties, LLC, an Indiana limited liability company ("**SP**"), and Hall Property Holdings, LLC, a Utah limited liability company ("**Hall**" together with SP, collectively referred to herein as the "**Parties**").

### WITNESSETH:

WHEREAS, SP and Hall entered into a Development Agreement dated as of January 22, 2020 (the "**Agreement**").

WHEREAS, Pursuant to Section 7 of the Agreement, SP and Hall have been in discussions regarding the next BTS Project Site on proposed Lot 3 of the Property which is more particularly identified on Schedule 1, attached hereto and incorporated herein (the "**Lot 3 SP Takedown Parcel**").

WHEREAS, Hall does not desire to exercise its BTS Buyback Option with respect to the Lot 3 BTS Project Site and the Parties desire to proceed with the Lot 3 BTS Project Site being a SP Takedown Parcel under the Agreement.

WHEREAS, SP and Hall now desire to amend the Agreement in accordance with the provisions of Section 7(c) of the Agreement as more fully set forth herein as if and to the extent that such amended provisions had been originally included in the Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein, Landlord and Tenant hereby agree to the following amendments to the Agreement:

1.    **Defined Terms.** Terms used, but not defined in this Amendment, shall have the same meaning ascribed to such terms in the Agreement.

2.    **Legal Description of Property.** Exhibit A to the Agreement is hereby replaced and superseded in its entirety with First Amendment Exhibit A, attached hereto and incorporated herein.

3.    **Waiver of Buyback Option.** Hall hereby waives its BTS Buyback Option solely with respect to the Lot 3 SP Takedown Parcel. For the avoidance of doubt, Hall retains both BTS Buyback Options pursuant to the terms of the Agreement with respect to the Property (as such defined term is amended by the terms of this Amendment).

4.    **SP Takedown Parcel.** SP hereby agrees to proceed with the Lot 3 SP Takedown Parcel being a SP Takedown Parcel under the terms of the Agreement.

5.    **Net Land Lease.** Pursuant to Section 7(c) of the Agreement, contemporaneously with the execution of this Amendment, the Parties shall execute and acknowledge an amendment to the Land Lease in order to reflect a release of the Lot 3 SP Takedown Parcel from the Land Lease.

6.    **BTS Project Timing.** Section 6(b) of the Agreement is hereby amended and restated in its entirety to read as follows:

"b.    Hall will initiate and approve new BTS Projects in accordance with the following schedule:

(i)    1st BTS Project was initiated and approved prior to 1/22/20;

DocuSign Envelope ID: 22036577-2E6A-416B-9906-94C422724F34

(ii)    2nd BTS Project is satisfied via the Lot 3 Takedown incorporated above;
(iii)   3rd BTS Project to be initiated and approved on or before 1/22/23;
(iv)    4th BTS Project to be initiated and approved on or before 7/22/24;
(v)     5th BTS Project to be initiated and approved on or before 1/22/26; and
(iv)    Full development of the Property to be completed on or about 1/22/27.

For the avoidance of doubt, the terms "initiate and approve" as used in this <u>Section 6(b)</u> shall include the conclusion of the Amendment Negotiation Periods and/or Fair Market Value Negotiation Period, as each may be applicable, set forth in in <u>Section 7</u> below, and the execution of all necessary amendments to this Agreement and the Land Lease. This will require the parties to initiate the process outlined in <u>Section 7</u> for each BTS Project prior to the dates specified in the schedule above in order to complete the process by the scheduled deadline. The BTS Projects will be developed by Hall Labs and/or SP on the BTS Project Sites in the following order: Lot 2, Lot 4, and then Lot 5. If Hall Labs fails to have a BTS Project approved in accordance with foregoing schedule and, as a result, SP pursues development of an SP Takedown Parcel pursuant to <u>Section 7(c)</u> below, then the Hall will surrender (and SP will accept) the BTS Project Sites in following order, Lot 5, 4, and then 2.

7.    <u>Miscellaneous</u>. Except as expressly modified or amended by this Amendment, all terms, conditions, and provisions of the Agreement, are hereby ratified and confirmed and shall remain in full force and effect; provided, however, that any other provision of the Agreement shall be deemed modified as necessary to give practical effect to the provisions of this Amendment. To the extent that the terms and provisions of this Amendment conflict with the Agreement, the terms and provisions of this Amendment shall control.

