Michael R. Johnson (A7070)
Elaine A. Monson (A5523)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Salt Lake City, Utah  84111
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
Email: mjohnson@rqn.com
Email: emonson@rqn.com

*Attorneys for Keystone Private Income Fund*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | **Bankruptcy No. 25-21038** |
| HALL LABS, INC., | Chapter 11 |
| Debtor-in-Possession. | Honorable Joel T. Marker |

**KEYSTONE'S MOTION TO CONVERT, OR ALTERNATIVELY,
FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE**

Keystone Private Income Fund  ("**Keystone**"), a secured creditor and party-in-interest in

the above-entitled case, by and through its attorneys of record, hereby moves this Court (the

"**Motion**"), pursuant to 11 U.S.C. §1112(b), to convert this bankruptcy case filed by Hall Labs,

Inc.  (the "**Debtor**") to a case under Chapter 7, or alternatively, if the Court declines to convert

this case under Section 1112(b), then Keystone moves this Court for the immediate appointment

of a Chapter 11 trustee pursuant to 11 U.S.C. §1104.

# TABLE OF CONTENTS

THE APPLICABLE LEGAL STANDARDS ...........................................................................1

   A.   Law Applicable to Dismissal or Conversion. ..............................................................1

   B.   Law Applicable to Appointment of a Trustee. .............................................................5

STATEMENT OF FACTS ...................................................................................................7

   A.   The Debtor's Obligations to Keystone and the Collateral Security. ................................7

   B.   The Lawsuit Filed By Keystone Against the Debtor and the Entry of Judgment in Favor of Keystone. .....................................................................................................................14

   C.   The Vanderhall Motor Works Stock and Related Vanderhall Entities. ..........................16

   D.   The Debtor's Bankruptcy Petition and Keystone's Proof of Claim. ..............................17

   E.   The Debtor's Statements and Schedules and the testimony provided by David Hall, its CEO, at the 341 Meeting. ..........................................................................................18

      1.   The Ownership and Management of the Debtor. .......................................................19

      2.   The Debtor's Stated Intent to Liquidate its Assets in Chapter 11 and Not Reorganize. ............19

      3.   The Affiliates of the Debtor. .................................................................................20

      4.   The Complete Collapse of the Debtor's Business and Revenues. ...............................21

      5.   The Debtor's Concerning Lack of Knowledge or Information Regarding the Vanderhall Entities. ..........................................................................................................................22

      6.   The Non-Recourse Promissory Notes the Debtor Entered Into With Insiders That Have No Value. ..............................................................................................................................26

      7.   Other Highly Concerning Transfers Made By the Debtor to Affiliates During the Preference Period. ..............................................................................................................................29

      8.   The Debtor's Transfer of Certain Assets That Are Pledged as Collateral on Keystone's Loan to Insiders. ..........................................................................................................................29

      9.   The Debtor's Purchase of Stock From Businesses Owned by Insiders in 2024 When It Was Insolvent. ..........................................................................................................................30

      10.   Payments Made to Insiders During the One Year Preceding the Petition Date When the Debtor When it Was Insolvent. ..................................................................................................30

      11.   The Merger or Consolidation of DRH Into the Debtor Just Prior to the Bankruptcy Filing. ....30

      12.   The Debtor's Concerning Lack of Knowledge or Information Regarding Other Information Relating to the Debtor. ..........................................................................................................31

      13.   Allegations of Fraud Made Against the Debtor Which it Denied During the 341 Meeting. ......32

      14.   The Fine Owed By the Debtor to the IRS for Failure to Pay Health Insurance to Employees and Inclusion of Consolidated Tax Return Information from a Related Entity on the Debtor's

Schedules. ...................................................................................................................... 34

   15.   The Debtor Bankruptcy Accounts That Are Actually In the Name of Affiliates. .................... 34

F.    The Filing of Keystone's 546(b) Notice. ..................................................................... 34

G.    The Debtor's First Monthly Operating Report. ........................................................... 35

ARGUMENT ..................................................................................................................... 37

A.    The Court Should Convert this Case to a Chapter 7. ................................................... 37

   1.    There has been a substantial or continuing loss to or diminution of the Debtor's estate and the absence of a reasonable likelihood of rehabilitation. ................................................. 39

   2.    There has been gross mismanagement of the Debtor's estate. .................................... 41

   3.    The Debtor's use of Keystone's cash collateral without authorization has been substantially harmful to Keystone. ............................................................................................... 46

   4.    Other Considerations Likewise Support the Conversion of this Case to a Chapter 7. ............. 51

B.    Alternatively, and at a Minimum the Court Should Appoint a Chapter 11 Trustee. ...................... 52

   1.    There has been fraud, gross mismanagement and incompetence on the part of the Debtor. ...... 52

   2.    Keystone (and likely other creditors) have no confidence in the Debtor, its ability to carry out its fiduciary duties or its willingness to pursue questionable transactions given its numerous conflicts of interest. ................................................................................................ 52

CONCLUSION ................................................................................................................... 53

## THE APPLICABLE LEGAL STANDARDS

**A.    Law Applicable to Dismissal or Conversion.**

11 U.S.C. § 1112(b)(1) and (2) provide, in relevant part, as follows:

(b)(1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court <u>shall</u> convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, <u>for cause</u> unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."

(b)(2) The court may not convert a case to one under chapter 7 or dismiss a case "if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interest of creditors of the estate, <u>and</u> the debtor or any other party in interest establishes that --

    (A)    there is a reasonably likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

    (B)    the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) –

        (i)    for which there exists a reasonable justification for the act or omission; and
        (ii)    that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(1) and (b)(2) (emphasis supplied).

Both courts and commentary have noted that conversion of a Chapter 11 case is now mandatory, and no longer permissive, following the enactment of BAPCPA, if requested by a party and the specific limited exceptions in 1112(b)(2) are not met. *See e.g., In re Van Eck*, 425 B.R. 54, 58 (Bankr. D. Conn. 2010); *see also* NORTON BANKRUPTCY LAW AND PRACTICE, § 103:66 at 103-14 (3d ed. 2008). Moreover, Section 1112(b)(4) sets forth a non-exhaustive list of circumstances or events that constitute "cause" for dismissal or conversion.

1

*See In re Consol. Pioneer Mortg. Entities*, 248 B.R. 368, 375 (9th Cir. BAP 2000).  The specific enumerated Section 1112(b)(4) "causes" supporting this Motion include:

- Section 1112(b)(4)(A), which says cause includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;"

- Section 1112(b)(4)(B), which says cause includes "gross mismanagement of the estate;"

- Section 1112(b)(4)(D), which says cause includes "unauthorized use of cash collateral substantially harmful to 1 or more creditors;

With respect to the first enumerated cause set forth above, which is substantial or continuing loss or diminution of the estate, this "requires the court to determine whether post-petition, the debtor has suffered or continued to experience a negative cash flow, or, alternatively, declining asset values.  The legislative amendments in 2005 set forth in the BAPCPA, added the word 'substantial' to the first inquiry. With the addition of the word 'substantial,' Congress has indicated that a loss need not be continuing. Rather if the loss has been substantial based on the financial circumstances of the debtor, the test may be satisfied." *In re Landmark Atlantic Hess Farm, LLC*, 448 B.R. 707, 713-14 (Bankr. D. Md. 2011); *see also In re Westgate Properties, Ltd.*, 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010) ("The first half of this equation is often met by showing that the debtor continues to incur losses or maintains a negative cash-flow position after the entry of the order for relief").

Similarly, the court in *In re McTiernan*, 519 B.R. 860 (Bankr. Wyo. 2014), stated as follows regarding what constitutes continuing losses to or diminution of the estate:

In evaluating whether a bankruptcy debtor has suffered continuing losses or diminution of the estate to support conversion or dismissal of a chapter 11 bankruptcy case, the court considers all relevant information, including the bankruptcy estate's financial history and financial prospects and the financial records

2

on file in the case. Under certain circumstances, negative cash flow alone can establish a continuing loss to or diminution of the estate for the purposes of establishing the first element. Diminution of the estate may also be established by showing declining asset values.

*Id.* at 866.

However, before a court can dismiss or convert under the first enumerated standard, i.e., Section 1112(b)(4)(A), it must also find the absence of a reasonable likelihood of rehabilitation. However, "rehabilitation' is a different and, unfortunately for the debtor, much more demanding standard than reorganization." *In re Brutsche*, 476 B.R. 298, 301 (Bankr. D.N.M. 2012). "Whereas confirmation of a plan could include a liquidation plan, rehabilitation does not include liquidation." *Id.* In other words, "[r]ehabilitation is more than reorganization. It signifies something more, such as 'to put back in good condition' or 'to re-establish on a firm, sound basis.' It contemplates the successful maintenance or reestablishment of the debtor's business operations. Rehabilitation starts in Chapter 11 with a confirmable plan." *ARS Analytical, LLC*, 433 B.R. 848, 863 (Bankr. D.N.M. 2010); *see also In re Ashley Oaks Dev. Corp.*, 458 B.R. 280, 287 (Bankr. M.D.N.C. 2011) ("Rehabilitation is not synonymous with reorganization and the determination is not whether a debtor can confirm a plan, but whether the debtor has sufficient business prospects for the benefit of creditors and the estate"); *In re Park*, 436 B.R. 811, 817 (Bankr. W.D. Va. 2012) (stating rehabilitation requires the prospect of re-establishing a business at minimum).

With respect to the second enumerated cause set forth above, which is "gross mismanagement of the estate" the *McTiernan* court explained that while the term "gross mismanagement" is not defined in the bankruptcy code, the word "mismanagement" has been defined as "ineptly, incompetently or dishonestly" managing, and the word "gross" has been defined as "glaring, flagrant, very bad." *Id.* at 867. Moreover, the court noted that an example of gross mismanagement found by several courts includes the failure to pay outstanding real property

3

tax and employment tax obligations.  *Id.* at 866.

With respect to the third enumerated factor set forth above, which is the "unauthorized use of cash collateral substantially harmful to one or more creditors", the term cash collateral is defined in 11 U.S.C. § 363(a) as follows:

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, ... or profits of property ... whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

Moreover, the court in *In re Visicon Shareholders Trust* observed that "substantial" is defined as "considerable in importance, value, degree, amount, or extent."478 B.R. 292, 314 (Bankr. S.D. Ohio 2012) (quoting *The American Heritage Dictionary* 1376 (4th ed. 2007)). The court concluded in *Visicon* that the effect of the debtor's unauthorized use of cash collateral rose to such a level of harm where the debtor used the cash collateral "to pay the numerous personal expenses of the insiders, to pay prepetition claims, to make unauthorized payments to professionals, to make mortgage and condominium association payments on [the debtor trust beneficiary's mother-in-law's] Florida condominium, to make the lease payments on [the debtor trust beneficiary's and her mother-in-law's] automobiles, and the payment of expenses for which no explanation was given." *Id.* These unauthorized expenditures—which according to the court, either had no demonstrable benefit to the estate or were made "in complete derogation of the bankruptcy priority scheme"—substantially harmed both the secured creditor who had an interest in the cash, as well as any unpaid unsecured creditors. *Id.*

Finally, it is also important to note that the meaning of the word "cause" in section 1112(b)

4

is flexible and fluid, and gives "wide discretion to the court to make an appropriate disposition of

the cause sua sponte or upon a motion of a party in interest . . ." *See* 11 U.S.C. § 1112 *His. & Rev.*

*Notes, Notes on Committee on the Judiciary,* S. Rep. No. 95-989.  As such, while cause may

include the specific factors listed on Section 1112(b)(4), the Court also can "consider other factors

as they arise," and may "use its equitable powers to reach an appropriate result in individual

cases." *Id.*

> **B.      Law Applicable to Appointment of a Trustee.**

11 U.S.C. § 1104(a) provides in relevant part as follows as it relates to the appointment

of a Chapter 11 trustee:

> (a)      At any time after the commencement of the case but before confirmation of a
> plan, on request of a party in interest or the United States trustee, and after
> notice and a hearing, the court shall order the appointment of a trustee –
>
> > (1)      for cause, including fraud, dishonesty, incompetence, or
> > gross mismanagement of the affairs of the debtor by current management,
> > either before of after the commencement of the case, . . .; or
>
> > (2)      if such appointment is in the interest of creditors . . .

