Andres Diaz (A4309)
Timothy J. Larsen (A10263)
**DIAZ & LARSEN**
757 East South Temple, Suite 201
Salt Lake City, UT 84102
Telephone: (801) 596-1661
Fax: (801) 359-6803
Email: courtmail@adexpresslaw.com
*Attorneys for the Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In Re: HALL LABS, LLC<br>3500 Mountain Vista Parkway<br>Provo, UT 84606<br><br>Debtor in Possession. | Bankruptcy No. 25-21038<br>Chapter 11<br><br>**FILED ELECTRONICALLY**<br><br>Judge Joel T. Marker |

## DEBTOR'S DISCLOSURE STATEMENT DATED MAY 12, 2025, WITH SUMMARY OF PLAN

### INTRODUCTION

Hall Labs, LLC., the above-named debtor and debtor in possession (the "Debtor"), has prepared this Disclosure Statement Dated May 12, 2025, With Summary of Plan (the "Disclosure Statement"). The Plan has not yet been filed with the United States Bankruptcy Court for the District of Utah in the Debtor's reorganization case under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") but this Disclosure Statement contains a detailed Summary of the Plan. This Disclosure Statement is provided to creditors and other parties in interest to disclose "adequate information" as far as reasonably practical in light of the nature and history of the Debtor's business affairs so that holders of claims and interests can arrive at an informed

Hall Labs, LLC
Bankruptcy No. 25-21038

i

judgment about the Plan within the meaning of 11 U.S.C.§1125(a)(1) once the Plan is filed and circulated.

THE DEBTOR BELIEVES THIS DISCLOSURE STATEMENT IS ACCURATE AND COMPLETE; HOWEVER, THERE IS NO GUARANTEE THAT IT IS. THE INFORMATION IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT OR CERTIFIED AUDIT. THE DEBTOR IS THEREFORE UNABLE TO WARRANT THAT THERE ARE NO INACCURACIES IN THE INFORMATION, ALTHOUGH THE DEBTOR MADE A GOOD FAITH EFFORT TO BE ACCURATE. NEITHER THE BANKRUPTCY COURT NOR ANY OTHER PARTY IN INTEREST HAS PASSED UPON THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

YOU SHOULD READ THIS DISCLOSURE STATEMENT, ITS EXHIBITS AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT**

# TABLE OF CONTENTS

PROCEDURAL INFORMATION..................................................................1
    Voting....................................................................................................1

ARTICLE A   BACKGROUND OF THE CASE ................................3
    A-1.00  Petition...............................................................................3
    A-2.00  Debtor in Possession.........................................................3
    A-3.00  Unsecured Creditors' Committee ....................................3
    A-4.00  No Trustee or Examiner ...................................................3

ARTICLE B   BACKGROUND AND AFFAIRS OF THE DEBTOR.............3
    B-1.00  Formation of the Debtor ..................................................3
    B-2.00  Debtor's Wholly Owned Subsidiaries.............................3
    B-3.00  Management of the Debtor and its Subsidiaries.............4
    B-4.00  Place of Business ..............................................................4
    B-5.00  Nature of the Debtor's Business......................................4
    B-6.00  Prepetition Operations and the Reason the Petition was Filed.......6

ARTICLE C   SIGNIFICANT EVENTS IN THE DEBTOR'S
             REORGANIZATION CASE ................................................11
    C-1.00  Petition.............................................................................11
    C-2.00  Statement and Schedules ...............................................11
    C-3.00  Employment of General Counsel ...................................11
    C-4.00  Keystone Notice of Interest in Cash Collateral.............11
    C-5.00  Keystone Motion for Comfort Order .............................12
    C-6.00  STAG Motion for Comfort Order ...................................12
    C-7.00  SPHL Stipulation with the Debtor .................................12
    C-8.00  Debtor's Motion to Approve Payment of Salaries.............12
    C-9.00  Meeting of Creditors......................................................12
    C-10.00 Keystone's Motion to Convert Case to Chapter 7 or Appoint a
             Trustee ............................................................................13
    C-11.00 Debtor's Initial Disclosure Statement ..........................13

ARTICLE D  FINANCIAL DATA, ASSETS AND LIABILITIES ......................13
    D-1.00  Summary of Chapter 11 Operations...............................13
    D-2.00  Assets of the Debtor and its Wholly Owned Subsidiaries...............13
    D-3.00  Claims Against the Debtor ............................................16
    D-4.00  Valuation of Real Property ............................................17
    D-5.00  Valuation of Vanderhall Stock ......................................18
    D-6.00  Valuation of Bacon Stock...............................................19
    D-7.00  Valuation of SmarterHome Stock...................................19
    D-8.00  Valuation of HOF1 Interest ...........................................20
    D-9.00  Valuation of R&D Assets ................................................20
    D-10.00 Disputed and Contingent Claims Against the Debtor ......................22

**ARTICLE E  SUMMARY OF THE DEBTOR'S PLAN** ........................................24

**SECTION 1.  INTRODUCTION AND OVERVIEW** .............................24
**E-1.00   Caution** ...............................................................................24
**E-2.00   Overview of the Plan**.........................................................24

**SECTION 2.  ADMINISTRATIVE EXPENSES AND TAXES**....................29
**E-3.00   Postpetition Operating Expenses**.......................................29
**E-4.00   Administrative Expenses** ..................................................29
**E-5.00   Priority Tax Claims** ..........................................................30
**E-6.00   Classes of Claims and Interests** ......................................30

**SECTION 3.  DESIGNATION AND TREATMENT OF IMPAIRED
          CLASSES** ............................................................31
**E-7.00   Impaired Classes** ..............................................................31
**E-8.00   Satisfaction of Claims by In-Kind Distribution** ...............31
**E-9.00   Class 1A – Claims of Central Bank Secured by Real Property
          Owned by HPH** .........................................................32
**E-10.00  Class 1B – Claim of Central Bank Secured by Real Property
          Owned by DRHH** .......................................................33
**E-11.00  Class 2 – Claim of Hillcrest Bank Secured by Real Property
          Owned by DRHH** .......................................................34
**E-12.00  Class 3 --Claims Secured by Personal Property (Keystone Claim)**34
**E-13.00  Class 4 – Permitted Indebtedness.**......................................36
**E-14.00  Class 5 – Undisputed Noncontingent Unsecured Claims** ...............37
**E-15.00  Class 6A – Contingent Unsecured Claims that will not be Paid**.....37
**E-16.00  Class 6B – Contingent Unsecured Claims that will be Paid**...........38
**E-17.00  Class 7 – Disputed Claims** ................................................38
**E-18.00  Class 8 – Interests** ...........................................................39
**E-19.00  Absolute Priority** ..............................................................39

**SECTION 4.  EXECUTORY CONTRANCTS AND LEASES**....................39
**E-20.00  Assumed Leases and Executory Contracts**............................39
**E-21.00  Catch-all Rejection.**..........................................................39
**E-22.00  Cure.**................................................................................39
**E-23.00  Deadline for Claims Based Upon Rejected Contracts or Leases**....40

**SECTION 5.  OPERATIONS OF THE REORGANIZED DEBTOR**........40
**E-24.00  Operation of the Business** ................................................40
**E-25.00  Management of the Reorganized Debtor**.............................40
**E-26.00  Compensation of Manager**................................................40
**E-27.00  Estimated Cash Flow** .......................................................41
**E-28.00  Avoidable Transfers**.........................................................41

**SECTION 6. OTHER MATTERS** ...................................................42
**E-29.00 Default**.............................................................................42
**E-30.00 Retention of Jurisdiction** ...............................................42
**E-31.00 Final Decree and Order Closing Case**............................42

**ARTICLE F   LIQUIDATION AND DISTRIBUTION ANALYSIS** ....................43
**F-1.00    Liquidation and Distribution Analysis** ........................43
**F-2.00    Advantages of the Plan** ..................................................44

**ARTICLE G   ALTERNATIVES TO THE PLAN AND RISKS** ..........................44
**G-1.00    Alternatives**......................................................................44
**G-2.00    Risks Related to the Debtor** ...........................................44
**G-3.00    Risks Related to the Company Stock**..............................45

**ARTICLE H   MANNER OF VOTING AND CONFIRMATION OF THE
PLAN** ...................................................................................46
**H-1.00    Solicitation of Acceptances**...........................................46
**H-2.00    Counting Votes and Acceptances** ..................................46
**H-3.00    Acceptance by Impaired Classes** ...................................46
**H-4.00    Manner of Voting**............................................................46
**H-5.00    Hearing on Confirmation** ...............................................47
**H-6.00    Best Interest of Creditors** ..............................................47
**H-7.00    Confirmation Without Acceptance by All Classes**........47
**H-8.00    Rejection by Secured Classes**.........................................47
**H-9.00    Rejection by Unsecured Classes** ....................................48

**ARTICLE I   TAX CONSEQUENCES OF THE PLAN**....................................48
**I-1.00    Tax Consequences**............................................................48

## EXHIBITS

**EXHIBIT 1**        **SCHEDULE OF PERMITTED INDEBTEDNESS**

**EXHIBIT 2**        **SUMMARY OF ASSETS**

**EXHIBIT 3**        **SUMMARY OF CLAIMS**

**EXHIBIT 4**        **R&D ASSETS**

**EXHIBIT 5**        **LIQUIDATION AND DISTRIBUTION ANALYSIS**

## PROCEDURAL INFORMATION

<u>Voting.</u> A ballot to be used for voting for or against the Plan is enclosed. Under the Bankruptcy Code, "impaired" classes of claims are entitled to vote on the Plan. CLAIMS IN CLASSES 1A through 7 AND INTERESTS IN CLASS 8 ARE IMPAIRED AND ENTITLED TO VOTE.

**IN ORDER TO BE COUNTED, BALLOTS MUST BE RETURNED SO THAT THEY ARE RECEIVED NO LATER THAN 4:30 P.M., MOUNTAIN TIME, ON _____, AT THE FOLLOWING ADDRESS:**

**DIAZ & LARSEN
HALL LABS, LLC BALLOT
757 EAST SOUTH TEMPLE, SUITE 201
SALT LAKE CITY, UT 84102**

**A HEARING ON CONFIRMATION OF THE DEBTOR'S PLAN WILL BE HELD BEFORE THE HONORABLE JOEL T. MARKER, UNITED STATES BANKRUPTCY JUDGE, ON _____, 2025. THE HEARING WILL BE A ZOOM VIDEO HEARING. PARTIES WHO WISH TO PARTICIPATE IN THE HEARING SHOULD CONSULT THE BANKRUPTCY COURT'S WEBSITE AT HTTPS://WWW.UTB.USCOURTS.GOV/PREPARING-PARTICIPATE-ZOOMGOV-VIDEO-HEARING FOR THE MOST UP-TO-DATE INFORMATION REGARDING VIDEO PARTICIPATION AT A HEARING. AT THE TIME OF THIS NOTICE, PARTIES WISHING TO PARTICIPATE IN HEARINGS HELD BEFORE THE HONORABLE JUDGE JOEL T. MARKER SHOULD JOIN VIA ZOOM NUMBER BELOW AT LEAST 10 MINUTES BEFORE THE SCHEDULED DATE AND TIME FOR THE HEARING: JUDGE MARKER MEETING ID: 161 5478 8875 PASSCODE/PARTICIPANT ID:**

3834658. IF YOU ARE UNABLE TO CONNECT VIA ZOOM, YOU MAY CALL

INTO THE HEARING BY DIALING 1 669 254 5252, WITH

PASSCODE/PARTICIPANT ID: 3834658.

OBJECTIONS TO CONFIRMATION OF THE PLAN, IF ANY, MUST BE

IN WRITING AND FILED WITH THE CLERK OF THE BANKRUPTCY

COURT, AT THE ABOVE ADDRESS, ON OR BEFORE

_____ 2025, AND COPIES OF SUCH OBJECTION MUST BE

SERVED UPON:

> Andres Diaz
> Timothy Larsen
> DIAZ & LARSEN
> 757 East South Temple, Suite 201
> Salt Lake City, UT 84102
> Attorneys for the Debtor in Possession
>
> Matthew Burne
> United States Trustee's Office
> 405 South Main Street, Suite 300
> Salt Lake City, UT 84111
>
> [Counsel for the Unsecured Creditors'
> Committee]
> [Address]

OBJECTIONS TO CONFIRMATION, IF ANY, WILL COME ON FOR

HEARING AT THE TIME OF THE HEARING ON CONFIRMATION SET

FORTH ABOVE.

## ARTICLE A

## BACKGROUND OF THE CASE

A-1.00 <u>Petition</u>. The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on March 5, 2025.

A-2.00 <u>Debtor in Possession.</u> The Debtor has remained in possession and has operated its business as Debtor in Possession since the filing of the petition.

A-3.00 <u>Unsecured Creditors' Committee.</u> An unsecured creditors' committee has been appointed in this case.

A-4.00 <u>No Trustee or Examiner.</u> No trustee or examiner has been appointed in this case.

## ARTICLE B

## BACKGROUND AND AFFAIRS OF THE DEBTOR

B-1.00 <u>Formation of the Debtor.</u> The Debtor, Hall Labs, LLC, was organized as a limited liability company under the laws of the State of Utah on March 30, 2015, under the name "NewVistas, LLC." The Debtor's name was changed to "Hall Labs, LLC" by the filing of an amendment to the Debtor's Certificate of Organization on December 21, 2016.

B-2.00 <u>Debtor's Wholly Owned Subsidiaries</u>. Hall Property Holdings, LLC ("***HPH***") is a wholly owned subsidiary of the Debtor. HPH was organized under the laws of the State of Utah on July 11, 2014, under the name "NewVista Property Holdings, LLC." HPH's name was changed to "NewVistas Property Holdings, LLC" by the filing of an amendment to its Certificate of Organization on May 18, 2016. HPH's name was changed to "Hall Property Holdings, LLC" on March 28, 2019.

DRH Holdings LLC ("***DRHH***") is a wholly owned subsidiary of the Debtor. DRHH was organized under the laws of the State of Utah on November 23, 2016.

B-3.00 Management of the Debtor and its Subsidiaries. The Debtor's capital structure consists of two classes of membership interests: Class A, which holds voting rights, and Class B, which is non-voting. The Class B membership interest holds substantially 100% of the economic interest of the Debtor. David R. Hall owns 100% of the Class A membership interest in the Debtor and 53.74% of the Class B membership interest. The David R. Hall Trust, an irrevocable trust established under the laws of the State of Utah[1], owns 46.26% of the Class B membership interest in the Debtor. Carl J. Belliston is the trustee of the Trust, but the sole function of the Trust is to hold a non-voting membership interest in the Debtor and potentially a few other assets for the benefit of the Debtor. David R. Hall is the authorized representative of the Debtor's bankruptcy estate and currently controls the Debtor as its manager and CEO.

