Andres Diaz (A4309)
Timothy J. Larsen (A10263)
**DIAZ & LARSEN**
757 East South Temple, Suite 201
Salt Lake City, UT 84102
Telephone: (801) 596-1661
Fax: (801) 359-6803
Email: courtmail@adexpresslaw.com
*Attorneys for the Debtor in Possession*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In Re: HALL LABS, LLC<br>    3500 Mountain Vista Parkway<br>    Provo, UT 84606<br><br><br>Debtor in Possession. | Bankruptcy No. 25-21038<br>Chapter 11<br><br>FILED ELECTRONICALLY<br><br>Judge Joel T. Marker |

### DEBTOR'S RESPONSE TO KEYSTONE'S MOTION TO CONVERT, OR ALTERNATIVELY, FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

Hall Labs, LLC., the Debtor in Possession in the above-captioned case (the "Debtor"), hereby submits the Debtor's Response to Keystone's Motion to Convert, or Alternatively, for Appointment of Chapter 11 Trustee (the "Motion") scheduled for hearing on May 29, 2025. In support of its Response the Debtor states the following:

### THE APPLICABLE LEGAL STANDARDS

**A.       Law Applicable to the Dismissal or Conversion.**

The Debtor agrees that the Court may convert this case to a case under chapter 7 if the Court determines that would be "in the best interest of creditors and the estate." However, the Court may decide not to convert the case based on "unusual circumstances establishing that converting or dismissing the case is not in the best interest of creditors of the estate." The

Debtor submits that the nature of the Debtor's assets and proposed in-kind distribution of those

assets constitute such "unusual circumstances," and supports the conclusion that the Debtor's

case should **not** be converted.

**B.      Law Applicable to Appointment of a Trustee.**

The Debtor agrees that the Court has discretion to appoint a trustee if it is in the best

interests of creditors.[1]  While the Debtor submits that such an appointment is unnecessary, the

Debtor believes that the appointment of a Chapter 11 Trustee would be better for the creditors

and other parties in interest than conversion of this case to one under Chapter 7 and the Debtor

would not oppose such appointment. The proposed Disclosure Statement highlights the

complications of this case and the need to provide all of the creditors with an opportunity to

receive a distribution of the Debtor's assets to satisfy their claims, which the Debtor believes

would be best achieved in Chapter 11.

**DEBTOR'S SUPPLEMENTAL STATEMENT OF FACTS[2]**

1.   The Debtor's capital structure consists of two classes of membership interests: Class A,

which holds voting rights, and Class B, which is non-voting.  The Class B membership interest

holds substantially 100% of the economic interest of the Debtor.  David R. Hall ("Hall") owns

100% of the Class A membership interest in the Debtor and 53.74% of the Class B membership

interest.  The David R. Hall Trust (the "Hall Trust"), an irrevocable trust established under the

---

[1] Contrary to Keystone's implication that the creditors in this case have lost confidence in the Debtor or that there exists a high level of acrimony between the Debtor and its creditors, there is no evidence of such facts in this case. While that may be true as to Keystone and maybe one or two other creditors, that is not generally the facts of this case. Indeed, the Debtor has not received any indication from other creditors that they are unwilling to work with the Debtor to bring its plan to fruition.

[2] The Debtor's Supplemental Statement of Facts are supported by the Declaration of David R. Hall in Support of the Debtor's Response to Keystone's Motion to Convert, or Alternatively, to Appoint Chapter 11 Trustee, filed contemporaneously with this Response.

laws of the State of Utah, owns 46.26% of the Class B membership interest in the Debtor.[3]

2. Hall currently serves as the Debtor's manager and CEO.

3. The Debtor has two wholly owned subsidiaries: Hall Property Holdings, LLC ("**HPH**") and DRH Holdings LLC ("***DRHH***").

4. HPH supports the Debtor's business by owning and managing real property and equipment, primarily for the use of the Debtor and its affiliates. Many obligations of the Debtor are guaranteed by HPH and vice versa. Nearly all of HPH's assets have been sold to try to keep the Debtor's operations going and to keep the Debtor current on debts to banks, holders of Investment Notes, and others.

5. DRHH previously was wholly owned by Hall. It holds and manages real property and a variety of investments. Many obligations of the Debtor are guaranteed by DRHH and vice versa. Nearly all of DRHH's assets have been sold to try to keep the Debtor's operations going and to keep the Debtor current on debts to banks, holders of Investment Notes, and others. Between 2020 and 2024, before Hall transferred 100% of the interest in DRHH to the Debtor, DRHH contributed over $14 million to the Debtor and HPH for such purposes. DRHH currently supports the Debtor's business and provides resources to enable the Debtor's operations.

6. The Debtor has been engaged in research, development, business incubation, and other legal activities. The Debtor has used a unique business model. It created projects to develop technologies in various fields. If a project showed promise, the Debtor created a business entity (a portfolio company) with the objective of forming a business enterprise.

7. The portfolio company hired its own staff and may have sought outside investment.

---

[3] Carl J. Belliston is the trustee of the Trust, but the sole function of the Trust is to hold a non-voting membership interest in the Debtor and potentially a few other assets for the benefit of the Debtor.

From time to time, however, the Debtor provided administrative services, technical and scientific input, and funding to the portfolio company. The ultimate objective was to sell the portfolio company or the Debtor's interest in the portfolio company.

8.   The Debtor maintained an administrative staff and a staff of scientists, inventors, and others with technical expertise. It made substantially all of its money by selling technology or interests in portfolio companies, i.e., asset sales. That was the Debtor's ordinary course of business.

9.   The Debtor typically has to make investments over several years before generating revenues from such sales. It has relied on the profits from sales of projects, debt, including unsecured investment notes issued to individual investors ("***Investment Notes***"), to bridge the time between R&D investments and such sales. Revenues typically were received in large chunks, with very little recurring revenue month to month.

10. The Debtor's assets, being comprised mostly of early-stage R&D projects and companies, are unusually illiquid. Such projects and companies normally must be packaged and sold to a strategic buyer. A sale may take several years. Between sales, the Debtor incurred expenses and accounting losses in the reasonable expectation of creating saleable value.

11. The Debtor and its predecessors owned and operated by Hall have used this model successfully for over 40 years, generating hundreds of millions of dollars in transactions. Hall has financed the operations of these entities with various forms of debt financing and has assumed personal responsibility for substantially all debts through personal guarantees or otherwise. Until 2020, none of Hall's entities has ever defaulted on any debt.

