Andres Diaz (A4309)
Timothy J. Larsen (A10263)
**DIAZ & LARSEN**
757 East South Temple, Suite 201
Salt Lake City, UT 84102
Telephone: (801) 596-1661
Fax: (801) 359-6803
Email: courtmail@adexpresslaw.com
*Attorneys for the Debtor in Possession*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In Re: HALL LABS, LLC<br>    3500 Mountain Vista Parkway<br>    Provo, UT 84606<br><br>Debtor in Possession. | Bankruptcy No. 25-21038<br>Chapter 11<br><br>FILED ELECTRONICALLY<br><br>Judge Joel T. Marker |

DECLARATION OF DAVID R. HALL IN SUPPORT OF THE DEBTOR'S RESPONSE TO KEYSTONE'S MOTION TO CONVERT, OR ALTERNATIVELY, FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

David R. Hall ("Hall"), the authorized representative of Hall Labs, LLC., the Debtor in Possession in the above-captioned case (the "Debtor"), declares the following in support of the Debtor's Response to Keystone's Motion to Convert, or Alternatively, for Appointment of Chapter 11 Trustee scheduled for hearing on May 29, 2025. The statements contained herein are true and correct to the best of my knowledge, information, and belief, and I would so testify if called upon by the Court to do so.

1. The Debtor's capital structure consists of two classes of membership interests: Class A, which holds voting rights, and Class B, which is non-voting. The Class B membership

interest holds substantially 100% of the economic interest of the Debtor. Hall owns 100% of the Class A membership interest in the Debtor and 53.74% of the Class B membership interest. The David R. Hall Trust (the "Hall Trust"), an irrevocable trust established under the laws of the State of Utah, owns 46.26% of the Class B membership interest in the Debtor.[1]

2. Hall currently serves as the Debtor's manager and CEO.

3. The Debtor has two wholly owned subsidiaries: Hall Property Holdings, LLC ("**HPH**") and DRH Holdings LLC ("**DRHH**").

4. HPH supports the Debtor's business by owning and managing real property and equipment, primarily for the use of the Debtor and its affiliates. Many obligations of the Debtor are guaranteed by HPH and vice versa. Nearly all of HPH's assets have been sold to try to keep the Debtor's operations going and to keep the Debtor current on debts to banks, holders of Investment Notes, and others.

5. DRHH previously was wholly owned by Hall. It holds and manages real property and a variety of investments. Many obligations of the Debtor are guaranteed by DRHH and vice versa. Nearly all of DRHH's assets have been sold to try to keep the Debtor's operations going and to keep the Debtor current on debts to banks, holders of Investment Notes, and others. Between 2020 and 2024, before Hall transferred 100% of the interest in DRHH to the Debtor, DRHH contributed over $14 million to the Debtor and HPH for such purposes. DRHH currently supports the Debtor's business and provides resources

---

[1] Carl J. Belliston is the trustee of the Trust, but the sole function of the Trust is to hold a non-voting membership interest in the Debtor and potentially a few other assets for the benefit of the Debtor.
Hall Labs, LLC.
Bankruptcy No. 25-21038

to enable the Debtor's operations.

6. The Debtor has been engaged in research, development, business incubation, and other legal activities. The Debtor has used a unique business model. It created projects to develop technologies in various fields. If a project showed promise, the Debtor created a business entity (a portfolio company) with the objective of forming a business enterprise.

7. The portfolio company hired its own staff and may have sought outside investment. From time to time, however, the Debtor provided administrative services, technical and scientific input, and funding to the portfolio company. The ultimate objective was to sell the portfolio company, or the Debtor's interest in the portfolio company.

8. The Debtor maintained an administrative staff and a staff of scientists, inventors, and others with technical expertise. It made substantially all of its money by selling technology or interests in portfolio companies, i.e., asset sales. That was the Debtor's ordinary course of business.

9. The Debtor typically has to make investments over several years before generating revenues from such sales. It has relied on the profits from sales of projects, debt, including unsecured investment notes issued to individual investors ("*Investment Notes*"), to bridge the time between R&D investments and such sales. Revenues typically were received in large chunks, with very little recurring revenue month to month.

10. The Debtor's assets, being comprised mostly of early-stage R&D projects and companies, are unusually illiquid. Such projects and companies normally must be

Hall Labs, LLC.
Bankruptcy No. 25-21038

packaged and sold to a strategic buyer. A sale may take several years. Between sales, the Debtor incurred expenses and accounting losses in the reasonable expectation of creating saleable value.