8.    <u>Counterparts</u>. This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. The Parties agree that signatures transmitted by electronic scan and email (including by way of DocuSign or other similar electronic signature exchange software or service) shall have the legal effect of original signatures. At the request of either Party, the Parties shall promptly exchange executed original counterparts of this Agreement or any amendment hereto.

SIGNATURE PAGE TO FOLLOW

DocuSign Envelope ID: 22036577-2E6A-416B-9906-94C422724F34

## SIGNATURE PAGE TO FIRST AMENDMENT TO DEVELOPMENT AGREEMENT

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Development Agreement to be effective as of the Effective Date.

**SP:**

SPHL Properties, LLC,
an Indiana limited liability company

By:_____

Mark D. Pfleging, Manager

**TENANT:**

HALL PROPERTY HOLDINGS, LLC,
a Utah limited liability company

By:  Hall Labs, LLC, Member

By:_____

David R. Hall, Manager

DocuSign Envelope ID: 22036577-2E6A-416B-9906-94C422724F34

## SCHEDULE 1

### DESCRIPTION OF LOT 3 SP TAKEDOWN PARCEL

**PROPOSED LOT 3**
A parcel of land being a part of Parcel 2, New Vista South Subdivision recorded November 7, 2019 as Entry No. 116225:2019 in the Office of the Utah County Recorder. Said parcel of land is located in the Southwest Quarter of Section 21 and the Northwest Quarter of Section 28, Township 7 South, Range 3 East, Salt Lake Base and Meridian and is described as follows:

**Beginning** at a point on the northerly line of said Parcel 2, which is 450.71 feet N. 89°59'57" E. from the northwesterly corner of said Parcel 2, said point is also 2659.90 feet S. 01°29'15" W. along the Section line and 2300.99 feet S. 00°41'57" E. along the Section line and 53.38 feet N. 89°59'57" E. from the Northeast Corner of said Section 20; thence along said Parcel 2 the following six (6) courses: 1) N. 89°59'57" E. 480.11 feet; 2) North 71.72 feet; 3) S. 42°12'16" E. 461.85 feet to a point of tangency with a 250.00 – foot radius curve to the right, concave westerly; 4) Southerly 184.14 feet along the arc of said curve, through a central angle of 42°12'06" (Chord bears S. 21°06'13" E. 180.01 feet); 5) S. 00°00'49" E. 90.66 feet; 6) West 855.21 feet; thence North 528.99 feet to the **Point of Beginning.**

The above-described parcel of land contains 400,624 sq. ft. in area or 9.197 acres more or less.

## FIRST AMENDMENT EXHIBIT A

Legal Description

Parcels 1 and 3 of New Vista South Subdivision recorded November 7, 2019, with the recorder of Utah County, Utah in Plat Book 47, Page 358

Together with:

Lot 2 of New Vista South Subdivision – Plat "B" Vacating Parcel 2 of New Vista South Subdivision Located in the Southeast Quarter of Section 20, The Southwest Quarter of Section 21, the Northeast Quarter of Section 29 and the Northwest Quarter of Section 28, Township 7 South, Range 3 East, Salt Lake Base and Meridian, Provo City, Utah County, Utah.

# EXHIBIT 5

## GUARANTY

THIS GUARANTY (this "**Guaranty**"), executed as of the 22nd day of January, 2020 by Hall Labs, LLC, a Utah limited liability company, DRH Holdings, LLC, a Utah limited liability company, and David R. Hall (collectively, and jointly and severally, the "**Guarantor**"), in favor of SPHL Properties, LLC, an Indiana limited liability company (the "**SP**").