Unlike Section 1104(a)(1), Section 1104(a)(2) does not require a finding of fault; the court

may appoint a trustee even if no "cause" exists.  *See In re Marvel Entm't Group, Inc.*, 140 F.3d

463, 474 (3rd Cir. 1998); *In re Euro–Am. Lodging Corp.,* 365 B.R. 421, 428

(Bankr.S.D.N.Y.2007). Indeed, section 1104(a)(2) simply reflects the practical reality that a

trustee is needed. *Id.; see also In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y.

2010) ("It is not necessary to find fault on the part of the debtor before appointing a chapter 11

trustee in 'the interests of creditors, any equity security holders, and other interests of the estate'

pursuant to § 1104(a)(2)."). Factors that courts have used to determine whether a trustee should

be appointed under this subsection include: (1) the trustworthiness of the debtor; (2) the debtor-

in- possession's past and present performance and prospects for the debtor's rehabilitation; (3)

the confidence—or lack thereof—of the business community and of creditors in present

management; and (4) the benefits derived by the appointment of a trustee, balanced against the

cost of the appointment. *See In re Euro–Am. Lodging Corp.,* 365 B.R. at 427 (quoting *In re*

*Ionosphere Clubs, Inc.,* 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990)).

The Tenth Circuit BAP has affirmed the appointment of a Chapter 11 trustee under

section 1104(a)(2) where it was in the best interests of creditors to do so. *See Sims v. Sims (In re*

*Sims)*, 1997 WL 854793, at *2 (10th Cir. BAP 1997). Among the reasons the court found

supporting the appointment, the court determined that there was a question as to whether the

debtor would pursue potentially avoidable transfers where the transfers were made to the

debtor's insider-family members. *See id.* at *2-3. These same concerns about management's

ability to fulfill their fiduciary duties to the estate and its creditors also have convinced courts in

other jurisdictions to appoint a trustee. *See, e.g., In re Ridgemour Meyer Props., LLC*, 413 B.R.

101, 113 (Bankr. S.D.N.Y. 2008) ("An independent trustee should be appointed under §

1104(a)(2) when [the Debtor's management] suffer from material conflicts of interest, and

cannot be counted on to conduct an independent investigation of questionable transactions in

which they were involved."); *In re Sharon Steel Corp.*, 86 B.R. 455, 465 (Bankr. W.D. Pa. 1988)

("The failure of Sharon management to pursue recovery of insider preferences and fraudulent

conveyances, and its apparent inability to do so because of conflicts of interest, is a violation of

its fiduciary duty, amounts to gross mismanagement and warrants the appointment of a trustee

under either § 1104(a)(1) or § 1104(a)(2)."); *In re Eurospark Indus.*, 424 B.R. at 629 (ordering

appointment of a trustee under Section 1104(a)(2); "As Mr. Speigel's statements confirm, his

interests materially conflict with the estate's interests"); *In re Bowman*, 181 B.R. 836, 845

6

(Bankr. D. Md. 1995) ("The presence of a conflict on the facts of this case compels the court to remove a debtor-in-possession from administration of the case").

Moreover, courts have appointed trustees pursuant to Section 1104(a)(2) where there is a loss of confidence by the debtor's creditors or there exists a high level of acrimony between the debtor and its creditors. *See e.g., In re Marvel Entm't Group*, 140 F.3d 463, 472-473 (3d Cir. 1998); *In re G-I Holdings, Inc.*, 385 F.3d 313, 316 (3rd Cir. 2004); Clifford J. White III & Walter W. Theus, Jr., *Chapter 11 Trustees and Examiners After BAPCPA*, 80 Am. Bankr. L.J. 289, 300-01 (Summer 2006) ("[a] high level of acrimony between a debtor's management and its creditors. . . , particularly if that acrimony is hampering the prospects of rehabilitation" can constitute grounds to appoint a trustee); *In re Eurospark Indus., Inc.*, 424 B.R. 621 (Bankr. E.D. Md. 2010) ("[A]crimony between the creditors and the debtor's management, standing alone, has been found to be a basis to appoint a chapter 11 trustee under § 1104(a)(2).").

## STATEMENT OF FACTS

### A.    The Debtor's Obligations to Keystone and the Collateral Security.

1.    On August 11, 2021, the Debtor, as borrower, executed that certain Secured Promissory Note in the original principal amount of $10,000,000.00 with Keystone as lender (the "**Note**"). *See* Declaration of Brad Allen at ¶7 (hereinafter referred to as the "**Allen Dec.**") that has been filed concurrently herewith. A copy of the Note is attached to the Allen Dec. as Exhibit A.

2.    On August 11, 2021, the Debtor, as borrower, also executed a Loan Agreement setting forth the terms and conditions on which the lender was willing to lend money to the Debtor. *See* Allen Dec. at ¶8. A copy of the Loan Agreement is attached to the Allen Dec. as

7

Exhibit B.

3.      Included in the Loan Agreement under Article 5.11(b) were the following

affirmative covenants:

> Until such time as payment and performance in full of all Obligations of Borrower to Lenders pursuant to the terms and conditions of the Loan Documents, Borrower hereby covenants and agrees that, unless otherwise consent to by Agent in writing, which consent may be withheld in Agent's sole and absolute discretion:

> .   .   .   .

> (b) Borrower hereby agrees to deliver to Agent on behalf of Lenders a perfected first priority (except with respect to Permitted Indebtedness) lien in not less than fifty-one percent (51%) of the total equity ownership of Vanderhall Motor Works, Inc., a Delaware corporation ("Vanderhall"), within five (5) Business Days following the earlier of the (i) expiration of the lock up period following Vanderhall's initial public offering and (ii) the decision or inaction by management of Vanderhall to no longer actively pursue an initial public offering of its securities.

4.      Further, under Article VI of the Loan Agreement the following negative

covenants are found:

> Until such time as payment and performance in full of all Obligations of Borrower to Lenders pursuant to the terms and conditions of the Loan Documents, Borrower hereby covenants and agrees that, without the prior written consent of Agent, which consent may be withheld, delayed or conditioned in Agent's sole and absolute discretion, Borrower will not:

> a.      6.1  <u>Liens</u>.  Create, incur, assume or suffer to exist (except with respect to Liens related to Permitted Indebtedness), directly or indirectly, any Lien on or with respect to any of its assets, of any kind, including the Collateral, whether now owned or hereafter acquired, or any income or profits therefrom, or take any action or series of actions, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any state or under any similar recording or notice statute, the result of any such action or inaction would prevent Agent or Lenders from securing a secured first priority and senior lien position on the Collateral.

b.      6.2 <u>Indebtedness</u>.  Create, incur, assume, suffer to exist, guarantee or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, other than ordinary payables incurred in the ordinary course of business, other than (i) Permitted Indebtedness and (ii) unsecured promissory notes through the PPM program as currently in effect by Borrower on the same terms as previously issued.

c.      6.3 <u>Negative Pledge</u>:  Pursue, agree to enter into or otherwise enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired, including for the avoidance of doubt, any stock ownership of Vanderhall Motor Works, Inc., a Utah corporation.

d.      6.4. <u>Investments</u>:  Pursue, agree to purchase or otherwise acquire the capital stock or other equity interests, assets (constituting a business unit), obligations or other securities of or any interest in any Person, be or become a party to any joint venture, limited liability company, partnership, or other business arrangement, or otherwise make any investments in any Person, other than in the ordinary course of Borrower's business as presently conducted.

e.      6.8 <u>Sale or Merger</u>.  Enter into or consummate any merger, consolidation, reorganization, or recapitalization, or reclassify its equity capital, or merge with or consolidate into, or acquire all of substantially all of the assets of, any Person, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets.

f.      6.10 <u>Disposal of Assets</u>.  Convey, sell, lease, license, assign, transfer or otherwise dispose of any of Borrower's assets other than shares of common stock of Vanderhall that are not subject to the provisions of Section 5.11(b) hereof, including the Collateral (or any portion thereof or enter into any agreement to accomplish any of the foregoing) other than in the ordinary course of its business as presently conducted.

g.      6.16 <u>Transactions with Affiliates</u>.  Unless disclosed to and consented to by Agent, directly or indirectly enter into or permit to exist any transaction with any Affiliate of Borrower, other than the ongoing contribution or investment of capital by Borrower to its portfolio companies as presently conducted in the ordinary course of business.

*See* Allen Dec., Exhibit B at pp. 14-16.

5.      As security for the Note, a Security Agreement, dated August 11, 2021, was

executed by and between the Debtor, as Grantor, and Keystone National Group, LLC ("**KNG**"),

in its capacity as administrative and collateral agent for Keystone, which granted a lien in favor

of KNG, in its capacity as agent, and Keystone on the following assets of the Debtor as

provided on page 1 thereof:

> <u>Grant of Security Interest</u>.  As security for the Obligations and other liabilities and
> obligations owed by Borrower to Agent or Lender as set forth in the Loan
> Documents, Grantor hereby pledges and grants to Agent on behalf of and for the
> benefit of Lenders, and Agent on behalf of and for the benefit of Lenders hereby
> accepts, a continuing security interest of first priority in all right, title and interests of
> Grantor in and to all of its assets, including without limitation, its interests in
> collectively, all of the now- owned and hereafter acquired, created or arising
> tangible and intangible assets and other property of Borrower, wherever located,
> including without limitation all loans, payment obligations, properties, assets,
> receivables, accounts, instruments, goods, equipment, contract rights, agreements,
> security interests, deeds of trust, general intangibles, claims, guarantees, securities,
> documents, cash, deposit accounts, supporting documentation, instruments, chattel
> paper, investment property, stock or other equity interests, financial assets and/or
> any other properties or assets purchased or otherwise acquired by Grantor, whether
> now owned or hereafter acquired, including Borrower's books and records relating
> thereto, and shall also include all renewals, replacements and substitutions of all of
> the foregoing, all products, collections, distributions, proceeds and/or any other
> amounts received from the foregoing, and any and all claims, rights and interests in
> any of the above and all substitutions for, additions and accessions to and proceeds
> thereof (collectively, the "Collateral").

*See* Allen Dec. at ¶9.  A copy of the Security Agreement is attached to the Allen Dec. as Exhibit

C.

6.      Keystone's lien on and security interest in the collateral identified in the

aforementioned Security Agreement was properly perfected on August 11, 2021, by the filing of

a UCC-1 Financing Statement with the Utah Division of Corporations and Commercial Code

and identified by filing no 210811796492-8.  *See* Allen Dec. at ¶10.  A copy of the UCC-1

10

Financing Statement is attached to the Allen Dec. as Exhibit D.

7.      On January 12, 2022, Debtor, as borrower, executed that certain Amendment No. 1 to Loan Documents ("**Amendment 1**") which, among other things, (a) increased the maximum loan amount to $15,000,000.00, and (b) and extended the maturity date of the loan to February 11, 2023.  *See* Allen Dec. at ¶11.  A copy of Amendment 1 is attached to the Allen Dec. as Exhibit E.