B-4.00 Place of Business. The Debtor's principal place of business is the State of Utah.

B-5.00 Nature of the Debtor's Business. The Debtor is engaged in research, development, business incubation, and other legal activities. The Debtor has a unique

---

[1] The David R. Hall Trust is not a family trust set up to preserve assets for David Hall and his family. Rather, it is an irrevocable trust established for the governance of Hall Labs and the benefit of NewVistas Foundation, a 501(c)(3) charitable organization. The beneficiaries of the David R. Hall Trust are (i) employees and regular contractors of Hall Labs and its portfolio companies, existing from time to time, excluding David Hall, and (ii) NewVistas Foundation. The benefit of the Trust to employees and contractors is employment opportunity. No distributions may be made to employees or contractors, only to NewVistas Foundation or another 501(c)(3) organization upon any termination of the Trust. The Trust has no substantial assets except its interest in the Debtor and the Vanderhall Stock (as defined below) that will be transferred to one of the Debtor's creditors. New Vistas Foundation has received no contributions from the Debtor since 2015, and it has no assets other than $10,000.00 in a bank account and an educational website. The Foundation will receive nothing under the Plan.

business model. It creates projects to develop technologies in various fields. If a project shows promise, the Debtor creates a business entity (a portfolio company) with the objective of forming a business enterprise. The portfolio company hires its own staff and may seek outside investment. The Debtor may provide administrative services, technical and scientific input, and funding. The ultimate objective is to sell the portfolio company, or the Debtor's interest in the portfolio company. Portfolio companies that have been owned in whole or in part by Debtor in the past six years are listed in Part 13 of the Statement of Financial Affairs.

The Debtor maintains a small administrative staff and a small staff of scientists, inventors, and others with technical expertise. It makes substantially all of its money by selling technology or interests in portfolio companies, i.e., asset sales. This is the Debtor's ordinary course of business. The Debtor typically must make investments over several years before generating revenues from such sales. It has relied on debt, including unsecured investment notes issued to individual investors ("*Investment Notes*"), to bridge the time between R&D investments and such sales. Revenues typically are received in large chunks, with very little recurring revenue month to month.

The Debtor and its predecessors owned and operated by David R. Hall have used this model successfully for over 40 years, generating hundreds of millions of dollars in transactions. Mr. Hall has financed the operations of these entities with various forms of debt financing and has assumed personal responsibility for substantially all debts through personal guarantees or otherwise. Until 2020, none of Mr. Hall's entities has ever defaulted on any debt.

HPH supports the Debtor's business by owning and managing real property and

equipment, primarily for the use of the Debtor and its affiliates. Nearly all of HPH's assets have been sold to try to keep the Debtor's operations going and to keep the Debtor current on debts to banks, holders of Investment Notes, and others.

DRHH holds and manages a variety of investments. Nearly all of DRHH's assets have been sold to try to keep the Debtor's operations going and to keep the Debtor current on debts to banks, holders of Investment Notes, and others. Between 2020 and 2024, before David Hall transferred 100% of the interest in DRHH to Hall Labs, David contributed over $14 million to Hall Labs and HPH for such purposes. DRHH currently functions solely to support the Debtor's business and to make resources available for the Debtor's operations.

David R. Hall's personal assets have been depleted. He owns no real estate, investments, or personal property other than a bank account that is solely from Social Security income for the past year and a truck with a lien on it.

B-6.00 <u>Prepetition Operations and the Reason the Petition was Filed</u>. In 2015, Novatek, Inc. ("***Novatek***"), a company previously owned by David R. Hall, was sold to Schlumberger Technologies ("***Schlumberger***") for approximately $129 million. The Debtor was formed in anticipation of the Schlumberger transaction. Prior to the consummation of the transaction, Novatek transferred to the Debtor and HPH all projects and assets that Schlumberger did not want Novatek to retain.

Part of the purchase price in the Schlumberger transaction was paid through an earn-out arrangement that provided revenues to the Debtor through 2020 in the amount of $10,000,000 per year. The Debtor anticipated that it would be able to sell one or more of

its portfolio companies by 2020, sufficient to enable the Debtor to remain current on all its debts, before the revenue stream from the Schlumberger transaction ended.

The Debtor's most mature and most valuable portfolio company at the time of the Schlumberger transaction was Vanderhall Motor Works, Inc. ("*Vanderhall*"), which was believed to be worth at least $250,000,000 to $300,000,000 in 2020 based on third-party analyses. (The stock of Vanderhall held by the Debtor is referred to herein as the "*Vanderhall Stock*.") The Debtor anticipated that Vanderhall would be acquired or would complete an initial public offering by 2020.

In early 2020, the Debtor was in negotiations for transactions involving two of its portfolio companies, but those negotiations collapsed when the COVID-19 pandemic shocked the world economy. A few months later, the Debtor's likeliest source of sufficient revenue to cover its debt obligations (the Schlumberger earn-out payments) ended. Vanderhall redoubled its efforts to find a buyer and then prepared for an initial public offering of its stock, but it decided to delay any IPO until it could complete its then-in-progress transition from gasoline-powered vehicles to fully electric vehicles. Skittishness in the economy ever since the COVID-19 pandemic has made any sale of Vanderhall or any of the Debtor's other portfolio companies very difficult.

The Debtor was compelled to look for additional sources of interim funding until Vanderhall could be sold, and other projects could be progressed to maturity. The Debtor continued to sell assets (bringing in over $86 million between the beginning of 2020 and the end of 2025, including assets sold by HPH, to keep the Debtor's operations going,

meet current obligations to creditors, and reduce debt), but it stopped selling Investment Notes.

Always in the past, David R. Hall's companies, including the Debtor, have maintained multiple projects, affording multiple exit possibilities. With the shocks following the COVID-19 pandemic, however, all of the Debtor's projects and portfolio companies were adversely affected.

On or about August 11, 2021, the Debtor borrowed $10,000,000 pursuant to a Loan Agreement with Keystone Private Income Fund ("***Keystone;***" such Loan Agreement, the "***Keystone Loan Agreement***"). The Keystone loan was secured by the Debtor's personal property, but there were two notable provisions that have importance in this bankruptcy. First, the priority of Keystone's lien was disclaimed with respect to all existing debt designated as "Permitted Indebtedness," (as defined in the Keystone Agreement, the "***Permitted Indebtedness***"). Attached hereto as **Exhibit 1** is a copy of the list of Permitted Indebtedness as set forth in the Keystone Agreement. Second, there was a carve-out and special provision for the Vanderhall Stock, because the Vanderhall Stock was subject to a lock-up agreement and could not be pledged. Rather than pledging 100% of the Vanderhall Stock or providing that the Vanderhall Stock was covered by Keystone's blanket lien on the Debtor's personal property, the Debtor agreed to deliver a lien, at such time as certain conditions were satisfied, on shares of Vanderhall Stock constituting 51% of the outstanding shares of capital stock of Vanderhall. The Keystone loan has been extended and increased. The provisions relating to the Vanderhall Stock have been modified, but no stock pledge covering the Debtor's shares of Vanderhall Stock has ever been delivered. As a result of this arrangement, Keystone only holds a

lien on other personal property of the Debtor.

In the meantime, between the beginning of 2020 and the middle of 2024, the Debtor gradually reduced funding for its projects and portfolio companies and tried to sell assets to keep obligations to its creditors. HPH and DRHH also sold assets to provide funds to the Debtor to pay interest on its debts to banks, Keystone, the holders of Investment Notes, and other creditors, and to preserve the value of existing projects.

The Debtor continued to pursue a favorable liquidation of its Vanderhall Stock. Multiple potential transactions have appeared likely to bear fruit, including discussions as recently as February, 2025 with a well-established publicly held potential strategic buyer, but Vanderhall has not been successful in getting a transaction done. Most of the Debtor's creditors, recognizing that the Debtor has no ability to pay them without a favorable transaction involving the Vanderhall Stock,[2] have taken no legal action against the Debtor.

By the middle of 2024, the Debtor was forced to discontinue most funding of projects and portfolio companies. Several projects were shut down, and some portfolio companies were sold to their employees in exchange for an earnout commitment (pursuant to an "***Earnout Agreement***") to be paid in the event the business was able, at some time in the future, to generate revenues. HPH, DRHH, and David R. Hall have spent substantially all of their assets, except for assets identified in this Disclosure Statement, in this process. The assets of the Debtor are largely depleted except for the

---

[2] Although Vanderhall has substantial value, it is a privately held early-stage company and cannot be sold quickly. Vanderhall recently launched its new fully electric side by side vehicle. Within a few months, the Debtor fully expects that Vanderhall will be able to demonstrate strong sales. Within 12-18 months, Vanderhall is likely to be able to find a buyer or pursue an initial public offering.

Debtor's holdings of the stock of Vanderhall, the stock of Bacon Work, Inc. ("***Bacon***,"

another of Debtor's early stage portfolio companies), a limited partnership interest in an

investment vehicle, Hall Opportunity Fund 1, LP ("***HOF1***," the only assets of which are

stock in Vanderhall and Bacon), and a few other assets (defined below as "R&D Assets")

unlikely to be of significant value to anyone other than the Debtor.

At the end of June 2024, the Debtor defaulted on its obligations to Keystone.  On

or about September 12, 2024, Keystone filed a lawsuit against the Debtor in the Third

Judicial District Court of Utah ("***State Court***") and subsequently filed a Motion for

Summary Judgment demanding a money judgement for amounts owed under the

Keystone loan and the right to take possession and ownership of the Debtor's assets.  The

Debtor acknowledged the debt but objected to the remedy demanded by Keystone.  On

December 31, 2024, without a hearing, the State Court granted Keystone's motion for

summary judgment, noting that "The issues raised in the pleadings as an attempt to

prevent judgment do not relate to liability but rather to issues that may arise in or during

the collection of the judgment, but such does not prevent the granting of judgment."  The

State Court subsequently entered a Judgment on February 7, 2025, granting all of

Keystone's requested relief.

The Debtor does not seek to relitigate the State Court action.  However, the issue

of priority, the *implications* of Keystone's priority vis-à-vis other creditors (who were not

before the State Court), and the proper manner of managing and disposing of assets of the

Debtor can only be sorted out fairly under the processes of the Bankruptcy Code.  The

Debtor believes that these are some of the "issues that . . . arise in or during the collection

of the judgment" as referenced by the State Court.

The Debtor recognized that a take-over of the Debtor's assets by Keystone would adversely affect the value of those assets and violate the rights of the Debtor's other creditors, who have had no opportunity to be heard by any court. Therefore, to protect the equity in the Debtor's estate and the interests of other creditors, and to provide for the resolution of issues that now have arisen in connection with the collection of Keystone's judgment, the Debtor was left with no choice but to seek bankruptcy protection under Chapter 11, which it did on March 5, 2025.

### ARTICLE C

### SIGNIFICANT EVENTS IN THE DEBTOR'S REORGANIZATION CASE

C-1.00 <u>Petition</u>. The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on March 5, 2025.

C-2.00 <u>Statement and Schedules.</u> On March 5, 2025, the Debtor filed its bankruptcy Statement of Financial Affairs and related Schedules of Assets and Liabilities ("*Statement and Schedules*"). Amendments to the Statement and Schedules were filed on April 24, 2025.

C-3.00 <u>Employment of General Counsel.</u> On March 5, 2025, the Debtor filed an application to employ Diaz & Larsen ("*D&L*") as its general counsel. The Court has granted the Debtor's application.

C-4.00 <u>Keystone Notice of Interest in Cash Collateral</u>. On March 19, 2025, Keystone filed Keystone's (i) Notice of Interest in and Refusal to Consent to Use of Cash Collateral, and (ii) Demand for Segregation and Accounting of Cash Collateral. The Debtor has opened a separate Debtor in Possession account into which it has segregated and deposited all funds to which the Debtor believes may be subject to Keystone's claim

for cash collateral, as demanded by Keystone.

C-5.00 <u>Keystone Motion for Comfort Order</u>. On March 19, 2025, Keystone filed a Motion for Comfort Order that the Automatic Stay Does Not Apply to Vanderhall Stock Owned by the David R. Hall Trust Pledged as Collateral to Keystone. The Debtor has filed a response to the Keystone Motion indicating that the automatic stay probably does not apply to such stock. However, the Debtor reserved its rights to object to Keystone's claim or to take such other actions that it believes necessary to ensure that the reasonable value of the stock is credited against the Debtor's obligation to Keystone. The hearing on Keystone's Motion is scheduled for May 29, 2025.

C-6.00 <u>STAG Motion for Comfort Order</u>. On April 14, 2025, STAG Industrial Holdings, LLC filed a Motion to Clarify the Automatic Stay, which is scheduled for hearing on May 29, 2025.

C-7.00 <u>SPHL Stipulation with the Debtor</u>. On April 18, 2025, the Debtor filed a Rule 9019 Motion to Approve a Settlement between SPHL Properties, LLC and the Debtor, which would release the Debtor from all liability related to a guarantee of a lease agreement. The hearing on the Settlement Motion is scheduled for May 29, 2025.

C-8.00 <u>Debtor's Motion to Approve Payment of Salaries.</u> On April 24, 2025, the Debtor filed a Motion to Approve the Debtor's Payment of Salaries to Employees for Prepetition Services that were Submitted for Payment Prior to the Bankruptcy Filing but did not Clear the Bank until After the Bankruptcy Filing. The hearing on the Debtor's Motion is scheduled for May 29, 2025.

C-9.00 <u>Meeting of Creditors.</u> The meeting of creditors under Section 341 of the Bankruptcy Code was held on April 9, 2025, and continued until April 28, 2025. The

meeting was conducted by Matthew Burne, an attorney with the United States Trustee's Office ("**USTO**"). David R. Hall appeared as the representative of the Debtor together with D&L, at which times the Debtor's representative submitted to approximately five hours of questioning over the two meeting dates.

C-10.00 Keystone's Motion to Convert Case to Chapter 7 or Appoint a Trustee. On May 1, 2025, Keystone filed a Motion to Convert Case to Chapter 7, or in the Alternative, for Appointment of a Chapter 11 Trustee. The hearing on the Motion is scheduled for May 29, 2025.

C-11.00 Debtor's Initial Disclosure Statement. This is the Debtor's initial Disclosure Statement, which still requires approval by the Bankruptcy Court.

## ARTICLE D

## FINANCIAL DATA, ASSETS AND LIABILITIES

D-1.00 Summary of Chapter 11 Operations. As anticipated when the Debtor filed its Petition, the Debtor has generated little cash during the pendency of this case. Because of the nature of its business, the Debtor will have the ability in the short term to generate revenue only from the sale of properties owned by HPH and DRHH. Some projects of the Debtor, and related intellectual property, have promise, but there is no prospect for generating revenues by selling any of them for at least a year or two.