12. In 2015, Novatek, Inc. ("***Novatek***"), a company previously owned by David Hall, was sold to Schlumberger Technologies ("***Schlumberger***") for approximately $129,000,000. The

Debtor was formed in anticipation of the Schlumberger transaction. Prior to the consummation of the transaction, Novatek transferred to the Debtor and HPH all projects and assets that Schlumberger did not want Novatek to retain.

13. Part of the purchase price in the Schlumberger transaction was paid through an earn-out arrangement that provided revenues to the Debtor through 2020 in the amount of $10,000,000 per year. The Debtor anticipated that it would be able to sell one or more of its portfolio companies by 2020, sufficient to enable the Debtor to remain current on its debts, before the revenue stream from the Schlumberger transaction ended.

14. The Debtor's most mature and most valuable portfolio company at the time of the Schlumberger transaction was Vanderhall Motor Works, Inc. ("***Vanderhall***"), which was believed to be worth at least $250,000,000 to $300,000,000 based on third-party analyses. (The Vanderhall Stock held by the Debtor, or any other entity or person is referred to herein as the "***Vanderhall Stock***.") The Debtor anticipated that Vanderhall would be acquired or would complete an initial public offering by 2020.

15. In early 2020, the Debtor was in negotiations for transactions involving two of its portfolio companies, but those negotiations collapsed when the COVID-19 pandemic shocked the world economy. A few months later, the Debtor's likeliest source of sufficient revenue to cover its debt obligations (the Schlumberger earn-out payments) ended. Vanderhall redoubled its efforts to find a buyer and then prepared for an initial public offering of its stock, but it decided to delay any IPO until it could complete its then-in-progress transition from gasoline-powered vehicles to fully electric vehicles. Skittishness in the economy ever since the COVID-19 pandemic has made any sale of Vanderhall or any of the Debtor's other portfolio companies very difficult.

16. The Debtor was compelled to look for additional sources of interim funding until Vanderhall could be sold, and other projects could be progressed to maturity.  The Debtor continued to sell assets (bringing in over $86 million between the beginning of 2020 and the end of 2024, including assets sold by HPH, to keep the Debtor's operations going, meet current obligations to creditors, and reduce debt), but it stopped selling Investment Notes.

17. Always in the past, Hall's companies, including the Debtor, have maintained multiple projects, affording multiple exit possibilities.  With the shocks following the COVID-19 pandemic, however, all the Debtor's projects and portfolio companies were adversely affected.

18. On or about August 11, 2021, the Debtor borrowed $10,000,000 pursuant to a Loan Agreement with Keystone Private Income Fund ("***Keystone;***" such Loan Agreement, the "***Keystone Loan Agreement***").  The Keystone loan was secured by the Debtor's personal property, but there were two notable provisions that have importance in this bankruptcy case.

19. First, the priority of Keystone's lien was disclaimed with respect to all existing debt designated as "Permitted Indebtedness," (as defined in the Keystone Loan Agreement, the "***Permitted Indebtedness***"), the current level of which is $51,429,411.  In other words, the Keystone lien did not have priority over the Permitted Indebtedness.

20. Second, there was a carve-out and special provision for the Vanderhall Stock, because the Vanderhall Stock was subject to a lock-up agreement and could not be pledged.  Rather than pledging 100% of the Vanderhall Stock or providing that the Vanderhall Stock was covered by Keystone's blanket lien on the Debtor's personal property, the Debtor agreed to deliver a lien, at such time as certain conditions were satisfied, on shares of Vanderhall Stock constituting 51% of the outstanding shares of capital stock of Vanderhall.  The Keystone loan has been extended and increased.  The provisions relating to the Vanderhall Stock have been modified, but no stock

pledge covering the Debtor's shares of Vanderhall Stock has ever been delivered.  As a result of this arrangement, it appears that Keystone does not hold a lien on the Vanderhall Stock and only holds a lien on other personal property of the Debtor.

21. In the meantime, between the beginning of 2020 and the middle of 2024, the Debtor gradually reduced funding for its projects and portfolio companies and tried to sell assets to keep obligations to its creditors.  HPH and DRHH also sold assets to provide funds to the Debtor to pay interest on its debts to banks, Keystone, the holders of Investment Notes, and other creditors, and to preserve the value of existing projects.

22. The Debtor continued to pursue a favorable liquidation of its Vanderhall Stock.  Multiple potential transactions have appeared likely to bear fruit, including discussions as recently as February 2025 with a well-established publicly held potential strategic buyer, but Vanderhall has not been successful in getting a transaction done.

23. Most of the Debtor's creditors, recognizing that the Debtor has no ability to pay them without a favorable transaction involving the Vanderhall Stock, have taken no legal action against the Debtor.

24. By the middle of 2024, the Debtor was forced to discontinue most funding of projects and portfolio companies.  Several projects were shut down, and some portfolio companies were sold to their employees in exchange for an earnout commitment (pursuant to an "***Earnout Agreement***") to be paid in the event the business was able, at some time in the future, to generate revenues.

25. At the end of June 2024, the Debtor defaulted on its obligations to Keystone.  On or about September 12, 2024, Keystone filed a lawsuit against the Debtor in the Third Judicial District Court of Utah ("***State Court***") and subsequently filed a Motion for Summary Judgment

demanding a money judgement for amounts owed under the Keystone loan and the right to take possession and ownership of the Debtor's assets.  The Debtor acknowledged the debt but objected to the remedy demanded by Keystone.  On December 31, 2024, without a hearing, the State Court granted Keystone's motion for summary judgment, noting that "[t]he issues raised in the pleadings as an attempt to prevent judgment do not relate to liability but rather to issues that may arise in or during the collection of the judgment, but such does not prevent the granting of judgment."  The State Court subsequently entered a Judgment on February 7, 2025, granting all of Keystone's requested relief.

26. The Debtor does not seek to relitigate the State Court action.  However, the issue of priority, the *implications* of Keystone's priority vis-à-vis other creditors (who were not before the State Court), and the proper manner of managing and disposing of assets of the Debtor can only be sorted out fairly under the processes of the Bankruptcy Code.  The Debtor believes that these are some of the "issues that . . . arise in or during the collection of the judgment" as referenced by the State Court.