11. The Debtor and its predecessors owned and operated by Hall have used this model successfully for over 40 years, generating hundreds of millions of dollars in transactions. Hall has financed the operations of these entities with various forms of debt financing and has assumed personal responsibility for substantially all debts through personal guarantees or otherwise. Until 2020, none of Hall's entities has ever defaulted on any debt.

12. In 2015, Novatek, Inc. ("*Novatek*"), a company previously owned by David Hall, was sold to Schlumberger Technologies ("*Schlumberger*") for approximately $129,000,000. The Debtor was formed in anticipation of the Schlumberger transaction. Prior to the consummation of the transaction, Novatek transferred to the Debtor and HPH all projects and assets that Schlumberger did not want Novatek to retain.

13. Part of the purchase price in the Schlumberger transaction was paid through an earn-out arrangement that provided revenues to the Debtor through 2020 in the amount of $10,000,000 per year. The Debtor anticipated that it would be able to sell one or more of its portfolio companies by 2020, sufficient to enable the Debtor to remain current on its debts, before the revenue stream from the Schlumberger transaction ended.

14. The Debtor's most mature and most valuable portfolio company at the time of the Schlumberger transaction was Vanderhall Motor Works, Inc. ("*Vanderhall*"), which was

believed to be worth at least $250,000,000 to $300,000,000 based on third-party analyses. (The Vanderhall Stock held by the Debtor, or any other entity or person is referred to herein as the "***Vanderhall Stock***.") The Debtor anticipated that Vanderhall would be acquired or would complete an initial public offering by 2020.

15. In early 2020, the Debtor was in negotiations for transactions involving two of its portfolio companies, but those negotiations collapsed when the COVID-19 pandemic shocked the world economy. A few months later, the Debtor's likeliest source of sufficient revenue to cover its debt obligations (the Schlumberger earn-out payments) ended. Vanderhall redoubled its efforts to find a buyer and then prepared for an initial public offering of its stock, but it decided to delay any IPO until it could complete its then-in-progress transition from gasoline-powered vehicles to fully electric vehicles. Skittishness in the economy ever since the COVID-19 pandemic has made any sale of Vanderhall or any of the Debtor's other portfolio companies very difficult.

16. The Debtor was compelled to look for additional sources of interim funding until Vanderhall could be sold, and other projects could be progressed to maturity. The Debtor continued to sell assets (bringing in over $86 million between the beginning of 2020 and the end of 2024, including assets sold by HPH, to keep the Debtor's operations going, meet current obligations to creditors, and reduce debt), but it stopped selling Investment Notes.

17. Always in the past, Hall's companies, including the Debtor, have maintained multiple projects, affording multiple exit possibilities. With the shocks following the COVID-19

pandemic, however, all the Debtor's projects and portfolio companies were adversely affected.

18. On or about August 11, 2021, the Debtor borrowed $10,000,000 pursuant to a Loan Agreement with Keystone Private Income Fund ("***Keystone;***" such Loan Agreement, the "***Keystone Loan Agreement***"). The Keystone loan was secured by the Debtor's personal property, but there were two notable provisions that have importance in this bankruptcy case.

19. First, the priority of Keystone's lien was disclaimed with respect to all existing debt designated as "Permitted Indebtedness," (as defined in the Keystone Loan Agreement, the "***Permitted Indebtedness***"), the current level of which is $51,429,411. In other words, the Keystone lien did not have priority over the Permitted Indebtedness.

20. Second, there was a carve-out and special provision for the Vanderhall Stock, because the Vanderhall Stock was subject to a lock-up agreement and could not be pledged. Rather than pledging 100% of the Vanderhall Stock or providing that the Vanderhall Stock was covered by Keystone's blanket lien on the Debtor's personal property, the Debtor agreed to deliver a lien, at such time as certain conditions were satisfied, on shares of Vanderhall Stock constituting 51% of the outstanding shares of capital stock of Vanderhall. The Keystone loan has been extended and increased. The provisions relating to the Vanderhall Stock have been modified, but no stock pledge covering the Debtor's shares of Vanderhall Stock has ever been delivered. As a result of this arrangement, it appears that Keystone does not hold a lien on the Vanderhall Stock and only holds a lien on other

personal property of the Debtor.

21. In the meantime, between the beginning of 2020 and the middle of 2024, the Debtor gradually reduced funding for its projects and portfolio companies and tried to sell assets to keep obligations to its creditors. HPH and DRHH also sold assets to provide funds to the Debtor to pay interest on its debts to banks, Keystone, the holders of Investment Notes, and other creditors, and to preserve the value of existing projects.