## RECITALS

WHEREAS, SP and Hall Property Holdings, LLC, a Utah limited liability company (the "**Hall**"), have entered into that certain Development Agreement of even date herewith (the "**Development Agreement**") concerning the future development of certain land located on Tracy Hall Parkway in Provo, Utah (the "**Property**"), which Property is more particularly described in Development Agreement;

WHEREAS, "**Obligations**" as used in this Guaranty shall mean (a) all obligations, liabilities, and indebtedness of Hall to SP, now or hereafter existing under the Development Agreement, together with all costs and expenses (including, without limitation, prevailing party's reasonable attorneys' fees) incurred by SP in the enforcement or collection thereof whether such obligations, liabilities, and indebtedness are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several; and (b) all costs and expenses (including without limitation, reasonable attorneys' fees) incurred by SP in the enforcement or collection of this Guaranty; and

WHEREAS, SP, as a condition to entering into the Development Agreement, has required that Guarantor enter into this Guaranty.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged hereby, Guarantor covenants and agrees as follows:

**1.    Incorporation of Recitals; Capitalized Terms.** The recitals are incorporated herein by reference. Capitalized terms not defined herein shall have the meaning ascribed to them in the Development Agreement.

**2.    Guarantee.** Guarantor absolutely and unconditionally guarantees the full and prompt payment and performance when due of the Obligations. This Guaranty shall continue, in full force and effect throughout the entire term, including any extension or renewal terms, of the Development Agreement, until all of the Obligations are paid and performed in full.

**3.    Joint and Several Liability.** The obligations and liabilities of each Guarantor under this Guaranty shall be joint and several.

**4.    Waivers.** Guarantor expressly waives (a) presentment for payment, demand, notice of demand and dishonor, protest, and notice of protest and nonpayment or nonperformance of the Obligations; and (b) diligence in (i) enforcing payment or performance of, or collecting, the

Page 1

Obligations; (ii) exercising its rights or remedies under the Development Agreement; or (iii) bringing suit against Hall or any other party. SP shall be under no obligation (a) to notify Guarantor of (i) its acceptance of this Guaranty or (ii) the failure of Hall to timely pay or perform any of the Obligations, except as provided in the Development Agreement, or (b) to use diligence in (i) preserving the liability of Hall or any other party or (ii) bringing suit to enforce payment or performance of, or to collect, the Obligations. To the full extent allowed by applicable law, Guarantor waives all defenses (a) given to sureties or guarantors at law or in equity, other than the actual payment and performance of the Obligations, and (b) based upon questions as to the validity, legality, or enforceability of the Obligations. The payment by Guarantor of any amount pursuant to this Guaranty shall not in any way entitle Guarantor to any right, title, or interest (whether by way of subrogation or otherwise) in and to (a) any of the Obligations; (b) any proceeds thereof; or (c) any security therefor. Guarantor unconditionally waives (a) any claim or other right now existing or hereafter arising against Hall or any other party that arises from, or by virtue of, the existence or performance of this Guaranty (including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, or to payment); and (b) any right to participate or share in any right, remedy, or claim of SP.

**5.      Rights.** SP, without (a) authorization from, or notice to, Guarantor, and/or (b) impairing or affecting the liability of Guarantor hereunder; from time to time except as provided in the Development Agreement, at its discretion and with or without consideration, may (a) alter, compromise, accelerate, or extend the time or manner for the payment or performance of any or all of the Obligations as provided in the Development Agreement; (b) release, discharge, or increase the obligations of Hall; (c) add, release, discharge, or increase the obligations of any other endorsers, sureties, guarantors, or other obligors; (d) make changes of any sort whatever in the terms or conditions of (i) payment or performance of the Obligations; or (ii) doing business with Hall or any other party; (e) settle or compromise with Hall or any other party on such terms and conditions as SP may determine to be in its best interests; and (f) apply all moneys received from Hall or any other party against the payment of the Obligations (regardless of whether then due) as SP may determine to be in its best interests, without in any way being required to (i) marshal securities or assets; or (ii) apply all or any part of such moneys against any particular part of the Obligations. SP is not required to retain, protect, exercise due care with respect to, perfect security interests in, or otherwise assure or safeguard any collateral or security for the Obligations. No exercise, or failure to exercise, by SP of any right or remedy in any way shall (a) affect (i) any of the obligations of Guarantor hereunder or (ii) any collateral or security furnished by Guarantor, or (b) give Guarantor any recourse against SP.

**6.      Continuing Liability.** Notwithstanding the incapacity, death, disability, dissolution, or termination of Hall or any other party, the liability of Guarantor hereunder shall continue. The failure by SP to file or enforce a claim against the estate (either in administration, bankruptcy, or other proceeding) of Hall or any other party shall not affect the liability of Guarantor hereunder. Guarantor shall not be released from liability hereunder if recovery from Hall or any other party (a) becomes barred by any statute of limitations or (b) otherwise is restricted, prevented or unavailable.