8.      In connection with Amendment 1, on January 12, 2022, the Debtor, as borrower, executed that certain Amended and Restated Secured Promissory Note in the original principal amount of $15,000,000.00 (the "**Amended Note**") with Keystone, as lender, and KNG, as agent for the benefit of Keystone.  *See* Allen Dec. at ¶12.  A copy of the Amended Note is attached to the Allen Dec. as Exhibit F**.**

9.      The Note and the Amended Note shall collectively be referred to as the "**Loan**".

10.     On February 11, 2023, Debtor, as borrower, executed that certain Amendment No. 2 to Loan Documents ("**Amendment 2**") which, among other things, (a) extended the maturity date of the loan to December 31, 2023; (b) changed the definition of "ordinary interest rate"; (c) changed the definition of "collateral documents" to the definition set forth below; and (d) added certain performance covenants.  *See* Allen Dec. at ¶14.  A copy of Amendment 2 is attached to the Allen Dec. as Exhibit G.  The new definition of collateral documents as set forth in Amendment 2 is as follows:

> "Collateral Documents" shall mean the collective reference to the Security Agreement, the Guaranty Agreement, and all other instruments, documents and agreements delivered by Borrower or any other Person pursuant to this Agreement or any of the other Loan Documents in order to grant Agent for the benefit of Lenders a Lien on such Person's assets as security for the Obligations, including effective as of February 11, 2023, that certain Pledge Agreement, dated effective as of February 11, 2023, given by the David R. Hall Trust in favor of

11

Agent for the benefit of Lenders (the "Pledge Agreement") as additional
Collateral for all purposes of the Loan Documents."

The additional performance covenants as set forth in Amendment 2 are as follows:

"(c)  The independent valuation of the enterprise value of Vanderhall shall at all
times not be less than $200,000,000.00, which valuation may be determined by (i)
independent, unaffiliated professional valuation agents, engaged on behalf of
Vanderhall for purposes of completing 409(a) valuations, or (ii) independent,
unaffiliated buyers of any of the outstanding securities of Vanderhall, whether
newly issued by Vanderhall or acquired for secondary purchase from any
shareholders of Vanderhall."

"(d)  Notwithstanding anything else to the contrary set forth in any Loan
Document, Borrower shall not sell, assign, transfer, convey, lien, pledge,
encumber, grant or otherwise dispose of more than $6,000,000.00 of its shares of
Vanderhall without the prior written consent of Agent."

*See* Allen Dec., Exhibit G at p. 2.

11.    In connection with Amendment 2, that certain Pledge Agreement, dated February

11, 2023, was executed by and among non-debtor The David R. Hall Trust, as Grantor, and

KNG, in its capacity as administrative and collateral agent for Keystone, which pledged the

"Pledged Securities" identified on Schedule A to the Pledge Agreement (i.e., 3,699,501 shares

of common stock of Vanderhall Motor Works, Inc. ("**VMW**") that are owned by David R. Hall

Trust) as additional security for the Loan.  *See* Allen Dec. at ¶¶15-16.  A copy of the Pledge

Agreement is attached to the Allen Dec. as Exhibit H.  The specific granting language set forth

in the Pledge Agreement states in paragraph 2 thereof as follows:

2.  The Pledge.  To secure the Obligations, Grantor hereby pledges and assigns to
Agent for the benefit and on behalf of Lenders, and grants to Lenders a security
interest in, all of Grantor's right, title and interest, whether now existing or
hereafter arising in all instruments, certificated and uncertificated securities,
money and general intangibles of, relating to or arising from the following
property (the "Pledged Collateral"):

12

(a)     All of the shares, stock, securities and other equity interests more particularly described on <u>Schedule A</u> hereto (the "Pledged Securities");

(b)     All dividends (including cash dividends), other distributions (including redemption proceeds), or other property, securities or instruments in respect of or in exchange for the Pledged Securities, whether by way of dividends, stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares or otherwise; and

(c)     All proceeds of the foregoing ("Proceeds").

*See* Allen Dec., Exhibit H thereto at p. 1, ¶2 (under the Agreement heading).

12.     The following covenants are also contained in paragraph 6 of the Pledge

Agreement:

6.     <u>Covenants Relating to Collateral</u>.  In addition to those covenants, promises and obligations set forth elsewhere in the transaction documents, Grantor hereby agrees, promises and covenants:

(a)  to maintain good and marketable title to all Pledged Collateral free and clear of all liens, encumbrances and security interests and to perform all acts that may be necessary to maintain, preserve, protect and perfect the Pledged Collateral, the lien granted to Lenders herein and the perfection and priority of such lien;

(c)  to promptly notify Agent and Lenders of any claim, action or proceeding affecting the Pledged Collateral, or any part thereof, or the security interest created hereunder and, at Grantor's expense, defend Lender's security interest in the Pledged Collateral against the claims of any person or entity;

(g)  without the prior written consent of Agent, not to surrender or lose possession of (other than to Lenders), sell, encumber, lease, rent, or otherwise dispose of or transfer any Pledged Collateral or right or interest therein, and to keep the Pledged Collateral free of all liens;

*See* Allen Dec., Exhibit H thereto at pp. 2 and 3.

13.     On June 22, 2023, the Debtor, as Borrower, and KNG, as administrative and

collateral agent for Keystone, executed a Consent and Partial Release of Collateral.  *See* Allen

13

Dec. at ¶17.  A copy of the Consent is attached to the Allen Dec. as Exhibit I.

14.     In the Consent, (a) the Debtor acknowledged that Keystone had a security interest in all of Debtor's assets, including share of the capital stock of VMW; (b) Debtor was granted authority to sell or transfer a limited number of shares of VMW stock to an existing VMW stockholder or affiliate (which turned out to be Trousdale Sarosphere, LLC ("**Trousdale**")); (c) the number of VMW shares that could be sold or transferred was 3,731,343 for a total price payable to Debtor of $4,029,850.44; (d) Debtor represented and warranted to Keystone that following the sale and/or transfer the Debtor would still own 94,811,225 shares of VMW stock; (e) the sale and/or transfer of the VMW stock under the Consent would satisfy in full the amount of permitted transfers permitted under the Loan Agreement and the Security Agreement and that Debtor could not sell, transfer, convey, assign, pledge, lien, encumber or otherwise transact in the VMW stock without the prior written consent of Keystone; and (f) $1,200,000.00 of the transfer proceeds would be paid by Debtor to Keystone and applied to reduce the principal amount owing on the Loan.  *See* Exhibit I at pp. 1-2.

15.     On January 25, 2024, Debtor, as borrower, executed that certain Amendment No. 3 to Loan Documents ("**Amendment 3**") which, among other things, extended the maturity date of the loan to June 30, 2024.  *See* Allen Dec. at ¶18.  A copy of Amendment 3 is attached to the Allen Dec. as Exhibit J.

16.     The Note, Loan Agreement, Security Agreement, UCC-1, Amendment 1, Amended Note, Amendment 2, Pledge Agreement, the Consent, and Amendment 3 shall collectively be referred to herein as the "**Loan Documents**".

   **B.     The Lawsuit Filed By Keystone Against the Debtor and the Entry of Judgment in Favor of Keystone.**

14

17.    Debtor subsequently defaulted on its obligations to Keystone and, as a result, Keystone and KNG filed suit against the Debtor in the Third Judicial District Court in and for the State of Utah, Salt Lake County (the "**Third Judicial District Court**") in an action entitled *Keystone Private Income Fund and Keystone National Group, LLC v. Hall Labs, Inc. and Carl Belliston, Trustee of the David Hall Trust*, Civil No. 240907334 (the "**Litigation**").

18.    On February 7, 2025, the Third Judicial District Court, entered its *Judgment* in the Litigation in favor of the Keystone and KNG and against the Debtor and Carl Belliston, Trustee of the David Hall Trust.  A copy of the Judgment is attached hereto as **Exhibit "A."**

19.    Among other relief, the Judgment awarded money damages in favor of Keystone and KNG and against the Debtor in the amount of $13,800,000.00, plus interest thereon in the amount of $627,899.98 as of August 30, 2024, plus pre- and post-judgment interest on the unpaid principal balance from August 31, 2024, until paid in full at the rate of eighteen percent (18%) per annum, plus attorneys' fees and costs of $14,652.60.  *See* Exhibit A at p. 2.

20.    The Judgment further provides as follows with respect to all pledged collateral, including the stock pledged under the Pledge Agreement:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiffs can proceed to obtain all pledged collateral, including all instruments, certificated and uncertificated securities, money and general intangibles of, relating to or arising from 3,699,501 shares of common stock of Vanderhall Motor Works, Inc., a Delaware corporation, together with all dividends (including cash dividends), other distributions (including redemption proceeds), or other property, securities or instruments.  Further, Plaintiff shall use the appropriate Writs issued to the constable or Sheriff of Salt Lake County, or such other appropriate county (or such other appropriate officer of the Court) to seize and sell the Hall Trust Collateral according to the laws and practices of this Court, to satisfy the amounts which are found herein due and owing by Defendant Hall Labs LLC and that the proceeds of such sale be applied first to the costs of foreclosure, including attorneys fees, and then to the indebtedness and obligations of Defendant Hall Labs LLC herein.

*See* Exhibit A at pp. 2, 3.

21.     The Judgment further provides that Keystone's lien on the assets of the Debtor is

the first and senior lien on the Debtors' assets:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiffs' lien
> and security interest is the first and prior lien on all tangible and intangible assets
> of Defendant Hall Labs LLC, now owned or hereafter acquired, including but not
> limited to all loans, payment obligations, properties, assets, receivables, accounts,
> instruments, goods, equipment, contract rights, agreements, security interests,
> deeds of trust, general intangibles, claims, guarantees, securities, documents, cash,
> deposit accounts, supporting documentation, instruments, chattel paper,
> investment property, stock or other equity interests, financial assets of Defendant
> Hall Labs LLC (the "Hall Labs Collateral") for the payment of the obligations of
> Defendant Hall Labs LLC under this Judgment, superior to all right, title or
> interest of the Defendants herein, and all other parties claiming under them, and
> ordering, at the request of Plaintiff, that a Writ of Replevin, and accompanying
> Writ of Assistance, and/or a Writ of Execution shall be issued directing the
> constable or Sheriff of Salt Lake County, or such other appropriate county (or
> such other appropriate officer of the Court) to seize and sell the Hall Labs
> Collateral according to the laws and practices of this Court, to satisfy the amounts
> which are found herein due and owing by Defendant Hall Labs LLC and that the
> proceeds of such sale be applied first to the costs of foreclosure, including
> attorneys fees, and then to the indebtedness and obligations of Defendant Hall
> Labs LLC herein.

*See* Exhibit A at pp. 3, 4.

**C.     The Vanderhall Motor Works Stock and Related Vanderhall Entities.**

22.     The Debtor lists a 51% ownership interest in VMW which it values at

$98,218,686.00.  *See* Exhibit E at p. 7.

23.     David Hall testified that the Debtor's primary asset is its shares in VMW.  *Id.* at

p. 33, line 18 through line 25.

24.     The David Hall Trust also has a partial ownership interest in VMW as reflected

by the Pledge Agreement.  *See* Allen Dec. at Exhibit H.

16

25.     As reflected in paragraphs 10-12 above, the VMW stock has been pledged to Keystone as collateral for the Loan.

26.     However, during the 341 meeting, David Hall, the Debtor's CEO, testified that there are other related Vanderhall entities and that there is some recent or current restructuring going on related to those entities.  *See* Exhibit F at p. 52, line 6 through line 20 and p. 94 line 6 through line 10.