D-2.00 Assets of the Debtor and Its Wholly Owned Subsidiaries. Attached hereto as **Exhibit 2** is a summary of the assets of the Debtor, which have been scheduled by the Debtor. For transparency, the most substantial assets of HPH and DRHH are included in **Exhibit 2**, even though they are not owned directly by the Debtor. The assets of Hall Opportunity Fund 1, LP, in which the Debtor holds a limited partnership interest, and

Hall Labs Opportunity Fund, LLC, in which the Debtor holds a membership interest, also are included.

The Debtor's assets fall into five general categories, as follows:

First, "*Cash and Cash Proceeds*" means the small amount of cash that the Debtor holds as of the present time plus any additional revenues or cash proceeds that the Debtor may receive as contemplated by the Plan. The Debtor holds one contract receivable, described in **Exhibit 2**, which will yield Cash and Cash Proceeds. Some of the Cash and Cash Proceeds constitute cash collateral as indicated in **Exhibit 2**.

The Cash and Cash Proceeds are the only available assets for covering administrative expenses and priority claims.

Second, "*Real Property*" means the tracts of real property described in **Exhibit 2** that are owned by HPH and DRHH. The Real Property is encumbered by liens held by Central Bank and Hillcrest Bank, which are creditors of the Debtor. The Real Property also is encumbered by additional liens held by other persons.[3]

The Debtor can cause HPH and DRHH to sell Real Property and satisfy debts to Central Bank and Hillcrest Bank with the transaction proceeds. Such sales also may generate net cash proceeds that can be used by the Debtor for administrative expenses and priority claims.

Third, "*Vanderhall Stock*" means the common stock of Vanderhall held by the Debtor plus all shares of common stock of Vanderhall that the Debtor receives pursuant to the exercise of its rights under those certain non-recourse promissory notes described

---

[3] The Debtor does not have any liability for additional liens, but it will not be able to receive any value from HPH or DRHH deriving from a sale of Real Property without satisfying all liens. HPH and DRHH are legally separate from the Debtor and must satisfy their own debts.

in **Exhibit 2** (the *"Non-Recourse Notes"*). The Non-Recourse Notes are secured by shares of the common stock of Vanderhall. The Debtor presumes that the makers of the Non-Recourse Notes will return the stock to the Debtor rather than make payment in cash.[4]

As a practical matter, the Vanderhall Stock and the Company Stock (described below) are the only assets of the Debtor that can satisfy creditors' claims.

Fourth, *"Company Stock"* means equity interests held by the Debtor in Bacon, HOF1, and SmarterHome, Inc., (*"SmarterHome"*). (The stock of Bacon held by the Debtor is referred to herein as the *"Bacon Stock;"* the Debtor's limited partnership interest in HOF1 is referred to herein as the *"HOF1 Interest:"* and the stock of SmarterHome held by the Debtor is referred to herein as the *"SmarterHome Stock."*)

Fifth, *"R&D Assets"* means the assets described in **Exhibit 2** that are related to the Debtor's core business of creating technology and incubating technology-based businesses. These assets include (i) patents and other intellectual property (*"Patents and IP"*), (ii) the Debtor's interests in the Earnout Agreements, (iii) the Debtor's interest in Hall Labs Opportunity Fund, LLC, which owns shares of SmarterHome Stock and a portion of the earnout payments under one of the Earnout Agreements (the *"HLOF Interest"*), and (iv) stock in Nernst Electric, Inc. (*"Nernst"*), which is a very early stage project with no prospect of revenues in the near future.

A sale of the R&D Assets may generate some cash proceeds to be added to cash collateral.

---

[4] The Non-Recourse Notes are due on July 31, 2025. It is possible that one or more of the Non-Recourse Notes may be paid at that time, but that is highly improbable given that the principal balance on the Notes far exceeds the value of the stock securing the Notes.

In addition to the five categories listed above, the Schedules show a substantial *Net Operating Loss*, which may be valuable for tax purposes. However, the Debtor expects that the Net Operating Loss will be used up based on transactions proposed in the Plan and will not, as a practical matter, be transferable to any potential buyer of the Debtor or its assets.

D-3.00 <u>Claims Against the Debtor.</u> Attached hereto as **Exhibit 3** is a summary of the claims scheduled by the Debtor and the Debtor's estimate of the claims that will be allowed. Again, for transparency, **Exhibit 3** references all liens against the Real Property, even though some of those liens do not arise from obligations of the Debtor.

The claims against the Debtor fall into eight general categories, described in more detail in **Exhibit 3**, as follows (these categories of claims are arranged into nine creditor Classes as provided in Section E-6.00 below):

First, "*Priority Claims*" means all claims against the Debtor that qualify as priority claims under the Bankruptcy Code.

Second, "*Real Property Claims*" means claims against the Debtor that are secured by Real Property owned by HPH and DRHH. These include the claims of Central Bank and Hillcrest Bank.

Third, the "*Keystone Claim*" means claim of Keystone, which is partially secured by a blanket lien on the Debtor's personal property, excluding the Vanderhall Stock.

Fourth, "*Permitted Indebtedness Claims*" means claims of holders of Permitted Indebtedness. These include the claims of holders of Investment Notes and the claims of landlords under terminated leases that have been guaranteed by the Debtor. The Permitted Indebtedness Claims are unsecured, but they have equal priority with Keystone

in the context of a bankruptcy or dissolution in accordance with the terms of the Keystone Loan Agreement.

Fifth, "*Non-Contingent Unsecured Claims*" means all other claims against the Debtor that are not contingent and not disputed, except that some are disputed as to amount. These claims include claims of Leaf Capital Funding and NewCo Capital Group, which filed UCC financing statements against the Debtor's personal property but were named as defendants in the State Court Action and did not dispute Keystone's priority. Portions of the Keystone Claim and the Permitted Indebtedness Claims also are unsecured.

Sixth, "*Contingent Unsecured Claims*" means all unsecured claims against the debtor that are contingent. Some of these are claims of current and former employees and contractors of the Debtor and its portfolio companies, who have certain rights that are contingent upon the occurrence of specified events. The Contingent Unsecured Claims also include potential claims of landlords under certain unexpired leases that have been guaranteed by the Debtor.

Seventh, the "*Boyer Commitment*" means the Debtor's contractual obligation to deliver shares of Vanderhall Stock to Daniel Boyer upon completion of certain services to the Debtors' portfolio companies. (This obligation is treated as an executory contract in the Schedules, because Daniel Boyer's right to receive the shares of Vanderhall Stock had not vested as of the time the bankruptcy petition was filed.)

Eighth, "*Disputed Claims*" means the claims identified as such in **Exhibit 3**. The Debtor denies any liability for Disputed Claims.

D-4.00 <u>Valuation of Real Property</u>. The value of the Real Property, as set out in

the Schedules, is based upon appraisals and offers or expressions of interest that HPH and DRHH have received from potential buyers. The Debtor does not expect that HPH and DRHH will receive sufficient cash from sales of Real Property, after satisfying liens and transaction costs, to enable the Debtor to pay any claims of its creditors other than Priority Claims.

D-5.00 Valuation of Vanderhall Stock. The value of the Vanderhall Stock, as set out in the Schedules, is based upon a valuation by Carta, Inc. issued January 23, 2025 (the "*Carta Valuation*"), which was performed at Vanderhall's request for the purpose of establishing a "fair market value" of common stock in connection with grants of equity incentives. The valuation established a "fair market value" of $0.82 per share, assuming the recipient of an equity grant would own a minority interest in Vanderhall.[5] In light of the purpose for which the valuation was done by an independent third party, the Debtor believes the valuation is conservative.

Vanderhall is an early stage privately held company. The liquidation of the Debtor's interests in such an enterprise nearly always requires a process of searching out potential buyers and engaging in extensive due diligence over several months before a sale can be achieved at a reasonable price. Two or three years may be required to identify an investor or strategic buyer that can close a transaction. The "commercially reasonable" process for liquidating such interests is almost always through a sale of the company, not a percentage interest in the company.

---

[5] Since the Debtor owns a majority interest in Vanderhall, the valuation used in the Schedules backed out "minority discount" that was applied in the Carta Valuation and arrived at a fair value of $1.025 per share. For purposes of the Plan, however, the lower $0.82 per share valuation is used, because the Plan contemplates a division of the Vanderhall Stock into minority interests before it is sold.

The Vanderhall Stock has substantial value, but that value can be realized only through a process that inevitably takes time. To force a sale by auction or to expect to find a buyer within 90 days would decimate the value of the Vanderhall Stock to the detriment of all creditors, not because the Vanderhall Stock is without genuine value but simply because that is not a commercially reasonable way to sell it.

The Plan contemplates that most claims in the bankruptcy will be satisfied by an in-kind distribution of Vanderhall Stock, which will be valued according to the Carta Valuation. The Carta Valuation assumes a commercially reasonable approach to the sale of Vanderhall Stock.

D-6.00 <u>Valuation of Bacon Stock.</u> The value of the Bacon Stock, as set out in the Schedules, is based upon a current fundraising effort by Bacon in which senior preferred stock is being offered. The Debtor has applied a discount of 20% to reach an estimated value for the Debtor's preferred stock of Bacon, recognizing that the Debtor holds a minority of the outstanding capital stock and has no control over Bacon.

As with the Vanderhall Stock, the Bacon Stock will take time to sell. However, any recipient of the Bacon Stock under the Plan will receive genuine value that can be realized in time. The Plan contemplates that some claims in the bankruptcy will be satisfied by an in-kind distribution of Bacon Stock.

D-7.00 <u>Valuation of SmarterHome Stock.</u> The value of the SmarterHome Stock is zero. This valuation is based on the fact that SmarterHome is losing money, with no prospect that the Debtor can take any action to make SmarterHome profitable. The liabilities of SmarterHome exceed its assets, and SmarterHome is unable to pay its obligations as they fall due. SmarterHome's vendors are unwilling to continue to supply

SmarterHome.

SmarterHome is working with a new company, Garage Smart Industries, Inc. (**"Garage Smart"**), which has been formed by one of SmarterHome's founders and some of SmarterHome's former employees, to use existing SmarterHome assets to satisfy some of SmarterHome's debts and transfer responsibility for supporting existing SmarterHome customers, preparatory to a complete shut-down of SmarterHome. Garage Smart will establish its own relationships with some of SmarterHome's vendors to begin marketing and selling some of SmarterHome's products, which Garage Smart believes it can do profitably. Garage Smart has not received, and will not receive, any assets from SmarterHome, but it purchased 19 patents and patent applications from the Debtor on or about February 28, 2025, related to SmarterHome products. The purchase was subject to an existing royalty-free license back to SmarterHome. All purchase proceeds were placed in the Debtor's cash collateral account.

The Plan does not contemplate any distribution or sale of SmarterHome Stock, because SmarterHome will be shut down and no assets will be available for distribution to shareholders.

D-8.00 <u>Valuation of HOF1 Interest.</u> The value of the HOF1 Interest derives from the composition of HOF1's assets, as listed in **Exhibit 2**, including stock of Bacon and stock of Vanderhall.

The Plan contemplates that some claims in the bankruptcy will be satisfied by an in-kind distribution of the HOF1 Interest.

D-9.00 <u>Valuation of R&D Assets.</u> The R&D Assets have been valued at zero on the Schedules, because it is unlikely that anyone other than the Debtor can realistically

get any substantial value from them. However, it may be possible to find someone who will purchase some of the R&D Assets for speculative value. A summary of the R&D Assets is set out in **Exhibit 4**.

One category of R&D Assets consists of the Patents and IP, including patents, patent applications, internet domain names, and other intellectual property related to technologies that have been pursued by the Debtor in the past. The Patents and IP are unlikely to be saleable independently of a business built around the related technologies.

A second category of R&D Assets consists of interests in the Earnout Agreements, which are agreements with early-stage companies whose owners previously worked with one or more of the Debtor's former portfolio companies. Collectively, these companies have minimal revenues on which to base earnout payments, which makes such payments in the future highly speculative. Moreover, the Earnout Agreements are not assignable to anyone other than an affiliate of the Debtor without consent.[6] The Debtor believes that managers of the companies are unlikely to consent to an assignment to any of the Debtor's creditors or a financially driven outside buyer.

A third category of R&D Assets consists of the HLOF Interest, which derives all of its value from a portion of the earnout payments under one Earnout Agreement, namely an Earnout Agreement between the Debtor and Hall Logic, LLC.[7] Any possibility of getting value from the HLOF Interest is speculative and uncertain for the

---

[6] Each agreement prohibits assignment "by operation of law or otherwise" by either party without the prior written consent of the other; except that the Debtor may assign its rights and obligations to an affiliate, and either party may assign its rights and obligations "in connection with a merger, consolidation, sale, or transfer of all or substantially all of [its] business or assets pertaining hereto." A naked assignment of an Earnout Agreement in conjunction with a shut down and dispersal of assets would not qualify for the exception.

[7] Hall Labs Opportunity Fund, LLC also owns shares of stock of SmarterHome, but those shares have no value.

same reasons set out above in connection with the Earnout Agreements.

A fourth category of R&D Assets consists of stock in Nernst, which is unlikely to have significant value to anyone other than the Debtor, because Nernst is a closely held early-stage R&D project with no saleable product and because the primary creator of Nernst technologies, Nicholas Farandos (*"Farandos"*), cannot be forced to accept a partner not of his own choosing. Farandos has the contractual right to leave Nernst and take with him an unlimited perpetual non-exclusive royalty-free license in all of Nernst's intellectual property if the project is shut down or if there is a transfer of 20% or more of Nernst's ownership that is unacceptable to him. Farandos is unlikely to accept any of the Debtor's creditors or any financially driven outside buyer unless the buyer is prepared to make substantial additional investments into Nernst.

The Plan contemplates that the R&D Assets will be sold to anyone willing to pay for them.

D-10.00 <u>Disputed and Contingent Claims Against the Debtor.</u> The general character of all undisputed non-contingent claims against the Debtor, listed in **Exhibit 3**, is straightforward. Detail related to the Contingent Unsecured Claims and the Disputed Claims is as follows:

*Emily Brimhall.* One of the Contingent Unsecured Claims listed in **Exhibit 3** is based upon an agreement between the Debtor and Emily Brimhall, pursuant to which the Debtor has committed to purchase Emily Brimhall's interest in SmarterHome and related contingent bonus commitment for $5,000,000 if a "Major Event," as defined in the applicable agreement, occurs on or before October 17, 2028. A "Major Event" includes any event that the Debtor designates as such. The Plan treats the Debtor's bankruptcy and

in-kind distribution of Vanderhall Stock to creditors as a Major Event and provides for the applicable purchase to be consummated using shares of Vanderhall Stock.