27. The Debtor recognized that a take-over of the Debtor's assets by Keystone would adversely affect the value of those assets and negatively affect the interests of the Debtor's other creditors, who have had no opportunity to be heard by any court.  Therefore, to protect the equity in the Debtor's estate and the interests of other creditors, and to provide for the resolution of issues that now have arisen in connection with the collection of Keystone's judgment, the Debtor was left with no choice but to seek bankruptcy protection under Chapter 11, which it did on March 5, 2025.

28. Keystone has raised many unfounded accusations of the Debtor's fraudulent designs, which the Debtor strongly disputes.  For instance, Keystone's accusation that the Debtor is

attempting to squirrel away assets fraudulently for the benefit of Hall and his family is false.

Indeed, the Debtor has been straightforward with respect to its intentions and objectives from the

inception of this case. The Debtor has made clear that neither Hall nor any of his family expect

to emerge from the bankruptcy with a dime of the Debtor's assets.

29. To the contrary, Hall and the Debtor's subsidiaries have utilized their assets to keep the

Debtor operating in an effort to provide all of the Debtor's creditors (including Keystone) with

an opportunity to get paid.

30. Most of the "alarms" raised by Keystone arise out of the fact that the Debtor's assets and

business model are complex and unusual. Keystone would have the Court infer that "unusual"

implies "improper." The Debtor submits that the Debtor has not acted improperly in this case

but that the "unusual circumstances" of this case justify a continuation under Chapter 11 and a

different approach to the repayment of the Debtor's creditors.

31. Precisely because of the complex and unusual nature of the Debtor's assets and business,

the Debtor submits that the interests of all creditors, especially unsecured creditors, will be best

served by allowing the Debtor to dispose of assets in a unique way. In this case, the Debtor

proposes to do an in-kind distribution of its assets to its creditors based upon the prorata portion

of their claims against the Debtor, which is not the typical way that creditors' claims in Chapter

11 cases.[4]

32. The Disclosure Statement provides detailed explanation of the Debtor's assets and

liabilities and a road map as to how those assets can best be distributed toward satisfaction of

allowed claims in this case. Moreover, the process of verifying the accuracy of assets and

---

[4] *See*, Debtor's Disclosure Statement Dated May 12, 2025, With Summary of Plan (Docket No. 64) (the "Disclosure
Statement.")

liabilities as described in the Disclosure Statement, resolving disagreements regarding creditors'

claims, and distributing assets in-kind will be far more efficient (and will avoid the kinds of

speculations and misperceptions that already are evident in Keystone's motion) through the

Chapter 11 process.


## DEBTOR'S RESPONSE TO KEYSTONE'S STATEMENT OF FACTS

**A.**    **The Debtor's Obligations to Keystone and the Collateral Security.**

Keystone's fact narrative leaves out a number of important matters, the most important of

which are set forth below:

Section 5.11 of the Keystone Loan Agreement provides as follows:

(a)      In order to secure payment and performance of the Obligations, Borrower has
granted to Lenders a first priority (**except with respect to Permitted Indebtedness**),
perfected security interest in the Collateral by executing and delivering to Agent and
Lenders the Collateral Documents. Borrower further agrees to execute and deliver to
Agent and Lenders from time to time such amendments to the Collateral Documents
or other agreements and similar documents to create or maintain Lenders' security to
the Collateral as may be necessary for Agent and Lenders to ensure the proper grant
of its security interest therein. Borrower further authorizes Agent to prepare and file
such financing statements as Agent may reasonably require to perfect and maintain its
perfected interest in the Collateral. Borrower agrees that Agent is authorized to file a
UCC-1 financing statement on behalf of Lenders covering the Collateral, and that as
new Collateral is acquired by Borrower, Agent is hereby authorized on behalf of
Lenders to timely file such additional UCC-1 financing statements or amendments
thereto as Agent believes are needed to cover any such new Collateral.


(b)      Borrower hereby **agrees to deliver** to Agent on behalf of Lenders **a perfected
first priority (except with respect to Permitted Indebtedness) lien** in not less than
fifty-one percent (51.0%) of the total equity ownership of Vanderhall Motor Works,
Inc., a Delaware corporation ("Vanderhall"), within five (5) Business Days following
the earlier of the (i) expiration of the lock up period following Vanderhall's initial
public offering and (ii) the decision or inaction by management of Vanderhall to no
longer actively pursue an initial public offering of its securities. (emphasis added.)[5]

---

[5] Many of the issues in this case surround the Vanderhall Stock which is stock in a start up owned and operated by

Referring to subsection (a), the priority of the security interest granted to Keystone excepts "Permitted Indebtedness," which is defined by referring to a Schedule that lists many creditors, most of which had no security interest in any personal property of the Debtor. Indeed, currently these creditors' claims in the aggregate amount of approximately $51,429,411 far exceed Keystone's claim

Referring to subsection (b), the language indicates that a lien on the Vanderhall Stock was **not** intended to be granted under the Security Agreement and was **not** intended to be covered by the broad general language of the UCC financing statement.  This language was added to the Loan Agreement, because the Debtor was prohibited from granting any security interest in the Vanderhall Stock at that time.  The Debtor was unable to sign a stock pledge agreement covering the Vanderhall Stock as Keystone had requested.  At no time has Keystone requested delivery of a lien on the Vanderhall Stock, nor has the Debtor offered to deliver a lien and in fact no subsequent lien was ever delivered.

While the Security Agreement does not include the carve out related to "Permitted Indebtedness," or any specific language relating to the Vanderhall Stock, such language does exist in the Loan Agreement.  As such the entire agreement must be given meaning

Keystone may argue that the Debtor is estopped from arguing that no security interest has attached to the Vanderhall Stock, because the Debtor was contractually obligated to deliver the lien when Vanderhall's efforts toward an IPO diminished.  However, such an argument is not available vis-à-vis other unsecured creditors who had nothing to do with the Debtor's actions.

---

David Hall's son, Stephen.  The Debtor recommends that the Court, creditors and other parties in interest afford themselves of the opportunity to visit Vanderhall's website at vanderhallusa.com.

Under **Utah Code § 70A-9a-203(1)**, a security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment.  In a contest between Keystone and other creditors, no security interest ever attached to the Vanderhall Stock, because the lien was not delivered as required by the Security Agreement.  Under **Utah Code § 70A-9a-203(1)**, coupled with the Debtor standing in its role under Section 544 of the Bankruptcy Code, would indicate that Keystone's rights with respect to the Vanderhall Stock did not "become enforceable against the debtor with respect to the collateral," and that the Keystone Loan Agreement "expressly postpone[d] the time of attachment." As such, any security interest that Keystone may have been entitled to in the Vanderhall Stock did not attach as of the Petition Date and is not enforceable against the Debtor.