22. The Debtor continued to pursue a favorable liquidation of its Vanderhall Stock. Multiple potential transactions have appeared likely to bear fruit, including discussions as recently as February 2025 with a well-established publicly held potential strategic buyer, but Vanderhall has not been successful in getting a transaction done.

23. Most of the Debtor's creditors, recognizing that the Debtor has no ability to pay them without a favorable transaction involving the Vanderhall Stock, have taken no legal action against the Debtor.

24. By the middle of 2024, the Debtor was forced to discontinue most funding of projects and portfolio companies. Several projects were shut down, and some portfolio companies were sold to their employees in exchange for an earnout commitment (pursuant to an "*Earnout Agreement*") to be paid in the event the business was able, at some time in the future, to generate revenues.

25. At the end of June 2024, the Debtor defaulted on its obligations to Keystone. On or about September 12, 2024, Keystone filed a lawsuit against the Debtor in the Third Judicial District Court of Utah ("*State Court*") and subsequently filed a Motion for

Summary Judgment demanding a money judgement for amounts owed under the Keystone loan and the right to take possession and ownership of the Debtor's assets. The Debtor acknowledged the debt but objected to the remedy demanded by Keystone. On December 31, 2024, without a hearing, the State Court granted Keystone's motion for summary judgment, noting that "[t]he issues raised in the pleadings as an attempt to prevent judgment do not relate to liability but rather to issues that may arise in or during the collection of the judgment, but such does not prevent the granting of judgment." The State Court subsequently entered a Judgment on February 7, 2025, granting all of Keystone's requested relief.

26. The Debtor does not seek to relitigate the State Court action. However, the issue of priority, the *implications* of Keystone's priority vis-à-vis other creditors (who were not before the State Court), and the proper manner of managing and disposing of assets of the Debtor can only be sorted out fairly under the processes of the Bankruptcy Code. The Debtor believes that these are some of the "issues that . . . arise in or during the collection of the judgment" as referenced by the State Court.

27. The Debtor recognized that a take-over of the Debtor's assets by Keystone would adversely affect the value of those assets and negatively affect the interests of the Debtor's other creditors, who have had no opportunity to be heard by any court. Therefore, to protect the equity in the Debtor's estate and the interests of other creditors, and to provide for the resolution of issues that now have arisen in connection with the collection of Keystone's judgment, the Debtor was left with no choice but to seek

bankruptcy protection under Chapter 11, which it did on March 5, 2025.

28. Keystone has raised many unfounded accusations of the Debtor's fraudulent designs, which the Debtor strongly disputes. For instance, Keystone's accusation that the Debtor is attempting to squirrel away assets fraudulently for the benefit of Hall and his family is false. Indeed, the Debtor has been straightforward with respect to its intentions and objectives from the inception of this case. The Debtor has made clear that neither Hall nor any of his family expect to emerge from the bankruptcy with a dime of the Debtor's assets.

29. To the contrary, Hall and the Debtor's subsidiaries have utilized their assets to keep the Debtor operating in an effort to provide all of the Debtor's creditors (including Keystone) with an opportunity to get paid.

30. Most of the "alarms" raised by Keystone arise out of the fact that the Debtor's assets and business model are complex and unusual. Keystone would have the Court infer that "unusual" implies "improper." The Debtor submits that the Debtor has not acted improperly in this case but that the "unusual circumstances" of this case justify a continuation under Chapter 11 and a different approach to the repayment of the Debtor's creditors.

31. Precisely because of the complex and unusual nature of the Debtor's assets and business, the Debtor submits that the interests of all creditors, especially unsecured creditors, will be best served by allowing the Debtor to dispose of assets in a unique way. In this case, the Debtor proposes to do an in-kind distribution of its assets to its creditors based upon

    the prorata portion of their claims against the Debtor, which is not the typical way that creditors' claims in Chapter 11 cases.[2]

32. The Disclosure Statement provides detailed explanation of the Debtor's assets and liabilities and a road map as to how those assets can best be distributed toward satisfaction of allowed claims in this case. Moreover, the process of verifying the accuracy of assets and liabilities as described in the Disclosure Statement, resolving disagreements regarding creditors' claims, and distributing assets in-kind will be far more efficient (and will avoid the kinds of speculations and misperceptions that already are evident in Keystone's motion) through the Chapter 11 process.

DATED this 19th day of May 2025.

                                                             /s/ David R. Hall
                                                             CEO and Authorized Representative of the
                                                             Debtor in Possession

---

[2] *See*, Debtor's Disclosure Statement Dated May 12, 2025, With Summary of Plan (Docket No. 64) (the "Disclosure Statement.")
Hall Labs, LLC.
Bankruptcy No. 25-21038