**7.      Action by SP.** SP shall not be required to pursue any other rights or remedies before invoking the benefits of this Guaranty. Specifically, SP shall not be required to exhaust its rights and remedies against Hall or any other endorser, surety, guarantor, or other obligor. SP may

maintain an action on this Guaranty, regardless of whether (a) Hall is joined in such action or (b) a separate action is brought against Hall.

**8.    Default.** Guarantor absolutely and unconditionally covenants and agrees that, if (a) Hall defaults for any reason in the payment or performance of all or any part of the Obligations and (b) SP exercises any of its rights or remedies under the Development Agreement, then Guarantor shall pay, upon demand, such amounts as may be due to SP as a result of the default by Hall and the exercise by SP of its rights or remedies, without (a) further notice of default or dishonor; and (b) any notice with respect to any matter or occurrence having been given to Guarantor previous to such demand.

**9.    Preference.** If (a) any payment by Hall to SP is held to constitute a preference under any bankruptcy law, or (b) SP is required for any reason to refund any such payment, or pay the amount thereof to any party, then (a) such payment by Hall to SP shall not constitute a release of Guarantor from any liability under this Guaranty, (b) Guarantor shall pay the amount thereof to SP upon demand, and (c) this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment.

**10.    Subordinated Debt.** Guarantor expressly agrees that (a) all Subordinated Debt (as defined below) shall be subordinated to the Obligations; (b) it shall not receive or accept any payment from Hall with respect to the Subordinated Debt at any time from and after a default by Hall of its obligations under the Development Agreement; and (c) if it receives or accepts any payment from Hall on the Subordinated Debt in violation of this Section, then Guarantor shall (i) hold such payment in trust for SP; and (ii) immediately turn such payment over to SP, in the form received, to be applied to the Obligations. For purposes of this Guaranty, **"Subordinated Debt"** shall mean all obligations, liabilities, and indebtedness of Hall to Guarantor, together with all interest accruing thereon, whether such obligations, liabilities, and indebtedness are (a) direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, joint and several, or evidenced by a written instrument; or (b) now due or hereafter to be due, now existing or hereafter owed, or now held or hereafter to be held by Guarantor.

**11.    Representations.** Guarantor hereby represents and warrants to SP that (a) this Guaranty is the legal, valid, and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms and conditions; (b) there is no action or proceeding at law or in equity, or by or before any court or governmental instrumentality or agency, now pending against or, to the knowledge of Guarantor, threatened against, Guarantor that may materially and adversely affect the financial condition of Guarantor; (c) any schedule of consolidated stockholder's equity that has been or hereafter may be furnished to SP in connection with this Guaranty does and shall represent fairly the financial condition of Guarantor for the period for which such schedule of consolidated stockholder's equity is furnished; (d) all other information, reports, and other papers and data furnished to SP shall be (i) accurate and correct in all respects at the time given; and (ii) complete, such that SP is given a true and  accurate reporting of the subject matter; and (e) Guarantor is solvent.

**12.    Financial Statements.** So long as they are not publicly available on sec.gov or similar resource during the term of this Agreement, Guarantor shall provide to SP on an annual basis within ten (10) days following the end of Guarantor's fiscal year copies of Guarantor's current

financial statement prepared in accordance with generally accepted accounting principles. In addition, upon request by SP in connection with any refinancing, sale, or other recapitalization event related to the Development Agreement, Guarantor shall provide to SP, within five (5) days of SP's request, a copy of Guarantor's most recent financial statements prepared as of the end of Guarantor's fiscal year. All such financial statements shall be signed by Guarantor or an officer of Guarantor, if applicable, who shall attest to the truth and accuracy of the information set forth in such statements.