27.     The Utah Department of Commerce website shows that, on April 20, 2023, an entity named Vanderhall North America, LLC ("**Vanderhall NA**") was registered with a principal office address located at 3500 Mountain Vista Parkway, Provo, Utah 84606 and that James Thayer is its Registered Agent.  *See* **Exhibit "B"** attached hereto]

28.     Mr. Thayer is also a secretary and registered principal of VMW which also has a principal office address located at 3500 Mountain Vista Parkway, Provo, Utah 84606.  *See* **Exhibit "C"** attached hereto.

29.     On January 1, 2025 (just a few months prior to the Debtor's bankruptcy filing), an entity named Vanderhall, Inc. was formed in the State of Delaware.  *See* **Exhibit "D"** attached hereto.

**D.     The Debtor's Bankruptcy Petition and Keystone's Proof of Claim.**

30.     On March 5, 2025, the Debtor filed a petition for bankruptcy under chapter 11 of the United States Bankruptcy Code (the "**Petition Date**").  *See* Dkt. #1.  In its petition, the Debtor listed its principal business address as 3500 Mount Vista Parkway, Provo, Utah.  *Id.*

31.     On March 10, 2025, Keystone filed its proof of claim in the Debtor's bankruptcy case.  It included a detailed explanation of the claim along with accompanying documentation. *See* Keystone's Proof of Claim #2 in the Debtor's claims register.

17

32.     The proof of claim states that as of the March 5, 2025, Petition Date, the amount

owed to Keystone under the Judgment and under the Debtor's loan from Keystone was

$15,775,089.58, calculated as follows:

| | |
|---|---|
| Principal: | $13,800,000.00 |
| Interest to August 30, 2024: | $    627,899.98 |
| Interest August 31, 2024-March 5, 2025: | $  1,290,300.00 |
| Attorneys' Fees and Costs: | $      36,889.60 |
| TOTAL: | $15,775,089.58 |

*Id*.

33.     Keystone also asserts in its proof of claim that the collateral securing the

aforementioned obligations consists of essentially all personal property assets of the Debtor,

although the actual value of that collateral is currently unknown by Keystone.  *Id.*

34.     David Hall, as representative of the Debtor, admitted at the 341 meeting that the

amount of Keystone's claim is at least $15,505,153.00.  *Id.* at p. 84, line 12 through line 16.

**E.     The Debtor's Statements and Schedules and the testimony provided by David
        Hall, its CEO, at the 341 Meeting.**

35.     On March 5, 2025, the Debtor filed its Statement of Financial Affairs (the

"**SOFA**") and Schedules.  A copy of the SOFA and Schedules are collectively attached hereto as

**Exhibit E.**[1]  On April 24, 2025, the Debtor filed some amendments to its SOFA and Schedules.

*See* Dkt. #49.  Keystone has used the amended figures and information when referenced below.

---

[1] For purposes of clarity, the page numbers referenced on Exhibit E correlate to those listed on the docket
information appearing at the top of each page of Exhibit E.

36.     The SOFA and Schedules were signed by David Hall, as the chief executive

officer of the Debtor, under penalty of perjury. *Id*. at p. 1.

37.     On April 9, 2025, the Debtor's 341 meeting was held and David Hall, as the

Debtor's CEO, testified on its behalf. [2]  A copy of the 341 Meeting transcript is attached hereto

as **Exhibit F.**[3]

38.     The SOFI, the Schedules and the 341 Transcript provide evidence of the

following facts that are pertinent to this Motion.

### 1.  The Ownership and Management of the Debtor.

39.     The Debtor is owned by David Hall (53.737%) and the David Hall Trust

(46.263%). *See* Exhibit E at p 93.  David Hall is the trustee of the David Hall Trust and therefore

asserts that he is essentially the 100% owner of the Debtor. *See* Exhibit F at p. 21, lines 5-21.

40.     David Hall testified that he is the CEO of the Debtor. *See* Exhibit F. at p. 8, line

2 through line 5.

41.     David Hall testified that other than himself the primary directors and officers of

the Debtor are Wendy Copeland (the CFO) and Carl Belliston. *See* Exhibit F at p. 11, lines 3 and

4, and p. 29, line 20 through line 25.

### 2.  The Debtor's Stated Intent to Liquidate its Assets in Chapter 11 and Not Reorganize.

42.     Mr. Hall admitted at the 341 meeting that the Debtor is not conducting any

---

[2] The Debtor's 341 meeting was continued for the purpose of allowing the Debtor to provide additional documents and other information to the United States Trustee.  As a result of the continuance, Keystone reserves its right to supplement this motion to add further documents and information that comes to light.
[3] For purposes of clarity, the page numbers referenced on Exhibit E correlate to those listed on the docket information that appears at the top of each page of Exhibit E.

business but, instead, merely holds assets that it intends to liquidate.  He testified:

> BURNE:  Okay.  All right.
> So now that we've kind of laid the groundwork of why you filed bankruptcy, what's the plan – in your mind what's the plan to get – get you guys out of bankruptcy and get creditors paid?
>
> HALL:  We – we are putting a plan together, and we're well along with it, which would distribute the assets to the creditors.  And then we would close down.
>
> BURNE:  Okay.
>
> HALL:  So our purpose is to get assets to creditors, and then cease to operate.

*See* Exhibit F at p. 33, line 6 through line 17.

43.     When David Hall was asked where the funds would come from to pay the Debtor's four or five remaining employees he testified they would come from the sale of assets from DHR Holdings and Hall Properties, although he and his attorney were noncommittal about whether court approval would be sought for such sales, even though some real estate sales are already pending, and Keystone asserts that it holds a security interest in all of the Debtor's assets, including any interest it holds in DHR Holdings and Hall Properties.  *See* Exhibit F at p. 89, line 2 through p. 90, line 8.

### 3.  The Affiliates of the Debtor.

44.     In its SOFA the Debtor lists numerous entities in which the Debtor has or has had an interest, including Bacon Work, Inc., Dyol, Inc., Medic, Inc., Nernst Electric, SmarterHome, Inc., VMW, Hall Opportunity Fund 1, Hall Property Holdings, LLC ("**Hall Property**") and DRH Holdings, LLC ("**DRH**").  *See* Exhibit E at pp. 83-85.

20

### 4.   The Complete Collapse of the Debtor's Business and Revenues.

45.      "The Debtor's business model is to create R&D projects and progress them to

for-profit enterprises.  In its earliest stages, each project consists of intangibles and intellectual

property.  *See* Exhibit E at p. 11.

46.      David Hall explained how the Debtor generated revenue for its business

operations and how that revenue dried up over the last few years:

> BURNE:  . . . .  So what – what precipitated Hall Labs having to file this
> bankruptcy case?
>
> HALL:  So normally we would have exits that would bring in the funds to
> keep the company going.  But exits declined, and essentially froze for the
> last couple of years.  And so we didn't have any exit money to keep the
> operations going.
>
> And then that forced default on loans, which then forced us having
> to file.

Exhibit F at p. 31, line 18 through p. 32, line 3.

47.      Mr. Burne also asked Mr. Hall if the Debtor had any cash flow or money coming

in to which Mr. Hall responded "No.  Only from sale of assets."  *See* Exhibit F at p. 32, line 4

through line 8.

48.      Gross revenue from the Debtor's business in 2023 was $10,860,828.00, in 2024,

was $28,733.00, and was $27,919.00 from January 1, 2025, to the Petition Date.  *See* Exhibit E at

p. 71.

49.      The accumulated total of net operating losses (Federal) for the Debtor is listed at

$24,357,061.00 through 2023.  *See* Exhibit E at p. 12.

50.      The Debtor lists the amount of its cash equivalents at only $129,333.33.  *See*

Exhibit E at p. 6.

51.     The Debtor lists its accounts receivable, that are 90 days old or less, at $299,736.00.  *See* Exhibit E at p. 7.

52.     The Debtor lists the value of its personal property assets at $126,236,712.33 and its total liabilities at $86,908,232.29.[4]  *See* Exhibit E at p. 5.

53.     As of the Petition Date, the Debtor had just four or five employees.  *See* Exhibit F at p. 19, line 9 through line 12.

54.     The Debtor's Schedules state that "[T]he Debtor uses office and lab space that is leased by its subsidiary, Hall Property Holdings, LLC from an unaffiliated landlord and subleased to Vanderhall Motor Works, Inc. then sub-subleased by Hall Property Holdings, LLC from Vanderhall Motor Works, Imc. [sic].  It is a month-to-month lease." *See* Exhibit E at p. 10.

55.     However, the Debtor's testimony at the 341 meeting revealed the Debtor is no longer operating from that location and now its employees are just working out of their homes.  *See* Exhibit F at p. 43, line 4 through line 15.

56.     Mr. Hall testified that right now the debtor is "receiving about $20 – to $30,000 a month."  *See* Exhibit F at p. 32, line 16 through line 20.

57.     The Debtor listed eleven current 'earliest stage' projects on pages 11 and 13 on its Schedules.  It also stated not all of the listed projects are currently active or being funded.  *See* Exhibit E at p. 11.  All eleven projects are all valued by the Debtor at $0.00.  *Id.* at pp. 11, 13.

### 5.  The Debtor's Concerning Lack of Knowledge or Information Regarding

---

[4] If the value of the personal property assets is anywhere close to the value listed by the Debtor, Keystone's claim is substantially oversecured.  If and to the extent Keystone is oversecured, it is entitled to (both contractual interest and Default Interest), and its reasonable attorneys' fees and costs, from the Petition Date through the effective date of any confirmed Chapter 11 plan, pursuant to 11 U.S.C. § 506(b).  That said, Keystone does not believe the VMW stock owned by the Debtor is worth anything close to what the Debtor says.

**the Vanderhall Entities.**

58.     David Hall testified that in addition to VMW there are a couple of other Vanderhall entities.  However, Mr. Hall indicated he was not familiar with all of them and lumped them all together as "Vanderhall".  He also had surprisingly little information about those companies.  Mr. Hall testified:

> BURNE:  Okay.  And there's a couple other Vanderhall entities, right?  So there's Vanderhall Incorporated.  Can you tell me what that – what that company is and what it did?
>
> HALL:  I'm not familiar with all of the different Vanderhall companies.  I just refer to – as Vanderhall.  The board of directors of that company has recently done – done some shifting, moving out of Delaware to Utah.
>          And so I think they're – they're those are involved in restructuring the company here in Utah.

*See* Exhibit F at p. 52, line 6 through line 17.

59.     Later in the 341 meeting Mr. Hall was asked by Keystone's attorney about the status of secured debt and the stock holdings in VMW and he had little information to provide: The testimony was as follows:

> JOHNSON:  Now, you – the schedules indicate, and I believe it was your testimony, that the debtor Hall Labs owns 51% of – 51 percent of the common stock of Vanderhall Motor Works correct?
>
> HALL:  Yes.
>
> JOHNSON:  And that's common stock, not preferred stock; right?
>
> HALL:  Yes.
>
> JOHNSON:  To your knowledge, is there any secured debt at the Vanderhall Motor Works level?
>
> HALL:  I'm not aware.

23

JOHNSON:  Do you know approximately the amount of the preferred stock held at the Vanderhall Motor Works level?

HALL:  I'm not aware of those details.

JOHNSON:  Is it in the millions?  Tens of millions?  Hundreds of Thousands?

HALL:  I don't know.

JOHNSON:  You do know, though, that whatever the preferred stock is, that – that stock would need to be staffed [should be satisfied] before any funds would go to Hall Labs on account of its common ownership; correct?

*See* Exhibit F at p. 90, line 19 to p. 91, line 22.