*Contingent Bonus Commitments*.  A second group of Contingent Claims listed in **Exhibit 3** consists of "Contingent Bonus Commitments." These are agreements to pay bonuses to certain current and former employees and contractors when the Debtor's interests in portfolio companies are sold.  The amount of the applicable bonus is based upon a number of bonus "units" equivalent to shares of stock in a specified company. For example, if a grantee holds 1,000 bonus "units" associated with a portfolio company and the Debtor sells its interest in that portfolio company, the grantee is entitled to a bonus equal to the value of 1,000 shares of common stock as determined by the terms of the sale transaction.  If the Debtor sells less than 100% of its interest in a portfolio company, the grantee's bonus is reduced proportionately.

The holders of Contingent Bonus Commitments hold, in the aggregate, 5,354,271 bonus units associated with shares of Vanderhall Stock, which equate to a bonus equivalent to the net proceeds of sale on 5,354,271 shares of common stock of Vanderhall in connection with any sale of Vanderhall Stock by the Debtor.  The Plan treats the in-kind distribution of Vanderhall Stock to creditors as a sale and provides for the applicable bonus to be paid in shares of Vanderhall Stock.

The holders of Contingent Bonus Commitments hold varying numbers of bonus units associated with other current and former portfolio companies of the Debtor.  The Plan does not provide for payment of any of those contingent obligations, because no event triggering a payment obligation has occurred or is likely to occur.

*Lease Guarantees*.  The Debtor has guaranteed certain leases of HPH related to

the buildings being used by Vanderhall. The lease payments on those leases are being made by Vanderhall. The leases have not been terminated.

The Plan does not provide for payment of this contingent obligation, because no event triggering a payment obligation has occurred.

## ARTICLE E

## SUMMARY OF THE DEBTOR'S PLAN

### SECTION 1. INTRODUCTION AND OVERVIEW

E-1.00 Caution. THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. CREDITORS ARE URGED TO READ THE PLAN IN FULL. THE PLAN REPRESENTS A LEGALLY BINDING DOCUMENT. AN INTELLIGENT JUDGMENT ABOUT THE PLAN CANNOT BE MADE WITHOUT READING IT.

E-2.00 Overview of the Plan. The effective date of the Plan is 30 days after the Confirmation Date as that term is defined in the Plan.

*Assets Available to Satisfy Creditors' Claims*. The Plan recognizes that the only assets that realistically can be used to satisfy creditors' claims are the Vanderhall Stock, the Bacon Stock, and the HOF1 Interest. (Cash collateral also can be used to satisfy a portion of the Keystone Claim and the Permitted Indebtedness Claims, but such cash collateral will cover only a very small portion of such claims. The Debtor desires to use as much cash as the Bankruptcy Court will allow to cover administrative expenses in an orderly and fair liquidation of the Debtor's assets and to satisfy Priority Claims.) The Vanderhall Stock, the Bacon Stock, and the HOF1 Interest cannot be sold quickly. If any of these assets are auctioned hastily, the inevitable result will be the decimation of value

for everyone other than the buyer.

*In-Kind Distribution of Stock*. In light of the foregoing, the Plan provides for an expeditious final determination of all claims against the Debtor's estate as of a specific time, the date of filing of the bankruptcy petition, and the Vanderhall Stock, the Bacon Stock, and the HOF1 Interest will be distributed in-kind to creditors in satisfaction of such claims.

It is unknown whether creditors will be able to sell their shares of Vanderhall Stock, Bacon Stock, and HOF1 Interest for an amount equal to, or in excess of, their claims in the bankruptcy. However, the best available valuation of Vanderhall (the Carta Valuation) and a discounted valuation of Bacon, which assume a commercially reasonable process of sale, establish a value sufficient to cover the claims of all creditors. The Plan creates a further discount of the Vanderhall Stock to provide as much assurance as possible that the distributed assets will cover creditors' claims. More importantly, there is no practical alternative to reliance on the value of the Vanderhall Stock, the Bacon Stock, and the HOF1 Interest in the bankruptcy. There is nothing else to offer. An in-kind distribution does not guarantee that creditors will get full value in cash, but it ensures that all creditors can be treated fairly. If creditors are paid in Vanderhall Stock, Bacon Stock, and HOF1 Interest, each of them can try to find a buyer immediately or hold onto the stock (or other interest) until a transaction can be carried out at a more favorable valuation.

*Liquidation of HPH and DRHH Assets (Real Property)*. The Debtor will cause HPH and DRHH to complete sales of Real Property to satisfy the Real Property Claims. Any net proceeds from such transactions may be distributed to the Debtor or used to

cover administrative expenses. After disposal of the Real Property, HPH and DRHH will be shut down.

*Shut-Down of SmarterHome*. The Debtor will cause SmarterHome to wind down its activities in a manner that minimizes unsatisfied obligations and allows Garage Smart to assume responsibility for supporting existing SmarterHome customers. (No SmarterHome assets will be transferred to Garage Smart.) After applying remaining SmarterHome assets to SmarterHome liabilities, SmarterHome will be shut down.

*Sale of R&D Assets*. The R&D Assets will be offered for sale in three separate packages: (i) the Patents and IP, (ii) the Earnout Agreements and HLOF Interest, and (iii) the Debtor's holdings of stock in Nernst. Any assignment of the Earnout Agreements will be subject to the consent of the companies obligated to make the earnout payments, which cannot be assured. Any transfer of the Debtor's stock in Nernst will be subject to the consent of the founder and CEO of Nernst, which cannot be assured.

The Plan contemplates that the R&D Assets will be sold to any person who can complete a transaction and submits the highest and best offer. The proceeds of any purchase and sale of R&D Assets will be placed in the Debtor's cash collateral account.

*Cash Collateral*. The Debtor desires to use all Cash and Cash Proceeds for administrative expenses. If the Bankruptcy Court does not allow the Debtor to use cash collateral for administrative expenses, the cash collateral will be distributed to Keystone and the holders of Permitted Indebtedness in proportion to their final allowed claims.[8]

*In-Kind Distribution of Bacon Stock and HOF1 Interest*. A special purpose

---

[8] If the Bankruptcy Court does not agree that holders of Permitted Indebtedness are entitled to equal priority with Keystone in the cash collateral, all cash collateral that is not permitted to be used by the Debtor will be distributed to Keystone.

vehicle ("*SPV*") will be formed for the purpose of holding the Bacon Stock and the

HOF1 Interest,[9] which are covered by Keystone's security interest. All of the Bacon

Stock and the HOF1 Interest will be transferred to the SPV. Keystone and the holders of

Permitted Indebtedness will own the SPV in proportion to their final allowed claims[10]

(after adjusting Keystone's final claim for the value of common stock of Vanderhall

received from The David R. Hall Trust, as described below) and will have voting rights

in the same proportions. A designated representative will be appointed by the owners to

exercise the rights of the SPV in connection with the Bacon Stock and the HOF1 Interest.

*Application of In-Kind Distributions to Final Claims*. Separately from the Plan,

The David R. Hall Trust will transfer to Keystone 3,699,501 shares of common stock of

Vanderhall under the terms of a Pledge Agreement between Keystone and the David R.

Hall Trust.[11] The discounted value of such shares, which will be the same value applied

to the Vanderhall Stock to be distributed under the Plan, will be applied to the Keystone

Claim. The value of the SPV interest, based upon the value of the Bacon Stock and the

HOF1 Interest as described in **Exhibit 2**, will be applied proportionately to the Keystone

Claim and the Permitted Indebtedness Claims. The final claims of Keystone and the

holders of Permitted Indebtedness, after applying such amounts, will be their respective

---

[9] The Bacon Stock and HOF1 Interest will not be apportioned directly among Keystone and all of the holders of Permitted Indebtedness, because such a distribution would be administratively very burdensome for Bacon and HOF1. By using a special purpose vehicle, a single designated representative can be appointed to interface with Bacon and HOF1 in connection with the applicable interests.

[10] The Bacon Stock and the HOF1 Interest are covered by Keystone's security interest, and the holders of Permitted Indebtedness are entitled to equal priority with Keystone in those assets. If the Bankruptcy Court does not agree that holders of Permitted Indebtedness are entitled to equal priority with Keystone in the Bacon Stock and the HOF1 Interest, those interests will be distributed directly to Keystone rather than using an SPV. In such a scenario, the final claims of Keystone and the holders of Permitted Indebtedness to be satisfied with Vanderhall Stock will adjust, but the economic outcome for all creditors (based on a commercially reasonable disposition of Vanderhall Stock and Company Stock) will be essentially the same.

[11] These shares of stock of Vanderhall and a Class B membership interest in the Debtor are the only substantial assets owned by The David R. Hall Trust.

"*Adjusted Final Claims*."

*Distributable Vanderhall Stock*. The Debtor will recover all shares of common stock of Vanderhall that secure the Non-Recourse Notes[12] and will transfer shares of Vanderhall Stock to Daniel Boyer to satisfy the Boyer Claim. The shares of stock of Vanderhall held by the Debtor after such transactions will constitute the "*Distributable Vanderhall Stock*."

*In-Kind Distribution of Distributable Vanderhall Stock*. Neither Vanderhall nor the holders of Permitted Indebtedness are entitled to any priority in the Vanderhall Stock.[13] After all credits, transfers, and adjustments described above, the Distributable Vanderhall Stock will be distributed in-kind to Keystone, holders of Permitted Indebtedness, holders of Non-Contingent Unsecured Claims, and holders of allowed Contingent Unsecured Claims pro-rata in proportion to such creditors' final claims or Adjusted Final Claims.

*Final Distribution of Assets*. After all Bacon Stock, HOF1 Interest, and Vanderhall Stock are distributed and all tax filings and other administrative matters are completed, any remaining cash of the Debtor will be applied to tax liabilities or distributed pro rata to all creditors in the same proportions as the Distributable

---

[12] If one or more of the Non-Recourse Notes were paid (highly improbable), the Plan provides for the payment proceeds to be added to cash collateral and used in the same way as other cash collateral.

[13] If the Bankruptcy Court does not agree that Keystone is unsecured in the Vanderhall Stock, a *portion* of the Vanderhall Stock reasonably equal in value to the Adjusted Final Claims of Keystone and the holders of Permitted Indebtedness will be distributed to them, leaving some shares of Distributable Vanderhall Stock for distribution to other creditors. In such a scenario, it is assumed that the Bankruptcy Court would apply a *discount* to the value of the Distributable Vanderhall Stock, similar to the discount contemplated in the Plan, to achieve reasonable assurance that Keystone and the holders of Permitted Indebtedness will receive full value for their respective claims. In such a scenario, the mechanics of allocating the Vanderhall Stock will adjust, but the economic outcome for all creditors (based on a commercially reasonable disposition of Vanderhall Stock and Company Stock) will be essentially the same.

Vanderhall Stock. No assets will be retained by the reorganized Debtor, and no payments will be made to the Debtor's members, David R. Hall and The David R. Hall Trust.

The reorganized Debtor will file a motion for final decree and order closing the case.

The Plan provides for the continued operation of the Debtor's affairs and business after confirmation by the reorganized Debtor. Expenses of administration, consisting of quarterly fees due to the USTP and attorneys' fees of D&L, as general counsel, will be paid on the effective date of the Plan. Holders of these administrative expenses may agree to be paid over some period of time after the effective date of the Plan. Ongoing operating expenses incurred post-petition by the reorganized Debtor will be paid as they come due.

## SECTION 2. ADMINISTRATIVE EXPENSES AND TAXES

E-3.00 <u>Post-Petition Operating Expenses.</u> The Plan provides for the payment of ongoing post-petition operating expenses as they come due in the ordinary course of business until all creditors' claims are finally established and the Company Stock is distributed. For clarity, the Debtor's "ordinary course of business" while the Plan is in effect is limited to administrative functions, actions related to restructuring, settlement or establishment of claims, preservation of the value of the Debtor's existing assets, winding down SmarterHome, and sales of HPH and DRHH assets.

E-4.00 <u>Administrative Expenses.</u> Administrative expenses of the Chapter 11 case consist of: Quarterly fees to the USTP and attorneys' fees to D&L, general counsel for the Debtor. The Debtor will have paid all quarterly fees due through confirmation to the USTP. Any quarterly fees due after confirmation will be paid as they become due. D&L

anticipates approximately $50,000.00 in fees and costs will be incurred prior to confirmation of the Plan. The Plan permits the reorganized Debtor to pay fees of professionals whose employment was authorized during the bankruptcy case, for services rendered after confirmation of the Plan, upon receipt of statements for those services. Any amounts paid by the reorganized Debtor to such professionals after confirmation will be subject to final approval by the Court at the hearing on the reorganized Debtor's motion for final decree and order closing case.

E-5.00 Priority Tax Claims. There is a priority tax claim in the amount of $153,125 for an ESR penalty. The Plan provides for a resolution of this claim, together with all tax liabilities that may arise from the cancellation of debts or the transfer of Vanderhall Stock and Company Stock in satisfaction of debts in connection with the bankruptcy, by paying over to taxing authorities 100% of cash remaining after all Bacon Stock, HOF1 Interest, and Vanderhall Stock are distributed, and all tax filings and other administrative matters are completed.

E-6.00 Classes of Claims and Interests. Pursuant to the Bankruptcy Code, the Plan establishes the following classes of claims and interests:

*Class 1A* is comprised of all Real Property Claims of Central Bank that are secured by Real Property of the Debtor's wholly owned subsidiary, HPH.

*Class 1B* is comprised of all Real Property Claims of Central Bank that are secured by Real Property of the Debtor's wholly owned subsidiary, DRHH.

*Class 2* is comprised of all Real Property Claims of Hillcrest Bank that are secured by Real Property of the Debtor's wholly owned subsidiary, DRHH.

*Class 3* is comprised of the Keystone Claim, which is secured by personal

property of the Debtor, excluding the Vanderhall Stock.

*Class 4* is comprised of the Permitted Indebtedness Claims, which are nonpriority unsecured claims that have equal priority with the Keystone Claim as provided in the Keystone Loan Agreement.

*Class 5* is comprised of the Non-Contingent Unsecured Claims, which are nonpriority unsecured claims that do not have equal priority with the Keystone Claim.

*Class 6A* is comprised of Contingent Unsecured Claims that will not be paid.

*Class 6B* is comprised of Contingent Unsecured Claims that will be paid.

*Class 7* is comprised of the Disputed Claims.

*Class 8* is comprised of the interests of the Debtor's members, namely, David R. Hall and The David R. Hall Trust.