Even if a security interest in the Vanderhall Stock is deemed to have attached, however, the priority of Keystone's security interest vis-à-vis holders of Permitted Indebtedness in the context of the bankruptcy is specifically addressed in the above-quoted language.  The Security Agreement specifically gave Keystone priority only over indebtedness that might arise _after_ August 11, 2021.  All indebtedness existing _prior to_ August 11, 2021, was identified as "Permitted Indebtedness" and was expressly excepted from the first priority of Keystone's lien. This means that all holders of Permitted Indebtedness have equal right to participate in any sale of the Debtor' assets (including the Vanderhall Stock) and a proportionate right to any proceeds of the sale when Keystone exercises its rights as a secured creditor.

Even though the holders of Permitted Indebtedness do not themselves hold a perfected and competing security interest in the collateral, to the extent that Keystone may have a security interest in the Vanderhall Stock, the Debtor is able to step into the shoes of the holders of the Permitted Indebtedness and preserve their rights to equal priority for the benefit of the estate

12

under Section 551 of the Bankruptcy Code.

**B.      The Lawsuit Filed by Keystone Against the Debtor and the Entry of Judgment in**

**Favor of Keystone.**

Again, Keystone's fact narrative leaves a number of important matters, the most

important of which are set forth below.

First, the key standard with respect to all matters in this bankruptcy case is the best

interests of **<u>all</u>** creditors and the estate.  Other creditors and parties in interest were not parties to

the State Court action and never had any opportunity to be heard. They should not be denied that

opportunity in this bankruptcy case.

Second, when granting Keystone's Motion for Summary Judgment, the State Court

specifically noted that "The issues raised in the pleadings as an attempt to prevent judgment do

not relate to liability but rather to issues that may arise in or during the collection of the

judgment, but such does not prevent the granting of judgment."  The issues set forth above with

respect to the attachment of a security interest specifically to the Vanderhall Stock and the

priority of and implications of Keystone's legal rights in all of the collateral constitute "issues

that . . . arise in or during the collection of the judgment."

Third, given the peculiarly illiquid character of the Vanderhall Stock and the Debtor's

other assets, turning over those assets to Keystone would violate the requirement under Utah law

that every aspect of a disposition of collateral, including the method, manner, time, place, and

other terms, must be commercially reasonable. **Utah Code § 70A-9a-610(2).**  This is especially

true when a fair manner of disposition as set forth in the proposed Disclosure Statement is

readily available.

Allowing all of the Debtor's assets to be foreclosed upon by Keystone or putting those

13

assets up for auction without marketing those assets (or valuing those assets based on the price that likely could be received in such an auction), is unreasonable.  Unsecured creditors should be entitled to some effort to offer the Vanderhall Stock in channels reasonably likely to turn up a buyer and in a manner that is somewhat usual for disposition of this kind of property – or that the stock be distributed in-kind on a pro rata basis so as to allow the creditor to take such steps as it deems appropriate to obtain the highest value possible for the Vanderhall Stock.

The Utah Supreme Court has stated, "Whether a sale is commercially reasonable is a matter to be determined on a case-by-case basis according to the circumstances of the sale and the business context in which it occurred."  Security State Bank v. Broadhead, 734 P.2d 469, 472 (Utah 1987); citing Scharf v. BMG Corp, 700 P.2d 1068, 1070 (Utah 1985).  The Debtor is not aware of any decided cases that discusses what might be required for a "commercially reasonable" sale of privately held stock, but some of the discussion in Cottam v. Heppner, 777 P.2d 468, 473 (Utah 1989), suggests that substantial effort, considering the usual way in which such property is sold in market transactions, may be expected.

## C.      The Vanderhall Motor Works Stock and Related Vanderhall Entities.

Keystone (i) points out that The David R. Hall Trust delivered a pledge of Vanderhall Stock, (ii) fails to mention any such pledge by the Debtor, and then (iii) asserts that, "as reflected in paragraphs 10-12 above," the Vanderhall Stock (implying all of the Vanderhall Stock) has been pledged.  This conclusion is inaccurate.  The failure of Keystone to obtain a pledge from the Debtor at the same time it received a pledge from the David R. Hall Trust, or before, leads to the exact opposite conclusion – that unlike the Vanderhall Stock held by the David R. Hall Trust that was pledged, the Vanderhall Stock held by the Debtor was **not** pledged.

With respect to the existence of other "related Vanderhall entities," there is no reason to

assume an impropriety related to such entities.  Vanderhall has proposed to adjust some of its

legal structure and has formed certain legal entities in anticipation of such adjustments.  As of

the present time, there is no evidence that these adjustments have any effect on the Debtor's

holdings of Vanderhall Stock or the economic value thereof.

**D.        The Debtor's Bankruptcy Petition and Keystone's Proof of Claim.**

The Debtor does not dispute the facts set forth in this section of the Motion.

**E.        The Debtor's Statements and Schedules and the testimony provided by David Hall,
its CEO, at the 341 Meeting.**

**1.  The Ownership and Management of the Debtor.**

Hall is not the trustee of the David R. Hall Trust,[6] but he is the authorized representative

of the Debtor.  Ultimately, all of the Debtor's assets will be distributed to creditors.  Neither Hall

nor the David R. Hall Trust has any expectation of keeping or receiving anything based upon

their ownership of the Debtor.

**2. The Debtor's Stated Intent to Liquidate its Assets in Chapter 11 and Not
Reorganize.**

As recognized by Keystone above, reorganization includes rehabilitation or liquidation. It

is not inappropriate for the Debtor to seek to liquidate under Chapter 11 and the mere fact that

the Debtor intends to do so does not provide a basis for conversion to Chapter 7 or the

appointment of a Chapter 11 Trustee.  More importantly, as stated numerous times during this

---

[6] Carl Belliston is the trustee of the David R. Hall Trust.  The David R. Hall Trust is not a family trust set up to
preserve assets for David Hall and his family.  Rather, it is an irrevocable trust established for the governance of the
Debtor and the benefit of NewVistas Foundation, a 501(c)(3) charitable organization.  The beneficiaries of the
David R. Hall Trust are (i) employees and regular contractors of the Debtor and its portfolio companies, existing
from time to time, excluding Hall, and (ii) NewVistas Foundation.  The sole function of the trustee is to hold a non-
voting interest in the Debtor and potentially other passive interests.  The benefit of the Trust to employees and
contractors is employment opportunity.  No distributions may be made to employees or contractors, only to

case neither the Debtor nor its principals seek to retain or receive anything from the distribution
of the Debtor's assets. The Debtor's only goals are to facilitate the sale of R&D assets, other
property, and the distribution of Vanderhall Stock for the benefit of all creditors, which justifies
proceeding under Chapter 11 especially given that the Debtor's assets and business operations
are complex and unusual.