**13.    Notice.**  All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Guaranty shall be in writing and shall be deemed to have been given and received for all purposes upon delivery, refusal to accept delivery or the inability to deliver on account of a change of address with respect to which no notice was given if delivered in person or by Federal Express or other reliable 24-hour delivery service or sent by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at the address set forth below or when delivery is refused, and such notices shall be addressed as follows:

| | |
|---|---|
| To SP: | c/o Scannell Development Company |
| | 8801 River Crossing Blvd., Suite 300 |
| | Indianapolis, IN  46240 |
| | Attention:  General Counsel |
| | |
| To Guarantor: | Hall Labs, LLC |
| | 3000 Sierra Vista Way |
| | Provo, UT 84606 |
| | Attention: David R. Hall |
| | |
| | DRH Holdings, LLC |
| | 3000 Sierra Vista Way |
| | Provo, UT 84606 |
| | Attention: David R. Hall |

For the purposes of this Section, any party may substitute another address stated above (or substituted by a previous notice) for its address by giving fifteen (15) days' notice of the new address to the other party, in the manner provided above.

**14.    Miscellaneous.**  The rights of SP are cumulative and shall not be exhausted by its exercise of any of its rights and remedies against Guarantor under this Guaranty or otherwise; or by any number of successive actions, until and unless each and all of the obligations of Guarantor under this Guaranty have been paid, performed, satisfied, and discharged in full. This Guaranty shall be deemed to have been made under, and shall be governed by, the laws of the state in which the Property is located in all respects, and shall not be modified or amended, except by a writing signed by SP and Guarantor. This Guaranty shall bind Guarantor and its successors, assigns, and legal representatives, and inure to the benefit of all transferees, credit participants, endorsees, successors, and assigns of SP, provided non-permitted third-party transfer cannot increase

4

Guarantor's liability hereunder.  If the status of Hall changes, then this Guaranty shall continue, and cover the Obligations of Hall in its new status, according to the terms and conditions hereof. SP is relying, and is entitled to rely, upon each and every one of the terms and conditions of this Guaranty.  Accordingly, if any term or condition of this Guaranty is held to be invalid or ineffective, then all other terms and conditions shall continue in full force and effect.  Each of the parties signing below as Guarantor shall be jointly and severally liable for all obligations set forth herein and the release, in part or in whole, of one guarantor shall not affect the liability of the other.

[Signature page follows.]

IN WITNESS WHEREOF, Guarantor has hereto caused this Guaranty to be duly executed under seal as of the day and year first above written.

**GUARANTOR:**

Hall Labs, LLC,
a Utah limited liability company

By: _____
    David R. Hall, Manager


DRH Holdings, LLC,
a Utah limited liability company

By: _____

Name: _____

Its: _____


_____
David R. Hall, Individually

# EXHIBIT 6

ENT **14671:2020**  PG 1 of 7
**Jeffery Smith**
**Utah County Recorder**
2020 Feb 04 01:38 PM FEE 40.00 BY MA
RECORDED FOR First American Title Insurance Compan
ELECTRONICALLY RECORDED

**PREPARED BY**
**AND RETURN TO:**

David J. Duncan, Esquire
Scannell Properties
8801 River Crossing Blvd
Suite 300
Indianapolis, IN  46240
(317) 843-5959

---

(ABOVE SPACE FOR RECORDER'S USE ONLY)

## MEMORANDUM OF LAND LEASE

     **THIS MEMORANDUM OF LEASE**, is made as of the 23 day of Jan , 2020, by and between **SPHL PROPERTIES, LLC,** an Indiana limited liability company (the "Landlord"), whose address is 8801 River Crossing Blvd., Suite 300, Indianapolis, IN 46240, and **HALL PROPERTY HOLDINGS, LLC,** a Utah limited liability company (the "Tenant"), whose address is 3000 Sierra Vista Way, Provo, UT  84606.

     Landlord and Tenant entered into that certain Net Land Lease (the "Lease") between Landlord and Tenant dated ___123___, 2020, as may be amended from time to time, of certain real estate (the "Property") located at Ironton Business Park, Provo, Utah County, Utah, as described in Exhibit A, attached.

     **NOW, THEREFORE,** for and in consideration of the sum of One Dollar ($1.00) and other valuable consideration, the parties agree as follows:

     1.    Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, subject to all the terms, covenants and conditions contained in the Lease, the Property for an Initial Term of fifteen (15) years commencing of even date herewith and expiring on ___123___, 2035, unless earlier terminated pursuant to the provisions of the Lease.

    2.      This Memorandum of Lease is entered into pursuant to the provisions of the Lease and is subject to all of the terms, covenants and conditions contained therein, all of which are incorporated by reference herein. This Memorandum of Lease is not intended to and shall not change any of the terms and conditions of the Lease.