60.     Mr. Hall was then asked "tell me what your understanding is of Vanderhall North America."  *See* Exhibit F at p. 92, line 3 through line 6.  He answered that "I'm not aware of those details."  *Id.*  He was then asked if he had "an understanding of Vanderhall, Inc.," and Mr. Hall answered that "I'm not aware of their current—their current organization structure."  *Id.* at p. 92, line 7 through line 10.

61.     Mr. Hall was then asked "does the debtor have any ownership interest?  Either Vanderhall, Inc., Vanderhall North America?" Mr. Hall answered "I don't know.  I know they have been reorganizing."  *Id.* at p. 92, line 19 through line 23.

62.     Mr. Hall also was asked if he knew whether "assets were transferred out of Vanderhall Motor Works to one or both of those entities, including the gas line business," and he answered "I'm not aware."  *Id.* at p. 92, line 24 through p. 93, line 3.

63.     Mr. Hall was then asked "does debtor have any—as the 51 percent common ownership—stock ownership holder, does the debtor have any information or records regarding

24

what either Vanderhall North America or Vanderhall, Inc. is and what they may own?" Mr. Hall

answered "I don't have any of that." [*Id.* at p. 93, line 19 through p.94, line

64.     David Hall also could not identify the business connection, if any between,

Vanderhall, Inc. and Vanderhall North America:

> BURNE:     Okay.  Do you know if Vanderhall Incorporated or
> Vanderhall North America, if they're, like, the parent company for
> Vanderhall Motor Works?  Of if they're subsidiaries to Vanderhall Motor
> Works?
>
> HALL:  I'm sorry.  I don't know those details.

*Id.* at p. 53, line 17 through line 23.

65.     Keystone's attorney also asked David Hall about the efforts to market its

ownership interest in VMW and the other Vanderhall entities, and although Mr. Hall testified that

some offers had been received he had no details relating to those offers.  The exchange was as

follows:

> JOHNSON:  Has there been any effort to market Hall – to market the
> debtor's stock ownership in Vanderhall Motor Works or any of these other
> entities?
>
> HALL:  Through – through Vanderhall.  We've been relying on them to try
> and sell our interest.
>
> JOHNSON:  Okay.  And how long has that been going on?
>
> HALL:  Several years.
>
> JOHNSON:  Okay.  Have – have – have you received any offers
> whatsoever?
>
> HALL:  Yes.  But none have followed through.
>
> JOHNSON:  Okay.  What – what was the amount of the offers and when

25

did that occur?

HALL:  I'm not aware of that.

JOHNSON:  Who would be –

HALL:  This detail – Vanderhall.

JOHNSON:  You're not aware of the – the debtor's not aware of offers it may have received?  Is that your testimony?

HALL:  They were received through Vanderhall.  Vanderhall was in charge of it.

JOHNSON:  But would Vanderhall not contact you and say, We got an offer for your shares, here it is?

HALL:  Yes.

JOHNSON:  Would you think?

HALL:  Yes.  What I'm saying – yes, but I don't have – I don't have that information.  You'd have to contact Vanderhall.

*See* Exhibit F at p. 94, line 22 through p. 96, line 5.

66.     David Hall testified that Steven Hall, his son, is the founder and CEO of VMW.

*See* Exhibit F at p 52, line 18 through p. 53, line 4.

**6.  The Non-Recourse Promissory Notes the Debtor Entered Into With Insiders That Have No Value.**

67.     The Debtor lists as additional estate assets several separate "nonrecourse" promissory notes that allegedly have no value.  *See* Exhibit E at pp. 11-12.  The borrowers for these notes, as well as the amounts owed and maturity dates are as follows:  (a) Streamline Consulting ($2,475,000.00/matures 7/31/25); (b) Carl Belliston ($990,000.00/matures 7/31/25); Jeffrey Duncan ($990,000.00/matures 7/31); (c) Michael Hall ($990,000.00/matures 7/31/25); (d)

26

Emily Brimhall ($990,000.00/matures 7/31/25); (e) Wendy Coplen ($74,250.00/matures

7/31/25); (f) Tyrone Foster ($74,250.00/matures 7/31/25); (g) Brett Wilkey ($74,250.00/matures

7/31/25) and (h) Sky Evans ($74,250.00/matures 7/31/25). *Id.*

68.     Michael Hall and Emily Brimhall are David Hall's son and daughter. *See*

Exhibit E at pp. 76, 78; *see also* Exhibit F at p. 56, line 2 through line 5 and p. 100, line 20

through p. 101, line 1.

69.     Streamline Consulting, Carl Belliston, Jeffrey Duncan, Michael Hall, Wendy

Coplen, and Brett Wilkey are all identified as being officers or directors of the Debtor or on its

executive committee. *See* Exhibit E at pp. 85-87.

70.     Mr. Burne asked Mr. Hall about the above-referenced non-recourse promissory

notes totaling in excess of $24 million. Part of the exchange between Mr. Burne and Mr. Hall

relating to these notes is as follows:

> BURNE: Okay. And what were the – what were the purposes of – of these
> loans or those promissory notes generally speaking?
>
> HALL: It was to allow the employees to purchase shares in Vanderhall
> back when it was doing the C-round.
>
> BURNE: Okay. So the debtor would give money to these individuals to go
> out and buy their own shares in Vanderhall?
>
> HALL: Yes.
>
> BURNE: Okay. And were any of these –
>
> HALL: Yes.
>
> BURNE: -- so you have – some of them are at zero, like the total – total
> face value. Why is it zero? Like, looking at the second one; right? Like,
> Streamline Consulting promissory note of $2,475 million, but the face

amount is zero.  So why is it zero?

HALL:  Well, the – those loans only have to be paid back, you know, if
they – I'll have to get you some more details on that.

BURNE:  Okay.  Well –

HALL:  Yeah, they're – okay.  The – they're nonrecourse loans.  They're –
we can't go after them for anything.

BURNE:  Okay.  So why – how is it promissory, then?

HALL:  They – well, they were – they were – I'm sorry.  Wrong term?
They were done to give the – these employees incentives to stay with the
company.

*See* Exhibit F at p. 62, line 20 through p. 64, line 1.  But when pressed further, Mr. Hall testified

that no funds were actually paid by the Debtor to these individuals and entities and that the

transactions were just "incentives" given to employees to try to get them to stay with the Debtor.

*Id.* at p. 62, line 2 through p. 66, line 11.

71.    When subsequently asked whether any shares had been transferred to the

individuals and entities identified, Mr. Hall testified that he did not know:

JOHNSON:  Did you transfer the shares?

HALL:  I'm not aware of whether we transferred them or not.

JOHNSON:  Why are you not aware of that?

HALL:  I'd have to study it out.  I don't remember right now.

JOHNSON:  So your testimony is, as the CEO of this company, that you do
not know whether the company transferred Vanderhall shares to these
people, Carl Belliston, Jeffrey Duncan, Michael Hall, Emily Bramhall,
Wendy Copeland?  You don't know whether they – the – whether the
debtor transferred shares to those people?  That's your testimony?

28

HALL:  I don't know if we transferred the shares, or if we were going to wait until the end of the agreement.

JOHNSON:  It – if the – and what do you mean by the end of the agreement?

HALL:  The agreements expire July 31st of '25.

*See* Exhibit F at p. 96, line 16 through p. 97, line 13.

**7.  Other Highly Concerning Transfers Made By the Debtor to Affiliates During the Preference Period.**

72.     On January 9, 2025, the Debtor paid Nernst Power Limited $72,000.00 during the 90-day preference period as an "investment".  *See* Exhibit E at 72.

73.     On February 20, 2025, the Debtor transferred "all of the capital stock of Nernst Power Limited to Nernst Electric Inc." for no consideration.  *See* Exhibit E at p. 73.

74.     Between December 16, 2024, and February 27, 2025, the Debtor paid Microclimate, Inc. $16,545.44 during the 90-day preference period for the "use of employees." *See* Exhibit E at p. 73.

**8.  The Debtor's Transfer of Certain Assets That Are Pledged as Collateral on Keystone's Loan to Insiders.**

75.     On March 31, 2023, the Debtor transferred shares of Bacon Work, Inc., an affiliate of the Debtor, having a value of $2,500,000, to Hall Opportunity Fund 1A, LP whose relationship to the Debtor is identified as "Partial Owner".  *See* Exhibit E at p. 76.

76.     The Debtor also transferred certain assets to Dyol Manufacturing Inc., an affiliate of the Debtor, whose relationship to the Debtor is identified as "Controlled by Mark Hall, David Hall's son".  *See* Exhibit E at p. 77.

77.     On May 22, 2024, the Debtor also transferred certain assets to Hall Logic, Inc., whose relationship to the Debtor is identified as "Controlled by Michael Hall, David Hall's son". *See* Exhibit E at p. 78.

**9.  The Debtor's Purchase of Stock From Businesses Owned by Insiders in 2024 When It Was Insolvent.**

78.     On March 12, 2024, the Debtor repurchased stock held by it in Sure-Fi, Inc., whose relationship to the Debtor is identified as "Controlled by Mark Hall, David Hall's son". *See* Exhibit E at p. 77.

79.     On May 20, 2024, the Debtor also repurchased stock in MicroClimate, Inc., whose relationship to the Debtor is identified as "Controlled by Michael Hall, David Hall's son." *See* Exhibit E at p. 78.

**10. Payments Made to Insiders During the One Year Preceding the Petition Date When the Debtor When it Was Insolvent.**

80.     During the one-year period preceding the Debtor's bankruptcy filing it lists 16 payments made to insiders, including several family members of David Hall, totaling in excess of $268,342.42.  *See* Exhibit E at pp. 86-88.  The payments were allegedly made for payroll, salary, contingent bonuses, employee pay and contractor services.  *Id.*

**11. The Merger or Consolidation of DRH Into the Debtor Just Prior to the Bankruptcy Filing.**

81.     David Hall testified that just prior to the Debtor's bankruptcy filing there was some sort of merger or transfer of assets between the Debtor and DRH, although it is unclear from the testimony exactly what type of arrangement was reached.  *See* Exhibit F at p. 23, line 12 – p. 29, line 25.  By way of summary the following exchange took place between Mr. Burne and

Mr. Hall:

> BURNE:  Okay.  All right.  So if I'm understanding, you individually transferred your interest in DRH and Hall Properties to Hall Labs so that Hall Labs could pay debts; correct?

> HALL:  Well, Hall Properties is already owned by Hall Labs.  But DRH Holdings was only owned by me.

> BURNE:  Okay.  All right.

> HALL:  And so I – I wanted Hall Labs to have access to all those assets.

> BURNE:  Okay.  All right.  So you gave – basically you gave up our interest in DRH and gave it to Hall Labs so that Hall Labs had access to those assets to pay creditors; correct?

> HALL:  Yes.  Yes.

*See* Exhibit F at p. 28, line 7 through line 23.

82.    On Schedule H, the Debtor is listed as a co-debtor with DRH on twelve separate obligations.  *See* Exhibit E at pp. 66-70.

### 12. The Debtor's Concerning Lack of Knowledge or Information Regarding Other Information Relating to the Debtor.

83.    The Debtor lists the ownership of two handheld laser welders valued at $17,856.00 and no other machinery, equipment or vehicles.  *See* Exhibit E at p. 9.

84.    However, when Mr. Burne asked Mr. Hall about the "two hand-held laser welders valued at $17,000." Mr. Hall first responded that "since the time of this filing, they might have been sold" and then, when asked who they were sold to, stated "I'm not familiar.  So I'll have to get back to you on that." *See* Exhibit F at p. 59, 11 through line 24.