## SECTION 3.  DESIGNATION AND TREATMENT OF IMPAIRED CLASSES.

E-7.00 <u>Impaired Classes</u>.  Under the Bankruptcy Code the Debtor is required to specify any class of claims or interest that are impaired under the Plan. Essentially, unless a plan leaves unaltered the legal, equitable, and contractual rights to which a claim or interest entitles the holder of such claim or interest, such claim or interest is impaired. All classes of claims and interests are impaired.

E-8.00 <u>Satisfaction of Claims By In-Kind Distribution</u>.  The Debtor does not have the ability to satisfy creditors' claims in cash, except for a portion of tax liabilities.  An auction of the Debtor's assets to generate cash would inevitably result in a minimal pay-out to creditors.  It is therefore in the best interests of creditors to make an in-kind distribution of the Company Stock in satisfaction of claims, giving individual creditors the freedom to determine the timing and manner of selling their shares as they are able.

All of the Bacon Stock and the HOF1 Interest will be distributed to an SPV that is owned by Keystone (Class 3) and the holders of Permitted Indebtedness (Class 4) in accordance with their final claims as established under the Plan. For purposes of the Plan, the Bacon Stock and the HOF1 Interest will be valued as indicated in **Exhibit 2**.

All of the Vanderhall Stock will be distributed to creditors in Classes 5 and 6 in accordance with their final claims (or, in the case of the Keystone Claim and the Permitted Indebtedness Claims, their Adjusted Final Claims) as established under the Plan. For purposes of the Plan, the Vanderhall Stock will be valued at $0.7175 per share, which is equal to the aggregate amount of all final claims and Adjusted Final Claims in Classes 5 and 6 *divided by* the total number of shares of Distributable Vanderhall Stock. This valuation is more favorable than the Carta Valuation of $0.8200 per share. Therefore, the reasonable fair market value of Vanderhall Stock to be distributed to creditors, based on the best available valuation, will be *higher* than the value of their respective claims.

All payments and in-kind distributions to be made under the Plan, together with applicable valuations, are set out in **Exhibit 5, Liquidation and Distribution Analysis**.

E-9.00   CLASS 1A – Claims of Central Bank Secured by Real Property Owned by HPH. Class 1A contains the claims of Central Bank secured by Real Property that is owned by HPH, which are listed on Debtor's Schedule D. These include claims in the amounts of $1,415,882, $1,638,200, and $3,037,574.

Some of Central Bank's claims have been satisfied in accordance with a Real Estate Purchase Contract dated December 2, 2024, between Cody Black and HPH (the "*Ironton REPC*"). Based upon the Ironton REPC, as amended, Cody Black or assigns,

purchased Real Property for the sum of $5,609,794.00. [14]  All of the net proceeds of the

transaction were applied to Central Bank's claims.

The Debtor anticipates that some of Central Bank's claims will be satisfied in

accordance with a proposed Real Estate Purchase Contract for Land dated April 28, 2025,

between Entitlement Holdings, LLC and HPH (the "*Ironton 2 REPC*"). Based upon the

Ironton 2 REPC, as amended, Entitlement Holdings, LLC or its assigns will purchase

Real Property for the sum of $2,000,000.00.  Most or all of the net proceeds of the

transaction will be applied to Central Bank's claims.  If any proceeds received by HPH in

the transaction can be provided to the Debtor, they will used for administrative expenses

or Priority Claims.

The Debtor believes that the equity value in the Real Property owned by HPH is

sufficient to satisfy all obligations of the Debtor to Central Bank in Class 1A.

E-10.00   CLASS 1B – Claim of Central Bank Secured by Real Property Owned

by DRHH.  Class 1B contains the claim of Central Bank secured by Real Property that is

owned by DRHH, which is listed on Debtor's Schedule D.  This claim is in the amount of

$222,448.

The Debtor anticipates that Central Bank's claim will be satisfied in accordance

with a proposed Real Estate Purchase Contract dated April 29, 2025, between TMoore

Real Estate LLC and DRHH (the "*Riverton REPC*").  Based upon the Riverton REPC,

TMoore Real Estate LLC will purchase Real Property, including a parcel securing

---

[14] Exhibit 2 shows the value of the property as $7,533,832. This is because the buyer assumed an existing
lien of Provo City Redevelopment Agency in the amount of $1,923,588 in addition to paying the
$5,609,794.00 purchase price.

Central Bank's claims, for the sum of $780,000.00. Some of the net proceeds of the transaction will be applied to Central Bank's claims, and some will be applied to other liens on the Real Property, transaction costs, and other liabilities of DRHH. If any proceeds received by DRHH in the transaction can be provided to the Debtor, they will used for administrative expenses or Priority Claims.

The Debtor believes that the equity value in the Real Property owned by DRHH is sufficient to satisfy all obligations of the Debtor to Central Bank in Class 1B.

E-11.00   CLASS 2 – Claim of Hillcrest Bank Secured by Real Property Owned by DRHH. Class 2 contains the claim of Hillcrest Bank secured by Real Property that is owned by DRHH, which is listed on Debtor's Schedule D. This claim is in the amount of $819,469.

The Real Property that is owned by DRHH is secured by liens in favor of Central Bank and Hillcrest Bank, including some liens that are not tied to obligations of the Debtor. Such Real Property including parcels securing Hillcrest Bank's claims, will be sold as Central Bank and Hillcrest Bank may direct to satisfy their respective claims and the claims of any other lienholders, and any excess proceeds will be paid to DRHH.

If any sale of such Real Property yields net proceeds over and above amounts necessary to pay off Central Bank, Hillcrest Bank, any other liens on the Real Property, transaction costs, and other liabilities of DRHH, such proceeds may be used for administrative expenses or Priority Claims.

The Debtor believes that the equity value in the Real Property owned by DRHH is sufficient to satisfy all obligations of the Debtor to Hillcrest Bank in Class 2.

E-12.00 CLASS 3 – Claims Secured by Personal Property (Keystone Claim).

Class 3 contains the Keystone Claim, which is the sole claim secured by personal property as listed in the Debtor's Schedule D.[15] This claim is in the amount of $15,505,153.

The Keystone Claim will be adjusted downward by $2,677,329, which is the value, for purposes of the Plan, of 3,699,501 shares of common stock of Vanderhall that will be transferred to Keystone outside of the Plan by The David R. Hall Trust pursuant to the terms of a Pledge Agreement between Keystone and The David R. Hall Trust.

A portion of the Keystone Claim, as adjusted as indicated above, will be satisfied by the distribution to Keystone of 19.96% of all cash collateral that the Debtor is not permitted to use for administrative expenses and Priority Claims. The remaining portion of such cash collateral will be distributed to holders of Permitted Indebtedness (Class 4), who have equal priority with Keystone in assets that secure Keystone Claims.

A portion of the Keystone Claim, as adjusted as indicated above, will be satisfied by the issuance to Keystone of a 19.96% interest in an SPV that receives an in-kind distribution of the following assets of the Debtor that secure the Keystone Claim:

(i)     851,528 shares of Series Seed-1 preferred stock of Bacon, and

(ii)    36.05% limited partnership interest in HOF1.

The SPV will be formed for the purpose of holding such assets. The remaining portion of the ownership in the SPV will be issued to holders of Permitted Indebtedness (Class 4), who have equal priority with Keystone in assets that secure Keystone Claims.

The remainder of the Keystone Claim is unsecured and falls into Class 5. That

---

[15] Leaf Capital Funding and NewCo Capital Group filed UCC financing statements against the Debtor's personal property but were named as defendants in the State Court Action and did not dispute Keystone's priority. Accordingly, their claims are unsecured and are included in Class 5.

portion of the Keystone Claim (Keystone's Adjusted Final Claim) will be satisfied by an in-kind distribution to Keystone of 17,174,022 shares of Vanderhall Stock, which represents Keystone's pro-rata portion of the Distributable Vanderhall Stock.

E-13.00 CLASS 4 – Permitted Indebtedness.  Class 4 contains the nonpriority unsecured claims listed in the Debtor's Schedule E/F that were identified as Permitted Indebtedness.  These claims include the claims of Investment Noteholders in the aggregate amount of $45,512,533, and landlords under terminated leases in the aggregate amount of $5,914,911.  Class 4 claims are entitled to equal priority with the Keystone Claims (Class 3) in the context of this bankruptcy even though they are unsecured.

A portion of the Permitted Indebtedness Claims will be satisfied by the issuance to holders of Permitted Indebtedness, in the aggregate,[16] of 80.04% of the interest in an SPV that receives an in-kind distribution of the following assets of the Debtor that secure the Keystone Claim:

(iii)   851,528 shares of Series Seed-1 preferred stock of Bacon, and

(iv)   36.05% limited partnership interest in HOF1.

The SPV will be formed for the purpose of holding such assets.  The remaining portion of the ownership in the SPV will be issued to Keystone (Class 3).

The remainder of the Permitted Indebtedness Claims are unsecured and fall into Class 5.  That portion of the Permitted Indebtedness Claims (the Adjusted Final Claim of holders of Permitted Indebtedness) will be satisfied by an in-kind distribution to holders

---

[16] Each holder of Permitted Indebtedness will receive its own percentage ownership interest in the SPV, with the total of such individual interests aggregating to 80.04%.

of Permitted Indebtedness, in the aggregate,[17] of 68,851,588 shares of Vanderhall Stock,
which represents the pro-rata portion of holders of Permitted Indebtedness of the
Distributable Vanderhall Stock.

   E-14.00 <u>CLASS 5 – Undisputed Noncontingent Unsecured Claims</u>. Class 5
contains the Non-Contingent Unsecured Claims, which are listed in the Debtor's
Schedule E/F, and the unsecured portions of the Keystone Claim and the Preferred
Indebtedness Claims. The Non-Contingent Unsecured Claims in Class 5 include (i) a
claim by LEAF Capital Group, LLC in the amount of $206,413; (ii) a claim by NewCo
Capital Group, LLC in the amount of $219,758; and (iii) a claim by Hillcrest Bank for
$675,726 (secured by equipment of HPH that has no value).

   All Class 5 claims will be satisfied by an in-kind distribution of each creditor's
pro-rata share of Distributable Vanderhall Stock based on the final claims or Adjusted
Final Claims, as applicable, of creditors in Classes 5 and 6B.

   E-15.00 <u>CLASS 6A – Contingent Unsecured Claims that Will Not Be Paid</u>. Class
6A contains the Contingent Unsecured Claims that will not be paid, including certain
undisputed contingent nonpriority unsecured claims set out in the Debtor's Schedule E/F.
These include (i) the contingent claims arising out of all contingent Bonus Commitments
other than those associated with Vanderhall Stock; and (ii) the contingent claims of
landlords (amount indeterminate) against the Debtor under guarantees of leases that have
not been terminated.

   The Plan does not provide for payment of any claims in Class 6A, because the

---

[17] Each holder of Permitted Indebtedness will receive its own shares of Distributable Vanderhall Stock,
with the total of such individual stock distributions aggregating to 68,851,688 shares.

applicable contingencies have not been satisfied.

E-16.00 CLASS 6B – Contingent Unsecured Claims that Will Be Paid. Class 6B

contains the Contingent Unsecured Claims that will be paid, including certain undisputed

contingent nonpriority unsecured claims set out in the Debtor's Schedule E/F. These

include (i) the contingent claim of Emily Brimhall in the amount of $5,000,000; and

(ii) the claims of holders of Contingent Bonus Commitments associated with Vanderhall

Stock in the amount of $4,390,502.[18]

All Class 6B claims will be satisfied by an in-kind distribution of each creditor's

pro-rata share of Distributable Vanderhall Stock based on the final claims or Adjusted

Final Claims, as applicable, of creditors in Classes 5 and Class 6B.

E-17.00 CLASS 7 – Disputed Claims. Class 7 contains all disputed nonpriority

unsecured claims, including claims asserted by Evans Development, Inc. and claims of

unspecified amounts in lawsuits against Vanderhall alleging defects in vehicles sold by

Vanderhall. The Debtor denies that it owes anything with respect to any of these claims.

However, the Debtor has previously offered to settle all disputes with Evans against all

parties. The Debtor is willing to settle with and include Evans in the distribution of

Vanderhall Stock under the Plan if a settlement can be reached.

The Plan does not provide for payment of any claims in Class 7. To the extent the

Court requires the Debtor to include disputed claims in Class 7, the Debtor hereby

requests that the Court estimate the plaintiffs' claims at zero ($0.00) for purposes of

---

[18] The Contingent Bonus Commitments are denominated in terms of Vanderhall Stock equivalents and
therefore adjust automatically with any adjustment in the assumed value of a share of Vanderhall Stock.
The value given here is higher than the value given in Exhibit 5, because this value is based upon the Carta
Valuation of $0.82 per share, whereas the distributions contemplated in the Plan (as shown in Exhibit 5) are
valued at $0.7175 per share.

voting and distribution under the Plan until such time as the claims are validated.

E-18.00   CLASS 8 – Interests. After distribution of the Bacon Stock, HOF1 Interest, Distributable Vanderhall Stock, and other assets of the Debtor, nothing will remain for distribution to the members of the Debtor, namely, David R. Hall and The David R. Hall Trust.

E-19.00   Absolute Priority. Under the "absolute priority rule," all classes of creditors must either vote in favor of the Plan or receive payment of their claims in full. It is the Debtor's position that all of the creditors in Classes 1A, 1B, and 2 will be paid in full; therefore, the "absolute priority rule" has been satisfied with respect to such creditors. Creditors in Classes 3, 4, 5, 6, and 7 may not be paid in full. However, because the Debtor's owners will retain no interest in the reorganized Debtor, the "absolute priority" rule has been satisfied.

**SECTION 4. EXECUTORY CONTRACTS AND LEASES.**

E-20.00 Assumed Leases and Executory Contracts. There are no Unexpired Leases or Executory Contracts to which the Debtor is a party, except for a commitment to Daniel Boyer to transfer shares of Vanderhall Stock to Daniel Boyer upon satisfaction of the applicable vesting requirement. The vesting requirement has been satisfied, and the Debtor will comply with its commitment.

E-21.00 Catch-all Rejection. All Executory Contracts and Leases not assumed under the Plan are rejected. Although the Debtor is not aware of any Executory Contracts or Leases this provision is included in the Plan in the event such Executory Contracts and Leases exist.

E-22.00 Cure. To the extent that there may be a default by the Debtor under any

Executory Contracts or Leases assumed under the Plan and cure is not otherwise provided in the Plan, any such default shall be cured by the reorganized Debtor under such terms and conditions as may be negotiated between the reorganized Debtor and the other party to such Executory Contract or Lease. If no cure agreement is reached on or before the Effective Date of the Plan, then the Court shall determine the nature of any such default and the manner in which it should be cured upon motion of any party to the Executory Contract or Lease.