### 3. The Affiliates of the Debtor.

The Debtor has a few affiliates, which came into existence for good business purposes
when the Debtor's operations were extensive.

### 4. The Complete Collapse of the Debtor's Business.

Keystone seeks to raise alarm regarding the alleged "complete collapse," of the Debtor's
business. Such unfounded accusations reflect a willful misunderstanding of the Debtor's
business model. In the normal course of the Debtor's business, activities in the various projects
and portfolio companies consume cash and bring in few if any revenues. No project funds itself
by its own revenues, except for a mature project that no longer belongs in the Debtor's portfolio
and that the Debtor seeks to sell.

If a project can be supported through an exit, the project may yield a very large return.
But if funding is discontinued for any reason, the value of the project goes quickly to zero. It
does not diminish gradually, and the loss of value is no indication of mismanagement. The fact
that a project is not generating revenue is not a reason to discontinue funding, because continuing
funding is the only way to preserve and grow value.

Keystone and the holders of Investment Notes were aware of this business model when
they provided funds to the Debtor.

---

NewVistas Foundation or another 501(c)(3) organization upon any termination of the Trust.

With that said, the Debtor has now closed down all of its non-revenue generating projects due to lack of funds.  It does not expect to continue funding such projects in the bankruptcy or after the bankruptcy.

**5. The Debtor's Concerning Lack of Knowledge or Information Regarding the Vanderhall Entities.**

Keystone uses words like "concerning" and "surprisingly" to imply impropriety where there is none.  There is no basis for concern regarding Hall's lack of knowledge regarding the legal particulars of Vanderhall's capitalization and structure.  Moreover, the Debtor is not involved in such matters or the day-to-day activities and performance of Vanderhall.  Vanderhall has a competent board of directors.  If a transaction is proposed, the Debtor will become educated on the transaction to the extent appropriate for approval or disapproval, but it is not involved in negotiations and Hall cannot be expected to recall details of past transactions, especially those that did not close. Moreover, when requested to provide information that he did not have at his fingertips, Hall provided that information in a timely manner.  For example, one of the creditors requested information regarding a sale agreement for certain real property, which information Hall did not have at that time.  During a ten-minute break David Hall was able to retrieve that information and provide it to the creditor when the 341 recommenced.

As to the other Vanderhall entities, Vanderhall has proposed to adjust some of its legal structure and has formed certain legal entities in anticipation of such adjustments.  To the best of the Debtor's knowledge, this has no effect on the Debtor's holdings of Vanderhall Stock, or the economic value thereof and therefore should not be expected to be a matter of great focus for Hall.

The fact that Vanderhall's CEO is Hall's son, Stephen, does not imply any fraud or

improper dealing.

### 6. The Non-Recourse Promissory Notes the Debtor Entered Into With Insiders That Have No Value.

Over four years ago, the Debtor sold shares of Vanderhall Stock to certain key employees and contractors.  The purchase price for the stock was paid to the Debtor by a small cash downpayment and a non-recourse promissory note.  The arrangement was intended to be substantially equivalent to an option to purchase, with the expectation that the individual would pay off the note if the stock became liquid and likely would walk away from the note and return the stock otherwise.  The purpose of the arrangement was to provide incentive compensation tied to the potential increase in the value of the Vanderhall Stock.

This type of arrangement is not uncommon.  Indeed, such arrangements are specifically addressed in Treasury Regs. Section 1.83-3(a) (2), which states, in part, that "if the amount paid for the transfer of property is an indebtedness secured by the transferred property, on which there is no personal liability to pay all or a substantial part of such indebtedness, such transaction may be in substance the same as the grant of an option."

It is not surprising (and no cause for concern) that Hall would not remember the details of how these incentives were structured more than four years ago – whether a transfer of stock subject to forfeiture or an option to buy stock at a later time.  They were incentives that were reviewed and approved at the time.

The employees and contractors have not received any windfall value at the Debtor's expense from this arrangement.  Indeed, they have not received any value at all.  They paid a cash downpayment to the Debtor and monthly interest payments and will probably end up with nothing.

Per the terms of the non-recourse notes, all of the executives and contractors are expected to tender their applicable shares of Vanderhall Stock in satisfaction of the notes before they become due.  The notes will be satisfied without any action, approval, or compromise by the Debtor, and all of the applicable Vanderhall Stock will be returned to the Debtor.

**7. Other Highly Concerning Transfers Made By the Debtor to Affiliates During the Preference Period.**

Keystone provides no explanation as to why the identified transactions are "highly concerning."  Such phrasing doubtless arises from a misunderstanding of the Debtor's assets and business model.  (The repetition of such phrasing illustrates why allowing the Debtor to carry out its plan under Chapter 11, drawing upon the knowledge and assistance of key employees, will be far more effective and advantageous to creditors than allowing speculation and guesswork to drive the actions of a trustee.)

One of the Debtor's portfolio companies is Nernst Electric, Inc. ("*Nernst Electric*"), which was formed to market and sell products based upon technologies that might be developed within Nernst Power Limited ("*Nernst Power*").  Nernst Power was formed as an Irish company, because two of the founders live in Ireland.  The Debtor and the two companies were tied together with agreements that ensured that Nernst Electric had rights in all intellectual property created within Nernst Power and contemplated the eventual formal consolidation of Nernst Electric, Nernst Power, and all such intellectual property into Nernst Electric whenever it was advantageous to do so.

The Debtor made investments into the Nernst Power before the bankruptcy filing.  The last such investment occurred within the preference period and was disclosed.  The Debtor received equity for the investment.

The Debtor, Nernst Electric, Nernst Power, and all of the shareholders of Nernst Electric

caused Nernst Power to be transferred to Nernst Electric before the bankruptcy filing, essentially

as contemplated by the existing agreements.  This consolidated all of the Debtor's interest into

Nernst Electric equity without affecting the value of the Debtor's total interest in the "Nernst"

project.