**(End of text. Execution on following page.)**

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Memorandum of Lease through their respective authorized officers.

**LANDLORD:**                          **TENANT:**

**SPHL PROPERTIES, LLC,**              **HALL PROPERTY HOLDINGS, LLC**
an Indiana limited liability company   a Utah limited liability company

                                       By: Hall Labs, LLC, Member

By: _____

  Mark A. Bullock, Manager             By: _____

                                         David R. Hall, Manager


Date: _____, 2020              Date: _____, 2020


- 3 -

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Memorandum of Lease through their respective authorized officers.

**LANDLORD:**                           **TENANT:**

**SPHL PROPERTIES, LLC,**               **HALL PROPERTY HOLDINGS, LLC**
an Indiana limited liability company    a Utah limited liability company

                                        By:  Hall Labs, LLC, Member

By: _____             By: _____
    Mark A. Bullock, Manager             David R. Hall, Manager

Date: _____, 2020            Date: _____, 2020

ENT **14671:2020**   PG  5 of 7

## ACKNOWLEDGMENT – LANDLORD

STATE   OF UTAH            )
                                          ) SS:
COUNTY OF SALT LAKE )

Before me, Kristen Carson_____, a Notary Public in and for the above State and
County, on this 14 day of ___January___, 2020, personally appeared **MARK A.
BULLOCK,** Manager of **SPHL PROPERTIES, LLC,** an Indiana limited liability company, known
to me to be the same person who signed and acknowledged that he signed the foregoing instrument
as such Manager of said limited liability company for and on behalf of the limited liability company,
and that he executed the same as his free and voluntary act and deed and as the free and voluntary act
and deed of the limited liability company, for the uses and purposes set forth in the instrument.

**IN TESTIMONY WHEREOF,** I have subscribed my signature and affixed my official seal
on the day and year set forth above.

_____
Notary Public

My commission expires: 8.6.22

County of residence: Salt Lake

Notary Public - State of Utah
**KRISTEN CARSON**
Comm. #701663
My Commission Expires
August 6, 2022

## ACKNOWLEDGMENT – TENANT

STATE   OF   UTAH        )
                        ) SS:
COUNTY OF  UTAH    )

Before me,  Brett Wilkey  , a Notary Public in and for the above State and County, on this  21ˢᵗ day of  January  , 2020, personally appeared David R. Hall, Manager of Hall Labs, LLC, the Member of **HALL PROPERTY HOLDINGS, LLC**, a Utah Indiana limited liability company, known to me to be the same person who signed and acknowledged that he signed the foregoing instrument as such Manager for and on behalf of the limited liability companies, and that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of the limited liability companies, for the uses and purposes set forth in the instrument.

**IN TESTIMONY WHEREOF,** I have subscribed my signature and affixed my official seal on the day and year set forth above.

BRETT WILKEY
NOTARY PUBLIC·STATE OF UTAH
COMMISSION# 701810
COMM. EXP. 08-21-2022

Notary Public

My commission expires:  08-21-2022

County of residence:  Juab

-5-

## EXHIBIT A

### Legal Description of the Property

Parcels 1, 2 and 3 of New Vista South Subdivision recorded November 7, 2019, with the Recorder of Utah
County, Utah in Plat Book 47, Page 358.

PREPARED BY
AND RETURN TO:

David J. Duncan, Esquire
Scannell Properties
8801 River Crossing Blvd
Suite 300
Indianapolis, IN  46240
(317) 843-5959

ENT **107530:2022** PG 1 of 6
**Andrea Allen**
**Utah County Recorder**
2022 Oct 06 10:08 AM FEE 40.00 BY IP
RECORDED FOR First American Title Insurance Company - NCS Chicago
ELECTRONICALLY RECORDED

---

(ABOVE SPACE FOR RECORDER'S USE ONLY)

## FIRST AMENDMENT TO MEMORANDUM OF LAND LEASE

THIS FIRST AMENDMENT TO MEMORANDUM OF LEASE, is made as of the *30th* day of *September*, 2022,  by and between **SPHL PROPERTIES, LLC**, an Indiana limited liability company (the "Landlord"), whose address is 8801 River Crossing Blvd., Suite 300, Indianapolis, IN 46240, and **HALL PROPERTY HOLDINGS, LLC**, a Utah limited liability company  (the "Tenant"), whose address is 3000 Sierra Vista Way, Provo, UT 84606.