85.    Mr. Burne also asked Mr. Hall about the $299,000 in accounts receivable listed

on Schedule A/B, including "how you arrived at the value of this," and "who owes that money? Is it just one party, or is it multiple people that owe the debtor $299,000?" *See* Exhibit F at p. 59. Mr. Hall had no answer to those questions, stating "I will have to get back to you on the details of that." *See* Exhibit F at p. 59, line 2 through line 10.

86.     David Hall also testified that he did not know any details regarding a transfer of $2.5 million in shares from Bacon Work to Hall Opportunity Fund 1A, which is partially owned by the Debtor, as set forth on Exhibit E at p. 77. *See* Exhibit F at p. 77, line 15 through line 22.

87.     When questioned about the earn out transactions that had occurred in the last few years as listed on Exhibit E at pp. 77-78, Mr. Hall explained them as follows:

> JOHNSON:  Tell me about what the earn outs – what's – what's your general understanding of what these earn outs are that you've listed on the schedules and statements?
>
> HALL:  They're a future earnings to Hall Labs based on the performance of the companies.
>
> JOHNSON:  And so Hall Labs owned the companies, transferred them, and then there's some agreement to pay Hall Labs in the future depending on how the company performs.  Is that accurate?
>
> HALL:  Yeah.  Usually, it's a percentage of sales.  Once the company got to that stage.

*See* Exhibit F at p. 99, line 9 through line 22. But then when asked whether Keystone or any other secured creditor was asked about the transfers prior to their happening, Mr. Hall responded, "I don't recall." *Id*. at p. 100, line 7 through line 10.

### 13. Allegations of Fraud Made Against the Debtor Which it Denied During the 341 Meeting.

88.     Matt Burne of the US Trustee's Office asked David Hall whether anyone had

made any allegations of fraudulent or unlawful conduct against the Debtor, and Mr. Hall

answered no.  Mr. Hall testified as follows:

> BURNE:  . . . .  Have there been any allegations that you have participated
> in actual fraud, dishonesty or criminal conduct in the management of the
> debtor's affairs or the debtor's public reporting?

> HALL:  No.

*See* Exhibit F at p. 20.

89.     But according to a document filed by Jamie D. Evans and Evans Development

(the "**Evans Parties**") in this case, the Evans Parties filed a lawsuit against the Debtor and others

in July of 2022 "alleging claims for, among other things, securities fraud and fraudulent transfer

and also directly alleging that Hall Labs had used Evens' and Evans Development (as assignee)

funds to pay off prior noteholders of Hall Labs."  *See* Dkt. #37 at ¶11. However, when the

attorneys for the Evans Parties pointed out the allegations to David Hall during the 341 meeting,

Mr. Hall testified that he couldn't remember:

> WILLIE:  Okay.  Mr. Hall, do you recall listing a case called Jamie Evans
> et al. versus David Hall et. al. in that document?

> HALL:  Yes.

> WILLIE:  Are there allegations of fraud against Hall Labs in that case?

> HALL:  I can't remember.

> WILLIE:  You don't remember if there's allegations of fraud against Hall
> Labs?

> HALL:  I – I'm sorry.  I haven't reviewed that case in a long time.

*See* Exhibit F at p. 105, line 5 through line 16.

**14. The Fine Owed By the Debtor to the IRS for Failure to Pay Health Insurance to Employees and Inclusion of Consolidated Tax Return Information from a Related Entity on the Debtor's Schedules**.

90.      Schedule E/F lists a claim owed to the IRS in the amount of $153,125.00.  *See* Exhibit E at 31.

91.      David Hall testified that the IRS claim was "a fine for not paying health insurance on employees."  *See* Exhibit F at p. 69, line 17 through line 23.

92.      When questioned by Mr. Burne, about the $24,357,061.00 in accumulated net operating losses for 2023 that is set forth on Exhibit E at p. 12, Mr. Hall testified this was from a consolidated tax return and therefore, was "primarily from Hall Labs" but "there might be some from Smarter Home there, too."  *See* Exhibit F at p. 66, line 12 through line 23.

**15. The Debtor Bankruptcy Accounts That Are Actually In the Name of Affiliates.**

93.      During questioning, the Debtor revealed that multiple accounts had been opened up for the Debtor's bankruptcy case.  *See* Exhibit F at p. 11 through p. 12, line 6.  The Amended Schedules reflect these two accounts which are in the names of DHR and Hall Property.  *See* Dkt. #49 at p. 60.

94.      During the 341 meeting, Debtor's attorney also confirmed that two of the three accounts listed as Debtor accounts on Schedule A/B were in fact accounts belonging to affiliates DRH and Hall Property.  *See* Exhibit F at p. 56, line 14 through p. 58, line 8; p. 87, line 10 through line 14.

**F.      The Filing of Keystone's 546(b) Notice.**

95.      On March 7, 2025, which was two days after the Petition Date, *Keystone's (I)*

34

*Notice of Interest In and Refusal to Consent to Use of Cash Collateral, and (II) Demand for*

*Segregation and Accounting of Cash Collateral* was filed with the Court (the "**546(b) Notice**").

*See* Dkt. #10.

96.     The 546(b) Notice, among other things, provided the Debtor and other parties in

interest notice of (a) its perfected security interest in the collateral described in the Security

Agreement, (b) the granting language set forth in the Security Agreement; (c) the Judgment

entered in Keystone's favor against the Debtor; (d) certain provisions set forth in the Judgment

relating to the perfection and priority of Keystone's lien in the collateral described in the Security

Agreement; and (e) the amount due and owing by the Debtor to Keystone as of the Petition Date.

*Id.*

97.     The 546(b) Notice also contained the notice set forth below in which Keystone

made it clear that it did not consent to the use of its cash collateral:

> By this Notice of Interest, the Keystone Creditors hereby invoke their statutory
> rights (to the extent necessary, and without waiving their right to claim perfection
> under applicable nonbankruptcy law) in accordance with 11 U.S.C. § 546(b). The
> Debtor and other parties in interest are hereby further advised (i) that the Keystone
> Creditors, having an interest in cash collateral, **do not consent** to the Debtor's or
> the estate's use thereof absent an acceptable cash collateral agreement and
> adequate protection stipulation; and (ii) the Debtor and the estate are prohibited
> from using the Keystone Creditor's cash collateral, except as otherwise authorized
> by 11 U.S.C. § 363(c)(2). Further, any unauthorized use of the Keystone Creditor's
> cash collateral will result in a request by the Keystone Creditors for either
> dismissal or conversion of this Bankruptcy Case, or a request for appointment of a
> Chapter 11 trustee.

*Id.* at pp. 3-4 (emphasis supplied).

**G.     The Debtor's First Monthly Operating Report.**

98.     On April 21, 2025, the Debtor filed its first monthly operating report (the

35

"**MOR**") that contains several items of information that are pertinent to this Motion which is set forth below.  A copy of the MOR is attached hereto as **Exhibit "G"**.

     a.     The Debtor's cash balance on Petition Date was $209,294.00.  Total receipts for the month amounted to $5,000 creating a cash balance of $214,294.00.  Disbursements from Debtor accounts were in the amount of $84,961.00 leaving an end cash balance of $129,333.00.  *See* MOR at p.2.

     b.     "Disbursements made by third party for the benefit of the estate" amounted to $92,445.  *See* MOR at p.2.

     c.     The $92,445 referenced on page 2 of the MOR came from DRH as a "shareholder distribution."  *See* MOR at p. 25.

     d.     The funds deposited were part of several transfers from Account X6590, which is DRH's account, into the Debtor's account, Account X7876.  *See* MOR at p. 60 (showing DRH's account is "Acct. No. 6590").

     e.     The MOR shows the following transfers from DRH's account into the Debtor's account during March of 2025: (a) $245,015.35 on March 6, (b) $3,968.45 on March 7, and (c) $12,607.09 on March 11.  *See* MOR at pp. 19-20.

     f.     Interestingly, it appears that the Debtor also transferred $250,000.00 from its account (Account No. X7876) back to DRH's account (Account No. X6590) on March 7, 2025.  *See* MOR at p. 20.

     g.     It appears that the Debtor did not even fund the payroll until March 6, 2025, or the day after the Petition Date.  *See* MOR at p. 20 ($67,434.78 transfer to Payzoomllc on March 6).

     h.     $132,188 in general and administrative expenses are reflected in the MOR, as well as $52,242 in other expenses.

     i.     Page 13 of the MOR reflects payroll payments that were made by the Debtor to insiders between March 7, 2025, and March 28, 2025, in the total amount of $59,740.77.

     j.     Page 15 of the MOR reflects a $21,754.50 receivable from VMW.  Page 15 further reflects that Hall Venture Partners and Hall Logic, also presumably insiders, owe small amounts to the Debtor.

k.      Page 16 of the MOR shows negative net income for the Debtor from March 5 to March 31 of $177,022.00.

l.      Page 18 of the MOR shows an account payable to VMW in the amount of $3,313.23.

m.      The March bank statement for account 7876 that is in the name of the Debtor is attached to the MOR.  This bank statement reflects multiple payments that were made out of the account (or at least cleared) post-petition.

n.      Page 25 of the MOR reflects the payment of a $32,886.64 retainer. This amount was also paid (or at least cleared) post-petition.

99.      The Debtor also admitted during the 341 meeting that there were pre-petition debts that were paid which cleared the Debtor's bank account post-petition.  *See* Exhibit F at p. 17, line 11 through p. 18, line 21.

## ARGUMENT

### A.      The Court Should Convert this Case to a Chapter 7.

"Under the 2005 Amendments, it is now substantially easier for a creditor or the United States Trustee to secure the conversion of a case to Chapter 7, or the appointment of a trustee or examiner. The 2005 Amendments achieve this result by expanding the definition of "cause" for such relief, and by leaving courts less discretion to deny such relief once the moving party establishes cause. . . . The changes to § 1112 have great significance because they apply to all Chapter 11 cases, not just cases filed by small businesses." *See* Hon. Thomas E. Carlson & Jennifer Frasier Hayes, The Small Business Provisions of the 2005 Bankruptcy Amendments, 79 Am. Bankr. L.J. 645, 667 (2005).

In short, there is a fundamental obligation of the Bankruptcy Court to convert a pending Chapter 11 case when cause exists and unusual circumstances do not exist:

37

"With cause present, § 1112(b)(2) commands the Court to convert or dismiss the case unless Debtor establishes a statutory reason not to so rule. One court has summarized these shifting burdens of § 1112 as follows:

'Once the movant establishes cause, the burden shifts to the debtor to demonstrate by evidence "unusual circumstances" that establish that dismissal or conversion to chapter 7 is not in the best interests of the creditors and the estate. See 7 Collier on Bankruptcy at ¶ 1112.05[2]. The bankruptcy court retains discretion in determining whether unusual circumstances exist and whether conversion or dismissal is in the best interest of creditors and the estate. *See id.; Gilroy v. Ameriquest Mortg. Co. (In re Gilroy)*, 2008 Bankr.Lexis 3968 (B.A.P. 1st Cir. 2008). A determination of unusual circumstances is fact intensive and contemplates facts that are not common to chapter 11 cases. See 7 Collier on Bankruptcy at ¶ 1112.05[2].  *In re Hosp. de Damas, Inc.*, 2012 WL 1190651, *3 (Bankr. D.P.R. Apr. 9, 2012). The Collier treatise, cited by such court, states:

Once the movant has established cause, the burden shifts to the respondent to demonstrate by evidence the unusual circumstances that establish that dismissal or conversion is not in the best interests of creditors and the estate. Courts have much discretion in making the determination as to whether there are unusual circumstances that should prevent dismissal or conversion. Although a finding of unusual circumstances is within the court's discretion, the word "unusual" contemplates facts that are not common to chapter 11 cases generally. A determination of the existence of unusual circumstances is necessarily fact intensive. An order that denies the requested dismissal or conversion on the basis of "not in the best interests" appears susceptible to reversal on appeal unless the required specifically identified unusual circumstances are a part of the court's findings of record.  7 Collier on Bankruptcy ¶ 1112.05[2] at 1112-43 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2011).