E-23.00 <u>Deadline for Claims Based Upon Rejected Contracts</u>. All Claims resulting from the rejection of Executory Contracts or Leases under the Plan shall be filed and copies thereof served on the reorganized Debtor and its undersigned counsel on or before 30 days after the Confirmation Date or are forever barred.

## SECTION 5. OPERATIONS OF THE REORGANIZED DEBTOR.

E-24.00 <u>Operation of the Business.</u> As of the effective date of the Plan, the reorganized Debtor will operate its current business. For clarity, the Debtor's "current business" while the Plan is in effect is limited to administrative functions, actions related to restructuring, settlement or establishment of claims, preservation of the value of the Debtor's existing assets, winding down SmarterHome, and sales of HPH and DRHH assets.

E-25.00 <u>Management of Reorganized Debtor</u>. David R. Hall will remain as the manager of the reorganized Debtor.

E-26.00 <u>Compensation of Manager</u>. David R. Hall will receive no compensation as the reorganized Debtor's manager. David R. Hall will not retain any membership interests in the reorganized Debtor.

E-27.00 <u>Estimated Cash Flow</u>.  Because the Debtor anticipates an in-kind distribution of its assets, the Debtor does not anticipate any income from operations during the Plan. The Debtor may incur some expenses related to compensation of some key personnel, including Carl Belliston and Wendy Coplen.

E-28.00 <u>Avoidable Transfers</u>.  Under the Bankruptcy Code, certain transfers made within 90 days of the filing of the bankruptcy petition,[19] that may have been made on account of an antecedent debt, made while the Debtor was presumed to be insolvent under section 547(f) of the Bankruptcy Code, that enable the transferee to receive more than it would have received in a Chapter 7 bankruptcy liquidation, may be recovered as preferential transfers.[20]  There are numerous circumstances that prevent a transfer from being a preference and a number of defenses available to the transferee under the Bankruptcy Code.  In addition, fraudulent transfers made within one year of the petition date may be recovered under the Bankruptcy Code.  Fraudulent transfers include those made with actual intent to hinder, delay or defraud creditors and, if the Debtor was insolvent, those made for less than fair equivalent value.

The Statement of Financial Affairs filed by the Debtor in this case shows no avoidable transfers to insiders within one year.  To the extent that the Statement of Financial Affairs shows payments within 90 days to various creditors, the Debtor believes all of which were made in the ordinary course of business.  Additional payments are shown to secured creditors and employees, all of which appear to be unavoidable under the Bankruptcy Code.  Accordingly, other than as noted above, the Debtor does not

---

[19] One year is the applicable period if the transfer is to an insider.

[20] There may be an issue as to whether Keystone's judgment obtained within 90 days of the bankruptcy filing is a preferential transfer.

believe that there are any avoidable transfers to be pursued in this case.

## SECTION 6. OTHER MATTERS.

E-29.00 <u>Default</u>. If the reorganized Debtor fails to meet its obligations under the Plan with respect to any claim in Classes 1A, 1B, or 2, the holder of the claim may exercise its rights under Utah state law and the documents evidencing the obligation as modified by the Plan. Exercise of these rights, however, will be only permitted after 30 days' notice to the reorganized Debtor and holders of unpaid allowed claims. The reorganized Debtor may cure the default during the 30-day period. During the 30-day period, any party adversely affected by the threatened action may seek to obtain from the Bankruptcy Court an order prohibiting such action.

If the reorganized Debtor fails to make a distribution on account of any claim in Class 3, Keystone will be permitted to pursue recovery of the claim in a court of appropriate jurisdiction, other than the Bankruptcy Court. However, Keystone must first give the reorganized Debtor and an appropriate representative of holders of Permitted Indebtedness 30 days' notice of its intent to pursue such claim if the default is not cured within the 30-day period.

E-30.00 <u>Retention of Jurisdiction</u>. The Bankruptcy Court retains jurisdiction under the Plan to resolve any objections to claims, declare a default, and over other matters specifically set forth in the Plan.

E-31.00 <u>Final Decree and Order Closing Case</u>. Local Rule 3022-1 requires the reorganized Debtor to file a motion for final decree and order closing case within one year after confirmation of the Plan. The Plan provides that the reorganized Debtor will file such a motion. The reorganized Debtor will file a motion prior to the one-year period

if the Plan has been substantially consummated, *i.e.*, the Bacon Stock, HOF1 Interest, and

Vanderhall Stock have been transferred to creditors.

## ARTICLE F

## LIQUIDATION AND DISTRIBUTION ANALYSIS

F-1.00 <u>Liquidation and Distribution Analysis.</u> Attached hereto as **Exhibit 5** is a

Liquidation and Distribution Analysis prepared by the Debtor. The liquidation analysis

shows anticipated recovery by creditors if the case is converted to a case under Chapter 7

and liquidated by a Chapter 7 trustee.

Although the Debtor believes that the valuation of Vanderhall Stock reflected in

the Carta Valuation is conservative, yielding a total value of $82,384,713 to be

distributed to creditors, an auction of the Vanderhall Stock and Company Stock is

unlikely to yield more than ten cents on the dollar, and an auction of the R&D Assets is

unlikely to yield more than $80,000.[21]  Creditors are much worse off under a Chapter 7

liquidation than under the Plan.

Amounts payable to taxing authorities also will be less under a Chapter 7

liquidation than under the Plan, even if there is minimal cash with which to pay taxes

under the Plan. In Chapter 7, no taxes would be payable beyond the $153,125 ESR

penalty, because liquidation proceeds would not exceed the Debtor's NOLs.

Although the Debtor cannot and does not guarantee a specific recovery amount,

the recovery anticipated under the Chapter 11 Plan to holders of undisputed nonpriority

---

[21] The value of the R&D assets has been listed in the Schedules as zero, which is the Debtor's evaluation of those assets as of the present time. However, the liquidation analysis allows for the possibility that someone might be persuaded to buy the Nernst stock, the Earnout Agreements, and the Patents and IP for speculative value.

unsecured claims (based on a reasonable fair market value of the Vanderhall Stock and the Company Stock realized over time) would be **100%**.

F-2.00 <u>Advantages of the Plan.</u>  The advantage of confirmation of the Plan as opposed to liquidation of the Debtor in a Chapter 7 case is recovery of a greater percentage on account of nonpriority unsecured claims in all Classes.  The Plan also gives holders of claims the ability to manage their own holdings of Vanderhall Stock and sell whenever and however is most beneficial for them rather than being forced to accept the unsatisfactory results of an immediate auction.

## ARTICLE G

## <u>ALTERNATIVES TO THE PLAN AND RISKS</u>

G-1.00 <u>Alternatives.</u>  An alternative to the Plan is the conversion of the case to a case under Chapter 7.  As set forth in Article F, the Debtor believes that confirmation of the Plan provides substantial advantages to creditors with unsecured claims that outweigh those of liquidation in a case under Chapter 7.  Other alternatives include amending the Plan or dismissal of the case.

G-2.00 <u>Risks Related to the Debtor.</u>  There are inherent risks in any business operation.  Allowing the Debtor to continue in operation as debtor in possession could result in the loss of some assets that otherwise could be distributed to creditors.  However, the salable value of assets proposed to remain with the Debtor is very small and cannot practicably be shared among all of the creditors.  Auctioning off the Debtor's assets is almost certain to result in a lower overall payout to creditors than allowing the Debtor to continue to operate as contemplated by the Plan.  The Plan only contemplates that the reorganized debtor will engage in limited activities for a limited time prior to the

distribution of Bacon Stock, the HOF1 Interest, and Vanderhall Stock to creditors.

G-3.00 <u>Risks Related to the Company Stock</u>.  Bacon and Vanderhall are early-stage businesses.  There is no guarantee that any Bacon Stock or Vanderhall Stock distributed to creditors (or held within HOF1) as contemplated by the Plan actually will yield the value estimated in the Plan.  Debtor and Vanderhall have been trying for more than four years, with minimal success, to achieve a liquidity event with respect to Vanderhall or the Vanderhall Stock.  Vanderhall has not operated profitably since it began transitioning away from gasoline powered vehicles toward electric vehicles.  Revenues dropped from over $50,000,000 per year to about $10,000,000 in 2024.  Vanderhall's electric vehicles are now being sold, and Vanderhall anticipates a return to prior revenue levels and future growth, but there is a risk that Vanderhall will not be successful.  Vanderhall currently is seeking funding to obtain sufficient cash to return to profitability.

The Debtor believes that Vanderhall's current product line has great promise in the near future and that the valuation given to the Vanderhall Stock and the Company Stock is conservative.  More importantly, the Vanderhall Stock and Company Stock are the only assets available to pay to creditors, whether by an auction or by an in-kind distribution.  Ultimately, there is nothing else to offer.  Creditors must decide whether a greater value is more likely to be obtained by auctioning the Vanderhall Stock and Company Stock for cash under the direction of a bankruptcy trustee or by taking Vanderhall Stock and Company Stock in-kind and selling it according to their own best interests.

## ARTICLE H

## MANNER OF VOTING AND CONFIRMATION OF THE PLAN

H-1.00 <u>Solicitation of Acceptances.</u> This disclosure statement shall have been approved by the court in accordance with Section 1125 of the Bankruptcy Code before being provided to each creditor. Under the Bankruptcy Code, acceptances of the Plan may not be solicited from claim holders unless a copy of the approved disclosure statement is, or has been, transmitted to the claim holder.

H-2.00 <u>Counting Votes and Acceptances.</u> In determining acceptances of the Plan, a vote will be counted if timely submitted by the holder of a claim that is impaired and (a) whose claim is scheduled by the Debtor as undisputed, noncontingent, and liquidated, (b) who has timely filed with the Court a proof of claim which has not been disallowed prior to computation of the votes on the Plan, (c) whose claim is an allowed secured claim under Sections 502 and 506(d) of the Bankruptcy Code, or (d) whose claim has been temporarily allowed by the Bankruptcy Court for purposes of voting.

H-3.00 <u>Acceptance by Impaired Classes.</u> An impaired class of claims is deemed to accept the Plan if at least (a) 50% plus one of the number of allowed claims voting to accept the Plan and (b) 2/3 of the aggregate dollar amount of the allowed claims voting vote to accept the Plan.

H-4.00 <u>Manner of Voting.</u> A ballot for accepting or rejecting the Plan will be enclosed with the approved Disclosure Statement and Plan. Holders of claims should read the instructions carefully, complete, date and sign the ballot and transmit it to the address indicated on the ballot. In order to be tabulated, your ballot must be received by the time indicated thereon. Failure to vote or a vote to reject the Plan will not affect the

treatment to be accorded a claim if the Plan is confirmed.

H-5.00 <u>Hearing on Confirmation.</u>  The notice of hearing on confirmation indicates the time and place of the confirmation hearing. The Court may confirm the Plan at the hearing only if the requirements set forth in Section 1129 of the Bankruptcy Code are satisfied.  The Debtor may propose or file modifications to the Plan either before or at the hearing on confirmation.  If the Bankruptcy Court finds that the proposed modification or modifications do not adversely change the treatment of any creditor who has not accepted the modification in writing, the modification may be deemed accepted by all parties in interest who have previously accepted the Plan.

H-6.00 <u>Best Interest of Creditors.</u>  The Debtor must establish with respect to each class that each holder of a claim in that class has accepted the Plan or will receive or retain under the Plan on account of such claim or interest property of a value that is not less than the amount that such holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

H-7.00 <u>Confirmation Without Acceptance by All Classes.</u>  The Bankruptcy Code contains provisions for the confirmation of a Plan if it is not accepted by all impaired classes. Once a class of impaired claims has accepted the Plan, the Plan may be confirmed over the objection of every other class of creditors pursuant to Section 1129(b) of the Bankruptcy Code.

H-8.00 <u>Rejection by Secured Classes.</u>  If a class of secured claims rejects the Plan, the Plan may be confirmed under Section 1129(b) if the Plan does not discriminate unfairly as to that class and is "fair and equitable" to the class. Section 1129(b) states that the "fair and equitable" standard requires, among other things, that the Plan provide (a)

that the lien securing the claims of members of the class be left in place and that holders of secured claims will receive deferred cash payments of a present value equal to the lesser of the amount of the claim or the value of the collateral, (b) that the collateral securing the claims be sold free of the liens with the liens attaching to the proceeds and with such liens on the proceeds being treated under one of the other two standards described in this paragraph or (c) a treatment for the claim which is the "indubitable equivalent" of the claim.

H-9.00 <u>Rejection by Unsecured Classes.</u>  If a class of unsecured claims rejects the Plan, the Plan may be confirmed if it does not unfairly discriminate and is "fair and equitable" as to the class. Under Section 1129(b) a Plan is "fair and equitable" as to a class of unsecured claims if, among other things, the Plan provides that (a) each holder of a claim included in the rejecting class receive or retain on account of that claim property which has a value, as of the effective date, equal to the amount of such claim, or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property on account of the junior claim or interest.

## ARTICLE I

## <u>TAX CONSEQUENCES OF THE PLAN</u>

I-1.00 <u>Tax Consequences.</u> As to the Debtor and the reorganized Debtor, because these entities are limited liability companies, they will continue to have the normal filing requirements and tax consequences associated with such entities. The treatment of claims and interests under the Plan may have tax implications to the holders of such claims and interests. For instance, there may be tax implications for the recapture of bad debts or implications regarding the timing of reportable income for entities that report income on

a cash basis. Because each of the holders of claims and interests have such varied circumstances, it is impossible for the Debtor and reorganized Debtor to provide legal or accounting advice regarding the applicability of the tax laws on an individualized basis. Therefore, holders of claims and interests should obtain advice from their own counsel or accountants regarding the applicability of tax laws.

Dated this 12th day of May 2025.