The identified payment to Microclimate was identified in the Schedule as being for "use

of employees."  This makes sense for a research institution.  The Debtor has employed scientists

and innovators with expertise in a variety of disciplines.  Some of the Debtor's portfolio

companies employ their own scientists and innovators.  Rather than duplicating capabilities

within every entity, the Debtor and its portfolio companies have used each other's scientists and

employees and have made appropriate transfer payments for those services.  In this case, the

Debtor used Microclimate personnel to wind down a Debtor project and paid Microclimate for

those services.

**8. The Debtor's Transfer of Certain Assets That Are Pledged as Collateral on
Keystone's Loan to Insiders.**

The Debtor's ordinary course of business is the sale of assets.  Keystone has been aware

of this from the beginning.  By Keystone's expansive interpretation of its security interests, the

Debtor literally would have been required to get permission for every transaction, every payroll,

and every other use of cash from the time of the Keystone Loan Agreement to the present.  By

Keystone's expansive interpretation, all cash ever in the Debtor's possession would constitute

cash collateral.  This was not the parties' intention, and it is not how Keystone has overseen its

relationship with the Debtor in the past.

After the bankruptcy filing, the Debtor has continued to operate in accordance with its

ordinary course of business, recognizing that, based on the unusual nature of the Debtor's

business model, literally every transaction or use of cash arguably could be characterized as a use

of Keystone's collateral.  However, the Debtor has made diligent efforts to reduce expenditures

to the bare minimum necessary to prepare a plan, preserve assets, and keep key employees who

can be most beneficial in connection with the resolution of creditors' claims and the disposition

of the Debtor's assets.

The transactions identified by Keystone in this section are transactions in the ordinary

course of the Debtor's business.  The Debtor received value.  The transactions involving Hall's

sons are essentially similar to several other transactions with non-family members at around the

same time.  The fact that the transactions involved David Hall's sons does not automatically

mean that any of them were improper.

**9. The Debtor's Purchase of Stock From Businesses Owned by Insiders in 2024**

**When It Was Insolvent.**

The Debtor did not repurchase any stock.  Sure-Fi, Inc. and Microclimate, Inc. bought

back shares of their stock held by the Debtor in exchange for an earnout agreement, because the

Debtor was unable to continue to provide support, and an earnout arrangement appeared to be the

best alternative for getting any value from these entities.  The Debtor entered into essentially

similar arrangements with others who operated projects that the Debtor no longer was able to

support.  The fact that the transactions involved entities controlled by Hall's sons does not

automatically mean that any of them were improper.

**10. Payments Made to Insiders During the One Year Preceding the Petition Date**

**When the Debtor When it Was Insolvent.**

The identified payments were made for payroll, salary, contingent bonuses, employee pay

and contractor services.  All were reasonable, necessary and done in the ordinary course of

business.  The Debtor received the employees' and contractors' services, which had value.

There is no basis for asserting that any of these payments were fraudulent or that employees,

including insiders, should not be paid for their services.

**11. The Merger or Consolidation of DRH Into the Debtor Just Prior to the
Bankruptcy Filing**.

Hall has committed all of his personal assets, and all of the assets of DRHH, to the

Debtor from the beginning.  The existence of co-debtor relationships reflects this.  David Hall

has not attempted to hide or protect assets from creditors.  The merger or consolidation of DRHH

into the Debtor facilitates the management and disposal of all assets within the Debtor, HPH, and

DRHH for the benefit of creditors.  It is unclear why Keystone has a complaint with respect to

this action. Indeed, the estate was only benefitted and not harmed by such transactions.

**12. The Debtor's Concerning Lack of Knowledge or Information Regarding Other
Information Relating to the Debtor.**

Hall has access to any and all information that may be needed to carry out distribution of

the Debtor's assets under the Bankruptcy Code.  He has overseen the establishment and

operation of dozens of projects and companies.  He has approved scores of transactions and

contractual arrangements involving many tens of millions of dollars.  Naturally, he relies on

others for operational matters and to preserve information on the details of the Debtor's

activities.  It seems disingenuous to expect that he would be keeping track of the whereabouts of

two laser welders worth $17,000, particularly given that Keystone never requested that the

Debtor provide an update as to the whereabouts or access to someone that would know the

whereabouts of the two laser welders. As with requests from other interested parties, Hall would

have been happy to provide such information upon request.

In addition, it also is unreasonable to expect that Hall would pay close attention to any possible communications with Keystone about earnout arrangements, which were transactions in the ordinary course of the Debtor's business at a time when the Debtor was not in default under the Keystone Loan Agreement. Again, if Keystone was truly interested in such information, the Debtor could have provided Keystone with access to someone that had knowledge readily available.

**13. Allegations of Fraud Made Against the Debtor Which it Denied During the 341 Meeting.**

The question referenced by Keystone was, "Have there been any allegations that you have participated in actual fraud, dishonesty or criminal conduct in the management of the debtor's affairs or the debtor's public reporting?"

Over three years ago, on March 24, 2022, Jamie Evans filed a sprawling complaint bundling David Hall, the Debtor, and other persons together as one, referred to collectively as "Hall," and alleging vaguely described agreements and other actions of "Hall" relating to certain properties of HPH.  Evans seeks to hold everyone responsible for the actions of "Hall."  The complaint does allege common law fraud, securities fraud, fraudulent transfer, civil conspiracy, and many other things, but most of the basic factual allegations revolve around actions that David Hall is supposed to have undertaken, either individually or on behalf of HPH in connection with HPH properties.  Evans has never pointed to any actual evidence of wrongdoing by anyone, so it is not surprising that David Hall did not consider (or remember) that the complaint included allegations of "fraud, dishonesty or criminal conduct in the management of the debtor's affairs or the debtor's public reporting." Moreover, this is one of the difficulties that

arises when 341 meetings are held telephonically.  If the meeting would have been in person, Evan's counsel could have handed David Hall a copy of the complaint which could have assisted him in in refreshing his recollection.

**14. The Fine Owed By the Debtor to the IRS for Failure to Pay Health Insurance to Employees and Inclusion of Consolidated Tax Return Information from a Related Entity on the Debtor's Schedules.**

Failure to offer health insurance to employees is not an act of misfeasance, and it does not imply fraud or mismanagement. It was a financial decision based upon the fact that it made better business sense to pay the fine than to incur the much larger cost of providing the insurance. It was a cost/benefit decision typical of what businesses regularly make as part of their day-to-day operations

**15. The Debtor Bankruptcy Accounts That Are Actually In the Name of Affiliates.**

All net assets of HPH and DRHH are available to satisfy creditors' claims.  The bank accounts of HPH and DRHH were disclosed in the interest of transparency.  It is unclear why Keystone believes this indicates misfeasance or fraudulent intent.