Landlord and Tenant entered into that certain Net Land Lease dated January 22, 2020, as amended by that certain First Amendment Net Land Lease dated *September 30*, 2022 (as amended, the "Lease").

Landlord and Tenant executed that certain Memorandum of Land Lease dated January 23, 2020 and recorded February 4, 2020, with the Recorder of Utah County, Utah as Ent: 14671: 2020 (the "Memorandum of Lease").

NOW, THEREFORE, for and in consideration of the sum of One Dollar ($1.00) and other valuable consideration, the parties agree as follows:

1.      The real estate described in Exhibit A, attached hereto and incorporated herein by reference, is hereby released from the Lease and the Memorandum of Lease.

2.      The Lease and the Memorandum of Lease shall remain in full force and effect with respect to the remainder of the Property subject to the Lease and the Memorandum of Lease.

(End of text.  Execution on following page.)

ENT **107530:2022** PG 3 of 6

IN WITNESS WHEREOF, Landlord and Tenant have executed this First Amendment Memorandum of Lease through their respective authorized officers.

LANDLORD:                                    TENANT:

**SPHL PROPERTIES, LLC,**                    **HALL PROPERTY HOLDINGS, LLC,**
an Indiana limited liability company         a Utah limited liability company

                                             By:  Hall Labs, LLC, Member

By: _____                      By: _____
    Marc D. Pfleging, Manager                     Brett Wilkey, Authorized Person


Date: _September 30_, 2022                   Date: _September 7_, 2022


- 3 -

ENT **107530:2022** PG 4 of 6

## ACKNOWLEDGMENT – LANDLORD

STATE OF ~~UTAH~~ *INDIANA*    )
                              )SS:
COUNTY OF SALT LAKE    *MARION* )

Before me, *Jane Ellen Butler*, a Notary Public in and for the above State and County, on this *30th* day of *September*, 2022, personally appeared Marc D. Pfleging, Manager of **SPHL PROPERTIES, LLC,** an Indiana limited liability company, known to me to be the same person who signed and acknowledged that he signed the foregoing instrument as such Manager of said limited liability company for and on behalf of the limited liability company, and that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of the limited liability company, for the uses and purposes set forth in the instrument.

**IN TESTIMONY WHEREOF,** I have subscribed my signature and affixed my official seal on the day and year set forth above.

_Jane Ellen Butler_
Notary Public

My commission expires:

County of residence:

ENT **107530:2022** PG 5 of 6

## ACKNOWLEDGMENT – TENANT

STATE OF UTAH      )
                 ) SS:

COUNTY OF UTAH    )

    Before me, _Adlai Jacob Krumtum_, a Notary Public in and for the above State and County, on this _7th_ day of _September_, 2022, personally appeared Brett Wilkey, Authorized Person of Hall Labs, LLC, the Member of **HALL PROPERTY HOLDINGS, LLC,** a Utah limited liability company, known to me to be the same person who signed and acknowledged that he signed the foregoing instrument as such Authorized Person for and on behalf of the limited liability companies, and that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of the limited liability companies, for the uses and purposes set forth in the instrument.

    **IN TESTIMONY WHEREOF,** I have subscribed my signature and affixed my official seal on the day and year set forth above.

                         _Adlai Jacob Krumtum_
                            Notary Public

My commission expires: _Aug 8th 2026_

County of residence: _Utah_

ADLAI JACOB KRUMTUM
Notary Public - State of Utah
Comm. No. 726094
My Commission Expires on
Aug 8, 2026

-5-

ENT 107530:2022 PG 6 of 6

## EXHIBIT "A"
## LEGAL DESCRIPTION – Lot 3

Lot 3, New Vista South Subdivision – Plat B, Vacating Parcel 2, New Vista South Subdivision, located in the Southeast Quarter of Section 20, The Southwest Quarter of Section 21, The Northeast Quarter of Section 29 and the Northwest Quarter of Section 28, Township 7 South, Range 3 East, Salt Lake Base and Meridian, Provo City, Utah County, Utah.