To summarize, under § 1112(b)(1), the court "shall convert . . . or dismiss" a case upon finding "cause." However, under § 1112(b)(2), the court "may not" convert or dismiss "if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor . . . establishes" the elements set out in both
§ 1112(b)(2)(A) and (B).'

The command that the Court "find" unusual circumstances connotes a finding of fact. See Rule 7052.6 As Collier observes, supra, the burden on the party opposing the motion is to "demonstrate by evidence" the unusual circumstances, a term that contemplates "facts" not common to chapter 11 cases generally. It also notes that the determination is "necessarily fact intensive." This Court

38

agrees.

*In re McKay*, 2013 WL 66263, at **2-3 (Bankr. D. Idaho Jan. 4, 2013).

Here, "cause" exists to convert this case to a Chapter 7 for a multitude of reasons as set forth below.

> **1. There has been a substantial or continuing loss to or diminution of the Debtor's estate and the absence of a reasonable likelihood of rehabilitation.**

Here, the Debtor's SOFA and its Schedules that have been signed under penalty of perjury as well as the testimony given by David Hall, the Debtor's CEO, at the 341 Meeting, as well as the Debtor's MOR establishes that there has been a substantial or continuing loss to or diminution of the Debtor's estate over the last two years, including very recent diminution in value. First, consider that gross revenues from the Debtor's business in 2023 were $10,860,828.00, whereas in 2024 they totally collapsed such that only a total of $28,733,00 were realized. Those numbers have also not significantly improved this year. From January 1, 2025, through the Petition Date, gross revenues amounted to $27,919.00.

Moreover, the Debtor's schedules establish that accumulated net operating losses (Federal) through 2023 amounted to $24,357,061.00 which also shows substantial diminution occurring in the Debtor's business over the last few years.

Additionally, substantial diminution is also reflected by the fact that the Debtor only has eleven early-stage projects on which it is working, none of which have any current value according to the Debtor.

The Debtor's estate has also been substantially diminished by payments made

during the preference period to Nernst Power Limited, and Microclimate, both of whom are affiliates of the Debtor, in the amounts of $72,000.00 and $16,545.44, respectively. Again, this happened when the Debtor was not engaged in business and purportedly had no money. During the preference period the Debtor's estate was further substantially diminished when the Debtor transferred all of the capital stock of Nernst Power Limited to Nernst Electric, Inc. for no consideration.

The Debtor's estate has also been substantially diminished by sixteen payments totaling in excess of $268,000.00 to insiders during the past year. These payments were again made when the Debtor was generating virtually zero revenue.

The Debtor's estate also appears to have been substantially diminished by the transfer of shares it owned in Bacon Work, Inc. to Hall Opportunity Fund 1A, which is also an affiliate of the Debtor. The Debtor's estate was also substantially diminished by transferring certain of its assets to Dyol Manufacturing, Inc. and Hall Logic, Inc., one of whom is identified as an affiliate of the Debtor and both of whom are controlled by David Hall's son, Mark Hall.

The Debtor's estate was also substantially diminished when it repurchased stock from Sure-Fi, Inc. and Microclimate, Inc., who are both controlled by David Hall's sons, Mark and Michael, in 2024, when the Debtor was insolvent.

And the substantial diminution of the Debtor's estate has continued post-petition. The Debtors' MOR reflects that total disbursements were made in March of $177,405.67 of which $138,060.31 was for wages to thirteen different employees (even though the

40

Debtor's CEO testified it now only has four or five employees) and it is going out of

business.  More detail relating to the post-petition transfers is set forth in subsection (c)

below.

Based on the foregoing, there is no question that the Debtor's estate has not only

substantially diminished, but dramatically diminished, over the last two years.

Nevertheless, before a court can dismiss or convert under Section 1112(b)(4)(A), it must

also find the absence of a reasonable likelihood of rehabilitation.  Here, there is no

reasonable prospect of rehabilitating the Debtor and in fact the Debtor has acknowledged

as much.  The Debtor's CEO testified during the 341 meeting that the Debtor intends to

file a Chapter 11 liquidating plan, distribute the Debtor's assets to creditors, and close-up

shop.

Accordingly, both prongs of the first enumerated standard set forth in Section

1112(b)(4)(A) are present and there is cause to convert the case to a Chapter 7 under this

subsection.

**2.   There has been gross mismanagement of the Debtor's estate.**

Cause also exists to convert the case to a Chapter 7 pursuant to 1112(b)(4)(B) due

to gross mismanagement on the part of the Debtor, including the following.  First, the fact

that the Debtor went from over $10 million in revenue in 2023 to approximately

$28,700.00 in gross revenues for all of 2024 shows gross mismanagement.

Second, the fact that the Debtor's accumulated net operating losses (Federal)

through 2023 amounted to $24,357,061 shows gross mismanagement.

41

Third, the fact that the Debtor's business has collapsed to the point where it now only has four or five employees who now work out of their homes shows gross mismanagement.

Fourth, the fact that none of the eleven projects which the Debtor has in development have any value shows gross mismanagement.

Fifth, the payment of $72,000 and over $16,000.00 to Nernst Power Limited and Microclimate, respectively, and the transfer of the stock of Nernst Power Limited (without receiving any consideration in return) during the preference period when the Debtor wasn't doing business and was generating no revenue constituted gross mismanagement.

Sixth, the Debtor's payments of over $268,000.00 during the last year to insiders when it has generated virtually no revenue was gross mismanagement.

Seventh, the execution of the eight recourse promissory notes to insiders, which allegedly were for the purpose of providing funds for those individuals to purchase VMW stock without recourse to the Debtor constituted gross mismanagement.  Again, VMW stock was pledged to secure the Debtor's Loan with Keystone.

Eighth, the merger or consolidation of DRH into the Debtor just prior to the Petition Date constituted gross mismanagement.  Although David Hall in the 341 meeting suggested that this was done for the benefit of the Debtor to allow it to have access to more funds in the bankruptcy case, if there was a merger or consolidation then DRH's liabilities would have become the Debtor's liabilities as well.  Indeed, on Schedule H, the Debtor is listed as a co-debtor with DRH on twelve separate loan obligations.  To

42

significantly alter the Debtor's business by merging or consolidating another entity into it, and all the unknowns that came with that transaction, was improper and also constituted gross mismanagement.

Ninth, the Debtor's failure to pay health insurance to its employees which resulted in a $153,125.00 fine to the IRS that is reflected on the Debtor's Schedules constituted gross mismanagement.

Tenth, the Debtor's lack of knowledge regarding critical aspects of its business is severely concerning to Keystone and is evidence of gross mismanagement. For instance, according to Mr. Hall the Debtor's stock in VMW is far and away its most valuable asset, which the Debtor purports to be worth approximately $100 million dollars. However, the Debtor's CEO has virtually no information or understanding about what is even going on at VMW. Interestingly, David Hall's son, Steven Hall, is its CEO. David Hall testified that he did not know what was going on at VMW or the other Vanderhall entities, Vanderhall North America and Vanderhall, Inc. Indeed, in David Hall's mind they were all just lumped together in one entity known as "Vanderhall." Mr. Hall couldn't even answer if the Debtor had any ownership interest in Vanderhall North America or Vanderhall, Inc. Instead, Mr. Hall's stock answers when questioned about any of these entities were usually some form of "I don't know," "I'm not aware," or "I don't have those details." Such responses are not only unsatisfactory but are alarming.

Notwithstanding, David Hall did testify that Vanderhall is currently undergoing a "restructuring" of some sort. The facts also show that VMW, Vanderhall North America

43

and/or Vanderhall, Inc. are utilizing the same address and there is at least some cross-over with its registered agent. The facts further show that Vanderhall, Inc. is a newly created Delaware entity. Moreover, when questioned whether the Debtor had ever attempted to market its stock interest in VMW, Mr. Hall replied that such attempts had taken place, that offers had been received and had fallen through but that he was not privy to all of the details because "Vanderhall was in charge of it." In other words, the Debtor was not even in charge of the marketing and sale of its most valuable asset. Rather, the amorphous "Vanderhall" was in charge. That is highly inappropriate and constitutes gross mismanagement on the part of the Debtor. Indeed, how is Keystone and other creditors supposed to have faith and confidence in the Debtor when its Chairman and CEO cannot answer even the most basic questions about the Debtor's assets, including whether the value of its most valuable asset—its ownership interest in VMW --has been eliminated or put at risk by a "restructuring" overseen by the Debtor's son Steven to place VMW assets into other Vanderhall companies?

Eleventh, David Hall had no knowledge about a fraud lawsuit that had been filed against the Debtor in which he was also named. When originally asked whether there had been any allegations of fraud asserted against the Debtor, Mr. Hall responded "no." When later questioned in the 341 meeting by the attorney for the Evans Parties who reminded Mr. Hall about the lawsuit filed against the him and the Debtor and the complaint included allegations of fraud, Mr. Hall then testified he didn't remember. Such testimony is astonishing and can only be interpreted as either evasive or totally out of touch with what

is going on in the Debtor's business.  Indeed, it raises the issue as to whether David Hall

is in charge of the Debtor or whether the shots are being called by others such as Mr.

Hall's sons.

Twelfth, when asked simple questions during the 341 meeting such as what

happened to the two hand-held lasers valued at approximately $17,000.00, Mr. Hall

responded that they might have been sold (perhaps even after the Petition Date, although

his testimony was unclear) but when asked to who, he testified, "I'm not familiar".

Likewise, when asked for details about the $299,000 in accounts receivable that the

Debtor listed on its Schedules, Mr. Hall stated "I will have to get back to you on the details

of that."

Finally, the gross mismanagement of the Debtor has continued after the bankruptcy

filing.  There are two accounts that have been opened for purposes of the Debtor's bankruptcy

but they apparently are in the names of non-debtor's DRH and Hall Property.  Moreover, the

disbursements that have been made by the Debtor post-petition are quizzical at best.  The

Debtor's MOR that was filed on April 21, 2025, reflected a beginning cash balance of

$209,294.00 with receipts coming in of $5,000.00 and a $92,445.00 contribution coming from a

third-party for the benefit of the estate.  The cash disbursement ledger that can be found on page

25 of the MOR reflects disbursements being made during the reporting period of $177,405.67

leaving an ending cash balance $129,333.00 (about an $80,000.00 cash decline by the end of the

month).  The disbursements made were as follows:  (a) $138,060.31 for wages; (b) $1,972.91 for

dues and subscriptions; (c) $985.91 for miscellaneous office supplies; (d) $3,500.00 for facilities;

45

and (e) $32,886.64 for a retainer.

Why the Debtor is paying $138,060.31 in payroll to thirteen separate employees when it has essentially been out of business for the past year and when it just plans to liquidate and distribute its assets is baffling.  It's also interesting that thirteen people were paid wages when the Debtor testified at the 341 Meeting that the Debtor now has just four or five employees. Further, the amount of wages paid, i.e., $138,060.31 is exorbitant when considering the fact that the Debtor's entire gross revenue for 2024 was $28,733.00.  Additionally, it's nonsensical for the Debtor to be paying $1,972.91 for dues and subscriptions when it plans to liquidate and go out of business.  Moreover, the payment of $985.91 for office supplies and $3,500.00 for facilities likewise makes no sense given the Debtor's testimony that the Debtor is not operating, and it's four or five employees are no longer working out of an office but are now working from home. Finally, there is the $32,886.64 retainer paid to an outside law firm (and not bankruptcy counsel). The Debtor seems to concede that this payment was improperly made according to testimony at the 341 meeting, as it is now trying to get that money back.  However, there is no guarantee that will happen and even if it does it will likely take time and cost money.