HALL LABS, LLC

By: /S/ David R. Hall
Its: Authorized Representative

DIAZ & LARSEN

By: /S/ Andres Diaz
Attorneys for Hall Labs, LLC

# EXHIBIT 1
## SCHEDULE OF PERMITTED INDEBTEDNESS

### Debt Schedule - Hall Property Holdings (6/30/2021)

| Description | Entity | Collateral | Monthly Payment | Principal Balance | Original Loan Amount | Original Date | Maturity Date | Int Rate | Notes |
|---|---|---|---|---|---|---|---|---|---|
| **LT RELATED PARTY LOANS** | | | | | | | | | |
| DRH Holdings | Hall Property Holdings, LLC | None | Interest | 3,446,885 | 16,235,246 | 9/15/2015 | 1/1/2041 | 3% | DRH is David Hall. No security. Subordinate to all other loan |
| DRH Holdings | Hall Labs, LLC | None | | 32,539,074 | 32,539,074 | 12/31/2020 | | 1.95% | DRH is David Hall. No security. Subordinate to all other loan |
| DRH Trust | | None | | 40,000 | 40,000 | | | 1.95% | DRH is David Hall. No security. Subordinate to all other loan |
| David Hall | RsiChip | None | | 918,263 | 918,263 | | | 1.95% | DRH is David Hall. No security. Subordinate to all other loan |
| DRH Holdings | Adaptive | None | | 918,263 | 918,263 | | | 1.95% | DRH is David Hall. No security. Subordinate to all other loan |
| DRH Holdings | NeverDump | None | | 248,533 | 248,533 | | | 1.95% | DRH is David Hall. No security. Subordinate to all other loan |
| DRH Holdings | RsiChip | None | | 225,000 | 225,000 | | | 1.95% | DRH is David Hall. No security. Subordinate to all other loan |
| DRH Holdings | Hall Labs, LLC | None | | 1,560,802 | 1,560,802 | | | 1.95% | DRH is David Hall. No security. Subordinate to all other loan |
| **TOTAL LT RELATED PARTY LOANS** | | | | 38,976,567 | | | | | |
| | | | | | | | | | |
| **ST RELATED PARTY LOANS** | | | | | | | | | |
| DRH Holdings | Hall Labs, LLC | None | | 1,185,293 | 1,185,293 | | | 1.95% | DRH is David Hall. No security. Subordinate to all other loan |
| **TOTAL ST RELATED PARTY LOANS** | | | | | | | | | |
| | | | | | | | | | |
| **BANK LOANS** | | | | | | | | | |
| Altabank | Hall Property Holdings, LLC | Ford Truck (Leased to Vandertel) | 1,285.50 | 13,082 | 69,065 | 11/8/2016 | 11/8/2021 | 4.50% | |
| Bank of the West | Hall Property Holdings, LLC | Office Furniture | 29,398.04 | 455,452 | 1,573,820 | 9/14/2017 | 9/14/2022 | 4.58% | |
| Central Bank LOC | Hall Property Holdings, LLC | 10 Parcels in Provo Utah | Interest | 2,181,441 | 3,037,574 | 12/20/2020 | 12/20/2021 | 6.50% | |
| Altabank | Hall Property Holdings, LLC | JOPDLaser (1st) | 8,837.63 | 200,810 | 463,500 | 12/21/2017 | 12/21/2022 | 5.35% | |
| Wells Fargo Equipment | Hall Property Holdings, LLC | JOPDLaser (2nd) | 9,136.38 | 392,279 | 550,565 | 3/28/2019 | 6/30/2025 | 5.58% | |
| Central Bank-LOC | Hall Labs, LLC | 10 Commercial Parcels in Provo Utah | Interest | 1,665,122 | 1,410,617 | 12/20/2020 | 12/20/2021 | 6.00% | Monthly Interest Payment |
| | Vandertel Motor Works | Belovac Vacuum Former, Forklift (2); Powder Coating Equipment | 2,882.47 | 84,822 | | | | | |
| US Bank | Sure-Fi | ACN Machine, Novo 102 Selective Solder Machine, RS-1 Smart Modular Mounter, G-Titan Automatic Screen; MicroJet EC Cleaner | 11,141.44 | 390,869 | 590,526 | 9/24/2019 | 9/24/2024 | 7.25% | |
| Rock Canyon Bank - LOC | Smarter Home | Smarter Home A/R and Inventory | | 566,065 | 700,000 | 12/5/2020 | 12/8/2021 | 7.25% | |
| SBA-EIDL | Hall Property Holdings, LLC | Secondary to all Debt - All Business Assets | - | 149,900 | 150,000 | 7/2/2020 | 7/2/2050 | 3.75% | Payment Begins 07/2022 |
| SBA-EIDL | Hall Labs, LLC | Secondary to all Debt - All Business Assets | - | 150,000 | 150,000 | 6/15/2020 | 6/15/2050 | 3.75% | Payment Begins 06/2022 |
| SBA-EIDL | Vandertel Motor Works | Secondary to all Debt - All Business Assets | - | 154,754 | 150,000 | 5/20/2020 | 5/20/2050 | 3.75% | Payment Begins 07/2022 |
| SBA-EIDL | Bacon | Secondary to all Debt - All Business Assets | - | 40,600 | 40,600 | 6/2/2020 | 5/3/2052 | 3.75% | Payment Begins 06/2022 |
| SBA-EIDL | Adaptive | None | - | 3,500 | 3,500 | 6/2/2020 | 5/3/2052 | 3.75% | Payment Begins 06/2022 |
| SBA-EIDL | Medic | Secondary to all Debt - All Business Assets | - | 8,500 | 8,500 | 6/30/2020 | 6/1/2052 | 3.75% | Payment Begins 07/2022 |
| SBA-EIDL | RsiChip | Secondary to all Debt - All Business Assets | - | 96,100 | 96,100 | 6/2/2020 | 5/3/2052 | 3.75% | Payment Begins 06/2022 |
| SBA-EIDL | Smarter Home | Secondary to all Debt - All Business Assets | - | 150,000 | 150,000 | 6/10/2020 | 5/10/2052 | 3.75% | Payment Begins 07/2022 |
| SBA-EIDL | Sure-Fi | Secondary to all Debt - All Business Assets | - | 149,900 | 149,900 | 6/3/2020 | 6/3/2050 | 3.75% | Payment Begins 07/2022 |
| SBA-EIDL | Hall Management Services | Secondary to all Debt - All Business Assets | - | 150,000 | 150,000 | 7/3/2020 | 6/4/2052 | 3.75% | Payment Begins 07/2022 |
| Interest Payable | All | | | 100,494 | | | | | |
| **TOTAL BANK LOANS** | | | | 7,103,870 | | | | | |

| Lender | Entity | Collateral | Payment | Balance | Total | Start Date | Maturity | Rate | Notes |
|---|---|---|---|---|---|---|---|---|---|
| **CONVERTIBLE DEBT** | | | | | | | | | |
| K-J Stanger Family Trust | Vanderhall Motor Works | Convertible Note | | 2,650,000 | 2,650,000 | 6/30/2021 | | | $54,824.00 Balloon |
| **OTHER LOANS** | | | | | | | | | |
| Provo City Redevelopment Agency | Hall Property Holdings, LLC | Vanderhall Property–Leased from Vista Heights Investment Lot 1 and Vista Heights Investment Lot 2 | Yearly | 154,824 | 894,674 | 2/22/2018 | 12/1/2024 | 0% | |
| Provo City Redevelopment Agency | Hall Property Holdings, LLC | 5 Commercial Parcels in Provo Utah | Yearly | 2,435,370 | 3,032,244 | 9/22/2016 | 9/22/2026 | 0% | |
| **Merchant loans against Sales** | | | | | | | | | |
| Clearbanc | SmarterHome Inc | Accounts Receivable | % of Sales | 116,879 | | | | 6.00% | |
| Shopify | MicroClimate | Accounts Receivable | % of Sales | 153,485 | | | | 9.00% | |
| Clearbanc | Becon | Accounts Receivable | % of Sales | 565,350 | | | | 15.00% | |
| Hall Venture Partners | Becon | None | | 250,000 | | | | 15.00% | |
| Hall Venture Partners | Medic | None | | 100,000 | | | | 15.00% | |
| Tenant Improvement Obligation | Hall Labs | None | | 512,889 | | | | 0.00% | Payment from builder to pay for tenant improvements. Most will go to reimburse Hall Property |
| **TOTAL OTHER LOANS** | | | | 4,318,788 | | | | | |
| **PPM NOTES** | | None | | 48,323,827 | | | | | |
| **LEASE OBLIGATIONS** | | | | | | | | | |
| STS-Connection, LLC | Hall Property Holdings, LLC | Specific to Buildings: 1919 Ironton Blvd & 2279 Mtn Vista Ln | 16,253.98 | 1,601,733 | 1,784,402 | 9/1/2018 | 8/1/2033 | 7.95% | |
| STS-MVI, LLC | Hall Property Holdings, LLC | Specific to Buildings: 1955 Ironton Blvd & 2365 Mtn Vista Ln | 12,970.34 | 1,272,141 | 1,435,762 | 6/1/2018 | 5/1/2033 | 7.70% | |
| STS-Ironton, LLC | Hall Property Holdings, LLC | Specific to Buildings: 2057 Mtn Vista Ln | 1,979.62 | 193,544 | 217,855 | 6/1/2018 | 5/1/2033 | 7.84% | |
| Sierra Partners, LLC | Hall Property Holdings, LLC | Specific to Buildings: 3000 Sierra Vista Way | 72,944.20 | 7,560,816 | 8,429,109 | 10/15/2018 | 9/15/2033 | 6.97% | |
| M2Lease Term Loan | Hall Property Holdings, LLC | Laser | 1,094.00 | 10,469 | 52,595 | 4/12/2017 | 4/22/2022 | 9.50% | |
| Scannell | Hall Property Holdings, LLC | Specific to Buildings: 3715 Tracy Hall Pkwy | 76,706.67 | 6,805,160 | 7,143,174 | 1/1/2020 | 12/1/2034 | 10.0% | |
| Thumpf | Hall Property Holdings, LLC | JCRD Laser | 6,850.00 | 341,073 | 362,500 | 3/24/2021 | 2/24/2025 | 5.06% | |
| **Leases to be transferred to Vanderhall after IPO** | | | | | | | | | |
| Vista Heights Investment Lot 2, LLC | Hall Property Holdings, LLC | Specific Land for Vanderhall New Building | 154,953.17 | 15,740,615 | 16,478,374 | 1/1/2019 | 12/1/2033 | 8.65% | Sub-leased to Vanderhall |
| Vista Heights Investment Lot 1, LLC | Hall Property Holdings, LLC | Specific to Buildings: 3500 Mountain Vista Pkwy | 49,974.81 | 4,734,193 | 5,199,615 | 4/1/2018 | 3/1/2033 | 9.87% | Sub-leased to Vanderhall |
| Diamond Hall Management | Hall Property Holdings, LLC | New - Vanderhall Building Construction in Progress | | 6,521,654 | TBD | 3/24/2021 | | | Sub-leased to Vanderhall |
| **TOTAL LEASE OBLIGATIONS** | | | | 45,181,398 | | | | | |
| **ADDITIONAL - RECENT LOANS (Not Listed on 6/30/2021 Financials)** | | | | | | | | | |
| DT Group Inc | Hall Property Holdings, LLC | Wide Area CMM | 2,724.31 | 98,075 | 98,075 | 8/3/2021 | 7/2/2024 | 0.00% | Sub-Leased to Adaptive |
| **TOTAL ADDITIONAL OBLIGATIONS** | | | | 98,075 | | | | | |

## EXHIBIT 2
## SUMMARY OF ASSETS

| Cash and Cash Proceeds | Value | Notes |
|---|---|---|
| Cash | $35,918 | Hall Labs expects $132,020 from DRH Holdings. |
| Cash Collateral | $163,500 | Set aside as collateral for Keystone (for the benefit of Keystone and holders of Permitted Indebtedness). |
| Contract Receivable | $150,366 | Monthly installments through 8/2025; cash received will constitute cash collateral and will be set aside. |
| **Real Property** | **Value** | **Notes** |
| Ironton Property (25 Acres) | $7,533,832 | This property is owned by HPH and is encumbered by liens in the amount of $6,376,984 (including some liens held by creditors of the Debtor); under contract. |
| Ironton Property (6 Acres) | $2,000,000 | This property is owned by HPH and is encumbered by liens in the amount of $1,638,200 (including a lien held by a creditor of the Debtor); under contract. |
| Riverton Property | $780,000 | This property is owned by DRHH and is encumbered by liens in the amount of $471,093; (including some liens held by creditors of the Debtor); under contract. |
| Heber Property | $5,739,920 | This property is owned by DRHH and is encumbered by liens in the amount of $5,739,920 (including some liens held by creditors of the Debtor). |
| **Vanderhall Stock** | **Value** | **Notes** |
| Vanderhall Stock | $78,574,949 | Based on Carta 409A valuation; this is 20% lower than the valuation set out in the Schedules, because it assumes the stock will be divided up into minority shares under the Plan. |
| Stock of Vanderhall Securing Non-Recourse Notes | $3,809,764 | The non-recourse notes are an asset of the Debtor (aggregate principal amount = $6.7M, due 7/31/2025); however, the practical value of the notes are in the 4,640,054 shares of VH stock that secures them (valued at $3.8M). |
| **Company Stock** | **Value** | **Notes** |
| Bacon Stock | $1,055,384 | Based on the price of senior preferred stock in current raise, with discount; this stock is not saleable quickly. |
| SmarterHome Stock | $0 | SmarterHome is not generating positive cash flow, and its assets are worth less than its liabilities. |
| Limited Partnership Interest in Hall Opportunity Fund 1, LP | $1,958,503 | The only assets of HOF1 are (i) 447,281 shares of Series Seed 2 preferred stock of Bacon, (ii) 142,576 shares of Series A preferred stock of Bacon, (iii) 7,038,002 shares of common stock of Vanderhall, and (iv) 351,593 shares of Series C preferred stock of Vanderhall. The value of the Debtor's HOF1 interest provided in the Schedules is based on the underlying value of the stock, the Debtor's percentage interest in HOF1 (36.05%), and the 20% carried interest of the General Partner. |

Hall Labs, LLC
Bankruptcy No. 25-21038

| R&D Assets | Value | Notes |
|---|---|---|
| Patents and IP | $0 | No value separate from company built around the underlying technology; see Exhibit 4. |
| Earnout Agreements | $0 | Payouts speculative; see Exhibit 4. |
| Interest in Hall Labs Opportunity Fund, LLC | $0 | The only assets of HLOF are shares of stock in SmarterHome (no value) and the right to receive a portion of payments related to one of the Earnout Agreements (speculative value). |
| Nernst Electric, Inc. | $0 | Very early-stage R&D; not saleable; see Exhibit 4. |

Hall Labs, LLC
Bankruptcy No. 25-21038

**EXHIBIT 3**
**SUMMARY OF CLAIMS[22]**

| Priority Claims | Value | Notes |
|---|---|---|
| IRS | $153,125 | Priority; ESR penalty. |
| **Real Property Claims** | **Value** | **Notes** |
| Central Bank | $4,453,396 | Secured by Ironton Property (25 Acres) owned by HPH worth $7,533,832. |
| Central Bank | $1,638,200 | Secured by Ironton Property (6 Acres) owned by HPH worth $7,533,832. |
| Central Bank | $222,448 | Secured by a portion of the Riverton Property owned by DRHH worth $800,000. |
| Hillcrest Bank | $819,469 | Secured by Heber Property owned by DRHH worth $5,739,920. |
| **Keystone Claim** | **Value** | **Notes** |
| Keystone | $15,505,153 | Partially secured by cash collateral, Company Stock, and R&D Assets.  Not secured by Vanderhall Stock. |
| **Permitted Indebtedness Claims** | **Value** | **Notes** |
| Investment Noteholders | $45,514,500 | Equal priority with Keystone in cash collateral, Company Stock, and R&D Assets. |
| Lease Guarantees (Terminated Leases) | $5,914,911 | HPH is the primary obligor; several long-term leases, including leases with Tom Stuart entities, STAG, and SPHL; all of these may be deemed terminated; equal priority with Keystone in cash collateral, Company Stock, and R&D Assets. |
| **Non-Contingent Unsecured Claims** | **Value** | **Notes** |
| NewCo Guarantee | $219,758 | Disputed; primarily an obligation of SmarterHome; any security interest is junior to Keystone. |
| Leaf Guarantee | $206,413 | Primarily an obligation of HPH (equipment loan); any security interest is junior to Keystone. |
| Hillcrest Bank Guarantee | $675,726 | Primarily an obligation of HPH (equipment loan) |

(continued on following page)

---

[22] For specific amounts asserted by creditors which have filed Proofs of Claim, please review the Claims Register maintained by the Clerk of the Court in this case. Some of those amounts may vary from the amounts set forth herein. To the extent those claims are allowed, the Debtor will distribute the pro rata portion based upon the allowed amounts of those claims.