**F. The Filing of Keystone's 546(b) Notice.**

The Debtor acknowledges that Keystone has not consented to the use of cash collateral. As noted above, however, by Keystone's expansive interpretation of its security interests (every asset of the Debtor (including all cash)) constitutes collateral, the Debtor is precluded from operating in the ordinary course of its business or otherwise.

After the bankruptcy filing, the Debtor has made diligent efforts to reduce expenditures to the bare minimum necessary to prepare a plan, preserve assets, and keep key employees who can be most beneficial in connection with the resolution of creditors' claims and the disposition of

the Debtor's assets.  The Debtor also acted in good faith to segregate certain funds that might

constitute cash collateral under a reasonable interpretation of that term, which at the time of this

Response exceeded $163,500. The Debtor believes that this amount actually exceeds the amount

to which Keystone may be entitled given that it does not have priority over the holders of the

Permitted Indebtedness, which interest the Debtor may preserve for the benefit of the estate

under Section 551 of the Bankruptcy Code.[7] If allowed on a prorata basis, Keystone's interest in

cash collateral would only amount to approximately 23% of the total cash collateral.

**G. The Debtor's First Monthly Operating Report.**

If the Debtor has made errors in the monthly operating report or has made disallowed

post-petition transfers, it has made efforts to correct the mistakes.  Some of the items identified

by Keystone were put into motion pre-petition but were not processed by others until after the

petition was filed.  These matters do not indicate incompetence or an intent to flout the law.

## **ARGUMENT**

**A.      The Court Should NOT Convert this Case to a Chapter 7.**

For the reasons stated above, the Debtor does not believe that converting this case to a

Chapter 7 would be in the best interests of all creditors.  Based on the unusual nature of the

Debtor's assets and business model, "unusual circumstances" exist that militate in favor of the

unique approach outlined in the Debtor's Disclosure Statement and would be best achieved

under Chapter 11.

1.      **Contrary to Keystone's assertions, there has not been a substantial or**

---

[7] If Keystone is only entitled to a prorata portion of the cash collateral in this case, it would be limited only to
23.47% of such cash collateral derived by dividing Keystone's claim amount ($15,775,090) by the total of the

**continuing loss to or diminution of the Debtor's estate and the absence of a reasonable likelihood of rehabilitation.**

Prior to the bankruptcy filing the Debtor acknowledges that there was a diminution in the value of the Debtor's pre-revenue projects and portfolio companies when the Debtor was forced to stop funding them.  This diminution of value, however, was not caused by any mismanagement or improper conduct by the Debtor or its management.  As indicated above, this was caused primarily by the drastic downturn in the economy related primarily to Covid-19.  Such diminution in value did not occur during the Debtor's case but was sustained prior to the bankruptcy filing.  Moreover, and has no bearing on the Debtor's ability to manage the implementation of a plan, the summary of which has been submitted to the Court as part of its proposed Disclosure Statement.

There has been no post-petition diminution in the value of the Debtor's post-revenue projects.  There is no reason to suppose that any of those projects will diminish in value if the Debtor is allowed to manage implementation of a plan, the summary of which was included in the proposed Disclosure Statement submitted to the Court.

None of the payments made by the Debtor during the preference period substantially diminished the Debtor's estate.  Keystone's statement to the contrary assumes that the Debtor's estate received no value for the payments, which is unsubstantiated and false.

None of the payments made by the Debtor for compensation during the past year (including the $268,000.00 identified by Keystone) substantially diminished the Debtor's estate.  The compensation was reasonable, and the Debtor received value for the applicable individuals' services.  The fact that the Debtor paid its employees and others during times of little revenue is

---

Keystone claim amount plus the current approximate amount of the Permitted Indebtedness ($67,204,501).



entirely irrelevant.  The business model of the Debtor and its predecessors over the past 40 years

has been built on expenditures on non-revenue-generating projects followed by exits.

There was no diminution of the Debtor's estate from alleged repurchases of stock from Sure-Fi Inc. and Microclimate, Inc.  First, Sure-Fi Inc. and Microclimate, Inc. repurchased stock that was held by the Debtor.  Second, the Debtor received value for the stock in the form of an earnout agreement.  The fact that these companies were controlled by David Hall's sons is irrelevant.

With respect to the alleged diminution of assets resulting from payments to "thirteen different employees," the Debtor has exercised diligent efforts to wind down operations as quickly as possible, exercising care to tie off obligations, preserving assets, pulling together information that will be beneficial to creditors, and preparing a Disclosure Statement.  The fact that the Debtor now has only two employees does not imply that it should have been able to reduce to two employees earlier, or that no employees are needed to carry out a liquidating plan.

> **2.    There has not been gross mismanagement of the Debtor's estate.**

This argument is false, and, like most of Keystone's allegations, is based on innuendo and conjecture.

First, the fact that the Debtor went from over $10 million in revenue in 2023 to approximately $28,700.00 in gross revenues for 2024 indicates nothing about mismanagement of the Debtor's bankruptcy estate., especially since all of the loss of revenue was prior to the bankruptcy filing. Moreover, as indicated above, the decline in revenues was due to economic conditions arising out of the Covid-19 pandemic, over which the Debtor had no control. Independent of those economic conditions, the Debtor's business model is not based on recurring revenues.  Operations in 2024 were funded by asset sales.  The Debtor's projects have always been illiquid, requiring an appropriate strategic buyer or investor, favorable market conditions,

and sometimes several years to complete.  Those conditions failed to align for reasons outside

the Debtors control.

Second, the fact that the Debtor's accumulated net operating losses (Federal) through

2023 amounting to $24,357,061 indicates nothing about mismanagement.  The Debtor's business

model, successful for 40 years, assumes up-front operating losses while investments are made

into projects, and those losses are offset against gains received when a project is sold.

Third, the that the Debtor's business has collapsed to the point where it now only has two

employees who now work out of their homes says nothing about mismanagement.  When it

became apparent that further investment in projects was not possible, the Debtor shut down the

projects and reduced expenditures as rapidly as possible to preserve value for creditors. That is

evidence of appropriate management, not mismanagement, as asserted by Keystone.