All of the foregoing combined together establishes gross mismanagement on the part of the Debtor.  As such the enumerated standard set forth in Section 1112(b)(4)(B) is met and the Court can convert this case to a Chapter 7 on this basis.

### 3. The Debtor's use of Keystone's cash collateral without authorization has been substantially harmful to Keystone.

There is no question here that the Debtor used Keystone's cash collateral without

46

authorization from Keystone or the Court. "Cash collateral," as defined by Section 363(a) of the Bankruptcy Code, "means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest in includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this tile, whether existing before or after the commencement of a case under this title."

Under Section 552(b)(1) of the Bankruptcy Code, if a prepetition security interest "extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise."

Under Section 363(c)(2) of the Bankruptcy Court, a Chapter 11 debtor may not use, sell or lease cash collateral unless "each entity that has an interest in such cash collateral consents," or "the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section."

Keystone's Proof of Claim is on file with the Court. *See* Claim No. 2. The Security Agreement the Debtor signed in favor of Keystone is attached as Exhibit "B" to the Proof of

47

Claim and Exhibit C to the Allen Dec.  Under Clause 2 of the Security Agreement, entitled

"Grant of Security Interest," the Debtor, as Grantor and Borrower, granted Keystone

> [A] continuing security interest of first priority in all right, title and interests of Grantor in and to *all of its assets*, including without limitation, its interests in collectively, *all of the now owned and hereafter acquired, created or arising tangible and intangible assets and other property of Borrower*, wherever located, including without limitation all loans, payment obligations, properties, assets, receivables, accounts, instruments, goods, equipment, contract rights, agreements, security interests, deeds of trust, general intangibles, claims, guarantees, *securities*, documents, *cash, deposit accounts*, supporting documentation, instruments, chattel paper, investment property, *stock or other equity interests*, financial assets and/or any other properties or assets purchased or otherwise acquired by Grantor, *whether now owned or hereafter acquired*, including Borrower's books and records relating thereto, and shall also include *all renewals, replacements and substitutions of all of the foregoing, all products, collections, distributions, proceeds and/or any other amounts received from the foregoing*, and any and all claims, rights and interests in any of the above and all substitutions for, additions and accessions to and proceeds thereof (collectively, the 'Collateral')."

(Emphasis supplied).

Keystone properly perfected it lien on the Collateral identified in the Security Agreement

by filing its UCC Financing Statement with the Utah Division of Corporations on August 11,

2021, Filing No. 210811796492-8.  *See* Proof of Claim, Exhibit D; Allen Dec. at Exhibit D.

Keystone's "all assets" security interest in the Debtor's assets includes as part of Keystone's

Collateral the Debtor's ownership interest in its affiliates, including DRH.  The Debtor's

ownership interest in its affiliates is investment property.  The Uniform Commercial Code

defines "investment property" as "a security, whether certificated or uncertificated, security

entitlement, securities account, commodity contract , or commodity account."  *Utah Code Ann*. §

70A-9a-101(49).  A "security" is "an obligation of an issuer, or a share, participation or other

interest in an issuer or in property or an enterprise of an issuer . . ."  *Utah Code Ann*. § 70A-8-

48

101(p).  A secured party may perfect a security interest in investment property by either (a) filing

a UCC Financing Statement with the applicable filing authority, or (b) obtaining control of the

investment property.  *See Utah Code Ann.* §§ 70A-9a-312 (perfection by filing) and 9a-314

(perfection by control).  And if stock, share or membership certificates are never issued, the only

way to perfect a security interest in investment property is through filing.  *See In re Jaghab*, 584

B.R. 472, 481 (Bankr. E.D.N.Y. 2018) (holding that Trustee could avoid Flores' lien on stock

pledged by the debtor to secure the debtor's repayment of a loan because Flores had failed to

perfect the lien through filing; "Flores was granted a security interest in the Debtor's shares of

GJ & JF pursuant to the Security Agreement but because the stock certificates were never

prepared, Flores never obtained possession of the shares pledged to him").

Here, the Debtor's interest in DRH (and in the other entities it has an interest in, such as

VMW) is investment property as defined in the Uniform Commercial Code.  Keystone has a

perfected security interest in all of the Debtor's investment property because (a) the Security

Interest the Debtor signed grants Keystone a lien on "all assets," including "securities," "stock"

or other "equity interests," and (b) Keystone perfected its lien through filing a UCC Financing

Statement with the Utah Division of Corporations.  Furthermore, Keystone's lien extends to "all

renewals, replacements and substitutions of" the Collateral, and "all products, collections,

distributions, proceeds and/or any other amounts received from" the Collateral.

Simply put, all of the funds that DRH transferred into the Debtor's bank account as a

"shareholder distribution" are the traceable proceeds of Keystone's perfected security interest,

and those funds constitute Keystone's cash collateral.  The Debtor freely admits that it used these

funds to fund its payroll obligations.  Finally, the use of Keystone's cash collateral to make

payroll resulted in the balance of the Debtor's bank account declining by almost $90,000.00 from the Petition Date to March 31, from $209,294 to $129,333.

Furthermore, the Debtor has been on notice since no later than two days following the Petition Date that Keystone did not consent to the use of its cash collateral. On March 7, 2025, Keystone filed its 546(b) notice, in which, it among other things, provided the Debtor and other parties in interest notice of (a) its perfected security interest in the collateral described in the Security Agreement, (b) the granting language set forth in the Security Agreement; (c) the Judgment entered in Keystone's favor against the Debtor; (d) certain provisions set forth in the Judgment relating to the perfection and priority of Keystone's lien in the collateral described in the Security Agreement; and (e) the amount due and owing by the Debtor to Keystone as of the Petition Date. *See* Dkt. #10. Further, Keystone specifically stated in the 546(b) Notice that "[t]he Debtor and other parties in interest are further advised (i) that the Keystone Creditors, having an interest in cash collateral, <u>do not consent</u> to the Debtor's or the estate's use thereof absent an acceptable cash collateral agreement and adequate protection stipulation; and (ii) the Debtor and the estate are prohibited from using the Keystone Creditor's cash collateral, except as otherwise authorized by 11 U.S.C. § 363(c)2)." *Id.* at pp. 3-4.

Notwithstanding the foregoing, the Debtor went ahead and used tens of thousands of dollars of Keystone's cash collateral anyway. Moreover, even though the Debtor's bankruptcy filing has now been pending for seven weeks no motion to use cash collateral has been filed. Finally, it was not until April 24, 2025, or *fifty days into the case*, that the Debtor finally filed a motion to bless the unauthorized post-petition payment of pre-petition wages to the Debtor's employees.

50

Finally, the Debtor's use of Keystone's cash collateral also caused substantial harm to Keystone. The Debtor used tens of thousands of Keystone's cash collateral without court authority, without Keystone's permission, without providing Keystone with adequate protection (indeed, it has no adequate protection it can provide since it is not operating), and without valid reasons for even using that cash. As such, Keystone is at risk of losing that collateral security and it has been harmed by the Debtor's actions. Accordingly, cause likewise exists under 11 U.S.C. § 1112(b)(4)(D) to convert the case to a Chapter 7.

### 4. Other Considerations Likewise Support the Conversion of this Case to a Chapter 7.

As a debtor-in-possession the Debtor owes a fiduciary obligation to its creditors to administer the case and propose a plan that will be in the best interests of its creditors. However, it's important to note that the Debtor has multiple conflicts in this case. For instance, there have been multiple transfers made by the Debtor of ostensibly millions of dollars to insiders, affiliates and others that need to be investigated and potentially pursued for recovery. Given the Debtor's conflicts and its prior conduct it is highly questionable whether the Debtor would be willing and able to pursue such an investigation.

Based upon the foregoing, the Court should find that "cause" exists to convert this case under 11 U.S.C. §§ 1112(b)(4)(A), (b)(4)(B) and (b)(4)(D). Indeed, if any of the enumerated standards that are set forth in 1112(b)(4) are met then the court must convert the case to a Chapter 7 unless the Debtor can establish the presence of unusual circumstance such that conversion would not be in the best interests of the estate and its creditors. However, "unusual

51

circumstances" do not exist here.  Finally, conversion makes sense because the Debtor, by its own admission, is not going to attempt a reorganization but rather is going to propose a liquidating plan that will distribute its assets to creditors and then closedown.  Given the substantial diminution of the Debtor's assets, the gross mismanagement that has occurred, the Debtor's improper use of cash collateral, and the numerous conflicts the Debtor has, it would be best to convert the case and have a Chapter 7 trustee handle the liquidation of the Debtor's assets, which obviously will include investigation into the numerous questionable transactions disclosed on the Schedules and SOFA.

**B.      Alternatively, and at a Minimum the Court Should Appoint a Chapter 11 Trustee**.

In the event the Court decides to not convert this case to a chapter 7, the Court should at least appoint a Chapter 11 trustee.  As shown below, the requirements to appoint a Chapter 11 Trustee under Section 1104(a) are clearly present.

**1.   There has been fraud, gross mismanagement and incompetence on the part of the Debtor.**

Evidence of fraud, gross mismanagement and incompetence on the part of the Debtor is set forth in great detail in the fact section of this Motion and summarily described above in the argument section A. of this brief.  Rather than restating that evidence here and for purposes of brevity Keystone incorporates by reference the arguments set forth in subsection A. above. Nonetheless, this factor is met in this case and it would be proper in the alternative for the Court to appoint a Chapter 11 Trustee if it does not convert the case to a Chapter 7.

**2.   Keystone (and likely other creditors) have no confidence in the Debtor, its ability to carry out its fiduciary duties or its willingness**

**to pursue questionable transactions given its numerous conflicts of interest.**

While fraud, gross mismanagement and incompetence support the appointment of a Chapter 11 Trustee, that is not the only standard that supports such an appointment under Section 1104(a). The case law interpreting this section establishes that even acrimony between the Debtor and its creditors is a sufficient basis to appoint a Chapter 11 Trustee. Here, Keystone has no faith that the Debtor is in charge of its business, that it knows what is going on with its business, or that it has the will or capacity to carry out its fiduciary duties in this bankruptcy case. Given everything that Keystone has learned about the Debtor recently, there is a solid basis to question whether this bankruptcy case has been filed for the benefit of the Debtor or whether it has been filed for the purpose of benefitting VMW, the other Vanderhall entities, and/or the insiders and affiliates of the Debtor. As such, the Debtor needs to be removed as soon as possible and at the very least a Chapter 11 Trustee appointed in its stead.

Based on the foregoing, it cannot reasonably be questioned that, given the current state of affairs, a neutral trustee with would be in the best interests of creditors as defined in Section 1104(a)(2) of the Bankruptcy Code.

## <u>CONCLUSION</u>

Having shown good cause therefore, Keystone respectfully requests that the Court enter an order converting this Chapter 11 case to a liquidation case under Chapter 7, or in the alternative, that the Court order the appointment of a Chapter 11 trustee to oversee the liquidation of the Debtor's assets.

DATED this 1st day of May, 2025.

RAY QUINNEY & NEBEKER P.C.

By:  */s/ Michael R. Johnson*
Michael R. Johnson
*Attorneys for Keystone Private Income Fund*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY on the 1st day of May, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to all of the electronic filing users in this case.

By: */s/ Annette Sanchez*_____

1707639