Hall Labs, LLC
Bankruptcy No. 25-21038

| Contingent Unsecured Claims | Value | Notes |
|---|---|---|
| Emily Brimhall | $5,000,000 | Contingent purchase commitment based on the occurrence of a "Major Event." |
| Contingent Bonus Commitments (Vanderhall) | $4,390,502 | Bonus commitments tied to the value of shares of Vanderhall stock in a sale transaction; the value given here is lower than the value given in the Schedules, because it is based upon a lower valuation for Vanderhall stock ($0.82 per share rather than $1.025 per share). The valuation given in Exhibit 5 is lower still, because it uses a further discounted stock value. |
| Contingent Bonus Commitments (Misc) | $3,368 | Bonus commitments tied to the value of stock of portfolio companies other than Vanderhall in a sale transaction. |
| Lease Guarantees (Leases Still in Force) | $970,093 | HPH is the primary obligor; leases on buildings used by Vanderhall; the leases are paid by Vanderhall and guaranteed by the Debtor. |
| **Boyer Commitment** | | |
| Daniel Boyer | N/A | Contingent commitment to transfer 140,000 shares of Vanderhall stock; the contingency was satisfied on 3/25/2025 but no stock has been transferred. |
| **Disputed Claims** | | |
| Evans Development | $0 | Disputed; Evans Grader & Paving has submitted invoices to HPH for $1,273,944 (which is reflected in the Schedules because Evans Development has included the Debtor as a defendant on all claims), but there is no valid basis for holding the Debtor responsible to Evans Development for any amount. |
| Vanderhall Lawsuits | $0 | Disputed; unspecified claims for product liability |
| Bloomberg Software | $0 | Disputed; Bloomberg claims $3,820. |

Hall Labs, LLC
Bankruptcy No. 25-21038

**EXHIBIT 4**
**R&D ASSETS**

| Patents and IP | | |
| --- | --- | --- |
| Patents and IP | $0 | Miscellaneous patents, patent applications, domain names, know-how, and other intellectual property pertaining to past projects. Hall Labs might be able to get some value out of the underlying technologies; for purposes of a Chapter 7 analysis, the Debtor assumes someone might pay $20,000 for speculative value. |
| **Earnout Agreements** | | |
| Sustainable Energy Solutions | $0 | SES has developed carbon capture solutions. The company was sold to Chart, Inc. in 2020. Part of the purchase price is payable in earn-outs upon the achievement of certain milestones. The company did not achieve the milestone specified for the end of 2023. Hall Labs will be entitled to a $2,375,000 payment if the company achieves a milestone specified for the end of 2028, but the achievement of the 2028 milestone is speculative. |
| Care.Life Technologies | $0 | Care.Life Technologies purchased the assets of Care.Life Services, which was in the business of developing nurse call systems and other monitoring systems. The purchase price is payable in earn-out payments equal to 5% of Care.Life Technologies' net sales in the field of business in each calendar quarter, beginning in the first quarter of 2025. Hall Labs has not received any sales report from Care.Life Technologies but it understands that sales will be less than $6,000 per month. Future sales are speculative. |
| Dyol | $0 | Dyol Manufacturing purchased the assets of Dyol, Inc., which was in the business of developing an innovative throttle for e-vehicles. The purchase price is payable in earn-out payments equal to 2% of the net sales of Dyol Manufacturing in the field of business in each calendar quarter. To Hall Labs' knowledge, Dyol Manufacturing has no sales revenues. Future sales are speculative. |
| Guardian Health | $0 | Guardian Health, Inc. purchased the assets of Medic, Inc., which was in the business of developing a medical toilet. The purchase price is payable in earn-out payments equal to 5% of Guardian Health's net sales in the field of business in each calendar quarter, beginning in the first quarter of 2025. To Hall Labs' knowledge, Guardian Health has no sales revenues. Future sales are speculative. |

Hall Labs, LLC
Bankruptcy No. 25-21038

| | | |
|---|---|---|
| SmartWinch | $0 | Hall Logic purchased the assets of SmartWinch, Inc., which was in the business of developing winches and hoists. The purchase price is payable in earn-out payments equal to 5% of Hall Logic's net sales in the field of business in each calendar quarter, beginning in June, 2025. To Hall Labs' knowledge, Hall Logic has no sales revenues in the field of winches and hoists. Future sales are speculative. |
| Sure-Fi | $0 | Sure-Fi purchased certain shares of its own capital stock held by Hall Labs. Sure-Fi is in the business of developing wireless communication technologies. The purchase price is payable in earn-out payments equal to 10% of Sure-Fi's gross revenues, beginning in March 2026, up to a maximum purchase price of $20,000,000. However, Sure-Fi's future revenues and ability to pay are uncertain. |
| Microclimate | $0 | Microclimate purchased certain shares of its own capital stock held by Hall Labs. Microclimate is in the business of developing air filtration helmets. The purchase price is payable in earn-out payments equal to 5% of Microclimate's gross revenues, beginning in May 2025, up to a maximum purchase price of $6,000,000. Microclimate first started selling its current product in March 2025, and it expects gross revenues of approximately $30,000 per month by May. Future sales are speculative. |
| Trolf | $0 | Trolf Ventures purchased the assets of Hall Labs' Trolf project, which was developing an innovative traveling golf bag. The purchase price is payable in earn-out payments equal to 5% of the net sales of Trolf Ventures in the field of business in each calendar quarter. To Hall Labs' knowledge, Trolf Ventures has no sales revenues. Future sales are speculative. |
| **Hall Labs Opportunity Fund, LLC** | **Value** | **Notes** |
| SmarterHome Stock | $0 | HLOF owns shares of SmarterHome Stock (worthless) |
| SmartWinch Earnout | $0 | HLOF has the right to receive a portion of earnout payments under the SmartWinch Earnout Agreement |
| **Nernst Electric, Inc.** | | |
| Nernst Stock | $0 | Very early-stage R&D; Nick Farandos can take a non-exclusive license in all IP if there is an involuntary sale; no value in an auction, but the Debtor (or an affiliate) can get value by working with Nernst; for purposes of a Chapter 7 analysis, the Debtor assumes someone might pay $50,000 for speculative value. |

Hall Labs, LLC
Bankruptcy No. 25-21038

# EXHIBIT 5
## LIQUIDATION AND DISTRIBUTION ANALYSIS

| Hall Labs Assets | # Shares | Value |
|---|---|---|
| Vanderhall Stock Value/Share | $ 0.8200 | |
| Bacon Stock Value/Share | $ 1.2394 | |
| | | |
| Cash and Cash Proceeds | | $ 311,633 |
| Real Property Owned by HPH/DRHH* | | $ 7,133,513 |
| | | |
| Company Stock | | |
| Bacon Stock | 851,528 | $ 1,055,384 |
| HOF1 | | |
| Hall Labs' % of HOF1 | 36.05% | |
| General Partner's Carry | 20.00% | |
| Vanderhall Stock | 7,389,595 | $ 1,747,651 |
| Bacon Stock | 589,857 | $ 210,852 |
| | | |
| Vanderhall Stock | | |
| Vanderhall Stock | 95,823,108 | $ 78,574,949 |
| Non-Recourse Notes | | |
| Vanderhall Stock | 4,646,054 | $ 3,809,764 |
| | | |
| R&D Assets | | $ 80,000 |
| | | |
| Total (based on Carta value for VH Stock) | | $ 92,923,746 |

| Distributions to Creditors | # Shares | Discounted Value | % Discount Off Actual Value |
|---|---|---|---|
| Cash Collateral | | $ 311,633 | |
| Proceeds from Sale of R&D Assets | | $ 80,000 | |
| Proceeds from Real Estate Sales | | $ 7,133,513 | |
| | | | |
| Special Purpose Vehicle | | | |
| Bacon Stock | 851,528 | $ 1,055,384 | |
| HOF1 Interest | 36.05% | $ 1,753,261 | |
| | | | |
| Vanderhall Stock | | | |
| Total Vanderhall Stock | 100,469,162 | | |
| Transfer to Daniel Boyer | 140,000 | | |
| Distributable VH Stock | 100,329,162 | $ 0.7143 | |
| Unsecured Claims to be Paid with VH Stock | | $ 71,663,407 | 12.89% |
| | | | |
| Total (based on Plan value for VH Stock) | | $ 81,997,198 | |

| Additional Distributions | # Shares | Discounted Value |
|---|---|---|
| DRH Trust Vanderhall Stock | 3,699,501 | $ 2,677,329 |
| Value per Share | | $ 0.7237 |

* This analysis assumes the value of the real property is equal to the claims of Hall Labs' creditors although appraised values are higher.
Any additional funds from real estate sales that are not used for other HPH and DRHH obligations or administrative expenses may be distributed to creditors.

Hall Labs, LLC
Bankruptcy No. 25-21038

| Disposition of Claims Secured by Real Property of HPH/DRHH | Claim | Real Estate Proceeds | % of Claim Satisfied |
|---|---|---|---|
| Class 1A - Central Bank (HPH Properties) | | | |
| 25 Acres (Ironton) | $ 4,453,396 | $ 4,453,396 | 100.00% |
| 5.8 Acres (Ironton) | $ 1,638,200 | $ 1,638,200 | 100.00% |
| Class 1B - Central Bank (DRHH Property) | | | |
| Riverton (1 parcel) | $ 222,448 | $ 222,448 | 100.00% |
| Class 2 - Hillcrest Bank (DRHH Property) | | | |
| 52 acres (Heber) | $ 819,469 | $ 819,469 | 100.00% |
| Total | $ 7,133,513 | $ 7,133,513 | |

| Disposition of Priority Claims, Secured Claims, and Claims Having Equal Priority with Keystone | Claim | Cash | Percentage Interest in SPV | Value of SPV Interest (using Plan value for VH Stock) | Value of SPV Interest (using Carta value for VH Stock) | % of Claim Satisfied (using Plan value for VH Stock) |
|---|---|---|---|---|---|---|
| Priority - Tax Liabilites | | | | | | |
| IRS ESR Penalty | $ 153,125 | $ 153,125 | | | | 100.00% |
| Class 3 - Secured by Personal Property | | | | | | |
| Keystone after DRH Trust Stock* | $ 12,827,824 | $ 47,615 | 19.96% | $ 560,714 | 601,688 | 4.74% |
| Class 4 - "Permitted Indebtedness" | | | | | | |
| Investment Noteholders | $ 45,512,533 | $ 168,937 | 70.83% | $ 1,989,386 | 2,134,761 | 4.74% |
| Guaranteed HPH Leases (Terminated) | $ 5,914,911 | $ 21,955 | 9.21% | $ 258,545 | 277,438 | 4.74% |
| Total | $ 64,408,393 | $ 391,633 | | $ 2,808,644 | $ 3,013,887 | |

\* The Keystone claim is $15,505,153 minus the value of Vanderhall stock transferred to Keystone by The David R. Hall Trust.

Hall Labs, LLC
Bankruptcy No. 25-21038

| Disposition of Claims to be Satisfied by In-Kind Distribution of Vanderhall Stock | # Shares Committed | Claim | Shares of VH Stock Distributed | % of Distributable Shares | Value of VH Stock (using Plan value) | Value of VH Stock (using Carta value) | % of Claim Satisfied (using Plan value) |
|---|---|---|---|---|---|---|---|
| **Class 5- Unsecured** | | | | | | | |
| Keystone (Unsecured Portion) | | $ 12,267,111 | 17,174,022 | 17.12% | $ 12,267,111 | $ 14,082,698 | 100.00% |
| Investment Noteholders (Unsecured Portion) | | $ 43,523,147 | 60,932,645 | 60.73% | $ 43,523,147 | $ 49,964,769 | 100.00% |
| Guaranteed HPH Leases (Unsecured Portion) | | $ 5,656,366 | 7,918,943 | 7.89% | $ 5,656,366 | $ 6,493,533 | 100.00% |
| Former Investment Noteholders | | $ 240,000 | 336,001 | 0.33% | $ 240,000 | $ 275,521 | 100.00% |
| Leaf Capital Funding Guarantee | | $ 206,413 | 288,979 | 0.29% | $ 206,413 | $ 236,963 | 100.00% |
| NewCo Guarantee | | $ 219,758 | 307,662 | 0.31% | $ 219,758 | $ 252,283 | 100.00% |
| Hillcrest Bank Guarantee (#1700) | | $ 675,726 | 946,020 | 0.94% | $ 675,726 | $ 775,736 | 100.00% |
| **Class 6A - Contingent Unsecured (No Pay)** | | | | | | | |
| Guaranteed HPH Leases (In Force) | | $ 970,093 | | 0.00% | $ - | $ - | 0.00% |
| Contingent Bonuses (Earnouts) | various | | | 0.00% | $ - | $ - | 0.00% |
| **Class 6B - Contingent Unsecured (Pay)** | | | | | | | |
| Emily Brimhall (SmarterHome) | | $ 5,000,000 | 7,000,027 | 6.98% | $ 5,000,000 | $ 5,740,022 | 100.00% |
| Contingent Bonuses (Vanderhall) | 5,354,271 | $ 3,874,886 | 5,424,861 | 5.41% | $ 3,874,886 | $ 4,448,386 | 100.00% |
| **Class 7 - Disputed Unsecured** | | | | | | | |
| Evans Development | | $ - | | 0.00% | $ - | $ - | 0.00% |
| Vanderhall Lawsuits | | $ - | | 0.00% | $ - | $ - | 0.00% |
| **Total** | | $ 72,633,500 | 100,329,160 | 100.00% | $ 71,663,405 | $ 82,269,911 | |