Fourth, the fact that none of the eleven projects which the Debtor previously had in

development have any value says nothing about mismanagement.  An early-stage pre-revenue

project has value only if funded and enabled to grow into commercial enterprises.  If the funding

dries up, the value of the project will go to zero almost immediately.

Fifth, the payment of $72,000 and over $16,000 to Nernst Power Limited and

Microclimate, respectively, and the transfer of the stock of Nernst Power Limited were based

upon reasonable business practices, not mismanagement.  The $72,000 paid into Nernst Power

was a reasonable investment that helped preserve and enhance the Debtor's holdings in Nernst

Electric.  The $16,000 paid to Microclimate was for services performed by Microclimate

employees for the benefit of the Debtor.  The Debtor received consideration for the transfer of

Nernst Power to Nernst Electric.

Sixth, the Debtor's payments of over $268,000.00 during the last year to insiders was ordinary course of business transactions for services received by the Debtor. The persons receiving the payments provided services; as such, the payments were reasonable compensation for those services. The generation of revenues (or failure to generate revenues) during the same time period is irrelevant. Expenditures and revenues do not necessarily correspond in a given time period under the Debtor's business model.

Seventh, the execution of non-recourse promissory notes by (not to) key employees and contractors connection with a sale of Vanderhall Stock does not constitute mismanagement. The arrangement was a normal and reasonable arrangement for incentive compensation, which turned out to cost the Debtor nothing. The notes were not "for the purpose of providing funds" but were given as partial payment for the stock, and all of the stock will be returned according to the terms of the notes. Keystone does not have even a plausible basis for its reckless contention that this stock was "pledged" to secure the Debtor's loan with Keystone, given that the relevant transactions occurred before Keystone extended any loan, the transfers would have been within the percentage of Vanderhall Stock that the Debtor was expressly permitted to transfer under the Keystone Loan Agreement, and no stock pledge was ever delivered to Keystone by the Debtor covering its holdings of Vanderhall Stock.

Eighth, the merger or consolidation of DRHH into the Debtor at the end of 2024 does not constitute mismanagement. Under no conceivable circumstances can the transfer of DRHH to the Debtor alter the Debtor's business or harm creditors of the Debtor. In fact the opposite is true given that the Debtor has been able to access DRHH's funds to sustain the Debtor's operations.

Ninth, the Debtor's failure to offer health insurance to its employees does not constitute mismanagement. It is a perfectly rational business decision, made deliberately on the

expectation that providing health insurance is more costly than paying the prescribed IRS penalty.

Tenth, the Debtor's lack of knowledge regarding details of certain aspects of transactions or internal operations of a well-managed portfolio company (Vanderhall) does not constitute mismanagement. It is not unusual for CEOs to focus on certain matters pertaining to the business they run and leave many other matters to others. Perhaps Keystone would insist on having a seat on Vanderhall's board of directors and overseeing every aspect of Vanderhall's business, but that does not mean it is "mismanagement" for David Hall to do otherwise. David Hall does not in fact control Vanderhall and naturally does not concern himself with legal structure, fundraising, or operational details. Vanderhall's proposed restructuring involving Vanderhall North America and Vanderhall, Inc. is of purely legal concern, with no identifiable adverse impact on the Debtor's economic interest, so it is not strange if David Hall has little interest in ascertaining the details. It is pretty far-fetched to suggest that a restructuring could summarily "eliminate" the Debtor's interest in Vanderhall if David Hall doesn't pay sufficiently close attention. Keystone asserts that it is "interesting" that one of David Hall's sons is CEO of Vanderhall without specifying wherein the interest lies. The implication seems to be that something very sketchy must be happening unbeknownst to Vanderhall's other shareholders and independent board of directors.

Eleventh, the fact that David Hall did not remember that one of the claims in the Jamie Evans lawsuit was a fraud claim related to the practices of the Debtor (it is a misrepresentation to claim he had no knowledge of the lawsuit) says nothing about mismanagement. The claims set out in that lawsuit are sprawling and confusing at best. Moreover, if the Debtor would have been

given the opportunity to review the complaint in question it may have refreshed his recollection.

Twelfth, the fact that David Hall does not know the status or whereabouts of two handheld lasers worth $17,000 does not constitute mismanagement.  He is not personally in charge of the Debtor's inventory of equipment.  Similarly, it is unrealistic to suppose that David Hall necessarily would be able to recognize a particular line item on a financial statement and immediately be able to provide details as if he were the Debtor's controller or CFO.

**3.      It is arguable that the Debtor did not use Keystone's cash collateral without authorization or that the Debtor's use of cash collateral was not substantially harmful to Keystone.**

As to the cash collateral issue, it is the Debtor's position that Keystone does not have priority over holders of the Permitted Indebtedness as to the cash collateral, which means it must share a prorata portion of such cash collateral with them even though they are not secured creditors. In that regard, the Debtor stands in the shoes of such creditors and should be able to preserve their interest for the benefit of the bankruptcy estate and to use their portion of the cash collateral to pay ordinary business expenses. Moreover, as explained in the proposed Disclosure Statement, there are adequate assets in the Debtor's estate to ensure satisfaction of Keystone's claims so that Keystone has suffered no harm as to the Debtor's use of cash collateral.  Indeed, as requested by Keystone, the Debtor did set up a cash collateral account in which is currently deposited $163,500.00, which may be more than Keystone is entitled to claim as its cash collateral.

**4.      Other Considerations do NOT Support the Conversion of this Case to a Chapter 7.**

As discussed above, there are no preferential transfers or fraudulent transfers to insiders,

affiliates or others.  The Debtor has disclosed such information in its Statement of Affairs and

Related Schedules to which the creditors and other parties in interest have access.

**B. Alternatively, to the Extent that the Court finds that it is in the Best Interest of Creditors, the Debtor does NOT object to the Appointment of a Chapter 11 Trustee.**

The Court has discretion to appoint a trustee if it is in the best interests of creditors. As

indicated above, the Debtor disputes that the actions the Debtor has taken in this case constitutes

cause for appointment of a Chapter 11 Trustee.  Other than Keystone, and perhaps Evans, there

is no evidence that the Debtor's creditors and other parties in interest have an acrimonious

relationship or have lost confidence in the Debtor and its current management. Accordingly,

while the Debtor submits that such an appointment is unnecessary, the Debtor would not object

to such an appointment if the Court determines that is in the best interest of creditors.


DATED this 19th day of May 2025.

DIAZ & LARSEN


By /s/ Andres Diaz
Attorneys for the Debtor in Possession


33